REDACTED VERSION OF
DOCUMENT FILED
UNDER SEAL

Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com

John M. Desmarais (SBN 320875)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com

*Attorneys for Plaintiff Apple Inc.*

[Additional counsel listed in signature block]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., <br><br> Plaintiff, <br><br> vs. <br><br> CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC., <br><br> Defendants. | Case No. 5:26-cv-07078-EJD <br><br> **PLAINTIFF APPLE INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Judge:** Edward J. Davila <br><br> **Hearing Date:** Oct. 1, 2026 <br><br> **Time:** 9:00 a.m. |

PLAINTIFF APPLE INC.'S MOTION FOR
A PRELIMINARY INJUNCTION

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 1, 2026, at 9:00 a.m. PT, in the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, California 95113, Plaintiff Apple Inc. will, and hereby does, move this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

For the reasons set out in Apple's supporting Memorandum of Points and Authorities, Apple respectfully requests that this Court enter a preliminary injunction prohibiting Chang Liu ("Mr. Liu") and Tang Yew Tan ("Mr. Tan") (collectively, the "Individual Defendants") and OpenAI Foundation and OpenAI Group PBC (collectively, "OpenAI") and io Products, LLC ("io") (collectively, the "Corporate Defendants"), along with their officers, directors, principals, agents, employees, successors, assigns, and attorneys, and all other persons who are in active concert or participation with any of them, from:

1. accessing, acquiring, using, or disclosing Apple's proprietary and trade secret information in any manner including commercial activities;

2. soliciting or otherwise encouraging the unauthorized acquisition, use, or disclosure of Apple's proprietary and trade secret information; and

3. destroying, deleting, or concealing evidence that is relevant to claims or defenses in this action.

Apple also respectfully requests that the Court order Defendants to:

4. collect, prepare full forensic images of, and submit to forensic inspection (by Apple's counsel or a forensic vendor) all devices and other repositories, e.g., cloud-based storage repositories, email mailboxes, messaging/collaboration platforms (e.g. Slack, Teams, or the equivalent), and any additional electronic applications, accounts, or repositories, in Defendants' possession, custody, or control that contain, or previously contained, any Apple confidential, proprietary, or trade secret information, and

5. collect and return all Apple confidential, proprietary, and trade secret information from such devices and other repositories where any Apple confidential, proprietary, and trade secret information may have been transferred or stored.

Additionally, Apple is concurrently filing a motion for expedited discovery pursuant to Federal Rule of Civil Procedure 26(d)(1) to aid in the resolution and enforcement of a preliminary injunction, or, in the alternative, take discovery in support of further requests for preliminary relief. Specifically, in its motion for expedited discovery, Apple respectfully requests an order:

1. directing Defendants to respond and produce materials responsive to expedited interrogatories and requests for production relating to their access, acquisition, use, and disclosure of Apple's proprietary and trade secret information;

2. directing Defendants Chang Liu, Tang Yew Tan, OpenAI employee Yu-Ting Peng, and another employee at OpenAI who used to work at Apple ("Individual No. 1") to sit for depositions; and

3. directing Defendants OpenAI Foundation f/k/a OpenAI, Inc., OpenAI Group PBC, and io Products, LLC f/k/a io Products, Inc. to produce one or more corporate designees to sit for a Federal Rule of Civil Procedure 30(b)(6) deposition.

Apple requests that this motion be heard on the first available regularly noticed motion hearing date given the imminent threat to its proprietary and trade secret information. This motion is based on this notice of motion and motion; the accompanying memorandum of points and authorities; the declarations of Parin Patel, Rafael Dionello, Jackie Hughes, Joy Ieyoub, Dr. Paul Hatch, Dr. Ayman Fayed, Daniel Roffman, James Pooley, and Christopher Henry, with supporting exhibits; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters of which the Court may take judicial notice. Apple respectfully reserves the right to amend its preliminary injunction request in view of additional evidence uncovered through expedited discovery.

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ......................................................................................................3

      A.    Defendants misappropriated Apple's proprietary and trade secret information.. 3

      B.    Apple's trade secrets are valuable and diligently protected................................6

      C.    OpenAI would not agree to adequate protocols to protect Apple's trade secrets.
            ..............................................................................................................................7

III.  LEGAL STANDARDS ...........................................................................................8

IV.   DEFENDANTS SHOULD BE ENJOINED FROM USING APPLE'S TRADE
      SECRETS. .............................................................................................................9

      A.    Apple is likely to succeed on the merits. ...........................................................9

            1.    Apple possesses valuable trade secrets. ..................................................9

            2.    Apple's trade secrets are independently economically valuable. ..........11

            3.    Apple takes reasonable measures to protect its trade secrets................13

            4.    Defendants misappropriated, and present a continuing threat of
                  misappropriation of, Apple's trade secrets, including in violation of
                  Apple's Intellectual Property Agreements.............................................13

      B.    Apple will be irreparably harmed absent a preliminary injunction. ..................17

      C.    The balance of equities sharply favors Apple.....................................................19

      D.    The public interest strongly favors injunctive relief. ........................................19

V.    NO INJUNCTIVE BOND SHOULD BE REQUIRED ................................................20

VI.   CONCLUSION.......................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ..................................................................................................... 8

*Bambu Franchising, LLC v. Nguyen*,
   537 F. Supp. 3d 1066 (N.D. Cal. 2021) ..................................................................................... 19

*BNF Distrib. Enter. v. BA Distrib., Inc.*,
   No. 25-cv-08527, 2025 WL 3724558 (N.D. Cal. Dec. 24, 2025)............................... 11, 16, 17, 20

*Catalent Pharma Sols. v. Woodard*,
   No. 25-cv-2394, 2025 WL 2062207 (D. Md. July 23, 2025) ......................................................... 17

*Cisco Sys., Inc. v. Chung*,
   462 F. Supp. 3d 1024 (N.D. Cal. 2020) ..................................................................................... 15

*Citibank, N.A. v. Mitchell*,
   2024 WL 4906076 (N.D. Cal. Nov. 26, 2024) .............................................................................. 20

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
   No. 18-cv-1441, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ...........................................*passim*

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ..................................................................................................... 19

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
   444 F. Supp. 3d 1198 (E.D. Cal. 2020)....................................................................................... 11

*DejaVuAI Inc. v. Kapustin*,
   No. 2:25-cv-00915, 2025 WL 2663117 (W.D. Wash. Sept. 17, 2025) ................................. 14, 20

*E. W. Bank v. Shanker*,
   No. 20-cv-07364, 2021 WL 3112452 (N.D. Cal. July 22, 2021) ............................... 11, 12, 13, 18

*Early Warning Servs., LLC v. Brandon O'Loughlin, P.A.Z.E. LLC*,
   No. 24-7315, 2025 WL 1895313 (9th Cir. July 9, 2025).......................................................... 8, 19

*Edwards v. Arthur Andersen LLP*,
   189 P.3d 285 (Cal. 2008) ........................................................................................................... 20

*Fujikura Composite Am., Inc. v. Dee*,
   No. 24-cv-782, 2024 WL 3261214 (S.D. Cal. June 28, 2024) ...................................................... 20

