REDACTED VERSION OF
DOCUMENT FILED
UNDER SEAL

Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com

*Attorneys for Plaintiff Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>             Plaintiff,<br><br>     vs.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,<br><br>             Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF RAFAEL DIONELLO IN SUPPORT OF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – TRADE SECRET**<br><br>**Judge:** Edward J. Davila<br><br>**Complaint Filed:** July 10, 2026 |

CASE NO. 5:26-CV-07078-EJD                    DECLARATION OF R. DIONELLO

| TABLE OF EXHIBITS | |
|---|---|
| **Ex.** | **Description** |
| A | |
| B | |
| C | |
| D | |
| E | |

CASE NO. 5:26-CV-07078-EJD                    DECLARATION OF R. DIONELLO

1

I, Rafael Dionello, declare as follows:

1.      I am over the age of eighteen and competent to testify to the matters set forth herein. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to them.

2.      I earned my bachelor's degree in mechanical engineering from Cornell University and have 18 years of experience in manufacturing and industrial design.

3.      I have worked for Apple for approximately 20 years and am currently a Senior Director in Industrial Design in Apple's Industrial Design ("ID") group, where I oversee industrial design work. Before I became a Senior Director, I held various positions at Apple focusing on, among other things, manufacturing and industrial design and Apple's global supply chain.

4.      In my current role, I oversee the development of industrial design models for Apple's product lines and manage supplier and vendor relationships. My responsibilities include running the day-to-day tasks for Apple's ID prototyping and model making efforts, including coordinating with suppliers and vendors, monitoring quality control, and ensuring the confidentiality and integrity of Apple's proprietary techniques.  I also oversee security and growth in connection with Apple's ID models, including proprietary metal-finishing processes. I have also managed Apple's relationship with ███████████, including the agreements governing ██'s exclusive and confidential work for Apple's ID team.

I.      ████████████████      AND APPLE'S███████ AT██

5.      In 2010, under the direction of Apple's ID leadership, a leader on my team (since retired from Apple) and I were asked to establish a model shop in Asia for producing cosmetic ID models for Apple products.  One of the key objectives of the model shop was to build the capability of anodizing Apple aluminum products for model making purposes.

6.      I worked with my colleague to establish a research and development ("R&D") facility at ██ to make ID models, which would require creating new metal finishing techniques. I helped negotiate some of Apple's agreements with ██ including agreements containing exclusivity and confidentiality obligations, which I discuss below.

7. The R&D facility we established for ID model making, which we called the "███████" was ██████████. The lab was dedicated exclusively to Apple's Industrial Design work and focused on developing metal finishing processes.

8. ██ and Apple first began working together on the ██████████. To my knowledge, ██'s business ██████ has generally been made up of: (a) ████████████████████████; (b) a ████████████ ████████████████████████████ ██████████; and (c) an external production team that handled a few non-Apple clients. ██ has been a trusted partner to Apple, and in December 2025, Apple decided to relocate the ███ to a different company, ████████████ ██████████ to do work similar to what it had been sending to the █████ at ██.

II. **APPLE'S PROPRIETARY TECHNIQUES AT ██**

9. Apple's confidential metal-finishing processes are important contributors to what makes Apple products distinctive. The look, feel, and texture of an Apple device's exterior are the result of techniques and processes that Apple has invested years and significant resources developing, refining, and protecting.

10. Consumers who use Apple products handle them every day and experience their surfaces directly. The finish quality—how the surface looks, how it feels in the hand, how it holds up over years of use—is a key element of Apple's products and an important part of Apple's identity. Apple's metal-finishing techniques give its products a look and feel that consumers recognize and associate with the Apple brand.

11. Other vendors the ID team worked with in the early 2000s were unable to produce the metallic finishes Apple needed. Apple established the ██████████ specifically to create that capability, and Apple invested in equipping and building out the █████. Before Apple established the ██████████, ██ had no anodizing capability. Anodizing aluminum to the high standard Apple required was not something ██ could do on its own. Apple's engineers worked to develop confidential anodizing processes at ██ that met Apple's requirements. ████████████ ████████████████████████████████████. ██ had to undergo a rigorous process to be qualified by Apple.

12. Two or three years after the █████ was established, Apple worked with ██ to build a

mass-production anodizing line—a capability it would not have developed without Apple's investment in the ███ and without access to the process knowledge Apple developed and shared with ██ under strict confidentiality.

13. The metal-finishing know-how developed through the ████ belongs to Apple. ██ had access to Apple's proprietary processes because Apple trusted ██ with that information exclusively for the purpose of performing Apple's work under the agreements I describe below. These proprietary processes include the ██ metal finishes, which I understand will be discussed in more detail by my colleague, Jackie Hughes.

14. The designation "██" is an internal Apple code. It is not an industry-standard term, and it does not appear in any public specification or industry reference that I am aware of. In my experience, someone requesting a finish by the designation "██" would have had to obtain that term from someone with prior access to Apple's confidential information—there is no other way to know it. ██, along with Apple's other metal finishing techniques, are maintained under strict confidentiality as I describe further below.

## III.    APPLE'S AGREEMENTS WITH ██

15. Apple's relationship with ██ was governed by several agreements that I am familiar with through my work with ██, including the following agreements:



- ████████████████████████ (Ex. A));
- ████████ (Ex. B);
- ████████████████ (Ex. C); and
- ████, (Ex. D).

