Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com

John M. Desmarais (SBN 320875)
Desmarais LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com

*Attorneys for Plaintiff Apple Inc.*

[Additional counsel listed in signature block]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>              Plaintiff,<br><br>       vs.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC F/K/A IO PRODUCTS, INC.,<br><br>              Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF DR. AYMAN FAYED IN SUPPORT OF APPLE INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**REDACTED Version of Document Filed Under Seal**<br><br>**Judge:** Edward J. Davila<br><br>**Complaint Filed:** July 10, 2026 |

CASE NO. 5:26-CV-07078-EJD                    DECL. OF DR. AYMAN FAYED ISO APPLE'S
                                               MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.      INTRODUCTION .......................................................................................................... 1

        A.      Summary of Qualifications ............................................................................... 1

        B.      Table of Exhibits .............................................................................................. 4

II.     SUMMARY OF OPINIONS ........................................................................................ 5

III.    LEGAL UNDERSTANDING ...................................................................................... 6

IV.     TECHNICAL BACKGROUND ................................................................................... 7

        A.      Battery-Powered Consumer Mobile Devices and Power Management Systems ......... 7

        B.      Display Systems and Touch ███████ Sensing .......................................... 8

        C.      System Coexistence ......................................................................................... 9

        D.      Peak-Power Delivery and Battery Management ......................................... 10

        E.      Custom Chip Development and Component Release Gating ....................... 11

        F.      Validation Testing Versus Failure Analysis ................................................ 12

        G.      Supplier Evaluation, Down-Selection, and Confidential Co-Development ............... 13

        H.      The Product-Development Lifecycle .......................................................... 14

V.      APPLE'S TRADE SECRETS ..................................................................................... 14

        A.      Apple Documents Overview......................................................................... 14

        B.      The Display Notes Compilation (Patel Ex. 1) ............................................ 15

        ████████████████████████████████ 16

        ████████████████████████████████ 17

        ████████████████████████████████ 19

        ████████████████████████████████ 19

        ████████████████████████████████ 21

        H.      Additional Documents Reviewed (Patel Exs. 20-26) .................................. 21

        I.      The Documents at Issue Collectively ........................................................... 23

        J.      Apple Hardware Components, Parts, and Samples ...................................... 23

VI.     APPLE'S TRADE SECRETS ARE VALUABLE DUE TO THEIR SECRECY .......... 24

        A.      Hardware R&D and Unreleased Product and Feature Information .......................... 26

B.    Power Management Information and Designs.............................................................. 28

C.    Battery Management Information and Designs ........................................................... 30

D.    Testing, Reliability and Failure Analysis, and Internal Performance Data ................ 32

E.    Supply Chain, Component Sourcing, and Fabrication Release Information .............. 33

F.    Development Hardware and Pre-Release Artifacts ...................................................... 35

G.    The Value of the Combinations and Compilations..................................................... 36

VII.    THE INFORMATION IN THE MATERIALS AT ISSUE IS NOT GENERALLY KNOWN
AND IS NOT READILY ASCERTAINABLE................................................................. 37

A.    The Information Is Not Published or Otherwise Generally Known .......................... 37

B.    The Information Cannot Be Ascertained from Shipped Products ............................. 39

C.    The Information Cannot Be Readily Ascertained by Independent Development ...... 40

VIII.    MISAPPROPRIATION OF APPLE'S TRADE SECRETS................................................ 40

IX.    CONCLUSION ................................................................................................................... 42

## I.  INTRODUCTION

1.    I, Ayman Fayed, submit this declaration in support of Apple's motion for preliminary injunction.  I have been retained as an expert by counsel for Plaintiff Apple Inc. in connection with the above-captioned lawsuit.  I was asked to provide expert opinions and testimony regarding certain technologies involved in this matter.  I was asked to review and evaluate internal engineering materials and information, the value of that information, and whether those materials and information are generally known or readily ascertainable to persons in the industry.  If called on to testify, I would do so competently and truthfully regarding this matter, consistent with the opinions and conclusions I provide below.

2.    For the time I spend working on this case, I am being compensated at my customary rate of $775 per hour plus reasonable travel expenses.  My compensation is in no way dependent on the outcome of this case, the direction of my analysis, my resulting opinions, or any testimony I may give.  I do not have any personal or commercial interest in the outcome of this case.

