REDACTED VERSION OF
DOCUMENT FILED
UNDER SEAL

Gabriel Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, 34th Floor
Boston, Massachusetts 02110-1800
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com

John M. Desmarais (SBN 320875)
DESMARAIS LLP
230 Park Ave
New York, New York 10169
Telephone: (212) 351-3420
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com

*Attorneys for Plaintiff Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC F/K/A IO PRODUCTS, INC.,<br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF JAMES POOLEY IN SUPPORT OF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**Highly Confidential—Outside Attorneys' Eyes Only**<br><br>**Judge:** Edward J. Davila<br><br>**Complaint Filed:** July 10, 2026 |

**Table of Contents**

I.    INTRODUCTION ........................................................................................1

    A.    Table of Exhibits.............................................................................1

    B.    Summary of Qualifications .............................................................3

    C.    Summary of Opinions.....................................................................5

II.    BACKGROUND AND SUMMARY OF RELEVANT FACTS .......................5

III.    APPLE'S PROTECTIVE MEASURES FOR TRADE SECRETS..................10

    A.    Digital Security Measures.....................................................................11

    B.    Physical Security...................................................................................13

    C.    Employee Contractual Obligations.......................................................15

    D.    Additional Protective Practices for Employees ....................................16

    E.    Supplier and Vendor Security and Confidentiality Obligations ............20

IV.    APPLE'S TRADE SECRET PROTECTION MEASURES ARE
APPROPRIATE, ROBUST, AND REASONABLE.........................................23

## I.    INTRODUCTION

1.    My name is James Pooley. I have prepared this Declaration pursuant to my role as an expert witness on behalf of Plaintiff Apple Inc. ("Apple"). In this declaration, I offer my opinions concerning whether Apple has, during relevant times, exercised "reasonable measures" to protect what it claims in this action as trade secrets. I base my opinions on my experience, training, research, scholarship, actual practice in the field of trade secret protection, and the information cited and discussed herein. I am not basing my opinions on any specific advice given to any specific client in a given instance. I do not intend to offer any opinions on questions of law; rather, my opinions deal with the reasonableness of the efforts taken by Apple to protect information claimed to constitute trade secrets. None of the opinions or conclusions I provide in this declaration are dependent, in any way, on my compensation for the time I spend on this case, the results of this case, or the results of Apple's motion for preliminary injunction.

### A.    Table of Exhibits

2.    The documents I considered in forming my opinions and reaching the conclusions set out in this declaration are identified in the Table of Exhibits presented below. True and correct copies of these documents are attached to this declaration or to the Declarations of Joy Ieyoub, Rafael Dionello, Parin Patel, or Jackie Hughes, as indicated in the table.

| TABLE OF EXHIBITS | |
|---|---|
| **Ex.** | **Description** |
| A. | James Pooley, J.D. Curriculum Vitae |
| B | IS&T – iCloud@Apple |
| C | IS&T – iCloud @Apple Rules of the Road |
| D | IS&T – iCloud@Apple FAQ – Leave Apple |
| E | Terms of Use |
| F | Global Security Requirements for Collaboration Tools |
| Patel Ex. 27 | Global Security Requirements for Physical Security |
| Patel Ex. 28 | Global Security Requirements for Prototype Field Testing |
| Patel Ex. 29 | Global Security Requirements for Transporting Prototypes |
| Patel Ex. 30 | Global Security Requirements for Protecting Your Devices |

| TABLE OF EXHIBITS | |
|---|---|
| Patel Ex. 31 | Global Security Requirements for Data Storage and Residency |
| Patel Ex. 32 | Global Security Requirements for Network Segmentation |
| Patel Ex. 33 | Global Security Requirements for Data Protection |
| Patel Ex. 34 | Global Security Requirements for Avoiding Spoilers |
| Patel Ex. 35 | Global Security Requirements for Products & Surprise |
| Patel Ex. 36 | Global Security Requirements for Confidentiality & Disclosure |
| Patel Ex. 37 | Apple Employee Use of Electronic Systems and Communications |
| Patel Ex. 38 | Global Security Requirements for Data Classification and Risk Assessment |
| Patel Ex. 39 | Global Security Requirements for Access Control |
| Ieyoub Ex. A | Security @ Apple |
| Ieyoub Ex. B | Form IPA |
| Ieyoub Ex. C | Tang Yew Tan IPA |
| Ieyoub Ex. D | Chang Liu 2017 IPA |
| Ieyoub Ex. E | Chang Liu 2018 IPA |
| Ieyoub Ex. F | 2026 Business Conduct Policy |
| Ieyoub Ex. G | 2026 Worldwide Business Conduct Training |
| Ieyoub Ex. I | Checklist for Employees Leaving Apple |
| ███████ | ████████████████ |
| ███████ | ████████████████ |
| Ieyoub Ex. L | Confidentiality Reminder |
| Hughes Ex. C | Core Design Principles |
| Hughes Ex. D | Using Software Tools at Apple |
| Hughes Ex. E | Global Security Requirements for Securing Your Workspace |
| Hughes Ex. F | Global Security Requirements for Destroying Confidential Material |
| ██████ | ███████████████████ |
| ██████ | ███████████████████ |
| ██████ | ███████████████████ |



**TABLE OF EXHIBITS**

**B.　Summary of Qualifications**

3.　My CV is attached as Exhibit A, but I summarize certain qualifications here.

4.　I have devoted the majority of my career to trade secret protection and management. Over the decades I have gained extensive experience in designing and managing systems for information protection. Companies have engaged me to advise on the design or improvement of secrecy management for sophisticated businesses in a variety of industries. As part of these engagements, I provide an external, objective analysis of the company's information protection systems and work with senior management to design robust protection measures that optimize a balance between security and access. I also advise clients in transactional settings, such as mergers and acquisitions, technology partnerships, and intellectual property licensing, helping them navigate the information protection issues that can arise in these contexts.