*Henry Schein Inc. v. Cook*,
   191 F. Supp. 3d 1072 (N.D. Cal. 2016) ..................................................................................... 19

*Implicit Conversions, Inc. v. Stine*,
   No. 24-cv-3744, 2024 WL 4112335 (N.D. Cal. Sept. 6, 2024)................................................... 14

*Jorgensen v. Cassiday*,
  320 F. 3d 906 (9th Cir. 2003) ................................................................................................. 20

*Juries.AI, Inc. v. Sheu*,
  No. 5:25-cv-10188, 2025 WL 3290235 (N.D. Cal. Nov. 25, 2025) ........................................... 16

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ................................................................................................. 18

*Power Integrations, Inc. v. De Lara*,
  No. 20-cv-410, 2020 WL 4582675 (S.D. Cal. Aug. 10, 2020) ............................................ 12, 16

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
  149 F.4th 1081 (9th Cir. 2025) ......................................................................................... 10, 11

*Reworld Sumter Indus. LLC v. VEP Env't. LLC*,
  No. 4:25-cv-05128, 2025 WL 2695014 (D.S.C. Sept. 19, 2025) ............................................... 15

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) ................................................................................................. 8

*SolarPark Korea Co. v. Solaria Corp.*,
  No. 23-cv-01181, 2023 WL 4983159 (N.D. Cal. Aug. 2, 2023) ................................. 8, 11, 12, 13

*TMX Funding, Inc. v. Impero Techs., Inc.*,
  No. 10-cv-00202, 2010 WL 1028254 (N.D. Cal. Mar. 18, 2010) ................................... 13, 15, 17

*Tri Tool, Inc. v. Hales*,
  No. 22-cv-01515, 2023 WL 7130610 (E.D. Cal. Oct. 30, 2023) ............................................... 12

*Trikha v. Doe*,
  No. 5:26-cv-04706, 2026 WL 1395941 (N.D. Cal. May 18, 2026) .............................................. 8

*United Flow Techs. Intermediate Holdco II, LLC v. Coholan*,
  No. 26-cv-01845, 2026 WL 1077406 (N.D. Cal. Apr. 20, 2026) ......................................... 14, 17

*Waymo LLC v. Uber Techs., Inc.*,
  No. 17-cv-00939, 2017 WL 2123560 (N.D. Cal. May 15, 2017) ......................................... 18, 19

*WeRide Corp. v. Kun Huang*,
  379 F. Supp. 3d 834 (N.D. Cal. 2019) ............................................................................... passim

*WHIC LLC v. NextGen Labs., Inc.*,
  341 F. Supp. 3d 1147 (D. Haw. 2018) ..................................................................................... 19

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ............................................................................................................. passim

*x.AI Corp. v. OpenAI, Inc.*,
  821 F. Supp. 3d 1100 (N.D. Cal. 2026) ................................................................................... 15

## SUPPORTING DECLARATIONS

Patel, Parin:              Apple Senior Director, Hardware Engineering ("**Patel Decl.**")

Dionello, Rafael:         Apple Senior Manager, Industrial Design ("**Dionello Decl.**")

Hughes, Jackie:           Apple Surface Finishing Manager ("**Hughes Decl.**")

Ieyoub, Joy:              Apple Human Resources Manager ("**Ieyoub Decl.**")

Hatch, Paul:              Technical Expert ("**Hatch Decl.**")

Fayed, Ayman:            Technical Expert ("**Fayed Decl.**")

Roffman, Daniel:          Expert Forensic Investigator ("**Roffman Decl.**")

Pooley, James:            International Trade Secret Expert ("**Pooley Decl.**")

Henry, Christopher:       Attorney, Weil, Gotshal & Manges LLP ("**Henry Decl.**")

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Apple respectfully moves the Court for a preliminary injunction to stop the theft of its trade secrets. Every relevant factor favors this relief.

*First*, Apple is likely to succeed on the merits of its trade secret claims. Defendant Chang Liu—on at least five separate occasions while working for OpenAI—exploited residual access to Apple's third-party cloud storage to download thousands of pages of Apple's most sensitive trade secrets improperly and without Apple's authorization. These include display power development programs, architecture analyses, and fabrication decisions (e.g., the DisplayNotes.key file), engineering data for an unannounced Apple product, including information about touch, display, and power systems (e.g., the █████████████████████████████ .key file), and advanced research compilations for additional undisclosed product features (e.g., the █████████████████ Final.key and ██ █████████████████ V2.key files). Defendant Tang Tan—Apple's former VP of Product Design turned OpenAI Chief Hardware Officer—used an Apple internal project codename for an unannounced product to elicit still more trade secrets from job candidates and distributed Apple's departure protocols to help recruits evade detection. In its recruiting efforts under Mr. Tan, OpenAI instructed candidates to bring to their interviews, among other things, prototypes and "CAD/design artifacts" for "show and tell" sessions. And OpenAI and io Products (the "Corporate Defendants"), in addition to benefiting from their employees' misconduct, exploited Apple's trusted partner network to use one of Apple's proprietary metal finishing processes. Defendants' acts of misappropriation violate the Defend Trade Secrets Act ("DTSA"), and Mr. Liu's and Mr. Tan's actions also breach their Intellectual Property Agreements ("IPAs") with Apple. Apple expects expedited discovery from Defendants, which will gather evidence uniquely in their possession, will reveal still more misappropriations and breaches.

*Second*, Apple has suffered and will continue to suffer irreparable harm absent injunctive relief. Apple has invested billions of dollars and decades of research and development ("R&D") into its trade secrets—spanning hardware engineering, manufacturing and industrial design, component technologies, testing and development processes, and supply chain operations—and OpenAI should

not be permitted to use Apple's secrets to gain an unjust head start in its hardware ambitions, which would inflict competitive injury that cannot be adequately addressed by monetary damages. Further, Defendants' possession and use of Apple's proprietary and secret information is ongoing. And, if Apple's trade secrets are used and spread throughout OpenAI, or get embedded in its products and operations, the damage cannot be undone. If Defendants' misappropriation and contractual violations are not stopped, Apple will be forced to compete in the market for consumer hardware against its own trade secret technologies.

*Third*, the balance of equities sharply favors an injunction. Injunctive relief is necessary to protect Apple's valuable trade secrets and its contract rights, whereas Defendants merely would be ordered to do what they already were obligated to do—follow the law. Any hardship Defendants face is entirely self-inflicted.

*Fourth*, the public interest favors injunctive relief. The public interest is served by protecting trade secrets and enforcing valid contractual obligations.

For these reasons, Apple respectfully requests that the Court issue an order that prohibits Messrs. Liu and Tan, OpenAI, and io, and OpenAI's and io's employees, from:

    i.    accessing, acquiring, using, or disclosing Apple's trade secret and proprietary information in any manner including commercial activities,

    ii.    soliciting or otherwise encouraging the unauthorized acquisition, use, or disclosure of Apple's proprietary and trade secret information, e.g., from Apple's employees and trusted partners, and

    iii.    destroying, deleting, or concealing evidence relevant to the claims or defenses in this action.