Among other things, these agreements include provisions relating to ██'s exclusivity, equipment use, and confidentiality obligations with respect to Apple proprietary information.

16. ████████████████

████████████████████



Ex. B ▮▮▮▮▮▮ at ▮▮▮▮

Ex. B ▮▮▮▮▮▮ at ▮▮▮▮▮

Ex. C ▮▮▮▮▮▮

CASE NO. 5:26-CV-07078-EJD

6

DECLARATION OF R. DIONELLO

Ex. C ███████████

█

███████████

Ex. C ███████████

█

███████████

Ex. C ███████████

█

███████████

Ex. C ███████████

█

███████████

Ex. D ███████████

## IV.    APPLE SAFEGUARDS ITS HIGHLY VALUABLE INDUSTRIAL DESIGN INFORMATION, INCLUDING ITS METAL FINISHING PROCESSES.

27.    Apple goes to considerable lengths to ensure that suppliers, like ▇, commit to stringent confidentiality obligations.

28.    As discussed above, Apple protects its confidential and proprietary information contractually. *See* Section III above. For example, the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ provides: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. D ▇▇▇▇▇▇▇▇

29.    The ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ also gave Apple ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. C ▇▇▇▇▇

30.    The ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ further addresses ▇▇▇▇ ▇▇▇▇▇▇▇▇▇ as follows:



Ex. C ▇▇▇▇▇

31.    The ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ also provides that ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇

██████████████████████████ ████████████████████████████████

████████ ██████████████ ████████████████████████████████

██████████████████████ ████████████████████████ The requirements outlined in the ██████████ are substantively the same as the requirements outlined in the ██████ provided to ███. These requirements include, among other things, that ██████████████ ██████████████████████████████, that ████████████████████ including ██████████████████████████████████████████ ████████████-████████████████████████████████████████████████ ██████████ Ex. E ████████████████

32.    In addition to protecting itself contractually with suppliers, as described above, Apple protects its proprietary information through agreements with employees.

33.    For example, as a condition of employment at Apple, I signed an Intellectual Property Agreement ("IPA") requiring me to protect Apple's proprietary and confidential information during and after my employment. And to my knowledge, all Apple employees are required to sign the same or a similar IPA as a condition of employment.

34.    Apple also reinforces the confidentiality obligations set out in its IPAs. I am required (and believe other Apple employees also are required) to review a Business Conduct Policy annually that discusses how to handle and protect Apple's confidential information and certify that they understand it. The policy also links to additional resources that are available to employees should they have any questions about Apple's approach to Business Conduct, including the Business Conduct Helpline and the Business Conduct website.

35.    I and other Apple employees also were taught that even within Apple, we can only disclose confidential information pertaining to projects to other team members who are "disclosed" on the project, and "disclosure" status requires Apple's review and approval.

36.    Apple's information relating to metal finishings is highly sensitive and is carefully guarded with multiple layers of protection, especially because this information needs to be shared with external suppliers. We needed to share confidential metal finishing processes with ███, but we only did so after we had confirmation that ██████████████████████████ that only ███

███████████████████████████████████████████████████████████ and that ██ had the requisite security protocols in place at its facility.

37. These measures, among others, have helped keep Apple's metal finishing processes secret. If these metal finishing processes were disclosed, Apple would be irreversibly harmed. These metal finishing processes took years to develop and required significant research and development and investment of resources. If other companies, like OpenAI, were able to use these processes, they would be able to bypass the years of research, development, and investment that we have put into these processes. They would also jeopardize Apple's position in the marketplace. Apple's proprietary metal finishing on its products has become a hallmark of Apple's quality design for consumers, and if OpenAI, for example, stole that hallmark of quality and exploited it as their own, Apple would lose the ability to distinguish its products in the market—a loss that could not be undone or measured after the fact.

## V. OPENAI AND IO PRODUCTS' USE OF APPLE'S METAL-FINISHING TRADE SECRETS AT ██

38. In May 2026, I learned from ██████████ and ██████████████ former employees of ██, that ██ had applied Apple's confidential ██ metal finishing process on models of products in the consumer electronic space for OpenAI, io Products, or its affiliates. During that conversation, I made sure to not ask any additional questions about the models to avoid learning about another company's confidential information.

39. I asked why ██ had applied Apple's confidential ██ metal finishing process for OpenAI, io Products, or its affiliates. ██████████ and ██████████ explained that ██ personnel were told they had permission to use Apple's proprietary metal-finishing information and techniques to carry out their work for OpenAI, io Products, or its affiliates. Specifically, ██ personnel were led to believe they had permission to do this from Apple purportedly because one of the founders of io Products, who previously worked at Apple, had been involved in the creation of metal-finishing work that ██ historically did for Apple.

40. What OpenAI, io Products, or its affiliates obtained by having ██ perform metal-finishing work for them was more than a finished part. They received the use and benefit of Apple's

entire package of processes, techniques, and parameters, that Apple spent years developing and kept confidential.

41.    I am not aware of Apple ever giving OpenAI, io Products, or their affiliates permission to use Apple's proprietary metal finishing techniques or processes for consumer electronic products. I am also not aware of Apple ever giving anyone at ▮ permission to use Apple's proprietary metal finishing techniques or processes, including the ▮ finishing process, for the benefit of OpenAI, io Products, or their affiliates.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed in San Francisco, California on July __29__, 2026

_____
Rafael Dionello

CASE NO. 5:26-CV-07078-EJD                    DECLARATION OF R. DIONELLO

12