3.    In forming these opinions, I have relied on my education, areas of my research, professional experience, and the materials cited herein, including the 26 proprietary Apple documents discussed in detail below.

4.    I reserve the right to supplement the opinions in this declaration should additional information be provided to me for consideration.

### A.  Summary of Qualifications

5.    I am currently a Professor in the Department of Electrical and Computer Engineering at The Ohio State University, where I direct the Power Management Research Lab. I have been a member of the Ohio State faculty since 2015.

6.    I have more than 27 years of experience in electrical, computer, and electrical-communications engineering, with a focus on analog, mixed-signal, and power management integrated circuits and systems. My experience spans both the design of such circuits and the methodologies used to develop them into hardware products, across the concept-and-architecture, prototyping, testing-and-validation, and mass-production phases of development. I have authored or co-authored more than 71 technical papers in international journals and conferences, and I am an

inventor or co-inventor on eight patents. Much of my published work, including my Master's and Ph.D. research, concerns analog, mixed-signal, and power management integrated circuits.

7.   My contributions to the field have been recognized with, among other honors, a National Science Foundation CAREER Award (2013); the Northrop Grumman Chair Professorship at Iowa State University (2013, 2014); the 2015 Darlington Best Transactions Paper Award from the IEEE Circuits and Systems Society; and the 2021 IEEE Transactions on Power Electronics Second Place Prize Paper Award from the IEEE Power Electronics Society.

8.   I have also held editorial and technical-committee roles in the field. From 2016 to 2023, I served on the editorial board of IEEE Transactions on Circuits and Systems I, a leading journal of the IEEE Circuits and Systems Society, where I received the journal's Best Associate Editor Award three times (2020, 2021, 2022). I have served on the Technical Program Committees of multiple IEEE international conferences, including the RF Integrated Circuits Symposium (2011–2021), the Applied Power Electronics Conference (2018–present), and the International Symposium on Circuits and Systems (2012–present). I also chaired the Analog Signal Processing Technical Committee of the IEEE Circuits and Systems Society (2022–2025), and I was a member of the committee that received the 2022 IEEE Circuits and Systems Society Outstanding Technical Committee Award.

9.   Before joining Ohio State, I was a member of the faculty of Iowa State University, first as an assistant professor (2009–2014) and then as an associate professor (2014–2015). At Ohio State, I served as an associate professor from 2015 to 2020 and have been a full professor since 2020.

10.   Before my academic career, I spent approximately eight years in industry at Texas Instruments as an analog, mixed-signal, and power management integrated-circuit designer. In 2000 and again from 2002 to 2005, I worked in Texas Instruments' Connectivity Department, where I designed systems and circuits for the front-end receive and transmit paths of several high-speed wire-line transceivers in multiple digital CMOS technology nodes, including Universal Serial Bus (USB) 2.0, High-Definition Multimedia Interface (HDMI), and IEEE 1394b transceivers. My designs encompassed adaptive receivers and signal equalizers, adaptive filters, clock-and-data-recovery circuits, high-speed low-jitter drivers and transmitters, high-speed signal detectors and rectifiers, on-chip transmission-line terminations, and voltage and current references. I worked alongside cited

contributors to the USB 2.0 standard and supervised the development of multiple USB 2.0 transceivers by third-party contractors. In the same period, I designed integrated power management systems and circuits for single-chip portable media players in digital CMOS processes, with support for multiple battery chemistries and for power and charging over USB. That work included architecture development and definition, load-sharing and distribution strategy, and power-state definition, and my designs encompassed high-efficiency adaptive and reconfigurable DC-DC power converters, linear and switching battery chargers and battery-management systems, and linear power regulators.