5.　I have published a number of books in this field, including my 800-page treatise *Trade Secrets*, which I have continuously updated since its publication in 1997. I published my first business book on the subject in 1982, with a second edition in 1989. My most recent book for non-lawyers was first published in 2015, with a second edition in 2024, titled *Secrets: Managing Information Assets in the Age of Cyberespionage*, which focuses on the management of trade secrets. On the same subject, I have also written the introductory chapter ("Information Security in the Modern Enterprise") for the *Computer and Information Security Handbook Fourth Ed.* (Morgan Kaufmann, 2024). I have published numerous articles and regular newsletters regarding trade secrets. I have taught trade secret law and practice at law schools, including several years at Santa Clara University in the 1980s and 14 years at the University of California at Berkeley. I have also taught trade secret law and procedure to state and federal judges. I am a co-author of the *Trade Secret Case Management Judicial Guide* (Federal Judicial Center, 2023).

6.      I was the founding Chair, and am now Chair Emeritus, of the Sedona Conference Working Group on Trade Secrets. The Sedona Conference is a volunteer think tank comprised of judges, lawyers and other professionals that was established to pursue in-depth study of critical issues in intellectual property and data security and to produce high-quality, nonpartisan commentary and practical guidance for companies and their counsel. The Trade Secret Working Group has published guidelines on secrecy management, including *The Sedona Conference Commentary on the Governance and Management of Trade Secrets, The Sedona Conference Commentary on Protecting Trade Secrets in Litigation About Them*, and *The Sedona Conference Commentary on Protecting Trade Secrets Throughout the Employment Life Cycle.* I served as Co-Editor-In-Chief for these publications.

7.      I have also served as co-chair of the International Chamber of Commerce's Trade Secret Task Force. In this role, I oversaw the publication of a 2019 report, *Protecting Trade Secrets*, which provides guidance to businesses on what measures they should take to benefit from the protections afforded to them under US and EU law. I have previously served as President of the American Intellectual Property Law Association and as Chairman of the National Inventors Hall of Fame.

8.      From late 2009 to late 2014, I served as Deputy Director General for the World Intellectual Property Organization ("WIPO"), an agency of the United Nations, where I managed the international patent system. In that position, I was responsible for implementing the Patent Cooperation Treaty, the international system for filing patents in multiple countries. Each year we received approximately 200,000 confidential patent applications, which had to be protected to ensure that none of the confidential information was misused or released before expiration of the 18-month period after filing (before which the applicant could withdraw the application to maintain secrecy). My responsibilities included oversight of a team of information security professionals and the design and execution of a major software development project (adapting the patent application process to a web-based system). To fulfill these duties, I oversaw approximately 400 staff members who were nationals of more than sixty countries.

9.      With the exception of my time at WIPO, I have been practicing as a lawyer since 1973, advising and representing clients on trade secret and patent issues in both a litigation and advisory capacity. I have acted as counsel in hundreds of trade secret disputes involving a variety of industries and technologies. I have also served as an arbitrator, special master, and temporary judge in trade

secret and patent litigation. In addition, I have provided analysis and testimony as an expert on trade secret and patent issues, in court proceedings as well as to the U.S. Senate and House of Representatives. In most trade secret disputes where I acted as litigation counsel, I have also advised clients on the business function of designing or improving their trade secret protection systems.

### C.    Summary of Opinions

10.    This declaration reflects opinions and conclusions that I formed through my independent evaluation and analysis. If called upon to testify, I would do so consistent with the statements and opinions contained herein.

11.    As explained more below, it is my opinion that Apple has taken reasonable measures to protect the secrecy of the information it has claimed as trade secrets in this action.

## II.    BACKGROUND AND SUMMARY OF RELEVANT FACTS

12.    I understand that Apple asserts claims against Chang Liu, Tang Yew Tan, OpenAI Foundation f/k/a OpenAI, Inc., OpenAI Group PBC, and io Products, LLC f/k/a io Products, Inc. for violations of the Defend Trade Secrets Act ("DTSA") and claims for breach of contract against Messrs. Liu and Tan.

13.    I understand the DTSA defines the term "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

14.    I understand that to prevail on claims of misappropriation under the DTSA, Apple must establish, among other things, that it took reasonable measures to protect its trade secrets. I further understand that to obtain a preliminary injunction, Apple must show, among other things, that it is

likely to succeed on the merits of its claims, including on the issue of whether it took reasonable protective measures.

15. What businesses should do to protect their proprietary information from loss or contamination depends primarily on three factors: the value of the information; the risk of loss or contamination; and the cost of various measures that could reduce or eliminate the risk.[1]

16. This basic approach applies across all industries and all types of businesses. Although smaller companies may have less need for formal structures, all enterprises that have or claim some competitive advantage based on secret information should guide their behavior through disciplined risk management.