Apple further requests that the Court order Defendants to:

    iv.    collect, prepare full forensic images of, and submit to forensic inspection (by Apple's counsel or a forensic vendor) all devices and other repositories, e.g., cloud-based storage repositories, email mailboxes, messaging/collaboration platforms (e.g. Slack, Teams, or the equivalent), and any additional electronic applications, accounts, or repositories, in Defendants' possession, custody, or control that contain, or previously contained, any Apple confidential, proprietary, or trade secret information, and

    v.    collect and return all Apple confidential, proprietary, and trade secret information from such devices and other repositories where any Apple confidential, proprietary, and trade secret information may have been transferred or stored.

## II.    BACKGROUND

### A.    Defendants misappropriated Apple's proprietary and trade secret information.

Defendant Chang Liu spent eight years at Apple as a Senior System Electrical Engineer working on some of Apple's most sensitive product development programs before leaving in January 2026 to join OpenAI. (Ieyoub Decl. ¶¶ 19-21.) Mr. Liu resigned on Thursday, January 22, 2026, and provided notice that he would start at OpenAI the following Tuesday. On his last day, he failed to respond to Apple's attempt to schedule his exit interview or sign his confidentiality reminder. (*Id.* ¶ 22.)

In the days following his departure, Mr. Liu seemed initially cooperative and aware of his obligations to Apple. He worked with others on his former Apple team to return certain Apple information remaining on his personal iCloud account to Apple.[1] He also continued to converse with former co-workers, for example, to answer questions about his earlier work and where certain information was stored. But these interactions and exchanges cannot explain the repeated, unauthorized downloading of voluminous technical files from Apple's cloud-based storage discussed below, which Mr. Liu performed on multiple occasions from February to April 2026 while employed by OpenAI. Moreover, Mr. Liu's messages to former Apple colleagues raise concerns that Mr. Liu improperly retained and continued to access even more Apple proprietary information in additional repositories.

In February 2026, while working for OpenAI, Mr. Liu discovered that he could exploit a previously unknown authentication bug to access Apple's third-party cloud storage without Apple's authorization. Mr. Liu laughed about this ("LOL"), and over the next two and a half months, he accessed and downloaded dozens of highly sensitive, proprietary Apple documents. (Roffman Decl. ¶¶ 20, 25, Table 4.) These documents span thousands of pages and reflect the trade secrets noted above, described in Section IV.A.1 below, and detailed in the accompanying Patel and Fayed Declarations. Mr. Liu also discussed confidential Apple projects with Yu-Ting ("Alyssa") Peng—then still an Apple employee—while he was developing hardware for OpenAI. (*Id.* ¶ 25; Ieyoub Decl. ¶ 24.) And he

---

[1] While Apple seeks discovery into what Apple confidential information Mr. Liu accessed from his personal storage accounts (including iCloud) and devices after his departure, the specific unauthorized downloads referenced in the complaint and at the heart of this motion are not based on iCloud activity, but instead relate to Apple's third-party cloud storage.

coached Ms. Peng on how to access and copy files from Apple workstations "to avoid trouble with the security team," and directed her to communicate with him over the Line Messenger app to avoid detection. (Roffman Decl. ¶ 25, Table 1.) Mr. Liu's work for OpenAI thus improperly benefited from a steady stream of Apple proprietary information that he actively concealed.[2]

As Apple's investigation broadened, including beyond Mr. Liu, a pattern emerged revealing misappropriation at the organizational level by the Corporate Defendants and their cohorts. In racing to develop their first hardware products, the Corporate Defendants resorted to trade secret theft to bypass the years of R&D and investment legitimate entry into this space would require. They have been unlawfully acquiring Apple's trade secrets in at least four ways: (1) using proprietary Apple information to acquire and use still more trade secrets, including from Apple's trusted business partners; (2) exfiltrating Apple's trade secret information directly (through conduct like Mr. Liu's); (3) maintaining ongoing information pipelines from contacts still employed at Apple; and (4) using Apple proprietary information during the recruiting processes to try to extract still more trade secrets from job candidates (e.g., through Mr. Tan's Apple-informed inquiries). (Roffman Decl. ¶¶ 20, 25, Exs. L-W; Dionello Decl. § V; Hatch Decl. § VIII; Fayed Decl. § VIII.)

For example, Mr. Tan and others at OpenAI instructed candidates to bring "parts or systems that you work on [at Apple]," such as "prototypes" and "CAD/design artifacts"—i.e., items Apple protects from dissemination—to OpenAI interviews for "show and tell" sessions. (Roffman Decl. ¶ 14, Ex. L (Mr. Tan telling an interviewee before a second interview, "Just like last time, bring some parts you worked on" and "mlb, battery, shields type of stuff is interesting"), ¶ 37, Ex. V (interviewee explaining he was "surprised" others brought parts to OpenAI interviews because he "didn't even know we could take those from the office" at Apple).) Mr. Tan also used Apple's internal information, including codenames for an unannounced product, ███████████ during interviews to probe for

---

[2] Apple has reached out to other former Apple employees at OpenAI regarding apparent inadvertent retention of Apple information, e.g., in personal iCloud accounts, and has worked to resolve those matters with straightforward remediation steps. Those instances of inadvertent retention are entirely separate from the misappropriation at the heart of this motion that does not involve iCloud or inadvertent retention of Apple information.

Apple proprietary information. In fact, Mr. Liu told Ms. Peng that another former Apple employee, who has since moved to OpenAI, "fumbled" his answers to Mr. Tan's questions about the unannounced product and helped her prepare for her own OpenAI interview on the same subject matter. (*Id.*, ¶ 25, Table 5.) Apple has seen no evidence suggesting Defendants took any steps to avoid the improper disclosure of Apple's trade secrets during such recruiting activities. To the contrary, that seems to be their very purpose.

Additionally, through its continuing investigation, Apple has uncovered information that raises serious concerns about other former Apple employees now working for OpenAI beyond Messrs. Liu and Tan and Ms. Peng. These now-OpenAI employees appear to have witnessed events in question and to have used, acquired, or retained still more proprietary Apple information after their own departures from Apple. These former Apple employees include eleven individuals other than Messrs. Liu and Tan and Ms. Peng named in Apple's outside counsel's July 10, 2026, letter to OpenAI's general counsel (*see* Henry Decl., Ex. D), including, for example, an individual who in the hours before his interview with OpenAI began screenshotting and downloading information related to the highly confidential Apple project about which Mr. Tan inquired during his interview. (*See* Roffman Decl. ¶¶ 28-29, Exs. I-J.)

OpenAI knows its misappropriation is wrong and has tried to conceal it. For example, OpenAI has been circulating to job candidates an Apple document that describes Apple's security processes when an employee leaves the company. (*Id.*, Exs. M-Q.) OpenAI's goal here is plain—to help departing Apple employees avoid the checks and protections of Apple's exit processes. (*Id.*, Ex. M (Mr. Tan: "One thing for sure is that Apple will probably walk you out (wasn't like that a year ago but they have been clamping down recently …. Attached below is the manager's checklist so this will give you time to plan."), Ex. W (OpenAI recruiter: "No, you won't sign anything at the exit interview. If they do ask you to sign anything, let me know asap.").)