11.    From 2005 to 2008, I was a member of the technical staff in Texas Instruments' Wireless Terminal Business Unit, where I led the system and circuit design of analog, mixed-signal, and embedded power management solutions for integrated wireless, RF, and baseband system-on-chip ("SoC") applications in digital CMOS technologies. My work included the design of various classes of delta-sigma data converters for wireless RF codec applications under the GSM and WCDMA standards, and the design of RF-friendly linear and switching DC-DC power converters and modulators, ripple-suppression and cancellation techniques, dynamic power supplies, low-noise low-EMI switching power supplies, and high-frequency fully integrated switching power converters for RF and mixed-signal modules. I also led Texas Instruments' "clear spectrum" task force, in which I was responsible for power-system architecture, supply-domain definition and specifications, noise and power budgeting, and the development of design-and-verification methodology for power management modules in large mixed-signal SoCs containing multiple noise-sensitive RF cores, including cellular, Bluetooth, and wireless-LAN transceivers. That responsibility encompassed circuit design, power-distribution networks, package and board parasitics modeling, communication across supply domains, and power-supply isolation—that is, the discipline of making switching power circuits coexist electrically with sensitive radios in a single dense device.

12.    I received my Ph.D. in Electrical and Computer Engineering from The Ohio State University in 2004, my M.Sc. in Electrical and Computer Engineering from The Ohio State University in 2000, and my B.Sc. in Electronics and Electrical Communications Engineering from Cairo University in 1998.

13.     Throughout my career in academia and industry, having to properly handle proprietary information has always been a necessary part of my work.  For example, due to my collaborative academic research with industry, I routinely had to identify proprietary information as well as apply and abide by extensive security and access control measures to such proprietary information provided by collaborators, which includes controlling access by other faculty members and students. Consequently, I am quite familiar with and accustomed to these measures and rules.

14.     A copy of my CV is attached as Exhibit 1.

## B.  Table of Exhibits

| Ex. | File Name | Abbreviation |
|---|---|---|
| 1 | Curriculum Vitae of Dr. Ayman A. Fayed | - |
| 2 | Kavishka Dissanayake, et al. *Review of Smartphone Energy Management Technologies*, Energy Conversion and Management: X (2026) | Dissanayake |
| 3 | Chulsoon Hwang, *RF Desensitization in Wireless Devices*, RF SYSTEMS, CIRCUITS AND COMPONENTS (2018) | Hwang |
| 4 | Sanjaya Maniktala, SWITCHING POWER SUPPLIES A TO Z (2006) | Maniktala |
| 5 | Gregory L. Plett, BATTERY MANAGEMENT SYSTEMS, VOLUME II: EQUIVALENT-CIRCUIT METHODS (2016) | BMS II |
| 6 | J. Vetter et al., *Ageing Mechanisms in Lithium-Ion Batteries*, J. Power Sources (2005) | Vetter |
| 7 | Behzad Razavi, DESIGN OF ANALOG CMOS INTEGRATED CIRCUITS (2017) | Razavi |
| 8 | Frank B. Watts, ENGINEERING DOCUMENTATION CONTROL HANDBOOK (2000) | Watts |
| 9 | Richard J. Ross, MICROELECTRONICS FAILURE ANALYSIS DESK REFERENCE (2011) | Ross |
| 10 | Douglas C. Montgomery, DESIGN AND ANALYSIS OF EXPERIMENTS (2013) | Montgomery |
| 11 | Karl Ulrich & Steven Eppinger, PRODUCT DESIGN AND DEVELOPMENT (2012) | Ulrich & Eppinger |
| 12 | Brigitte Hauke, *Basic Calculation of a Buck Converter's Power Stage*, Texas Instruments (2015) | Hauke |
| 13 | Chengwu Tao & Ayman A. Fayed, *A GSM Power Amplifier Directly-Powered From a DC-DC Power Converter*, IEEE Microwave & Wireless Components Letters (2012) | Tao & Fayed (GSM PA) |

| 14 | Chengwu Tao & Ayman A. Fayed, *A Low-Noise PFM-Controlled Buck Converter for Low-Power Applications*, IEEE Trans. Circuits & Systems (2012) | Tao & Fayed (PFM Buck) |
|---|---|---|
| 15 | Mina Nashed & Ayman A. Fayed, *Current-Mode Hysteretic Buck Converter With Spur-Free Control for Variable Switching Noise Mitigation*, IEEE Trans. Power Electronics (2018) | Nashed & Fayed |
| Patel 1 | DisplayNotes.key | DisplayNotes |
| Patel 2 | DisplayNotes(DonotChange).key | - |
| Patel 3 | | |
| Patel 4 | | |
| Patel 5 | | |
| Patel 6 | | |
| Patel 7 | | |
| Patel 8 | | |
| Patel 9 | | |
| Patel 10 | | |
| Patel 11 | | |
| Patel 12 | | |
| Patel 13 | | |
| Patel 14 | | |
| Patel 15 | | |
| Patel 16 | | |
| Patel 17 | | |
| Patel 18 | | |
| Patel 19 | | |
| Patel 20 | | |
| Patel 21 | | |
| Patel 22 | | |
| Patel 23 | | |
| Patel 24 | | |
| Patel 25 | | |
| Patel 26 | | |