17. Reasonable efforts are measured in part against the general approach taken by the company as a whole, and in part against how that approach is applied to any particular aspect of its business, such as its workforce and its external relationships such as customers, vendors, and partners. Reasonableness does not demand perfection and depends on circumstances, e.g., what is reasonable should be evaluated in the context of the size and scope of a company's business.

18. Implementing the principles of trade secret protection begins with knowing at least categorically what the potential trade secrets are. This identification is an important first step before the business can assess the value of a secret, understand its vulnerability, and determine what measures are best to reduce risk.

---

[1] Further details regarding the framework for assessing what measures are "reasonable" can be found in *The Sedona Conference Commentary on the Governance and Management of Trade Secrets*, available at https://thesedonaconference.org/node/10030; in my book *Secrets: Managing Information Assets in the Age of Cyberespionage* (Verus Press 2024), particularly chapter 5; and in the introductory chapter "Information Security in the Modern Enterprise," in *Computer and Information Security Handbook*, Fourth Ed., (Morgan Kaufmann, 2024). In addition, I am informed by counsel that the *Restatement (Third) of Unfair Competition*, § 43, comment c, explains that a trade secret owner should consider the risk of behavior that may lead to loss, weighed against the cost and effectiveness of preventive measures, and viewed in the context of the information's value.

---

19.    Secret information is usually valued in ways that reflect the perceived advantage that it gives the company over its competitors, such as a more efficient process that yields higher profits on manufactured goods, a desirable attribute of a product that allows setting a higher price, or prospective business opportunities. In addition, individual secrets should be valued in relation to the company's other secrets. Since most businesses do not have the resources to protect everything at the highest level of intensity, an understanding of relative value helps the company set priorities for sensible management of its information assets.

20.    Just as with its other assets, a company has to assess the relevant risks based on the collective experience of its managers. This process may involve identifying the various ways in which the secret might be lost or compromised, the likelihood that each of those events might actually happen (sometimes measured over a period of time), and the impact on the company if the risk is realized. As with the value component, this analysis of risk or vulnerability helps the company's management set priorities and allocate resources.

21.    Most measures taken to enhance information security come at some cost, either in terms of money or other resources, administrative inconvenience or other negative impact. When a company takes steps to reduce the risk to some secret information, it should be (and usually is) the result of management's decision that the value of that information exceeds the cost of protecting it. Conversely, a company's decision not to endure the cost of certain security measures can sometimes be taken as a reflection of its view that the relevant information is not sufficiently important or valuable, or that the risk it faces is relatively low.

22.    There is no one-size-fits-all approach to trade secret protection, because each company faces a different set of risks to assets of varying value. Therefore, while there are numerous ways in which risk can be mitigated, what is reasonable for any particular business depends on the circumstances of that business and the secrets involved, examined according to the criteria described above.

23.    Companies often consider some categories of preventive measures as critical for information protection. For example, physical security of premises, computer system controls, identification and labeling of secrets, written nondisclosure agreements for employees and for relevant outsiders, and employee training are all valid techniques. However, whether a business takes any, or even all of, these steps does not determine whether it has acted reasonably in the context of its particular

environment of value and risk. Ultimately, in designing protective measures, the owner of the claimed trade secret information should strive to create the appropriate balance between protection and access, taking into account the nature, value, and use of the particular information, the specific risks of loss or contamination that it faces, and the operational constraints of the business.

24. I understand that the Apple trade secrets at issue in this matter relate to the following:



I also understand that Apple's trade secrets are further identified in a preliminary trade secret identification that is being submitted with Apple's Motion for a Preliminary Injunction and described in more detail in the Declarations of Jackie Hughes, Rafael Dionello, Parin Patel, Paul Hatch, and Ayman Fayed filed in support of Apple's Motion. I refer to this information as the "Apple Trade Secrets" ("ATS").

25. Apple has recognized that it faces significant risks if the ATS were made available to other companies, such as OpenAI. In particular, Apple has recognized that if other companies could use these trade secrets, they could bypass years of research, development, and billions of dollars in

investment that were needed to discover and develop them. Dionello Decl. ¶ 37; Hughes Decl. ¶ 30; Patel Decl. ¶¶ 5. Apple has also recognized that it would sustain substantial harm to its position in the marketplace, as other companies could exploit this information to attain the extremely high quality of Apple's products. Dionello Decl. ¶ 37; Patel Decl. ¶¶ 5-6, 8-14, 27-28, 34, 36, 42, 49, 55-56; Hughes Decl. ¶ 30.

26.    Apple's business model places high value on maintaining the confidentiality of its trade secrets. Ieyoub Decl. ¶¶ 2-4. Apple has a robust system of protective measures in place that apply to a broad range of its confidential information, but it provides heightened protective measures to its trade secrets, including the ATS. Dionello Decl. ¶ 36; Patel Decl. § II; Ieyoub Decl. ¶ 13 ("Apple's New Product Security Team holds sessions to further communicate to employees the expectations around preserving and protecting Apple's proprietary information and trade secrets"). Apple impresses on its employees who work with its trade secrets that it should be treated with the utmost sensitivity. Dionello Decl. ¶ 36; Patel Decl. ¶¶ 81-82. Employees are taught to internalize the importance of maintaining the secrecy of Apple's trade secrets and to practice it in every aspect of their work. Ieyoub Decl. ¶ 3. Employees working with Apple trade secrets can only share them with others within Apple that have a business need-to-know, and they can only share them with third parties, such as suppliers and vendors, that have a business need-to-know and have agreed to abide by Apple's strict confidentiality measures as outlined in NDAs, security protocols, and other written guidance. Dionello Decl. ¶¶ 35-36; Patel Decl. ¶ 78; Hughes Decl. ¶ 29.