The Corporate Defendants, working with or through their partners, also have targeted Apple's partners, using knowledge of Apple's confidential design processes and terminology to extract Apple proprietary information. (Dionello Decl. § V.) For example, they have accessed and exploited Apple's proprietary industrial design techniques, including Apple's trade secret ███ metal finishing

process. (*Id.*) They directed a trusted Apple partner, ███████████ to perform that process for them, knowing it was proprietary to Apple. (*Id.*) ██ is bound by use restrictions and confidentiality obligations to Apple that prohibit this. (*Id.* § III.) And the Corporate Defendants and their leaders knew this too because they were involved in this partnership while at Apple. Apple did not give any Defendants permission to solicit or use its proprietary information. (*Id.* ¶ 41.)

**B.    Apple's trade secrets are valuable and diligently protected.**

Apple has invested billions of dollars and decades of effort in hardware, industrial, and manufacturing R&D and design, global supply chain innovations, and partner relationships. (Patel Decl. ¶ 5; Dionello Decl. § II, ¶ 37; Hughes Decl. ¶¶ 7, 18, 30.) Apple's trade secrets allow it to deliver leading computing devices globally, and they derive independent economic value from not being generally known or readily ascertainable because they are the fruit of sustained investment that would be difficult for competitors to replicate without the same expenditure of time and resources. (*See, e.g.*, Patel Decl. ¶¶ 5-6, 8-14, 27-28, 34, 36, 42, 49, 55-56; Dionello Decl. ¶ 37; Hughes Decl. ¶¶ 18, 30.)

Apple diligently protects its trade secrets—contractually, physically, and digitally. Apple employees sign Intellectual Property Agreements ("IPAs") as a condition of their employment, agreeing not to disclose Apple's proprietary information and to return and not take with them any Apple proprietary information when they depart. (Dionello Decl. ¶ 33; Patel Decl. ¶ 80.) Messrs. Liu and Tan signed IPAs imposing these obligations. (Ieyoub Decl., ¶¶ 7-8, Ex. D (Liu) § 1; *id.*, Ex. E (Liu) § 1, Ex. C (Tan) § 2.) Apple employees also receive annual reminders of their obligations to protect Apple's proprietary and trade secret information. (Dionello Decl. ¶ 34; Patel Decl. ¶ 82.) Apple's business partners, including companies in its supply chain, likewise commit to stringent confidentiality obligations. (Dionello Decl. ¶¶ 15-31.) (*See also* Pooley Decl. §§ III.C-III.E.)

Apple's physical security measures include locked buildings, access cards, security cameras, guards, and other controls (e.g., required visitor escorts), which prevent unauthorized access to Apple facilities and information stored in them. (Ieyoub Decl. ¶ 5; Patel Decl. ¶¶ 73-75.) (*See also* Pooley Decl. § III.B.) Apple suppliers also are obligated to implement these types of protective measures. (Dionello Decl. ¶¶ 31, 36.)

With respect to digital security, Apple's network and servers are password-protected, firewall-

protected, and accessible only to current Apple employees with credentials. (Ieyoub Decl. ¶ 5.) And Apple restricts access to file repositories for projects to those employees who are working on and authorized to view them, including by controlling who has access to proprietary and trade secret information based on demonstrated business needs. (Patel Decl. ¶¶ 77-78.) (*See also* Pooley Decl. § III.A.) For example, for information stored in cloud-based repositories, including third-party repositories, Apple controls access and conditions it on appropriate terms of use. (Pooley Decl. ¶ 38.) If Apple becomes aware of a vulnerability—for example the bug that Mr. Liu exploited to steal documents—it acts to investigate and resolve the issue. (Roffman Decl. ¶¶ 21-23; Pooley Decl. ¶ 39.)

When employees depart Apple, they are reminded of their confidentiality obligations to Apple, including to protect the company's proprietary and trade secret information. (Ieyoub Decl. ¶ 14.) They also are instructed to return Apple proprietary information, their badges, and Apple-owned equipment, including laptops and mobile devices. (*Id.* ¶ 15, Exs. C-E (IPAs).)

Due to Apple's robust security measures, Apple's trade secrets are not available to the public or Apple's competitors through legitimate means. (Patel Decl. § II; Dionello Decl. ¶ 37; Hughes Decl. ¶ 30; *see also* Pooley Decl. ¶¶ 77-78.)

**C.      OpenAI would not agree to adequate protocols to protect Apple's trade secrets.**

In February 2026, Apple contacted OpenAI to discuss concerns that Apple's trade secrets and proprietary information may have been improperly making its way into OpenAI's business. In a February 23 letter to OpenAI's general counsel, Apple's outside counsel asked OpenAI to discuss the steps it was taking to investigate and remediate any issues. (Henry Decl., Ex. A.) Apple's outside counsel mistakenly sent a second email to OpenAI's general counsel intended for another recipient and then sent a third email clarifying the mistake. (Id., Exs. B-C.) OpenAI failed to respond to Apple's outside counsel regarding any of these three emails.  While OpenAI directly emailed internal Apple contacts seeking confirmation that Apple's outside counsel represented Apple, after Apple confirmed the representation, OpenAI again never responded. Without a response, Apple continued its investigation that led to the discovery of the alarming facts described in the complaint (Dkt. 1).

After Apple filed suit, it sent OpenAI another letter, explaining that it intended to move for preliminary injunctive relief and that the parties may be able to avoid this if OpenAI would stipulate

that it would (i) not access, acquire, use, disclose, or solicit such information in the future, (ii) halt any and all access, acquisition, use, disclosure, or solicitation of Apple trade secret information, (iii) preserve relevant evidence, (iv) permit Apple's counsel and third-party forensic analysts to inspect, image, and analyze all devices, storage drives, and accounts in OpenAI's possession, custody, or control that contain, or previously contained, any of Apple's confidential, proprietary, or trade secret information, and (v) search any OpenAI network location where any Apple proprietary and trade secret information may have been transferred or stored. (*Id.*, Ex. D.) OpenAI initially responded that it would be willing to agree to the first three items (Ex. E), which thus should not be meaningfully disputed now. For over two weeks, both through direct party discussions and through their outside counsel, the parties conferred at length about the remaining items and that Apple would need to move for preliminary injunctive relief in the absence of an appropriate stipulation, but they could not reach agreement. (*Id.*, Exs. F-G.)

## III.    LEGAL STANDARDS

To obtain a preliminary injunction, a plaintiff must show: "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest." *SolarPark Korea Co. v. Solaria Corp.*, No. 23-cv-01181, 2023 WL 4983159, at *3 (N.D. Cal. Aug. 2, 2023) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)); *Early Warning Servs., LLC v. Brandon O'Loughlin, P.A.Z.E. LLC*, No. 24-7315, 2025 WL 1895313, at *1 (9th Cir. July 9, 2025). The Ninth Circuit applies a sliding scale approach to these "*Winter* factors," "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Trikha v. Doe*, No. 5:26-cv-04706, 2026 WL 1395941, at *3 n.1 (N.D. Cal. May 18, 2026). Thus, a preliminary injunction may issue "where the plaintiff raises serious questions going to the merits and the balance of hardships tilts sharply in the plaintiff's favor, assuming the other two elements have been met." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013).[3]

---

[3] Unless otherwise noted, internal quotation marks and citations are omitted from quotes and any emphasis has been added.