## II.  SUMMARY OF OPINIONS

15.    For the reasons discussed in detail below, it is my opinion that:

- Apple possesses trade secrets relating to hardware R&D and unreleased product and feature information; power management information and designs; battery management information and designs; testing, reliability and failure analysis, and internal performance data; supply chain, component sourcing, and fabrication release information; the combinations and compilations of these materials; and hardware components, parts, and samples, which are not generally known or readily ascertainable;

- Apple's trade secrets are highly valuable, including because they offer Apple competitive advantages; and

- OpenAI misappropriated Apple's trade secrets.

## III.  LEGAL UNDERSTANDING

16.  I am not an attorney.  I have been told of and understand certain legal standards at issue in this case, which I applied in forming my opinions.

17.  I understand that under the federal Defend Trade Secret Act ("DTSA"), a "trade secret" covers financial, business, scientific, technical, economic, or engineering information, like formulas, patterns, compilations, methods, techniques, processes, and procedures, whether tangible or intangible, so long as: (1) the owner has taken reasonable measures to keep the information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).  I also understand that a combination of information or components can constitute a trade secret even if some or all of the individual parts are generally known, as long as the combination or compilation itself is not generally known or readily ascertainable.

18.  I further understand that to qualify as trade secret information, the allegedly misappropriated information cannot be information generally known in the industry or public knowledge, and must derive independent economic value from not being generally known, in other words, the alleged trade secrets must provide a competitive advantage over information that is known in the industry.

19. I understand that the DTSA states that "misappropriation" is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or the "disclosure or use of a trade secret of another without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that—(I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake."  18 U.S.C. § 1839(5).

20. I understand that the DTSA defines "improper means" to "(A) include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

21. I understand that to prevail on the misappropriation claims at issue in Apple's motion for preliminary injunction, Apple must establish three things.  First, that the information at issue constitutes trade secrets; second, that Apple took reasonable measures to secure the confidentiality of that information, and third, that the Defendants misappropriated the trade secrets.

## IV. TECHNICAL BACKGROUND

22. This section provides a background of the technology at issue in this matter, based on the materials I reviewed.

### A. Battery-Powered Consumer Mobile Devices and Power Management Systems

23. A modern phone, tablet, or wearable device contains dozens of custom integrated circuits ("ICs," also referred to as "chips" or "silicon") that carry and process electrical signals. Among the most complex tasks these circuits perform is power management and control, which requires using specific types of chips to carry out various functions in managing how electricity is

converted and delivered within the device.  The chips responsible for this function are called power management integrated circuits ("PMICs").  Devices typically have a primary PMIC, called the PMU (power management unit) that manages the overall system-level power strategy.  The PMU draws power from the unregulated battery and converts it into the many precisely regulated voltages necessary to power each of the device's active components and subsystems.  *See* Ex. 2 (Dissanayake) at 4-6.  It also controls the timing and sequence in which those components and subsystems power up and shut down, which is a critical function given the limited power supply mobile devices operate on.  More complex products like smartphones add companion or secondary PMUs that are dedicated to particular subsystems.  For example, the display panel is one of the largest consumers of power on a mobile device, and often it has its own dedicated display power management integrated circuit ("DPMIC"), which regulates the specialized supply voltages it needs to function.  *See* Ex. 2 (Dissanayake) at 4-6.  A substantial amount of research and investment goes into architecting the overall design and organization of such a power system.