27.    Apple protects its trade secrets, including the ATS, through digital security measures, physical security measures, employee training, and contractual obligations. Ieyoub Decl. ¶ 3. Its trade secrets are protected from the time of their discovery or conception, through development, and through any exposure to Apple employees or third parties with a business need-to-know. *See* Ieyoub Decl. ¶¶ 4, 9-13; Dionello Decl. ¶¶ 27-36; Patel Decl. § II; Hughes Decl. ¶¶ 19-29. Apple employees receive periodic guidance and training about the importance of this information to Apple's business and how to protect it. Ieyoub Decl. ¶¶ 12-13; Patel Decl. ¶ 82.

## III.  APPLE'S PROTECTIVE MEASURES FOR TRADE SECRETS

28.  Apple carefully protects information about its hardware engineering and product design work, its testing, validation, and development methods, its manufacturing design, industrial design, and process engineering activities, and its supplier and vendor relationships. Dionello Decl. ¶¶ 27, 37; Patel Decl. § II; Hughes Decl. ¶¶ 28-29.

29.  Information within these categories, including the ATS, are critical to Apple's business performance and competitive strength in the market. Dionello Decl. ¶ 37; Patel Decl. ¶ 5; Hughes Decl. ¶ 30. Therefore, Apple employees with access to such information, including the ATS, are trained to understand its importance, including in relation to less critical information, and are given guidance on how to, and how important it is to, protect these trade secrets, as described in further detail below. Dionello Decl. ¶ 36 (metal finishing information is "carefully guarded with multiple layers of protection" and only shared with a third-party supplier after an NDA and security protocols were in place); Hughes Decl. ¶ 21 (metal finishing information is kept in restricted internal Apple databases); Patel Decl. ¶ 5 (proprietary information embodied in the documents downloaded by Defendant Chang Liu after he left Apple is "critical to Apple's R&D, product development, and resulting competitive position in the marketplace" and Apple is "especially cautious when handling or transmitting this information" and "ensure[s] that this information is subject to strict protections"); Ieyoub Decl. ¶ 13 (describing how senior leaders hold sessions with Apple employees to emphasize the culture of secrecy and confidentiality surrounding Apple's trade secrets).

30.  To protect its trade secret information, Apple employs teams of professionals to shape its secrecy and security measures, supervise the implementation of those measures, and monitor potential breaches in those measures. These teams include the New Product Security team, the Global Security team, the Information Security team, and the Security Engineering & Architecture team. Ieyoub Decl. Ex. A (Security @ Apple) at 2; Ieyoub Decl. ¶ 4.

31.  These teams take steps to protect Apple's trade secret information, including the ATS, through digital security measures, physical security measures, employment contracts, employee practices, and supplier and vendor restrictions as discussed below. I understand that these policies and practices are current and have been in place at least since the time of Defendants' alleged misappropriation. *See* Dionello Decl. ¶¶ 15, 31; Patel Decl. ¶ 73; Hughes Decl. ¶ 27; Ieyoub Decl. ¶ 12. I also

understand that while the precise form and phrasing of Apple's policies may have evolved over time, their substance has not substantially changed since at least the time of discovery or conception of the ATS. *See* Dionello Decl. ¶ 31; Patel Decl. ¶ 73; Hughes Decl. ¶ 27; Ieyoub Decl. ¶ 12. I further understand that Apple's culture and the emphasis it places on the protection of its confidential and proprietary information, including trade secrets, have been consistent for over twenty-five years, including during the employment periods of the two individual defendants named in this case—Defendants Chang Liu and Tang Tan. *See* Ieyoub Decl. Ex. C (Tang Yew Tan IPA) at § 2.A ("You understand and agree that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple"); Ieyoub Decl. Ex. D (Chang Liu 2017 IPA) at § I.A (similar); Ieyoub Decl. Ex. E (Chang Liu 2018 IPA) at § I.A (similar).

### A.    Digital Security Measures

32.    Apple protects its proprietary information through multiple digital security measures.

33.    Apple keeps proprietary information in multiple internal databases. In order for an employee to access that information, the employee must be logged into Apple's virtual private network ("VPN"). *See* Patel Decl. ¶¶ 77-78, Ex. 32 (Global Security Requirements for Network Segmentation) at 1. Then, the employee must log into AppleConnect with their Apple employee credentials and password. Hughes Decl. ¶ 21; Patel Decl. ¶ 77.