## IV.    DEFENDANTS SHOULD BE ENJOINED FROM USING APPLE'S TRADE SECRETS.

Defendants should be preliminarily enjoined as requested above and in Apple's proposed order. Each of the *Winter* factors favors this relief.[4]

### A.    Apple is likely to succeed on the merits.

Apple is likely to succeed on the merits of its claims. Apple will prove that it possesses trade secrets, that Defendants misappropriated them, and that such misappropriation caused—and, unless stopped, will continue to cause—irreparable harm to Apple. *See, e.g.*, *WeRide*, 379 F. Supp. 3d at 845 (granting a preliminary injunction, explaining the DTSA requires "a plaintiff to show that it possessed a trade secret, that the defendant misappropriated the trade secret, and that the defendant's conduct damaged the plaintiff"). Mr. Liu's and Mr. Tan's unlawful conduct also breached their contractual obligations not to disclose Apple proprietary information outside of Apple, not to take Apple proprietary information, and to return Apple proprietary information on departure from Apple. (Ieyoub Decl., Ex. E (Liu) § 1, Ex. C (Tan) § 2.)

### 1.    Apple possesses valuable trade secrets.

Apple possesses valuable trade secrets. The DTSA protects as trade secrets "all forms and types of financial, business, scientific, technical, economic, or engineering information" that

---

[4] Mr. Liu's employment contract includes an arbitration clause with an exception for seeking preliminary injunctive relief in court when an arbitral award would be ineffective without such relief. Without a preliminary injunction, no arbitral award would be effective here. Arbitration takes time, and without a court-issued injunction in the interim, Apple's trade secrets will continue to spread through OpenAI, become embedded in its products, and be disclosed to additional parties, rendering any eventual arbitral award a hollow remedy. The harm cannot be unwound after the fact. Also, OpenAI and its other employees and partners are not parties to the arbitration agreement, so arbitration with Mr. Liu alone would not provide sufficient discovery into their collective acts, much less relief against them all. And the relief Apple needs, including discovery into devices and systems from all Defendants, extends beyond what arbitration between only two parties could accomplish. Thus, a preliminary injunction now is necessary to preserve the status quo and for effective and timely relief.

(a) "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by," another, and (b) are subject to "reasonable measures" to maintain secrecy. 18 U.S.C. § 1839(3); *see also WeRide*, 379 F. Supp. 3d at 845-46. Apple's proprietary information relating to its hardware, industrial design, and manufacturing R&D and design, including with respect to future products, its global supply chain operations, and its supplier and vendor relationships meets these requirements and constitutes trade secret information. (Patel Decl. § I; Dionello Decl. § II; Hughes Decl. §§ I-II; Hatch Decl. § VI; Fayed Decl. §§ V-VII.)

Apple has identified its valuable, stolen trade secrets with the "sufficient particularity" the law requires, including in a preliminary trade secret identification included with this motion. (Henry Decl., Ex. H.) *See also Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1088-89 (9th Cir. 2025). The Apple trade secret documents Mr. Liu improperly acquired while working for OpenAI include (1) a file named DisplayNotes.key, which contains several hundred pages of information relating to Apple's custom display power development program, including architecture analyses, fabrication decisions, and testing results (Patel Decl. § I.A; Fayed Decl. § V.B); (2) a file named ▇▇▇▇▇▇▇.key, which comprises information relating to an unannounced product, including ▇▇▇▇▇▇▇ and power system requirements (Patel Decl. § I.B; Fayed Decl. § V.C); and (3) files named ▇▇▇▇▇▇▇ and ▇▇▇▇▇▇▇V2.key, which are compilations of two undisclosed Apple R&D projects for unreleased product features (Patel Decl. § I.F; Fayed Decl. § V.F). The misappropriated Apple trade secrets further comprise proprietary industrial design information the Corporate Defendants accessed, exploited, and used in directing Apple's trusted partner to perform Apple's confidential and proprietary ▇▇ metal finishing process for them (Dionello Decl. § V; Hughes Decl. §§ I-II; Hatch Decl. § VIII) and Apple information Mr. Tan is using to elicit disclosure of still more Apple trade secrets during interviews (Roffman Decl. ¶ 25, Table 5).

Moreover, as evidenced by the declarations accompanying this motion, these examples are the tip of the iceberg. (Patel Decl. § I; Fayed Decl. § V; *see also* Henry Decl., Ex. H.) For example, the exemplary trade secret documents discussed above constitute only four of the dozens of proprietary documents Mr. Liu stole. (Roffman Decl. ¶ 20.) And the trade secrets Defendants

misappropriated not only qualify for legal protection individually, they qualify as trade secrets as collections because they constitute veritable libraries of Apple's proprietary information—i.e., priceless guides to hardware design, development, manufacturing, and supply from which one can pick and choose valuable, secret information. (Fayed Decl. § VI.)

While Apple's investigation is ongoing and it has yet to receive discovery into the full scope of Defendants' misappropriation, its identification of the stolen trade secrets (Henry Decl., Ex. H) is more than sufficient. *See Quintara*, 149 F.4th at 1088-89; *SolarPark*, 2023 WL 4983159, at *4 (granting preliminary injunction, finding plaintiff described with sufficient particularity "trade secrets for mass-producing shingled solar modules" where plaintiff alleged misappropriation of its "'know-how' related to 'mass-producing low-cost, high-quality shingled solar modules'" and "production process improvements"); *BNF Distrib. Enter. v. BA Distrib., Inc.*, No. 25-cv-08527, 2025 WL 3724558, at *17 (N.D. Cal. Dec. 24, 2025) (granting preliminary injunction where plaintiff identified "sufficiently defined Sales Information, Delivery Information, Market Information, and Vendor Information"); *E. W. Bank v. Shanker*, No. 20-cv-07364, 2021 WL 3112452, at *3, *9 (N.D. Cal. July 22, 2021) (granting preliminary injunction, finding plaintiff described with sufficient particularity trade secrets comprising product roadmaps). The stolen documents and trade secrets also are "Proprietary Information" under Mr. Liu's and Mr. Tan's Apple IPAs. (Ieyoub Decl., Ex. D § 1, Ex. E § 1, Ex. C § 2.)

### 2. Apple's trade secrets are independently economically valuable.

Apple's trade secrets derive independent economic value, actual and potential, from not being generally known or readily ascertainable. Apple's trade secrets are the fruit of decades of work and investment. (*See* Section II.B; Patel Decl. ¶ 5; Dionello Decl. § II, ¶ 37; Hughes Decl. ¶¶ 7, 18, 30; Hatch Decl. § VII; Fayed Decl. § VI.) *See also Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020) ("As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret."); *SolarPark*, 2023 WL 4983159, at *5 ("A plaintiff may show independent economic value by circumstantial evidence of the resources invested in producing the information"); *WeRide*, 379 F. Supp. 3d at 847 (finding plaintiff was likely to succeed in showing its alleged trade secrets were in fact valuable "trade secrets" based on how plaintiff invested

in them). Furthermore, Apple's control over its closely guarded trade secrets and the timing and methods for related product and feature releases, for example, has significant economic and competitive value in the market. (*See, e.g.*, Ieyoub Decl. ¶ 2; Patel Decl. ¶ 22.)