24.    Power management design for mobile devices is a demanding discipline.  Under the constraints of an extremely tightly packed environment, engineers must define a system capable of delivering power efficiently across widely varying loads (that is, the amount of current needed to keep the entire device running as required); must do so within tight cost, board-area, and chip-area budgets; and must avoid generating electrical noise that disturbs noise-sensitive subsystems like radios (cellular, WiFi, Bluetooth, etc.), touch sensing, and audio processing that are operating millimeters away.  This is accomplished through iterative stages of precise measurement and revision to ensure that the design meets its performance targets across temperature and manufacturing variations, and other limitations such as reduced battery performance.  *See* Ex. 3 (Hwang) at 101-103; Ex. 4 (Maniktala) at 18-21; Ex. 14 (Tao & Fayed (PFM Buck)) at 3071-3072.

**B.  Display Systems and Touch ███████ Sensing**

25.    Display and touch-interaction systems are part of the same system domain.  As noted previously, the display system has one of the largest power budgets since it must perform a number of functions simultaneously.  One of those functions is sensing user input.  In touch-capable display panels, interaction is sensed through electrodes integrated into the display panel itself next to the

circuitry that drives the display's pixels.  Touch sensing works by detecting the minute electrical disturbance a fingertip creates in those electrodes, so the signals involved are very small, and detecting them reliably requires an electrically quiet environment for the sensor in the immediate vicinity of display-drive and display-power circuitry.

26.    A display panel must be refreshed many times per second, while the surface of that display simultaneously senses finger touches ███████████████████████ The display's drive signals are large, and the touch ████████ signals are comparatively tiny.  The two functions therefore must take turns on a very fine time scale.  This sub-microsecond, time-multiplexed turn-taking between display update intervals and the listening windows for touch ████████ signals is called "scan timing."  Like many parts of power management, correctly implemented scan timing is invisible to the user.  Getting it wrong, on the other hand, produces visible display artifacts and results in missed or incorrectly translated input signals.

**C.  System Coexistence**

27.    "Coexistence" (or "coex") refers to the challenge of making subsystems that share a small enclosure tolerate one another electrically.  *See* Ex. 15 (Nashed & Fayed) at 651-52.  Electrical current flowing within a device generates invisible electric and magnetic fields that can interfere with other functions elsewhere in the device.  This interference, or "noise," can corrupt nearby signals (i.e., electrically encoded information) traveling through the circuitry, as well as disrupt components that receive signals through the air (desensitization or "desense").  Whether noise actually causes harm depends on where it falls: each noise-sensitive function is vulnerable in particular frequency bands and during particular time windows, so the same noise source may be harmless to one neighboring subsystem and disruptive to another.  In the case of a mobile device, for example, switching power converters must not inject noise into touch ████████ listening windows, an operating display panel

DECL. OF DR. AYMAN FAYED ISO APPLE'S
MOTION FOR PRELIMINARY INJUNCTION

must not desensitize the cellular, WiFi, or Bluetooth radios, and so on.  *See* Ex. 13 (Tao & Fayed (GSM PA)) at 38-40; Ex. 3 (Hwang) at 101-118.

28.    Coexistence problems are among the most difficult in mobile-device engineering because they emerge only when real subsystems are integrated, and their solution strategies— frequency planning, filtering, timing coordination, and even the addition of special "mitigating" components—are worked out empirically, e.g., on prototype hardware, and iteratively across multiple development stages and hardware generations.

### D.  Peak-Power Delivery and Battery Management

29.    A battery in a mobile device can sustain a modest average power draw for hours, but the device's worst-case instantaneous demand—the display, processors, radios, camera, etc. all drawing close to maximum energy loads simultaneously—can exceed its delivery capabilities if not managed properly.  If this happens, a device without a strategy to change how power is being distributed will have the voltage provided by the battery collapse and shut down unexpectedly ("unintended power off" or UPO).  Peak-power management is the engineering discipline of characterizing that worst case power demand, budgeting the available power among active subsystems, and deciding how their performance can be scaled (e.g., dimming the display, reducing the CPU's clock speed, delaying execution of non-critical operations, etc.) to balance the power demand across the system with what the battery can provide.  *See* Ex. 5 (BMS II) at 28-29, 264-278.