34.    Not all Apple employees are given access to every project stored in the databases. Rather, employees need to be granted "disclosure" to a specific project and are often further limited to particular aspects of the project to which they are assigned. *See* Patel Decl. Ex. 35 (Global Security Requirements for Products & Surprise) at 1 ("Never share confidential project information or content with someone who isn't formally disclosed"). "Disclosure" status is granted on a "need to know" basis, which limits the number of employees with knowledge about any unannounced project, helping to preserve confidentiality. *See* Patel Decl. Ex. 36 (Global Security Requirements for Confidentiality & Disclosure) at 1 ("Apple Confidential Information should be shared only on a 'need-to-know' basis"); Patel Decl. ¶ 78.

35.     Apple manages requests for project disclosure and access to confidential information with an internal software tool called "Disclosure Central," which maintains disclosure records. *See* Patel Decl. Ex. 34 (Global Security Requirements for Avoiding Spoilers) at 1. Apple employees use Disclosure Central tools to guard against undesired disclosures. For example, employees can use Apple's "DisclosureBot for Mail" to automatically confirm that recipients of emails are disclosed on a project being discussed, or employees can "check users and group disclosure directly via [Apple's] Disclosure Central." *Id*.

36.     Apple further restricts access to applications handling confidential and proprietary data. For example, access is only granted to disclosed users, and these users can see only information they need to see. Patel Decl. Ex. 39 (Global Security Requirements for Access Control) at 2. Applications that handle highly sensitive data must use AppleConnect with Multi-Factor Authentication enabled or an approved equivalent. *Id*.

37.     Apple also has protective measures in place that apply when employees use file sharing platforms, such as iCloud. In order to use iCloud@Apple, an employee's Apple account must have two-factor authentication enabled, and the employee is prohibited from signing into the linked Apple Account on any device accessible by others. Ex. B (iCloud@Apple) at 3. Further, all work files must be stored in Apple Work folders, which can never be used to store personal files. Ex. C (iCloud@Apple Rules of the Road) at 1. Any files saved outside the Apple Work folders must be manually moved into the Apple Work folders. *Id*. When an employee leaves Apple, the employee is instructed to "[m]ake sure that no Apple corporate data is left outside of the Apple Work folders," and is informed that "Apple Work folders (and their contents) in iCloud Drive and Notes will be removed from [their] account" when they leave. Ex. D (iCloud@Apple – Leave Apple) at 2.

38.     Apple employees are also permitted to use certain third-party cloud repositories to collaborate on files, but only in accordance with Apple's security guidelines. For example, they must "check Disclosure Central to ensure [they] are only sharing with other people that are disclosed" and "set permissions for each collaborator appropriately." Ex. F (Global Security Requirements for Collaboration Tools) at 4. Applicable Terms of Use explain that "files stored [] are intended for work purposes and may contain Apple Confidential Information—including any non-public details regard-

ing our past, present, or future products and services" and therefore "external sharing is strictly prohibited" (unless the party with which such sharing is contemplated, for example approved external partners, has agreed to appropriate confidentiality obligations and protections). *Id*.; Ex. E (Terms of Use) at 1. Apple's policy is to disable and prohibit further access to third-party cloud repositories when an employee leaves. July 23, 2026 Interview with IS&T Manager.

39.    If issues arise with security for file-sharing platforms, Apple takes action to resolve those issues and ensure they do not repeat. July 23, 2026 Interview with IS&T Manager. For example, I understand that after Mr. Liu left for OpenAI in January 2026, Apple discovered a bug that was affecting its third-party cloud repository. *Id*. Apple uses automated scripts to provision access to this repository, and these scripts deprovision users when employees leave Apple. *Id*. But the bug Apple discovered affected the deprovisioning process, so when a request was sent to revoke Defendant Liu's access to the repository when he left Apple, his access was not revoked as expected. *Id.* When Apple discovered this bug, it investigated the cause, identified whether it impacted other similarly situated former employees, and remediated the bug so it could not be exploited again. *Id.*

40.    The digital protective measures described above were applied to the ATS. Patel Decl. ¶¶ 73, 77-79; Hughes Decl. ¶¶ 21, 28-30. The teams working with the ATS were advised that they were and are highly sensitive and needed to be given the utmost protection. Dionello Decl. ¶ 36; Hughes Decl. ¶ 29; Patel Decl. ¶¶ 79, 82.

### B.    Physical Security

41.    Apple protects its proprietary information through multiple physical security measures.

42.    Apple controls and monitors, and limits access to, the buildings where confidential projects are developed. Within those facilities, Apple restricts access by room and by floor depending on employees' assigned work. In order to gain access to these buildings, floors, and rooms, an employee must have pre-approval and use their badge. Patel Decl. ¶¶ 74.

43.    If there is a visitor to an Apple facility, that visitor must check in with reception or security and, unless pre-approved by Apple, sign a nondisclosure agreement prior to gaining access. During the visit, the visitor must be escorted by Apple employees. Patel Decl. ¶ 75.

44.    For any "data storage or cloud services hosted on servers owned by Apple," the data storage must have the following protective measures:

(i)    Layered Security: Reside behind at least two layers of physical security (e.g., facility entry, server room door).

(ii)    Access Control: Be accessible only through designated, logged security checkpoints. All personnel, including government officials, must be logged.

(iii)    Physical Barriers: Be fully enclosed by walls or cages that block physical access and line of sight. All inactive access points (windows, unused doors) must be secured and tamper-evident.