If others were to have access to Apple's trade secrets, they would gain significant unearned advantages—for example, by learning details about Apple's hardware products and secret future products, R&D relating to same, proprietary industrial and manufacturing processes, and partner relationships—to shortcut their own product development. (*See, e.g.*, Patel Decl. ¶¶ 5-6, 8-14, 27-28, 34, 36, 42, 49, 55-56; Dionello Decl. ¶ 37; Hughes Decl. ¶¶ 18, 30; Hatch Decl. ¶¶ 63-68; Fayed Decl. § VI.) Consequently, the "competitive advantage" Apple's trade secrets afford Apple would "evaporate." *WeRide*, 379 F. Supp. 3d at 847; *see also SolarPark*, 2023 WL 4983159, at *8.

The independent economic value of Apple's trade secrets is further demonstrated by Defendants' efforts to misappropriate them. Put simply, Defendants would not have embarked on a campaign to steal Apple's trade secrets, in multiple ways, if they lacked value. *See, e.g.*, *Comet Techs. U.S. of Am. Inc. v. Beuerman*, No. 18-cv-1441, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) ("A collection of data that allows the holder to recreate one of Plaintiff's top technologies derives its value from not being generally known"); *Power Integrations, Inc. v. De Lara*, No. 20-cv-410, 2020 WL 4582675, at *11 (S.D. Cal. Aug. 10, 2020) (finding a defendant's use of a plaintiff's secret information to develop competing products supported a finding of independent economic value). If the trade secrets lacked independent economic value derived from their secrecy, Defendants never would have (i) improperly accessed and downloaded them (Roffman Decl. ¶ 20); (ii) approached a trusted Apple partner, without permission from Apple, to exploit and use them (Dionello Decl. § V); (iii) deliberately chosen an encrypted, secure messaging platform to discuss their conduct (Roffman Decl. ¶ 25, Table 2); or (iv) counseled former Apple employees departing Apple for OpenAI about Apple's exit-related security procedures (*Id.* § III.D).

Courts in this Circuit regularly find that the types of information at issue here constitute trade secrets with independent economic value. *See, e.g.*, *E. W. Bank*, 2021 WL 3112452, at *9 (finding product roadmap had value as a trade secret); *Tri Tool, Inc. v. Hales*, No. 22-cv-01515, 2023 WL 7130610, at *4 (E.D. Cal. Oct. 30, 2023) (finding "information about future projects in [plaintiff's]

pipeline" had independent economic value); *SolarPark*, 2023 WL 4983159, at *5 (finding trade secrets enabling mass production of solar modules had independent economic value); *see also Comet Techs.*, 2018 WL 1990226, at *4. So should the Court find here.

**3.  Apple takes reasonable measures to protect its trade secrets.**

As detailed in Section II.B, Apple takes reasonable measures to protect its trade secrets through contractual, physical, and digital controls, including employee IPAs, annual confidentiality training and reminders, physical facility security, digital security protections, and stringent supplier agreements. (Section II.B; *see also* Pooley Decl. § III, ¶¶ 77-78.)

Relevant here, Apple uses third-party cloud-based storage as one tool within its broader security infrastructure to store and protect its proprietary information. Apple provisions and restricts access to this repository on a need-to-know basis, and the Terms of Use for this repository make clear that files stored there are for work purposes only and may contain Apple's proprietary information. (Pooley Decl. ¶ 38.) When Apple's investigation uncovered the rare, previously-unknown vulnerability that Mr. Liu exploited to circumvent these controls, Apple acted immediately and reasonably, investigating the issue and correcting it. (Roffman Decl. ¶¶ 21-23; Pooley Decl. ¶ 39.)

Apple's security measures satisfy the DTSA's "reasonable measures" requirement. (Pooley Decl. ¶¶ 77-78.) *See also WeRide*, 379 F. Supp. 3d at 847 (finding security measures reasonable based on VPN access, log-in credentials, and confidentiality agreements); *E. W. Bank*, 2021 WL 3112452, at *11 (similar); *TMX Funding, Inc. v. Impero Techs., Inc.*, No. 10-cv-00202, 2010 WL 1028254, at *4 (N.D. Cal. Mar. 18, 2010) (similar).

**4.  Defendants misappropriated, and present a continuing threat of misappropriation of, Apple's trade secrets, including in violation of Apple's Intellectual Property Agreements.**

Defendants misappropriated Apple's trade secrets and present a continuing threat of misappropriation. Under the DTSA, misappropriation encompasses "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and the "disclosure or use of a trade secret of another" who either "used improper means to acquire" the trade secret or "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret" was taken through "improper means." 18 U.S.C. §§ 1839(5)(A)-(B). Improper

means includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6)(A). And, with respect to improper use, "[a]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *DejaVuAI Inc. v. Kapustin*, No. 2:25-cv-00915, 2025 WL 2663117, at *7 (W.D. Wash. Sept. 17, 2025).

Defendants have improperly acquired, used, and disclosed Apple's trade secrets through improper means, including Mr. Liu's and Mr. Tan's violations of their IPAs. (Section II.A.) When he left Apple, Mr. Liu failed to sign Apple's standard confidentiality reminder and did not respond to Apple's departure-related communications. (Ieyoub Decl. ¶ 22.) Then, while working at OpenAI, he downloaded dozens of documents comprising thousands of pages of Apple's trade secrets and proprietary information from Apple's cloud-based storage, laughing when he discovered his access to those files—"LOL, I found out I can access" this repository, "so funny." (Roffman Decl. ¶¶ 20, 25, Table 4.) "[A]cquisition by improper means is, by itself, enough to establish misappropriation." *United Flow Techs. Intermediate Holdco II, LLC v. Coholan*, No. 26-cv-01845, 2026 WL 1077406, at *5 (N.D. Cal. Apr. 20, 2026) (citing *Implicit Conversions, Inc. v. Stine*, No. 24-cv-3744, 2024 WL 4112335, at *9 (N.D. Cal. Sept. 6, 2024) (downloading proprietary information evidences misappropriation)); *Comet Techs.*, 2018 WL 1990226, at *4 (finding a likelihood of success: "downloading and removing the Da Vinci Project information was theft or, at minimum, a breach of Defendant's contractual duty to maintain secrecy.")). Mr. Liu also coached Ms. Peng on preparing for an OpenAI interview using Apple information, telling her that another former Apple employee "fumbled" his answers to Mr. Tan's questions about Apple's top-secret ████████ to better prepare her to provide Mr. Tan and OpenAI—wrongfully—information about it. (Roffman Decl. ¶ 25, Table 5.) He also at times used the encrypted Line Messenger app to avoid detection. (*Id.* ¶ 25, Table 2.)

Mr. Tan and other OpenAI employees also instructed candidates to bring "prototypes" and "CAD/design artifacts" for "show and tell" sessions during interviews. (Section II.A; Roffman Decl. ¶¶ 37-38, Exs. L, S, T.) They also guided contacts inside Apple before their departures, for example, by distributing Apple's departure checklist to their recruits, giving them advance notice of Apple's security procedures—so they could evade them. (Section II.A; Roffman Decl. Exs. L-W.) And

multiple now-OpenAI employees appear to have witnessed events in question and to have used, acquired, or retained still more proprietary Apple information after their own departures from Apple. (*See* Section II.A above.)