30.    Battery aging is central to this problem because a battery's internal impedance—its opposition to delivering current—increases as the battery ages due to physical and chemical degradation.  *See* Ex. 6 (Vetter) at 269-281; Ex. 5 (BMS II) at 170.  Thus, system designs must account for suboptimal battery states, which can be temporary (e.g., when the battery is cold, when it is operating on a partial charge) and also permanent (e.g., an aged or damaged battery).  A design that only considers functioning with a new battery risks failures as things like battery aging conditions inevitably occur.  Predicting that trajectory requires aging models and, critically, data from measured impedance trajectories from real batteries aged under real usage.  *See* Ex. 6 (Vetter) at 269-281. Companies with large existing consumer bases and established service-return pipelines can independently collect and model data from thousands of units in actual customer use and incorporate

those findings on how the device's performance ages into future designs of the power management and battery systems.

### E.  Custom Chip Development and Component Release Gating

31.    For electronic devices, circuit functions can be handled by discrete, off-the-shelf components that are installed into the system, or they can be integrated into custom chips designed to meet specific requirements, such as performing multiple functions, having specific performance requirements, or being a certain shape or size.  Developing a custom chip starts with generating a specification that lays out the functions, performance requirements, and system interfaces.  Next it proceeds through architecture and circuit design, where the design concept is translated into a physical circuit blueprint.  It then goes through an extensive and iterative simulation and verification process using a variety of specialized software tools to verify that performance requirements are met, and also test for software-diagnosable problems prior to the expense of any manufacturing.  *See* Ex. 7 (Razavi) at 1-6.  Following the conversion of the design circuits into the geometric mask layers used in the chip's manufacture, the process culminates in a manufacturing release where the completed design is released to a semiconductor fabrication facility (sometimes shortened to "fab" or "foundry").  The fabrication process typically costs in the millions of dollars and takes months of processing.  Any error discovered after release generally cannot be fixed without a redesign, which can be extremely costly in waste (e.g., scrapped fabricated product and machine time) and schedule, since it must go through the same design process again from the beginning.  For this reason, the step of determining if a component meets a defined set of criteria before it is released for fabrication, called a "release gate," is extremely rigorous.  After fabrication comes "bring-up," which is a term used for the first powering on of a new chip, where engineers methodically test for startup faults, sequencing errors, or out-of-specification behavior only observable on physical hardware.

32.    Because releasing a design to fabrication converts any remaining design error into tooling cost and schedule delay, engineering teams control that step with a formal release gate, and the same discipline applies beyond chips to a device's other fabricated components.  A release gate typically consists of standardized review checklists in which each verification task is assigned to an engineer and closed with a recorded disposition.  *See* Ex. 8 (Watts) at 212-213.  Design rules of this

kind (numeric specifications against which the design is checked) are considered calibration knowledge. Each numeric limit sits where an organization's accumulated fabrication and field experience put it, balancing cost with failure risk tolerance. This release gate exists to ensure that nothing reaches a fabricator until every element of that accumulated discipline has been applied and its application recorded.

### F. Validation Testing Versus Failure Analysis

33. Validation testing is the process of determining if a design works as conceived—the structured measurement of a design against its requirements. In electrical hardware design, validation is the process of using software to test a design and diagnostic instruments to test a design in physical form or prototype. The process is administered through defined characterization setups, custom simulation test benches, and specific pass/fail criteria. The specific test objectives vary depending on the system under evaluation, but in power management, it can include battery drain, tolerance of voltage changes, and subsystem timing margins, among others. Failure analysis ("FA") is the reverse discipline as it attempts to determine the cause of a failure after it happened. FA proceeds from electrical localization to physical inspection, using techniques like time-domain reflectometry (pulse-echo fault determination), lock-in thermography (infrared imaging of thermal anomalies), lapping/delayering (grinding away millionths of a meter at a time to expose a buried defect), and focused ion beam milling (a nanometer-scale ion beam used to cut into and image a chip as a final diagnostic step). *See* Ex. 9 (Ross) at 383-396, 331-338, 397-416, 583-593.

34. Both disciplines run on documented procedures. Large consumer electronics companies maintain validated design-of-experiments standard operating procedures ("DOE SOPs") for the purpose of preserving a structured-experiment process that has itself been proven out, typically iteratively, on many generations of prototype hardware. These procedures tell the engineer what to vary, what to hold fixed, what to measure, and what result disposition to apply. *See* Ex. 10 (Montgomery) at 13-19. Symptom-indexed FA procedures do the same for post-failure diagnosis: starting from an observed issue, the process describes where to take measurements and what to do next based on the readings at each point. These procedures are refined over many years, and often across many products, based on real failures actually observed in a designer's factories and in the

field (i.e. consumer-initiated returns). Because these procedures are hard-won, cumulative experience, they are typically among the most sensitively guarded documents a hardware development company possesses.