(iv)    Alarms and Monitoring:

    a.    Employ intrusion detection systems (e.g., glass-break, hold-open alarms) at all entry points and physical barriers.

    b.    Have a documented alarm response procedure that includes notifying Apple of any breach.

(v)    CCTV Surveillance: Use high-definition CCTV to record all persons at entry points. Records must be maintained for at least 90 days.

(vi)    Visitor and Device Control – Implement and enforce procedures to identify and control visitors and prevent unauthorized devices from connecting to the data storage environment, and

(vii)    Audits: Conduct regular audits, including physical inspections and reviews of access logs and CCTV, to confirm all standards are being met.

Patel Decl. Ex. 27 (Physical Security) at 1.

45.    Apple employees receive specific instructions relating to testing and transportation of confidential prototypes and parts and need field security escorts when bringing prerelease prototypes and products into the field. Patel Decl. Ex. 28 (Prototype Field Testing) at 1. Apple employees must get approval before transporting prototypes outside of Apple. Patel Decl. Ex. 29 (Transporting Prototypes) at 1; Patel Decl. ¶ 76.

46.    Apple employees are reminded that hardware produced as part of the research and development process is Apple's property. Patel Decl. Ex. 30 (Protecting Your Devices) at 1. They also are instructed never to leave Apple prototypes or devices with unreleased software or Apple confidential information unsecured, e.g., in their car. *Id*.; Patel Decl. ¶ 76.

47.    These physical security measures applied to the ATS. Patel Decl. ¶ 73; Hughes Decl. ¶ 21. For example, Apple employees working on projects associated with the documents that I un-

derstand were obtained by Mr. Liu after he left Apple—including the unreleased product project referenced by Mr. Tan when interviewing Apple employees for OpenAI—and on Apple's proprietary metal-finishing processes worked in buildings that were only accessible by key card and that prohibited visitors without an escort. *Id.*

### C.    Employee Contractual Obligations

48.    Apple protects its proprietary information contractually and implements measures and policies to ensure that its employees understand their contractual obligations and the importance of protecting its proprietary and trade secret information. Ieyoub Decl. ¶¶ 6, 9-10.

49.    Before starting at Apple, employees must sign an Intellectual Property Agreement ("IPA"). Ieyoub Decl. ¶ 6. The IPA describes employees' confidentiality and non-disclosure obligations, for example:

> You understand and acknowledge that Your obligations under this Agreement with regard to any particular Apple Confidential Information will continue during and after Your Employment until such Apple Confidential Information has become generally available to the public unless it became publicly available through unlawful means or as a result of any breach of a confidentiality obligation to any Apple Entity, including any breach by You of this Agreement. You understand and agree that, without the written consent of Apple, You are prohibited, during and after Your Employment, from: (i) using any Apple Confidential Information, except as necessary to perform Your duties during and in the scope of Your Employment; (ii) disclosing any Apple Confidential Information, except during and in the scope of Your Employment to (a) personnel of any Apple Entity or (b) other third parties who have confidentiality obligations to any Apple Entity regarding the Apple Confidential Information to be disclosed ("Authorized Third Parties"), in each case (a) and (b), who need to know the Apple Confidential Information to be disclosed during and in connection with their respective work for such Apple Entity; or (iii) permitting any other person or entity to (a) use any Apple Confidential Information, except authorized uses by (1) personnel of any Apple Entity or (2) Authorized Third Parties, in each case (1) and (2), of the Apple Confidential Information as necessary to be used by them during and in connection with their work for the applicable Apple Entity or (b) disclose any Apple Confidential Information, except authorized disclosures (1) between personnel of any Apple Entity or (2) between personnel of any Apple Entity, on the one hand, and Authorized Third Parties, on the other hand, in each case (1) and (2), who need to know the Apple Confidential Information to be disclosed during and in connection with their respective work for the applicable Apple Entity. You understand and agree to strictly comply with all rules and policies of the Apple Entities regarding Apple Confidential Information and to use best efforts to safeguard such Apple Confidential Information and protect it against disclosure, misuse, loss, or theft. Upon termination of Your Employment, You will promptly deliver to the Apple Employing Entity all Apple property, documents, and materials of any kind containing any Apple Confidential Information, and

> You agree that You will not take with You any property, documents, materials, or copies thereof, whether on paper, in electronic form or in any other medium, containing any Apple Confidential Information.

Ieyoub Decl. Ex. B (Form IPA) at § I.A.

50.     As shown above, Apple IPAs prohibit unauthorized use of Apple's confidential and proprietary information and intellectual property. *Id*.

51.     As part of my review, I analyzed IPAs executed by Messrs. Liu and Tan. The IPAs they executed contain similar confidentiality provisions and provide that Apple proprietary information cannot be transferred or transmitted without Apple's consent. Ieyoub Decl. Ex. C (Tan Yew Tan IPA) at § 2.0(a); Ieyoub Decl. Ex. D (Chang Liu 2017 IPA) at § I.A; Ieyoub Decl. Ex. E (Chang Liu 2018 IPA) at § I.A;[2] Ieyoub Decl. ¶¶ 7-8.

### D.     Additional Protective Practices for Employees

52.     In addition to the IPAs that employees sign at the outset of employment, Apple provides employees with guidance and principles on how to preserve the confidentiality of its proprietary information. Ieyoub Decl. ¶ 10.