Further, the Corporate Defendants exploited one of Apple's partners using proprietary information, to have that partner, ███, use Apple's trade secret ███ metal finishing processes for them. (Dionello Decl. § V; Hatch Decl. § VIII; Hughes Decl. §§ I-II.) Defendants knew, or at a minimum should have known, that Apple did not consent to these wrongful acquisitions and disclosures.

All of the above-discussed acts were performed by OpenAI personnel within the scope of their employment at OpenAI, by its partners for OpenAI's benefit, or at OpenAI's direction and encouragement. The beneficiary of every act described is OpenAI. *See Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1054-56 (N.D. Cal. 2020) (sustaining DTSA claim against competitor based on scheme between competitor's employee and plaintiff's employee); *see also Reworld Sumter Indus. LLC v. VEP Env't. LLC*, No. 4:25-cv-05128, 2025 WL 2695014, at *15 (D.S.C. Sept. 19, 2025) (enjoining corporate defendants from "inducing, encouraging, or participating in any violation" by individual defendants and from "using, relying on, or benefiting from" any trade secrets that individual defendants provided). This is not a case of "mere hiring" from which misappropriation is inferred; it is a case of repeated instances of deliberate theft—theft undertaken to advance OpenAI's hardware program and ambitions through improper use of Apple's trade secrets. *See WeRide*, 379 F. Supp. 3d at 848-49 (finding misappropriation likely where former employee's download activity increased while considering other employment and confidential files were copied to personal device); *see also TMX Funding*, 2010 WL 1028254, at *7 (finding "communications with the same individuals who were [the former employees'] customer and vendor contacts during their employment with [plaintiff] make it likely that one or more [d]efendants has utilized proprietary information improperly").[5]

---

[5] The recent decision in *x.AI Corp. v. OpenAI, Inc.*, 821 F. Supp. 3d 1100 (N.D. Cal. 2026) is inapposite. There, the Court granted a motion to dismiss because a plaintiff alleged only that a former employee disclosed confidential information to a new employer, without allegations of organizational involvement. Here, the Corporate Defendants are not passive recipients of misappropriated information or uninvolved; they, including their officers, participated in and drove the misappropriation.

Additionally, injunctive relief is warranted "to prevent any actual or *threatened* misappropriation." 18 U.S.C. § 1836(b)(3)(A)(i); *Power Integrations*, 2020 WL 4582675, at *12; *Juries.AI, Inc. v. Sheu*, No. 5:25-cv-10188, 2025 WL 3290235, at *4 (N.D. Cal. Nov. 25, 2025) ("[T]hreatened misappropriation may be enjoined."). Defendants, including Mr. Tan, have been using Apple information, for example, to try to improperly obtain even more trade secrets. (Roffman Decl. ¶ 25, Table 5, Exs. L-W; Dionello Decl. § V.) The statutory remedy of injunctive relief thus applies squarely.

Mr. Liu also breached his IPA, which prohibits him from "using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple." (Ieyoub Decl., Ex. E (Liu) § 1.) Mr. Liu agreed that, upon separation, he would "deliver to Apple all documents and materials of any kind pertaining to your work at Apple" and would "not take with [him] any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information." *Id.* Mr. Liu breached these obligations. After his departure, he continued to access and use Apple's systems and proprietary information, including when he exploited a bug to access and download dozens of detailed and voluminous proprietary Apple documents. (Roffman Decl. ¶ 20.) Mr. Tan likewise breached his IPA, including by using Apple proprietary information, such as internal codenames, during interviews and soliciting further Apple proprietary information. (Ieyoub Decl., Ex. C (Tan) § 2.) He knew he had ongoing confidentiality obligations to Apple, having requested and received a copy of his IPA from Apple before his departure. (*Id.* ¶ 18.)

Further, for reasons discussed below, Defendants' unlawful conduct has damaged and harmed, and will continue to damage and harm, Apple, including irreparably if not enjoined. (*See* Section IV.B.) *See also WeRide*, 379 F. Supp. 3d at 845 n.3, 854-55 (addressing damage and irreparable harm together in granting a preliminary injunction).

For these reasons, Apple is overwhelmingly likely to succeed on the merits of its claims. At a minimum, Apple has raised "serious questions going to the merits," amply satisfying the first *Winter* factor. *WeRide*, 379 F. Supp. 3d at 845; *see also BNF Distrib.*, 2025 WL 3724558, at *17 (granting preliminary injunction, finding that where plaintiff "established substantial questions on the merits of its DTSA claim," "the first *Winter* factor" was satisfied).

**B.    Apple will be irreparably harmed absent a preliminary injunction.**

Irreparable harm from the theft of Apple's trade secrets may be presumed. *See, e.g.*, *Comet Techs.*, 2018 WL 1990226, at \*5 ("[C]ourts in this district have presumed that [p]laintiff will suffer irreparable harm if its proprietary information is misappropriated."); *TMX Funding*, 2010 WL 1028254, at \*8. Thus, if the Court concludes Apple is likely to succeed on its misappropriation claim (as it should), that conclusion supports a finding of irreparable harm. *See, e.g.*, *BNF Distrib.*, 2025 WL 3724558, at \*17 ("Given the current record establishing substantial questions on the merits of [Plaintiff]'s trade secret claims, that presumption [of irreparable harm] applies here" and "the second *Winter* factor weighs in favor of [Plaintiff].").

Regardless of whether the presumption applies, Apple has independently demonstrated the likelihood that Defendants' wrongful conduct will damage it and cause irreparable harm. Defendants have in their possession detailed stolen files constituting a library of Apple's trade secrets relating to hardware design, development, and manufacture, and OpenAI is racing to bring its first hardware products to market. (Section II.A.) OpenAI has openly announced and "long claimed that it wants to launch a hardware product[,] with some rumors being that it wants to launch its own phone,"[6] and the development of those devices would benefit immeasurably from Apple's stolen trade secrets. Accordingly, this is not a case where the damage and harm at issue is an abstract possibility that a competitor might someday use misappropriated information. The harm is happening now—every day that passes without an injunction allows OpenAI to embed their knowledge of Apple's stolen information into its hardware development efforts, further damaging Apple and making it increasingly more difficult to unwind the harm. As this Court recognizes, "when a former employee now with a competitor continues to possess trade secrets, there is irreparable harm because [m]isuse of that treasure trove remains an ever-present danger wholly at [the former employee's] whim, and such misuse cannot be unwound after the fact, nor can it be adequately compensated for with monetary damages." *United Flow Techs.*, 2026 WL 1077406, at \*6; *Catalent Pharma Sols. v. Woodard*, No. 25-cv-2394, 2025 WL 2062207, at \*3-4 (D. Md. July 23, 2025) (granting TRO where employee downloaded

---

[6] Henry Decl., Ex. I, Ropek, *OpenAI's first hardware device is reportedly a screenless speaker that can move*, TechCrunch (July 14, 2026).

confidential files, "depriv[ing] Plaintiff of the significant value of maintaining the secrecy of th[at] information and substantially impair[ing] its competitive position").