### G. Supplier Evaluation, Down-Selection, and Confidential Co-Development

35. Mobile device companies do not build every part of their devices themselves. Components like memory, display panels, battery cells, and connectors, for example, are purchased from suppliers. But before a part is selected to be integrated into a product, a company typically qualifies the part to ensure it is suitable. This involves making test measurements against requirements set by the engineering team, under real operating conditions, while also accounting for normal manufacturing variations. Qualification is a critical part of the process because a supplier datasheet (documentation made by the supplier providing necessary technical details for a purchaser of a given component) only describes a part in general terms. It does not tell a buyer how the part will actually perform after incorporation into another company's product under its specific requirements. When considering multiple potential suppliers, companies will use a process called "down-selection." Down-selection is the process of narrowing potential component suppliers over several rounds of in-depth testing and evaluation. *See* Ex. 11 (Ulrich & Eppinger) at 14, 23-24. The process is typically documented and will detail the alternatives that were considered, include comparisons of the specific components, and describe the selection rationale that can be referenced in future design decisions.

36. After selection, development proceeds jointly with the chosen vendor under nondisclosure agreements ("NDAs"). The supplier shares information and materials it does not publish, which can include simulation models of its parts, pre-release or custom specifications, and application guidance. Compare Ex. 12 (Hauke) with NDA-restricted vendor materials discussed in Sections V and VI. Similarly, the buyer discloses its confidential part requirements. Both parties treat these exchanges as confidential, because each side's contribution reveals unreleased or competitively sensitive information about its own products and capabilities. Any jointly developed know-how regarding the way a specific part was designed to perform in a specific product is also treated as confidential by both parties.

**H. The Product-Development Lifecycle**

37.    A product-development lifecycle (or development lifecycle) is the sequence of stages a product or component goes through from initial concept to reach mass production. *See* Ex. 11 (Ulrich & Eppinger) at 12.  The lifecycle typically includes the following ordered phases: (i) concept and architecture; (ii) design and prototyping; (iii) validation and testing; and (iv) mass-production approval. *See* Ex. 11 (Ulrich & Eppinger) at 13-15.  Each stage generates characteristic records: architecture trade studies at the first stage; schematics, simulations, and build matrices (the planning tables that specify how many prototype units of each configuration to build) at the second; test reports and DOE results at the third; and release checklists, factory procedures, and audit records at the fourth. *See* Ex. 11 (Ulrich & Eppinger) at 14-15, 23-25; Ex. 10 (Montgomery) at 13-19; Ex. 8 (Watts) at 211-215.

**V.  APPLE'S TRADE SECRETS**

**A. Apple Documents Overview**

38.    The 26 Apple documents that I reviewed describe confidential internal engineering work product, covering different aspects of the design and development process.  All of the non-code documents bear confidentiality markings or have handling instructions on their face.

41.    I describe some of these documents in further detail below.

DECL. OF DR. AYMAN FAYED ISO APPLE'S
MOTION FOR PRELIMINARY INJUNCTION

**SECTIONS OF THIS FILING COVERING CONFIDENTIAL TRADE SECRET INFORMATION HAVE BEEN FILED MANUALLY WITH THE COURT**

engineer-years.  Trade-secret value of this kind is extinguished by disclosure.  For example, engineers who have studied these materials cannot unlearn them; their subsequent design choices will be informed by Apple's results, including its negative results, whether or not any document is copied. No subsequent remedy can undo that harm.

118.   I further note that the benefit of these materials to a competitor is not limited to a competitor making phones ▇▇▇▇▇   The methodological materials—▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇—are transferable to any organization developing battery-powered, power-dense electronic hardware, including consumer electronics.

## IX.  CONCLUSION

119.   Based on my expertise in hardware development and trade secret protection in hardware development, I reached the conclusions provided above, including as set out in Section II.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed in Columbus, Ohio, on August 3, 2026.

_____
Dr. Ayman Fayed