53.     Annually, Apple employees review a Business Conduct Policy that discusses how to handle confidential material. The Policy explains that confidential material includes "all non-public materials or information relating to past, existing or future Apple products or services, including but not limited to sales, pricing, operations, sources of material, financials and marketing plans." Ieyoub Decl. Ex. F (2026 Business Conduct Policy) at 7; Ieyoub Decl. ¶ 11.

54.     The Business Conduct Policy further instructs employees that "[b]eing aware of where you are, who is around you, and what they might see or overhear is an important way we all protect Apple Confidential Information." Ieyoub Decl. Ex. F (2026 Business Conduct Policy) at 7. It also instructs employees to "[k]eep track of the assets and information Apple has entrusted to you, and prevent loss, misuse, waste, or theft." *Id*.

---

[2] I understand that Mr. Liu executed a first IPA in conjunction with an internship and a second IPA when he returned to Apple as a Hardware Development Engineer. Ieyoub Decl. ¶ 8.

55.    The Business Conduct Policy explains that Apple "is very selective when disclosing Apple Confidential Information to vendors, suppliers, or other third parties," and that employees should "only do so once a Non-Disclosure Agreement is in place." *Id*. It tells employees to "verify with [their] manager whether there is a business need to share Apple Confidential Information with a supplier, vendor, or other third party, and never volunteer more than what is necessary to address the business at hand." *Id*. It further instructs that "[e]ven within Apple, Apple Confidential Information should be shared only on a need-to-know basis." *Id*.

56.    Apple employees can access additional resources related to their confidentiality obligations on Apple's internal network. For example, they have access to a website titled "Confidentiality & Disclosure," which gives examples of Apple confidential information including "features, designs, specifications, pricing, or marketing information for unannounced products" and "project code names." Patel Decl. Ex. 36 (Global Security Requirements for Confidentiality and Disclosure) at 1. Via that website, employees are informed that it is a violation of their "obligation regarding Apple Confidential Information and trade secret information" to "send[] or post[] Apple Confidential Information outside of Apple, or to non-authorized Apple personnel." Patel Decl. Ex. 37 (Apple Employee Use of Electronic Systems) at 1.

57.    Through their training regarding confidentiality obligations, Apple employees are taught that "[o]ne of Apple's greatest assets is information about [its] products and services" and that they "must understand what's considered Apple Confidential Information, and how to handle this information both internally and externally." Ieyoub Decl. Ex. G (2026 Business Conduct Training) at 34-35. They are provided examples of Apple confidential information and requirements for protecting that confidential information. *Id*. at 36-61. Their training also includes practice questions applying confidentiality policies to real-world situations. *Id*. at 205-218. I understand that Mssrs. Liu and Tan completed this training, including in the immediate years before their departures from Apple. Ieyoub Decl. ¶ 12.

58.    Apple's New Product Security Team holds training sessions, often led by senior leaders, emphasizing the importance of preserving and protecting Apple's proprietary and trade secret information. These sessions reinforce and reiterate Apple's culture of maintaining secrecy and confi-

dentiality and protecting its proprietary information. Ieyoub Decl. ¶ 13. Apple employees are instructed to "[a]lways use code names when discussing unannounced products or services." Patel Decl. Ex. 34 (Global Security Requirements for Avoiding Spoilers) at 1. They are also told to never use third-party messaging apps for discussing Apple confidential information. *Id*. ¶ 78.

59.    Before Apple employees begin a development project, they are instructed to "assess the type of data their tool or infrastructure will handle to determine the required security posture." Patel Decl. Ex. 38 (Global Security Requirements for Data Classification and Risk Assessment) at 2. They are told to consider the New Product Security classification of the project(s), the sensitivity of the information to be handled, processed, or stored, the data flow and audience for this information, and the technology stack they will use. *Id*.; *see also id.* ¶ 79.

60.    Apple's policies instruct employees to adhere to the following core security principles:

(i)    Secrecy by Design: Security and secrecy considerations must be integrated into every phase of the project, from initial concept to deprecation.

(ii)    Principle of Least Privilege: Users and systems must be only granted the minimum level of access and permissions necessary to perform their required functions.

(iii)    Data Minimization and Obfuscation: The tool should only collect, process, and store data that is essential for the intended purpose.

(iv)    Defense in Depth: Multiple layers of security controls should be implemented to protect confidential data, ensuring that the failure of a single control does not lead to a compromise.

(v)    Secure Data Locations: Black and Ultra data must reside in physically and network-secured [Apple Information Security] approved Apple Environments to prevent unauthorized access.

(vi)    Need-to-Know Access: Access to confidential data is strictly governed by disclosure approval (via Disclosure Central) and the 'Need to Know' principle, ensuring it is granted only when essential for job function – based on necessity, not convenience.

Hughes Decl. Ex. C (Core Design Principles) at 1; Hughes Decl. ¶ 22.

61.    Apple employees may only use tools that are approved by Apple, and they are instructed to "[n]ever install prohibited tools on Apple-owned devices or use on Apple's network due to the risks they introduce." Hughes Decl. Ex. D (Using Software Tools at Apple) at 2. As applicable,

they are given specific guidance on how to securely use collaboration platforms. Ex. F (Global Security Requirements for Collaboration Tools) at 2-4. For example, Apple employees are prohibited from sharing highly sensitive materials with external partners via Messages. *Id*. at 2; Hughes Decl. ¶ 23.