OpenAI, its people, and partners should not be permitted to develop, release, and benefit from products using and developed with the benefit of Apple's trade secrets. Such wrongful conduct harms Apple, including irreparably, because it allows Defendants to unjustly benefit from Apple's investments in its trade secrets and the economic value those secrets provide and unjustifiably forces Apple to compete against its own intellectual property. (*See, e.g.*, Patel Decl. ¶¶ 5-6, 8-14, 27-28, 34, 36, 42, 49, 55-56; Dionello Decl. ¶ 37; Hughes Decl. ¶¶ 18, 30; Hatch Decl. ¶¶ 63-68; Fayed Decl. §§ V-VII.) *See also Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (affirming preliminary injunction: "An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained."); *WeRide*, 379 F. Supp. 3d at 853 (finding irreparable harm where defendants' "use of the trade secrets to accelerate their own progress" meant that "[w]ithout an injunction, [plaintiff] is likely to have its market position set back as [defendants] receive an unfair boost"); *E. W. Bank*, 2021 WL 3112452, at *12 ("'It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm'"); *Comet Techs.*, 2018 WL 1990226, at *5 (finding irreparable harm where plaintiff spent "considerable time and resources" on the project and misappropriation "jeopardize[d] [its] competitive position"). As this Court has held, "[i]t is far better to instead put in prophylactic measures now to prevent misappropriation (or further misappropriation)" than to try and "enjoin parts of defendants' technology that use [a plaintiff's] trade secrets" after trial. *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (explaining that after trial, "it may prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred"). OpenAI's refusal to agree and stipulate to adequate early-stage protective protocols and discovery further underscores the need for injunctive relief. *See* Section II.C.

With respect to Apple's contract claims, Apple has suffered and will continue to suffer irreparable harm due to Mr. Liu's and Mr. Tan's breaches of their Apple IPAs for the reasons discussed above. Notably, in their IPAs, Messrs. Liu and Tan correctly agreed that violations would irreparably harm Apple and provide bases for injunctive relief. (*See* Ieyoub Decl., Ex. D (Liu) § 4, Ex. E (Liu)

§ 4, Ex. C (Tan) § 5.) The irreparable harm *Winter* factor favors injunctive relief.

### C.     The balance of equities sharply favors Apple.

The balance of equities sharply favors an injunction. This *Winter* factor requires the Court to "balance the interests of all parties and weigh the damage to each." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019). Apple's proposed injunction is necessary to protect Apple's valuable trade secrets. And it "would do no more than require Defendant[s] to comply with federal and state laws." *Henry Schein Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016).

Apple is not seeking an order enjoining any legitimate business activities, and Defendants will not suffer any hardship by being ordered to do what they already should have done—follow the law, and in Mr. Liu's and Mr. Tan's cases, honor their contracts. *See Comet Techs.*, 2018 WL 1990226, at *5 (recognizing there is "little meaningful hardship" in requiring an accused misappropriator to "abide by existing law regarding the unauthorized use of another's trade secrets"). Even if Defendants "might be harmed by issuance of an injunction, it would be harm that is totally self-inflicted and would be caused by their own improper actions." *WHIC LLC v. NextGen Labs., Inc.*, 341 F. Supp. 3d 1147, 1166 (D. Haw. 2018). OpenAI is free to continue to develop its hardware products legitimately, just not by relying on stolen Apple trade secrets and other proprietary information.

Under these circumstances, the equities "tip decidedly and sharply in favor of" Apple. *Id.*; *Early Warning Servs.*, 2025 WL 1895313, at *2 (affirming preliminary injunction, agreeing balance of hardships favored plaintiff because defendant only had to stop the misappropriation).

### D.     The public interest strongly favors injunctive relief.

The public interest strongly favors injunctive relief. "The public interest is served by protecting trade secrets." *Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1080 (N.D. Cal. 2021); *see also Waymo*, 2017 WL 2123560, at *11 ("the public has an interest in vindicating" trade secret rights); *Early Warning Servs.*, 2025 WL 1895313, at *2 (affirming PI that "serve[d] the public's interest by protecting the secrecy of trade secrets"). Even "[t]hough California has a strong public policy in favor of vigorous competition, that interest yields to California's interest in protecting a company's trade secrets." *Bambu Franchising*, 537 F. Supp. 3d at 1080. The public interest likewise favors enforcement of valid contractual obligations. *See Henry Schein,* 191 F. Supp. 3d at 1078

("[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer.").

Apple does not seek to restrain employee mobility or prevent Defendants from competing. California's public policy favoring open competition and employee mobility, *see Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 291 (Cal. 2008), is fully consistent with the relief Apple requests. Apple's proposed injunction would not prohibit the Defendants from competing legitimately, only from using Apple's stolen trade secrets—a prohibition the law already imposes. *See Fujikura Composite Am., Inc. v. Dee*, No. 24-cv-782, 2024 WL 3261214, at *15 (S.D. Cal. June 28, 2024) ("Although these two California policies—aggressive enforcement of trade-secret rights and vigorous defense of an employee's right to move—initially appear in conflict, they in fact operate in harmony.").

## V.    NO INJUNCTIVE BOND SHOULD BE REQUIRED

District courts are vested "with discretion as to the amount of security required, if any," for preliminary injunctive relief, and a court "may dispense with the filing of a bond when"—as in this case—"there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Defendants never had any right to access, use, or otherwise exploit Apple's trade secrets, and enjoining them from using or disseminating Apple's trade secrets will cause no harm. *See Comet Techs.*, 2018 WL 1990226, at *6 (explaining no bond is necessary to "simply enjoin [a] [d]efendant from doing something [it] never had a right to do in the first place"); *BNF Distrib.*, 2025 WL 3724558, at *18 (declining to enter a bond where injunctive relief would not interfere with legitimate business); *DejaVuAI*, 2025 WL 2663117, at *10 (no security bond required for preliminary injunction). Mr. Liu also agreed in his IPA that Apple could seek injunctive relief for breaches without posting a bond. (Ieyoub Decl., Ex. D § 4, Ex. E § 4.)

## VI.    CONCLUSION

Apple respectfully requests that the Court grant its motion for a preliminary injunction.[7]

---

[7] The Court also should grant Apple's concurrent motion for leave to take expedited discovery. "District courts in the Ninth Circuit regularly permit expedited discovery in cases that," like this one, "implicate claims of improper use of confidential information or trade secrets." *Citibank, N.A. v. Mitchell*, No. 24-cv-08224, 2024 WL 4906076, at *6 (N.D. Cal. Nov. 26, 2024).

Dated: August 3, 2026

Respectfully submitted,
WEIL, GOTSHAL & MANGES LLP

*/s/ Gabriel S. Gross*
Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
Vanessa K. Sim (SBN 341107)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com
vanessa.sim@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
Nicole Elena Bruner (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com
nicole.bruner@weil.com

Heather Blacklaws (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
600 Congress Avenue, Suite 2170
Austin, Texas 78701
Telephone: (512) 487-1480
Facsimile: (512) 487-1520
heather.blacklaws@weil.com

Nina Shapiro (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
nina.shapiro@weil.com

John M. Desmarais (SBN 320875)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400

PLAINTIFF APPLE INC.'S MOTION FOR
A PRELIMINARY INJUNCTION

Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com

*Attorneys for Plaintiff Apple Inc.*