62.    Apple teaches its employees measures for securing their workplace. Apple employees are instructed that "[w]hen [they're] working on things that are considered Apple Confidential Information, it's critical to practice caution and set up your work area securely." Hughes Decl. Ex. E (Global Security Requirements for Securing Your Workspace) at 1. Employees also are taught: "When in use, prototypes and confidential documents must be in your positive control (on your person or within your direct line of sight) at all times. Never leave them unattended." *Id*. at 3; Hughes Decl. ¶ 25.

63.    Apple employees are given guidance on how to securely destroy proprietary information when it is no longer needed. They are told that "[c]onfidential material comes in many forms, from printed meeting agendas to fully functioning prototypes, and securely destroying unneeded material is important to protect Apple's trade secrets." Hughes Decl. Ex. F (Global Security Requirements for Destroying Confidential Material) at 1-2 (describing methods for secure destruction in various locations); Hughes Decl. ¶ 26.

64.    When an employee leaves Apple, the employee must return all Apple-owned devices, including laptops and mobile devices, as well as their badges and other Apple-owned equipment. Ieyoub Decl. Ex. I (Checklist for Employees Leaving Apple) at 2-3. This requirement is included in employees' IPAs. Ieyoub Decl. Ex. B (Apple Form IPA) at § I.A ("Upon termination of Your Employment, You will promptly deliver to the Apple Employing Entity all Apple property, documents, and materials of any kind containing any Apple Confidential Information, and You agree that You will not take with You any property, documents, materials, or copies thereof, whether on paper, in electronic form or in any other medium, containing any Apple Confidential Information"); Ieyoub Decl. Ex. C (Tan Yew Tan IPA) at § 2.0(a) (similar); Ieyoub Decl. Ex. D (Chang Liu 2017 IPA) at § I.A (similar); Ieyoub Decl. Ex. E (Chang Liu 2018 IPA) at § I.A (similar). Departing employees are instructed to remove any company data from all personal devices and reminded of their confidentiality obligations. Ieyoub Decl. Ex. I (Checklist for Employees Leaving Apple) at 2.

65.     Departing members of Apple's Hardware Engineering team are subject to additional protective measures. ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Ieyoub Decl. Ex. K ████████ ████████████████████ The procedures describe that "[h]aving in place strong exit procedures for departing employees is a critical element of our overall strategy for protecting our trade secrets." Ieyoub Decl. Ex. J (████████████████████████████ at 2. The security, human resources, and business teams coordinate to promptly provide the departing employee with a "Confidentiality Reminder" for signature, a link to schedule an exit interview with the Global Security team, and directions for how to return their devices. *Id.* at 3; Ieyoub Decl. Ex. L (Confidentiality Reminder). The Confidentiality Reminder reinforces that the employee's "obligations under the IPA do not expire after [they] leave Apple ... All Apple Confidential Information stays here." Ieyoub Decl. Ex. L (Confidentiality Reminder) at 1.

66.     The protective policies and practices described above were in place and applied during the period of, and following, the employment of Mssrs. Tan and Liu in this case. Dionello Decl. ¶ 37 (Apple's policies "have helped keep Apple's metal finishing processes secret"); Patel Decl. ¶¶ 73, 82 ("I have been given specific guidance on how to handle projects with varying levels of sensitivity, including projects involving the confidential and proprietary information I have discussed in this declaration, which is some of the most sensitive information at Apple"); Hughes Decl. ¶ 28 ("I rely on [] Apple policies and training [] to protect Apple's metal finishing processes in my day-to-day work as an Apple employee").

**E.     Supplier and Vendor Security and Confidentiality Obligations**

67.     Apple has adopted measures and policies to ensure that suppliers and vendors involved in the manufacture and assembly of Apple products (or any parts thereof) protect Apple's proprietary information. Dionello Decl. Ex. E ████████████████████████████ ████████████████████████████████████████████ ████ Dionello Decl. ¶ 31. The supplier responsible for applying Apple's proprietary metal-finishing

techniques to Apple's products ▮▮▮▮▮▮▮▮▮ was required to follow Apple's security measures. *See id.*; Dionello Decl. Ex. C ▮▮▮▮▮▮▮

68.    Before accessing, receiving, or working with Apple proprietary information, suppliers must sign confidentiality agreements. Dionello Decl. Ex. E ▮▮▮▮▮ at 1. I have reviewed an example of these confidentiality agreements, which was executed by ▮. *See* Dionello Decl. Ex. D



## IV.    APPLE'S TRADE SECRET PROTECTION MEASURES ARE APPROPRIATE, ROBUST, AND REASONABLE

77.    As described above, Apple has implemented a large suite of measures to protect its trade secrets, including the ATS, reflecting a consistent, thorough, and disciplined approach to risk management regarding this intellectual property. Apple's measures properly respond to multiple sources of risk, including internal access, unauthorized external access, physical security threats, and network security threats. Overall, Apple's information security efforts are extremely sophisticated and robust in addressing those risks.

78.    It is my professional opinion that Apple has implemented reasonable measures to protect the secrecy of the information it claims in this action to be its trade secrets.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed in Chase, British Columbia, Canada, on August 3, 2026.

James Pooley