Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

[Additional counsel listed in signature block]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., <br><br> Plaintiff, <br><br> vs. <br><br> CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC., <br><br> Defendants. | Case No. 5:26-CV-07078-EJD <br><br> **DEFENDANTS' MOTION TO DISMISS APPLE INC.'S COMPLAINT** <br><br> Date:     October 1, 2026 (Reserved) <br> Time:     9:00 a.m. P.T. <br> Courtroom: 4 - 5th Floor <br> Judge:    The Hon. Edward J. Davila <br> Trial Date:    None Set |

DEFENDANTS' MOTION TO DISMISS

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on October 1, 2026 at 9:00 A.M. or as soon thereafter as the matter may be heard in the above-entitled Court, the Honorable Edward J. Davila presiding, located at the San Jose Courthouse, Courtroom 4, 5th Floor, 280 South 1st Street, San Jose, CA 95113, Defendants Chang Liu, Tang Yew Tan, OpenAI Foundation, OpenAI Group PBC, and IO Products, LLC will and hereby do move this Court for an order dismissing Plaintiff Apple Inc.'s Complaint (Dkt. No. 1) pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion is made on the following grounds: (1) Apple's First, Second, Third, and Fourth Claims for Relief fail to state a claim on which relief may be granted; and (2) the Court should decline to exercise supplemental jurisdiction over Apple's remaining state-law claims.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the other pleadings and filings on record in this action, as well as other written or oral argument that Defendants may present to the Court.

DATED: August 5, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____ */s/ Andrew H. Schapiro* _____

Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products, LLC, and Tang Yew Tan

KWUN BHANSALI LAZARUS LLP

By _____ */s/ Kate Lazarus* _____

Attorneys for Defendant Chang Liu

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................... 1

II. LEGAL STANDARD ............................................................................................. 3

III. RELEVANT ALLEGATIONS IN APPLE'S COMPLAINT ................................. 3

IV. ARGUMENT .......................................................................................................... 5

    A. Apple Has Failed to Demonstrate It Owns A Protectable Trade Secret ..................... 6

    B. Apple Has Failed To Allege Conduct That Plausibly Supports A Claim Of Misappropriation ............................................................................................................... 13

        1. Apple Fails to Plausibly Allege Misappropriation Against Defendant Liu ................................................................................................................... 13

        2. Apple Fails to Plausibly Allege Misappropriation Involving Defendant Tan ................................................................................................... 17

        3. Apple Fails To Plausibly Allege Misappropriation By Defendants OpenAI or io Products ........................................................................................ 21

    C. Apple Fails to Plausibly Allege Any Injury Or Ongoing Harm ............................... 24

    D. The Court Should Decline to Exercise Supplemental Jurisdiction Over Apple's State Law Claims ............................................................................................... 25

V. CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*AlterG, Inc. v. Boost Treadmills LLC,*
388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...............................................................................9, 13

*Apple Inc. v. Rivos, Inc.,*
2023 WL 5183034 (N.D. Cal. Aug. 11, 2023) ...........................................................................22

*Arthur J. Gallagher & Co. v. Tarantino,*
498 F. Supp. 3d 1155 (N.D. Cal. 2020) .....................................................................................13

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ......................................................................................................... 3, 17, 24

*Ashitey v. Arista Networks, Inc.,*
2026 WL 1133896 (N.D. Cal. Apr. 27, 2026) ...........................................................................14

*Attia v. Google LLC,*
983 F.3d 420 (9th Cir. 2020) ......................................................................................................10

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.,*
2018 WL 2298500 (N.D. Cal. May 21, 2018).............................................................................8

*In re Century Aluminum Co. Sec. Litig.,*
729 F.3d 1104 (9th Cir. 2013) ....................................................................................... 3, 16, 20

*CleanFish, LLC v. Sims,*
2020 WL 4732192 (N.D. Cal. Aug. 14, 2020) .........................................................................6, 7

*Comet Techs. USA, Inc. v. XP Power, LLC,*
2026 WL 2028303 (9th Cir. Jul. 14, 2026)..................................................................................6

*Cooper Interconnect, Inc. v. Glenair, Inc.,*
2015 WL 13722129 (C.D. Cal. Feb. 3, 2015) ...........................................................................24

*Daniels-Hall v. Nat'l Educ. Ass'n,*
629 F.3d 992 (9th Cir. 2010) ......................................................................................................14

*Davis v. HSBC Bank Nevada, N.A.,*
691 F.3d 1152 (9th Cir. 2012) ....................................................................................................14

*Farhang v. Indian Inst. of Tech., Kharagpur,*
2010 WL 2228936 (N.D. Cal. June 1, 2010)..............................................................................22

*Fayer v. Vaughn,*
649 F.3d 1061 (9th Cir. 2011) ......................................................................................................3

*Focused Impressions, Inc. v. Sourcing Grp., LLC*,
  2020 WL 1892062 (D. Mass. Apr. 16, 2020) ........................................................................11, 12

*Google LLC v. Point Fin., Inc.*,
  2026 WL 579462 (N.D. Cal. Mar. 2, 2026) ..............................................................................7, 9

*Lamont v. Conner*,
  2019 WL 1369928 (N.D. Cal. Mar. 26, 2019) ............................................................................13

*Masimo Corp. v. Apple Inc.*,
  2020 WL 6653652 (C.D. Cal. Oct. 13, 2020) ...............................................................................8

*May v. Google LLC*,
  2026 WL 788376 (N.D. Cal. Mar. 20, 2026) ..............................................................................14

*Navigation Holdings, LLC v. Molavi*,
  445 F. Supp. 3d 69 (N.D. Cal. 2020) ..................................................................... 6, 17, 22

*P2i Ltd. v. Favored Tech USA Corp.*,
  2024 WL 4294652 (N.D. Cal. Sept. 24, 2024) .............................................................................8

*Palantir Techs., Inc. v. Abramowitz*,
  2020 WL 9553151 (N.D. Cal. July 13, 2020) ...............................................................................7

*Parrino v. FHP, Inc.*,
  146 F.3d 699 (9th Cir. 1998) .....................................................................................................14

*Patino v. Franklin Credit Mgmt. Corp.*,
  2017 WL 635316 (N.D. Cal. Feb. 16, 2017) ...............................................................................25

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
  149 F.4th 1081 (9th Cir. 2025) ............................................................................. 6, 7, 9, 12

*Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*,
  2010 WL 145098 (N.D. Cal. Jan. 8, 2010) ............................................................................10, 19

*Space Data Corp. v. X*,
  2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) ........................................................................7, 8, 13

*Teradata Corp. v. SAP SE*,
  2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ........................................................... 8, 12, 13

*Trinidad v. OpenAI Inc.*,
  2026 WL 21791 (N.D. Cal. Jan. 5, 2026) ...................................................................................11

*U.S. v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011) .......................................................................................................3

*UAB "Planner 5D" v. Facebook, Inc.*,
  2019 WL 6219223 (N.D. Cal. Nov. 21, 2019) ............................................................................16

*Vendavo, Inc. v. Price f(x) AG*,
  2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) ........................................................................7, 13

*Vox Network Sols., Inc. v. Gage Techs., Inc.*,
  2024 WL 1260573 (N.D. Cal. Mar. 25, 2024) ........................................................................ 13

*x.AI Corp. v. OpenAI, Inc.*,
  2026 WL 661938 (N.D. Cal. Mar. 9, 2026)............................................................................24

*x.AI Corp. v. OpenAI, Inc.*,
  2026 WL 1718645 (N.D. Cal. June 15, 2026)........................................................................ 18

**Rules / Statutes**

18 U.S.C. § 1836 *et seq.*..........................................................................................................5

18 U.S.C.A. § 1836(b).............................................................................................................6

18 U.S.C. § 1839(5)...........................................................................................................13, 19

18 U.S.C. § 1839(6).............................................................................................................. 16

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1, 10, 14

## I.    INTRODUCTION

Apple built its reputation by paying close attention to the smallest details.   This lawsuit does the opposite.   Plainly filed without adequate investigation and built on selectively excerpted communications and ordinary conduct stripped of context, Apple's Complaint is—to borrow its own phrase—"rotten to its core."

- **Apple falsely portrays Tang Tan's standard industry practices as trade secret theft.**  Mr. Tan is a respected industry veteran who spent 24 years helping Apple design some of its most iconic products. Apple points to routine recruiting and hardware-development activity—interviewing experienced candidates, discussing technical work and components, communicating with suppliers, and helping new employees understand departure procedures—but identifies no particular trade secret disclosed to him, no confidential component he received, and no Apple information he used at OpenAI. Mr. Tan repeatedly instructed recruits and his team not to bring or disclose former employers' confidential information. Apple's effort to recast legitimate professional activity as theft rests on speculation, not facts.

- **Apple falsely portrays Chang Liu's efforts to assist his former colleagues as unauthorized theft.**  Apple alleges that Mr. Liu, a hardworking engineer, accessed confidential information after leaving the company, but omits that Apple employees repeatedly contacted **him**, asking for help locating information to assist ***Apple's employees*** in continuing the projects on which Mr. Liu had been working before his departure.  Nor does Apple disclose that, at its request, it remained logged into Liu's personal accounts long after his departure, to continue accessing files rather than deleting them.

- **Apple omits the consequences of its own inexplicable information-management practices.** For years, Apple encouraged employees to use personal iCloud accounts for work, intermingling company and personal data, while failing to manage access cleanly across multiple Apple systems when employees departed. Those practices created precisely the confusion and unwanted access issues that Apple now characterizes as intentional misappropriation. Apple cannot transform the foreseeable consequences of its own systems and policies into evidence of theft by former employees who were attempting to assist their colleagues and comply with their obligations, or were simply not aware of their latent access.

- **Apple mischaracterizes its pre-suit communications with OpenAI**.  Apple claims it raised concerns in February and received no response.  It omits that its outside counsel emailed the wrong person after confusing two Asian last names, and then incorrectly represented that it had spoken with OpenAI's General Counsel. After OpenAI reached out and Apple apologized, its outside lawyers stated that they were "resolving any issues."  OpenAI heard nothing for five months; even in its prior miscommunications, Apple never raised the specific allegations in this lawsuit until they filed suit.

This, and other facts demonstrating that Apple's claims are meritless, will be shown in Defendants' forthcoming response to Apple's motion for preliminary injunction. But the Complaint fails even on its own terms. To state a claim under the DTSA, Apple must plausibly allege that it owns a sufficiently identified protectable trade secret, that a Defendant misappropriated it, and that the misappropriation caused injury. Apple does not do so.

Instead of pleading facts showing misappropriation, Apple recasts the benign, lawful conduct of former employees—who in many of the cited instances were in fact trying to *help* Apple, at Apple's request, by making sure their former colleagues' work could continue without them—as theft of so-called trade secrets. The proffered "trade secrets" are not specific, protectable information at all; they are generic categories of the product-development process—such as component manufacturing, product testing, vendor and supplier relationships, and distribution channels—repackaged as though Apple had invented them. As Apple's Complaint indicates, information belonging to these categories is not secret, nor were reasonable efforts taken to maintain secrecy; accordingly, Apple has failed to plead a protectable trade secret. Nor are OpenAI's recruiting practices and policies as alleged anything other than standard industry practices, all entirely proper. None of Apple's claims rests on a plausible theory of misappropriation. Apple's Complaint all but concedes as much: it pleads that it has "virtually no visibility" into the conduct it complains of, but asks the Court to allow discovery to "expose" a violation that it cannot presently describe. Dkt. 1 ("Compl") ¶ 54.

OpenAI has no use, need or desire for Apple's trade secrets. OpenAI is building something entirely new and different from anything at Apple. OpenAI *does* have an interest in hiring the best engineers, inventors, developers and creators—many of whom have decided to leave Apple and to come to OpenAI, attracted by the innovative and exciting work the company is doing. Apple might not like that. But California law and policy not only permit but encourage such employee mobility, which has been credited with powering the tech revolution that has made companies based in this state the envy of the world.

Apple should not be permitted to use a baseless and pretextual lawsuit to make up for its shortcomings in the market for talent and retaining its employees, and its failures to integrate AI

into its products. Because Apple has failed to plead sufficient facts to support each element of trade secret misappropriation asserted in its First, Second, Third, and Fourth Claims[1], and because there is no diversity jurisdiction over Apple's contract claims, the Complaint should be dismissed in its entirety.

## II. LEGAL STANDARD

To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "Although factual allegations are taken as true, [courts] do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (internal quotation omitted). When "two possible explanations" for the alleged misconduct exist, "only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citations and quotation marks omitted). If allegations of other facts consistent with the challenged pleading could not possibly cure deficiencies in the complaint, then dismissal with prejudice is appropriate. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).

## III. RELEVANT ALLEGATIONS IN APPLE'S COMPLAINT

Defendant io Products, Inc. was founded by Sir Jonathan Paul Ive, Scott Cannon, Evans Hankey, and Tang Yew Tan, with the mission of developing an entirely new generation of hardware devices untethered by traditional user interfaces. Compl. ¶ 36, n.9. In 2025, io Products merged

---

[1] First Claim For Relief (alleging trade secret misappropriation under DTSA against Chang Liu); Second Claim For Relief (alleging trade secret misappropriation under DTSA against Tang Tan); Third Claim For Relief (alleging trade secret misappropriation under DTSA against OpenAI); Fourth Claim For Relief (alleging trade secret misappropriation under DTSA against io Products). Compl. ¶¶ 24, 27, 30, 33.

with OpenAI, the pioneering artificial intelligence company behind ChatGPT. OpenAI has carried that mission forward, in harmony with its own mission to ensure that artificial general intelligence benefits all of humanity, aiming to build hardware unlike anything on the market, powered by artificial intelligence capabilities. *Id*. ¶¶ 35, 36, n.9.

Since io Products' founding, hundreds of Apple designers and engineers have chosen to leave their jobs at Apple to join OpenAI's effort to design a new family of devices for the AI era. *Id*. ¶ 53. Among them were Defendant Chang Liu, who resigned from Apple on January 22, 2026 after an eight-year career. *Id.* ¶ 55. Apple alleges (without any support) that Mr. Liu was unresponsive to certain "outreach," including a vague "confidentiality reminder" that it wanted him to sign—notwithstanding that Mr. Liu was already allegedly bound by Apple's IPA. *Id.*

According to Apple, its failure to detect a flaw in its own cyber-security allowed several unauthorized users, purportedly including Mr. Liu, to access allegedly confidential files hosted on Apple's servers. *Id*. ¶ 5. Although Apple admits that it is "still investigating" the consequences of its security lapse, it nevertheless alleges that Mr. Liu downloaded and shared links to several of these files with another employee still working at Apple—presumably someone with her own authorized access to the same information. *Id.* at n.1, ¶ 58. Apple acknowledges that it does not know whether Mr. Liu has used this information to benefit himself or to benefit his new employer, OpenAI. *Id.* ¶ 54. These allegations are based on Apple's selective review of its employees' personal iMessages left on Apple devices, *id.* ¶ 60.

Apple further alleges that OpenAI acted unlawfully by asking candidates questions about their prior work experience in job interviews. *Id*. ¶ 10. Out of the "over four hundred" former Apple employees that Apple alleges are now at OpenAI (*id*. ¶ 53), Apple identifies a handful of interview questions it alleges are actionable. *See id*. ¶¶ 9, 10, 65, 70, 75. Apple alleges that Defendant Tang Yew Tan used an Apple codename during an interview, and asked the candidate to bring "Actual parts" that they worked on in Apple for "show and tell" sessions, including "Batteries," "SIP," "mlb," and "shields." *Id*. ¶¶ 9, 70. Apple also alleges that OpenAI asks candidates to prepare "Technical Deep Dive" presentations with slides at their interviews, and instructs candidates to bring and/or discuss "CAD/design artifacts" and "prototypes," "subsystem and component selection"

information, "tools and methodologies you use for system integration" and "[v]endor selection and communication/collaboration with vendors." *Id*. ¶ 75. Except as a bare conclusion, the Complaint does not allege that these questions sought confidential information—as opposed to the sort of background any employer might ask about in an interview, such as an individual's experience with any of the thousands of non-confidential Apple parts or components already sold and widely available on the market, or parts and designs unrelated to Apple altogether.

Apple asserts that OpenAI "coaches candidates to prepare for their interviews by studying Apple confidential engineering documentation . . ." but provides no factual support for these allegations beyond the alleged activity of Defendant Liu, discussed below. *Id*. And while Apple concludes that "departing Apple employees, around the time they are leaving Apple, send Apple's confidential information to their personal email accounts for future use in their work at OpenAI," the only factual basis it offers are the same bald allegations involving Mr. Liu. *Id.*; *see id.* ¶ 9.

Apple then asserts that Defendants' alleged conduct amounts to theft of trade secrets—which it describes as Apple information belonging to five broad categories that reflect generic stages of product development. *Id*. ¶ 40. These categories of alleged trade secrets include "Hardware Engineering and Product Design," "Manufacturing, Design, Industrial Design, and Process Engineering," "Component Technologies," "Proprietary Testing, Validation, and Development Methodologies," and "Global Supply Chain Operations, Supplier Relationships, and Proprietary Business Operations." *Id*. Within each category, Apple provides a list of vague, non-limiting examples of information that is useful only to Apple and its products. *Id*. These examples include, "solutions … unique to Apple," "data developed for Apple's hardware products," "component technologies … for specific Apple hardware programs," and "product designs for current and future unreleased [Apple] products." *Id*. Before its list of categories and non-limiting examples, Apple includes a boilerplate statement that "[e]ach category of secrets derives independent economic value from its secrecy and has been the subject of Apple's extensive protective measures," without any further specificity or factual support. *Id*.

## IV.     **ARGUMENT**

Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA"), a trade secret

owner may bring a civil action for misappropriation of a trade secret.  18 U.S.C.A. § 1836(b).  To state a claim for trade secret misappropriation, "a plaintiff must allege (1) that it is the owner of a trade secret; (2) that the defendant misappropriated the trade secret; and (3) that it was damaged by the defendant's actions."  *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78 (N.D. Cal. 2020).  Apple fails to adequately allege any of the three requisite elements of its claims against Defendants.  Its trade secret ownership allegations rely on sparse, conclusory statements that are generic categories of product development information—which Apple's own assertions confirm are neither secret nor subject to reasonable measures to maintain secrecy.  Its misappropriation allegations against Mr. Liu rest on an untenable interpretation of documents that overlooks the obvious explanation for Mr. Liu's allegedly illicit behavior.  And its misappropriation allegations against Mr. Tan and OpenAI, which largely pertain to allegedly improper interview conduct, do not allege (except in the most conclusory of fashions) that either actually acquired, used, or disclosed an Apple trade secret.  Accordingly, Apple's Complaint should be dismissed in its entirety.

### A.      Apple Has Failed to Demonstrate It Owns A Protectable Trade Secret

The starting point of every trade secret misappropriation claim must be the existence of a protectable trade secret owned by the plaintiff.  *Id*.; *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (9th Cir. 2025) ("possession of a trade secret [is] the first element of any DTSA claim").  To satisfy this element, a plaintiff "must prove that they possess information that … they have tried to keep secret and … is unknown to others.'"  *Quintara*, 149 F.4th at 1087 (cleaned up).  As the Ninth Circuit recently confirmed, it is the plaintiff's burden to prove that the information it claims as trade secret is not readily ascertainable by proper means.  *Comet Techs. USA, Inc. v. XP Power, LLC*, 2026 WL 2028303, *4 (9th Cir. Jul. 14, 2026).  Apple has not only failed to plead facts that plausibly show its asserted information meets these criteria, its Complaint indicates that it cannot meet these requirements.  That failure alone warrants dismissal.

***First***, Apple's Complaint fails to sufficiently describe the information for which it claims trade secret protection; its generalized product development categories are not sufficient to survive a motion to dismiss.  "On a motion to dismiss, the burden is on the plaintiff to identify protectable trade secrets and '[show] that they exist.'"  *CleanFish, LLC v. Sims*, 2020 WL 4732192, at *3 (N.D.

Cal. Aug. 14, 2020) (citation omitted). Moreover, the identification and sufficient description of the alleged trade secrets must be ***in the complaint***. *Palantir Techs., Inc. v. Abramowitz*, 2020 WL 9553151, at *18 (N.D. Cal. July 13, 2020) (identifying trade secrets in other filings outside the complaint "does not change the Court's analysis" on a motion to dismiss); *see also Space Data Corp. v. X*, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (same); *Quintara Biosciences*, 149 F.4th at 1087-1088 (holding that, even based on "the conventional procedures under the Federal Rules of Civil Procedure," a trade secret plaintiff must "identify a trade secret with sufficient particularity" and not "simply rely upon catchall phrases or identify categories of trade secrets" (quotations and citations omitted)). "To prove that Plaintiff is the owner of a trade secret, it 'need not spell out the details of the trade secret,' but must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and ***to permit the defendant to ascertain at least the boundaries within which the secret lies***.'" *CleanFish*, 2020 WL 4732192, at *3 (N.D. Cal. Aug. 14, 2020) (citation omitted, emphasis added); *see also id.* (dismissing complaint which failed to permit an "item-by-item determination of what is and is not protectable" (internal citation and quotation marks omitted)).

Apple's Complaint falls far short of this standard. In the section entitled, "Apple and Its Trade Secrets," Apple alleges that its trade secrets encompass a laundry list of generic categories that could encompass any and all information relating to development of any hardware product. Compl. ¶ 40. These categories are: "Hardware Engineering and Product Design," "Manufacturing Design, Industrial Design, and Process Engineering," "Component Technologies," "Proprietary Testing, Validation, and Development Methodologies," and "Global Supply Chain Operations, Supplier Relationships, and Proprietary Business Operations." *Id*. Those are not trade secrets. And the invocation of those generic and non-specific categories does not help ascertain the boundaries of the information at-issue. "General allegations identifying the 'purported trade secrets in broad, categorical terms that are merely descriptive of the types of information that generally may qualify as protectible trade secrets are insufficient to state a claim.'" *Google LLC v. Point Fin., Inc.*, 2026 WL 579462, at *3 (N.D. Cal. Mar. 2, 2026) (internal citation omitted); *see also Vendavo, Inc. v.*

*Price f(x) AG*, 2018 WL 1456697, at \*4 (N.D. Cal. Mar. 23, 2018) (rejecting attempt to plead trade secrets in "broad, categorical terms, more descriptive of the types of information that generally *may* qualify as protectable trade secrets . . ."); *P2i Ltd. v. Favored Tech USA Corp.*, 2024 WL 4294652, at \*4 (N.D. Cal. Sept. 24, 2024) (dismissing trade secret claim alleging theft of "sweeping categories of trade secrets" that are "too high-level" and "too general").

Apparently aware that its high-level categories are insufficient, Apple appends to each category a list of examples, all following the word "includes." *See* Compl. ¶ 40(a)–(e), pp. 9:25, 10:16, 10:22, 11:7, 11:20. But these attempts at further specificity, which do not appear intended to limit the scope of the generic categories themselves, do not meaningfully aid Defendants in ascertaining the boundaries of what Apple claims. Apple itself has recognized this before. It previously persuaded a court that an identification of supposed "specific trade secrets" which "merely provide some examples of what is within the broad" categories asserted was insufficient to narrow an otherwise sweeping claim. *Masimo Corp. v. Apple Inc.*, 2020 WL 6653652, at \*3 (C.D. Cal. Oct. 13, 2020) (dismissing complaint where categories asserted "d[id] not actually narrow" the "impermissibly vague and unbounded description of the trade secrets that precedes them"); *see also Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2018 WL 2298500, at \*3 (N.D. Cal. May 21, 2018) (dismissing complaint where "a number of the categories are preceded by the phrases 'such files included' and 'such as,' thereby further expanding the scope of the allegations in which the categories are contained."). *Compare* Compl. ¶¶ 40(a) (identifying "circuit and system design specifications, component architecture, and power management innovations" as alleged trade secret information), 40(c) (identifying "confidential testing data, performance evaluations, and trend analyses generated through extensive engineering investment" as alleged trade secret information) *with, e.g.*, *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at \*4 (N.D. Cal. Dec. 12, 2018) (finding allegations relating to the "design and optimization of Teradata's MPP [i.e., massively parallel processing] systems" insufficient to state a claim); *Space Data Corp.*, 2017 WL 5013363, at \*2 ("data on the environment in the stratosphere" and "data on the propagation of radio signals from stratospheric balloon-based transceivers" were insufficient); *P2i Ltd.*, 2024 WL 4294652, at \*4 (dismissing allegations related to "the identity and quality controls imposed on suppliers of reactants

and equipment used in P2i's processes" and "confidential information pertaining to the specific chemical identity of reaction precursors").

**Second**, the breadth and lack of specificity of Apple's alleged trade secret information also establish that Apple has failed to plead a protectable trade secret, at least because Apple's own allegations confirm the categories and examples are not secret and that Apple has not taken reasonable measures to maintain secrecy of them. *Cf. Quintara Biosciences,* 149 F.4th at 1087; *Google LLC,* 2026 WL 579462, at *3. Instead, the Complaint indicates that the information Apple asserts as trade secret is readily ascertainable by proper means.

For example, Apple's "Global Supply Chain Operations, Supplier Relationships, and Proprietary Business Operations" "trade secret" category states that it could include "the identities and roles of specialized sub-suppliers and vendors who provide Apple with critical components and equipment." Compl. ¶ 40(e). This description is far too broad and generic to articulate any protectable trade secret—especially because it encompasses information that Apple acknowledges is not secret, has not tried to keep secret, and instead is reasonably ascertainable from proper means, including from the Complaint itself. *See, e.g.*, *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1144 (N.D. Cal. 2019) (dismissing trade secret complaint which claimed, *inter alia*, AlterG's "knowledge of vendors with appropriate, specialized skills, and technology innovation"). Indeed, as Apple's Complaint acknowledges elsewhere, it is public knowledge that "Foxconn [is] Apple's iPhone assembler" and "Luxshare and Goertek [are] both established Apple suppliers." Compl. at ¶ 37. Apple's Complaint acknowledges that its relationships with Goertek, for example, and its sub-suppliers, such as ███████, are no secret, nor has Apple tried to keep them secret.[2] Moreover, Apple has failed to allege facts that plausibly show it can meet its burden of proving its supplier relationships are not readily ascertainable by proper means. While not necessary to prevail

---

[2] APPLE SUPPLIER GOERTEK TO BUY LUEN FUNG COMMERCIAL'S UNITS FOR $1.3 BILLION, REUTERS, *available at* https://www.reuters.com/world/asia-pacific/apple-supplier-goertek-buy-luen-fung-commercials-units-13-billion-2025-07-22/ (last accessed Aug. 4, 2026).

on this motion[3], a cursory internet search shows that this information *is* readily ascertainable from proper means. For example, Apple itself publishes online a "Supplier List" that Apple tells the public "represents 98 percent of our direct spend for materials, manufacturing, and assembly of our products worldwide."[4] That's not all; numerous third-party webpages detail Apple's network of suppliers, manufacturers, and vendors, including the specific components and Apple products associated with each.[5] As one might expect, "[t]hese suppliers don't exclusively serve Apple."[6]

The rest of Apple's broad, unspecific categories of information suffer the same problems: they fail to articulate information that is secret, not readily ascertainable by proper means, and kept secret through reasonable measures taken by Apple. There is no way to ascertain from Apple's Complaint what information within these categories it alleges to be trade secret and which it concedes has been disclosed and thus "extinguishes [that] information's trade secret status." *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020). In fact, every category of its alleged trade secrets

---

[3] While not necessary to decide this motion, the Court may "take judicial notice of matters of public record." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 2010 WL 145098, at *4 (N.D. Cal. Jan. 8, 2010) ("A court deciding a Rule 12(b)(6) motion can take judicial notice of matters of public record.").

[4] SUPPLIER LIST, APPLE, *available at* https://s203.q4cdn.com/367071867/files/doc_downloads/2024/04/Apple-Supplier-List.pdf (last accessed Aug. 4, 2026); SUPPLY CHAIN INNOVATION REPORTS, APPLE, *available at* https://www.supplychainreports.apple/home/default.aspx (last accessed Aug. 4, 2026)

[5] LIST OF APPLE INC. SUPPLIERS, WIKIPEDIA, *available at* https://en.wikipedia.org/wiki/List_of_Apple_Inc._suppliers (last accessed Aug. 4, 2026); THE NEW AND FORMER COMPANIES ON APPLE'S FY2021 SUPPLIER LIST, SCOPE OF WORK, *available at* https://www.scopeofwork.net/ the-new-and-the-jilted-companies-on-apples-fy2021-supplier-list/ (last accessed Aug. 1, 2026).

[6] *E.g.*, APPLE'S GRIP ON METAL CHASSIS SUPPLIES LEAVES ULTRABOOK MAKERS SCRAMBLING, WIRED, *available at* https://www.wired.com/2012/07/apple-metal-chassis-domination/ (last accessed Aug. 1, 2026).

DEFENDANTS' MOTION TO DISMISS

includes information for which Apple has not sufficiently alleged it took reasonable measures to maintain secrecy. As a trade secret plaintiff, Apple must sufficiently plead (and eventually prove) that it took reasonable measures. But Apple's own Complaint says that it did not. *See Trinidad v. OpenAI Inc.*, 2026 WL 21791, at *4 (N.D. Cal. Jan. 5, 2026) (dismissing DTSA claim where plaintiff failed to take "any reasonable measures to keep" "'protocols and frameworks' secret"), *appeal dismissed*, 2026 WL 1251786 (9th Cir. Apr. 6, 2026). Apple's own Complaint suggests that its alleged measures were ***un***reasonable and insufficient to protect the information it now asserts as trade secret, i.e., that theft of "Apple's most sensitive information" has been happening for years, by potentially hundreds of its former employees. Compl. ¶ 53. According to Apple, the trade secret information is stored in its "network file repository," "restricting access … to only those employees currently working on and authorized to view them" and "disabl[ing] and prohibit[ing] access to its network storage upon an employee's departure." Compl. ¶¶ 47, 55. Yet, at the center of Apple's claims is its theory that vulnerabilities in its system allowed unauthorized users to access the repository—and, even worse, this vulnerability had previously been unknown to Apple. *Id*. at n.1, ¶ 5, ¶ 57. And while Apple touts its offboarding procedures as robust, its own allegations state that they were entirely circumventable. *Id*. at ¶¶ 4, 55 (alleging that departing employee left Apple without an exit interview, signing a confidentiality reminder, or returning at least one Apple-owned device, and tellingly failing to allege any follow-up by Apple on any of these so-called concerns for months). Apple also alleges that not only were its purportedly confidential prototypes left physically unsecured, its employees also lacked clarity on Apple's policies for handling them. *Id*. at 9 (alleging that its employee remarked that he "didn't even know we could take [prototypes] from the office"). As detailed below, Apple has not pled facts that could plausibly show that it reasonably protected the information that Apple alleges Messrs. Liu and Tan took. While Apple may claim it took some measures to maintain secrecy of its broad categories of alleged trade secret information, there is nothing reasonable about them.

***Third***, Apple's Complaint also fails to allege any facts that would plausibly support that it actually owns the information set forth in the alleged trade secret categories. *See, e.g.*, *Focused Impressions, Inc. v. Sourcing Grp., LLC*, 2020 WL 1892062, at *5 (D. Mass. Apr. 16, 2020)

(dismissing complaint where plaintiff "fail[ed] to allege" that it had "rightful legal or equitable title to, or license in" the information allegedly misappropriated (citation omitted)). For example, Apple's asserted categories repeatedly reference information and technology involving its third-party vendors and suppliers. *E.g.*, Compl. ¶ 40(b) (referencing "machinery used in its suppliers' factories" and "equipment housed at supplier facilities"), (c) (referencing "component technologies" and "plug-and-play solutions engineered with specialized third-party vendors"), (d) (referencing "supplier collaboration strategies"), (e) (referencing "supplier relationships—including the identities and roles of specialized sub-suppliers and vendors" and "personnel information"). While Apple may add the word "proprietary" when alluding to vendor/supplier information or technology, this conclusory, threadbare adjective is not enough—Apple has not alleged any factual basis why the information would belong to Apple rather than its vendors and suppliers, let alone why they would be protectable trade secrets. *See Teradata Corp.*, 2018 WL 6528009 ("[T]here are no allegations suggesting . . . how or why [the information] is proprietary [to plaintiff] besides simply being labeled a trade secret"); *Quintara Biosciences*, 149 F.4th at 1087 ("[N]ot all proprietary information qualifies for protection as a property interest under DTSA."). In fact, Apple states that its trade secret categories include information "developed in collaboration with trusted suppliers and sub-suppliers" and "solutions engineered with specialized third-party vendors"; the Complaint also acknowledges that "sub-suppliers and vendors [] collaborate with Apple on these technologies." Compl. ¶ 40(c). Apple has not alleged any plausible factual basis why these purportedly co-developed technologies are owned by Apple (even if they are confidential).[7]

***Finally***, as described in the following sections, Apple's Complaint fails to plausibly allege any improper conduct by any Defendant and, thus, those allegations cannot and do not help describe

---

[7] Apple's Complaint alleges that certain technologies developed with its vendors or suppliers are "subject to strict use restrictions" or "protected by stringent confidentiality terms." Compl. ¶ 40(c). But, even if true, restricted use or confidentiality is not equivalent to ownership. *See Focused Impressions, Inc.*, 2020 WL 1892062, at *5 (finding ownership insufficiently pled notwithstanding allegations that the information was subject to confidentiality agreements).

or identify what information Apple alleges is protectable trade secret. The complete lack of any nexus between Apple's descriptions in paragraph 40 of its Complaint and its misappropriation allegations only exacerbates the deficiencies in Apple's Complaint. *See, e.g.*, *Vox Network Sols., Inc. v. Gage Techs., Inc.*, 2024 WL 1260573, at *3 (N.D. Cal. Mar. 25, 2024) (dismissing complaint because "Vox does not allege which purported trade secrets were misappropriated or provide any factual allegations to support these conclusory assertions.").

Because Apple's Complaint fails to sufficiently identify a protectable trade secret owned by Apple, it has failed to state a DTSA claim. *See Lamont v. Conner*, 2019 WL 1369928, at *8 (N.D. Cal. Mar. 26, 2019) (granting motion to dismiss where "Plaintiff's description of his trade secrets as stated in the complaint are not plead with sufficient particularity"); *AlterG, Inc.*, 388 F. Supp. 3d at 1145 (dismissing claim where plaintiff "fail[ed] to identify its allegedly misappropriated trade secrets with sufficient particularity to state a claim under the DTSA"); *Vendavo, Inc.*, 2018 WL 1456697, at *4 (same); *Teradata Corp.*, 2018 WL 6528009, at *4 (same); *Space Data Corp.*, 2017 WL 5013363, at *2 (same).

**B.** **Apple Has Failed To Allege Conduct That Plausibly Supports A Claim Of Misappropriation**

The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or the "disclosure or use of a trade secret" "without express or implied consent." 18 U.S.C. § 1839(5); *see also Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1172 (N.D. Cal. 2020). As detailed below, the Complaint fails to allege conduct by any Defendant that would plausibly support a claim for misappropriation.

1. Apple Fails to Plausibly Allege Misappropriation Against Defendant Liu

Apple alleges that Chang Liu accessed Apple's "shared network folders" after his January 2026 departure and downloaded "dozens" of confidential files, including a presentation concerning the manufacture and testing of multi-layer boards. Compl. ¶ 5; *see id.* ¶¶ 55, 58-59. But the portions

of Mr. Liu's correspondence with his former Apple colleagues that Apple conspicuously leaves out[8] of its pleading show that the Complaint badly misreads the circumstances of this access. Far from misappropriation, any access and download of Apple information was ***requested and authorized*** by Apple itself.

The reason for this stems from Apple's own policies, which are set forth in detail in the Complaint. By Apple's own admission, when an Apple employee was leaving for OpenAI, Apple would "walk [them] out" and "promptly remove them from the company rather than giving them a standard two weeks" to arrange a transition. *Id.* ¶ 84. In Mr. Liu's case, Apple asked him to work until the end of his very last day and that walkout was apparently so hasty that, due to what Apple characterizes as an "authentication bug," it failed to disable his access to Apple's cloud storage systems. *Id.* ¶ 5. Messages and conversations between Mr. Liu and his former colleagues at Apple

---

[8] In deciding a motion to dismiss under Rule 12(b)(6), "courts may take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading. A court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (cleaned up); *see also Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (purpose of incorporation by reference doctrine is in "[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based"); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (ruling that documents were incorporated by reference because "Plaintiffs directly quoted the material posted on these web pages, thereby incorporating them into the Complaint"); *May v. Google LLC*, 2026 WL 788376, at *5 (N.D. Cal. Mar. 20, 2026) (judicially noticing the "chat history" that is "describe[d] . . . in some detail" in the complaint under the incorporation by reference doctrine); *Ashitey v. Arista Networks, Inc.*, 2026 WL 1133896, at *3 (N.D. Cal. Apr. 27, 2026) (permitting incorporation of the "screen shots displaying the Slack messages" that formed the basis of plaintiff's claim).

reveal that Apple itself began instructing Mr. Liu to retrieve information from his time at the company—and in some instances, Apple employees accessed and downloaded that information directly using Mr. Liu's credentials.

For example, correspondence between Mr. Liu and his former Apple colleagues, including his former Apple manager, shows *Apple employees* continuing to access Mr. Liu's personal iCloud account, downloading files from it, and asking him questions about its contents well after his departure:[9]

Ex. A at 1 (conversation with manager). On another occasion, more than a month after Mr. Liu had departed Apple and was settled at OpenAI, that same former manager texted Mr. Liu again asking for help: "Just in case you don't have enough work, I need some help. I have some vague

---

[9] Apple's common practice is to allow (and even incentivize) employees to use personal iCloud accounts for Apple work. This intermingling of the company's information with employees' personal information—in an account not controlled by the company, no less—further demonstrates that Apple has failed to allege reasonable measures.

recollection of you talking about ███████████████████████████ ███████████████████████████. Can you give me a brief refresh of this and point me to an EE who may have some knowledge?" *Id.* at 4. Apple's abbreviated offboarding of Mr. Liu had apparently left the Apple employee no other way to obtain this information. Apple, in short, kept coming back to Mr. Liu because—as his own former manager put it—he "need[ed] some help," and Mr. Liu was "the best[,] [e]ven if you don't work here anymore," *Id.* at 2. Having repeatedly asked for and authorized the very access it now calls theft, Apple cannot convert that access into a misappropriation claim, which requires that the information be acquired through improper means. *See* 18 U.S.C. § 1839(6) ("'improper means' . . . does not include . . . any other lawful means of acquisition"); *UAB "Planner 5D" v. Facebook, Inc.*, 2019 WL 6219223, at *11 (N.D. Cal. Nov. 21, 2019) (dismissing complaint which "does not explain how [the defendant's actions] constitute improper means").

Nothing in Apple's Complaint supports a contrary inference. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108 (allegations must "tend[] to exclude the [innocent] explanation"). The bulk of Apple's allegations against Mr. Liu concern this same pattern of information sharing, largely between Mr. Liu and a different Apple employee. *See e.g.*, Compl. ¶ 58 (noting Mr. Liu would "direct[] her attention to specific [Apple] folders, [Apple] engineering documentation, and [Apple] technical data"); *see generally id.* ¶¶ 55-67. Apple alleges that this employee later left Apple for OpenAI (*id.* ¶ 56), and that Mr. Liu sometimes messaged her over LINE (*id.* ¶ 66), the preferred and most popular messaging app in several East Asian countries.[10] But nothing beyond bare allegations offered "on information and belief," *id.* ¶ 65, shows that this exchange amounted to anything more than Mr. Liu helping one of his former colleagues locate information from his own prior work at Apple—after Apple hastily walked him out the door. Further, Apple appears not to have, and does not allege that it, fully investigated the possibility that some of the activity at issue was the result of unintentional processes, e.g., device syncing unknown to Mr. Liu, and a result of

---

[10]  *See, e.g.*, LINE: A GUIDE TO JAPAN'S MESSENGER GIANT, BBC, *available at* https://www.bbc.com/news/business-36710888 (last accessed Aug. 4, 2026).

Apple's failure to manage system access for departing employees.

Lastly, Apple's allegations that Mr. Liu "used" Apple's trade secret information during his work at OpenAI are insufficient. *Id.* ¶ 90. Beyond conclusory allegations lacking factual support, Apple does not allege that Mr. Liu ever disclosed a file to OpenAI or used one in OpenAI's hardware work. The only disclosure the Complaint actually describes is that Mr. Liu "shared his findings" with **Apple employees** such as Alyssa Peng and sent her links to materials. *Id.* ¶ 58. Ms. Peng was, on Apple's own allegations, an Apple employee at the time, with her own authorized access to Apple's systems. *Id.* ¶¶ 56, 58. Sharing Apple's information with Apple's own employees is not misappropriation. Apple's assertion that Mr. Liu "deploy[ed] Apple's institutional knowledge in hardware development for OpenAI," *id.* ¶ 92, is an entirely conclusory, formulaic recitation of an element, offered without a single supporting fact about what was supposedly deployed, into what, or when. *See Iqbal*, 556 U.S. at 678.

2.     <u>Apple Fails to Plausibly Allege Misappropriation Involving Defendant Tan</u>

Apple's Complaint alleges that Tang Yew Tan, a highly respected twenty-four-year Apple veteran who Apple trusted with "its most sensitive projects," elicited trade secret information from Apple employees who were interviewing with him for a new job at OpenAI. Compl. ¶ 8; *see id.* ¶ 9. The Complaint alleges that Mr. Tan directed one candidate to "bring some parts [she] worked on" to an interview for a "show and tell" session, and that in a separate instance, he allegedly referenced an Apple codename during an interview. *Id.* ¶ 70 (alteration in original).

Even if Apple had identified potentially protectable information somewhere in its Complaint, which it has not done, it never identifies any particular trade secret, at any level of detail, that Mr. Tan supposedly acquired, used, or disclosed. Nor, logically, does it allege that such information was not readily ascertainable through proper means. Instead, Apple speculates about conduct—interview questions, references to public parts and project codes, an offboarding document, and emails to a personal account—without identifying **any** trade secret he supposedly obtained. That comes nowhere close to the pleading requirements for trade-secret claims.

Apple's Complaint lacks any factual allegation to support its baseless claim that Mr. Tan sought its trade secrets (he did not) or that any candidate ever disclosed them in response (they did

not).  *See Navigation Holdings*, 445 F. Supp. 3d at 78-79 (plaintiff asserting "indirect trade secret misappropriation" claim must plead that Defendant "knew or had reason to know" the disclosed information was a trade secret and that it had been acquired through improper means or was disclosed by mistake (cleaned up)).

Take, for instance, Apple's allegations concerning its "parts." Apple alleges that products such as the iPhone, Apple Watch, and MacBook are "sold to consumers worldwide." Compl. ¶ 90. Many components from released consumer products therefore will be publicly available, observable, or susceptible to lawful inspection or reverse engineering—meaning they are, by definition, widely available and in the public domain.  *Id*.  But the Complaint does not identify any particular part allegedly misappropriated; allege that it came from an unreleased project, rather than a public product; identify the protected feature or information allegedly embodied in it; explain why that feature was not readily ascertainable through proper means; allege that any candidate actually displayed the part; or even allege that Mr. Tan or anyone else ever received, examined, retained, or used it, whatever it is.  To the contrary, the text messages immediately surrounding the messages Apple quotes in the Complaint show that the recipient of Mr. Tan's request understood him to be referring to ▮▮▮▮ parts, not anything that Apple could consider confidential.  Cheng Decl. ¶ 2 & Ex. B (*see* n.8, *supra*, explaining why Mr. Tan's communications are incorporated by reference). Apple asks the Court to infer trade secret misappropriation from a common and innocuous request that a candidate discuss or display his prior work, which the candidate himself understood to seek publicly available information.  This standard industry interviewing practice does not constitute misappropriation.  *See x.AI Corp. v. Openai, Inc.*, 2026 WL 1718645, at *1 (N.D. Cal. June 15, 2026) (asking a recruiting candidate about the "technical aspects" of a project they worked on for a prior employer does not state a claim for trade secret misappropriation).

Apple's unsupported allegation that Mr. Tan purportedly used Apple's "internal project code names" in an interview with an Apple employee adds nothing.  Compl. ¶ 69.  Here, again, Apple does not identify the purported code name, or say what information (let alone what trade-secret information) that code name supposedly conveyed, or explain what efforts Apple took to keep that code name secret, or even allege that it was not otherwise readily ascertainable through public

sources. Indeed, as with Apple's vendors and suppliers, publicly accessible sources identify numerous "codenames given to products by Apple Inc. during development."[11]   More fundamentally, Apple does not put Mr. Tan (or this Court) on notice as to what specific information he supposedly sought by using a code name, what the candidate said in response, or what trade secret he supposedly acquired through that process.  And although Apple vaguely alleges an apparently separate instance in which Mr. Tan "solicited" some unidentified "information about [an] Apple project," *id*. ¶ 69, it never offers any factual detail to support its speculation—and certainly none that would provide basis to conclude that any such information was a protectable trade secret.

Most fundamentally, Apple's Complaint does not allege that any candidate ***actually disclosed*** an identified trade secret, let alone that Mr. Tan received one.  It is not unlawful or improper to ask candidates about the type of work they performed at their previous jobs or about their prior technical experience, which is all the Complaint alleges Mr. Tan did.  For the same reasons, Apple also fails to plausibly allege that any candidate violated a confidentiality obligation or that Mr. Tan intended or induced a candidate to do so.  And while the DTSA can, of course, reach the active inducement of others' breaches of their confidentiality obligations, Apple does not allege facts that would support such a claim.  Indeed, the most Apple says about what actually occurred in these interviews is that it "has seen no evidence to date" that Defendants tried to ***prevent*** improper disclosure.  Compl. ¶ 71.  Setting aside that that is pure speculation, even if it were true, an alleged failure to prevent improper disclosure is not itself misappropriation—because a misappropriation claim requires the unauthorized acquisition, use, or disclosure of an identified trade secret.  *See* 18 U.S.C. § 1839(5).  Apple does not allege what information was disclosed, who disclosed it, or how Mr. Tan supposedly acquired or used it.

---

[11]  LIST OF APPLE CODENAMES, *available at* https://apple.fandom.com/wiki/List_of_ Apple_codenames (last accessed Aug. 4, 2026); *see also* LIST OF APPLE CODENAMES, *available at* https://en.wikipedia.org/wiki/List_of_Apple_codenames (last accessed Aug. 4, 2026); CODENAMES, *available at* https://theapplewiki.com/wiki/Codenames (last accessed Aug. 4, 2026); *supra*, n. 3 (citing *Realnetworks*, 2010 WL 145098, at *4).

Apple's allegations concerning an internal document describing Apple's offboarding procedures fare no better as a DTSA theory. Apple alleges that Mr. Tan possessed an Apple document that described Apple's offboarding procedures for departing employees. Compl. ¶¶ 11, 73. This is unsurprising: as a former Apple employee, Mr. Tan would be expected to have received Apple offboarding documentation. Apple does not identify that document as one of the trade secrets (nor could it, if it is handing the document to departing employees); identify the particular procedures within it alleged to be secret; explain why those procedures had independent economic value from not being generally known; allege why they were not readily ascertainable through proper means; or connect the document to Mr. Tan's acquisition, disclosure, or use of any identified trade secret. The document's alleged "Need to Know" designation may bear on whether Apple regarded it as confidential—and whether Apple was taking appropriate measures to protect its purportedly confidential information—but that alone does not establish that the document qualifies as a trade secret under the DTSA. Nor does Apple's own description of the document cure that deficiency. The Complaint describes the document as addressing employee-departure procedures, including security reviews, return of company property, and reminders of ongoing confidentiality obligations. *See* Compl. ¶¶ 46–47, 73. Apple does not plead facts showing what aspect of those procedures was a protectable, non-readily-ascertainable trade secret.

Apple tries to spin Mr. Tan's possession of the offboarding document as evidence of an attempt to evade confidentiality obligations. The opposite is true, and at least equally plausible: Mr. Tan retained this information to help ensure that new employees coming from Apple ***followed*** Apple's offboarding procedures and did ***not*** retain any Apple confidential information. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108 (declining inference where "obvious alternative explanation" existed). Although Apple baldly alleges that Mr. Tan's possession of this information was for nefarious purposes or actionable, it has asserted no facts to support that conclusion. Further, Apple's Complaint fails to plead facts showing Mr. Tan did anything improper or unlawful with the offboarding information—or that the description of offboarding procedures in the document is even amenable to improper or unlawful purposes. The plausible inference is that Mr. Tan might have a document describing offboarding procedures to ensure former employees complied with those

offboarding procedures—especially necessary when, according to the Complaint, it appears that Apple itself did little to nothing to follow its own offboarding and exit procedures. *Compare* Compl. ¶ 46 (alleging Apple's "departure procedures" include confidentiality reminders and return of "Apple-issued work devices"), *with id*. ¶ 55 (alleging Apple failed to receive signed confidentiality reminder and return of "at least one Apple-owned computer"). *Compare* Compl. ¶ 47 (alleging "Apple disables and prohibits access to its network storage upon an employee's departure"), *with id*. ¶ 5 (alleging Apple was unaware that access to its network storage remained for departed employees), *and id*. ¶ 57 (alleging Apple failed to remove network access for unauthorized users).

Finally, Apple's allegations about Mr. Tan's emails to a personal account do not help its case. Apple alleges that, "[i]n the months before he left Apple," Mr. Tan emailed himself "information about Apple's suppliers and internal summaries of the consumer electronics industry." Compl. ¶ 9. But what is this "information," whose are the summaries, and what data do they contain? Again, it is difficult to imagine that any of these are enforceable trade secrets owned by Apple—and nothing in Apple's Complaint offers even the most basic allegations to support a trade-secret claim. Apple does not identify *any* email or attachment; *any* particular supplier term, technical specification, price, allocation, capacity commitment, or other nonpublic information; or *any* particular portion of an industry summary that it claims as a trade secret. Nor does Apple allege why any such unidentified information was not readily ascertainable through public industry reports, supplier information, ordinary professional experience, or other proper means.

Apple offers nothing because it has nothing because there is nothing. Its Complaint cannot and does not state a misappropriation claim against Defendant Tan.

### 3. Apple Fails To Plausibly Allege Misappropriation By Defendants OpenAI or io Products

Apple also alleges misappropriation by corporate defendants OpenAI and io Products, but its scattershot allegations suffer from the same (or worse) defects.

*First*, Apple alleges that Messrs. Liu and Tan are the conduits of the alleged trade secret information into OpenAI. As explained above, Apple has failed to allege facts that plausibly show Mr. Liu or Mr. Tan accessed any trade secret improperly or without authorization. But even if it

had, a DTSA complaint must include factual allegations as to **OpenAI's** involvement in the alleged misappropriation. Courts in this District have repeatedly dismissed DTSA claims where the complaint fails to differentiate between the conduct of a corporate defendant and its employees. *See Navigation Holdings, LLC*, 445 F. Supp. 3d at 79 (dismissing a DTSA complaint against corporate defendants where the complaint improperly based its "trade secret misappropriation claims on [an employee's] conduct, without differentiating what each specific [corporate] Defendant is alleged to have done"); *Farhang v. Indian Inst. of Tech., Kharagpur*, 2010 WL 2228936, at *15 (N.D. Cal. June 1, 2010) (nonspecific allegation "that defendants disclosed plaintiffs' trade secrets without their express or implied consent" insufficient to avoid dismissal); *Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034, at *8 (N.D. Cal. Aug. 11, 2023) (dismissing complaint against corporate defendant where "[t]he SAC notably stops short of alleging any conduct by Rivos itself to induce the breach of Apple employees' confidentiality obligations or otherwise acquire Apple confidential information through other improper means"). Apple cannot bridge that gap: in fact, it admits outright that it has "virtually no visibility" into whether either individual defendant acted to benefit OpenAI or io. Compl. ¶ 54. No facts show improper conduct by the corporate defendants or by Messrs. Liu and Tan on their behalf, and Apple has conceded that.

**Second**, Apple attributes certain specific interview conduct directly to OpenAI, alleging that OpenAI asked candidates to provide "'CAD/design artifacts,' and 'prototypes' from their recent work at Apple," prepare "Technical Deep Dive" presentations, and describe their "subsystem and component selection," the "tools or methodologies" they use for system integration, and "'Vendor selection and communication/collaboration with vendors' in Apple's prized network of partners." *Id*. ¶ 75(b). These allegations fail for the same reasons discussed above with respect to the claims against Mr. Tan, including that Apple does not allege that **anyone** shared trade secret information in response to these questions. They also fail for an additional reason: Apple flatly mischaracterizes the document which these allegations purport to describe.[12] Contrary to Apple's assertion that this language specifically targeted Apple's information, it is drawn from a generic pre-interview guide

---

[12] *See supra* n.8.

-22-                                    Case No. 5:26-CV-07078-EJD
                                        DEFENDANTS' MOTION TO DISMISS

sent to candidates—that nowhere mentions Apple and never requests any trade secret information. Ex. C. With no allegations that OpenAI ever requested Apple's trade secret information, and no allegations that any Apple information was actually shared in response, these interview-related allegations alone offer no support whatsoever for Apple's misappropriation claim.

*Third*, Apple's two supplier-related allegations are far too vague and generalized to state a plausible claim for misappropriation. As to the first, Apple alleges that OpenAI had an unnamed "third-party partner" perform an unidentified "multi-step metal-finishing" technique. *Id*. ¶ 80. Apple does not describe the technique, does not allege when this occurred, and does not even allege that OpenAI ever learned how the technique is performed or used such a technique. *Id*. ¶ 81. At most, a partner's alleged breach of its own agreement with Apple may state a claim against that partner; it does not allege that OpenAI acquired, used, or disclosed an identified trade secret. And while Apple pleads that the partner was "misled" into believing Apple had consented to this technique, *id*., it offers no facts in support of this conclusory claim, nor does it allege the partner would have refused to perform the technique absent that belief. As to the second, Apple alleges only that OpenAI "approached" another supplier and asked "targeted questions." *Id*. ¶ 83. Apple does not allege what was asked, that any answer was given, or that any information changed hands.

OpenAI has no need or desire for any information involving the hardware design or supply chain for Apple's products. It is seeking to make hardware that is untethered by traditional interfaces such as Apple's and is unlike any known Apple product. *Id*. ¶ 36, n.9. Apple has not pled any coherent narrative of how the asserted categories of trade secret information—which the Complaint asserts are unique to Apple's products, personnel, schedules/timelines, and supply chains—have any use or value to OpenAI. *See id*. ¶ 40(a) (referencing trade secret categories as Apple's "product roadmaps, milestone schedules, and development timelines" and "AI and machine learning integration data developed for Apple's hardware products"), (b) (referencing "proprietary manufacturing processes, custom machinery, equipment designs," "proprietary metal alloys, metal-finishing techniques, and material specifications," and "part tolerances, and production scalability"—all of which, Apple pleads, are required by "Apple's unique product designs"), (c) (referencing "specific technical specifications, performance parameters, and design requirements

Apple imposes on these components"), (d) (referencing "confidential testing data, performance evaluations, and trend analyses" for Apple devices), and (e) (referencing Apple's "confidential coordination and management of its complex network of suppliers, sub-suppliers, vendors, and internal teams"). Yet Apple never alleges that OpenAI is building something akin to an iPhone, an Apple Watch, or a MacBook, or that OpenAI's device shares any design, tolerance, alloy, supplier, or component requirement with any Apple product. A schedule for an unreleased Apple product and a tolerance for an Apple housing have no application to a different company's different device, and Apple pleads no facts suggesting otherwise.

At bottom, Apple asks that the Court allow it to plead a violation it admits it cannot describe and has no facts to support. It admits that it "lacks visibility into what's been happening behind closed doors at OpenAI," *id*. ¶ 13; that it has "virtually no visibility" into the conduct at issue; and speculates that "[d]iscovery will expose" misappropriation "on a scale many times greater" than the instances it has alleged, *id*. ¶ 54. Its theory of OpenAI's motive is that OpenAI's "recruiting practices suggest" a purpose to obtain Apple's information. *Id*. ¶ 76. A complaint that rests on what its own allegations "suggest," and that asks for discovery to supply what pleading cannot, does not cross the line from possible to plausible. *See Iqbal*, 556 U.S. at 678; *see also x.AI Corp. v. OpenAI, Inc.*, 2026 WL 661938, at *1 (N.D. Cal. Mar. 9, 2026) ("xAI was 'required to have completed [its] investigation [of its claims] *before* filing suit, *not after*,' and if it "lacked the requisite information to allege [its] claims in the manner required . . . when [it] filed suit, [it] should not have sued [OpenAI] in the first instance." (alterations in original) (citation omitted)). Apple's trade secret claims must be dismissed due to its failure to adequately allege misappropriation.

### C. Apple Fails to Plausibly Allege Any Injury Or Ongoing Harm

Apple's Complaint is devoid of any factual allegation that plausibly shows any injury or ongoing harm to Apple caused by misappropriation. *See e.g.*, *Cooper Interconnect, Inc. v. Glenair, Inc.*, 2015 WL 13722129, at *4 (C.D. Cal. Feb. 3, 2015) (dismissing trade secret claim against former employee and his new employer when "Plaintiff [did] not provide[] facts to support an inference of actual harm"). Apple does not allege that it lost a sale, a supplier, a customer, or an employee it wished to keep; that any Apple product was delayed, degraded, or made more

expensive; or that the value of any identified secret declined by any amount.

Apple's own allegations and conduct likewise refute the ongoing harm it alleges. Apple alleges that OpenAI did not respond to its pre-suit communications, apparently suggesting that it had no choice but to file this lawsuit (five months later) to stop ongoing harm. Compl. ¶ 14. But the facts are that Apple had misdirected its pre-suit communications, *e.g.,* sending correspondence addressed to a Mr. Wang to OpenAI's General Counsel, Che Chang; OpenAI *did* respond and raised this issue to Apple immediately; Apple's pre-suit communications never referenced the specific allegations in the Complaint; and Apple represented to OpenAI that the issue was being resolved. OpenAI did not learn of the allegations in the Complaint until after the lawsuit was filed. Moreover, as to its allegations directed to Mr. Liu, Apple pleads that it discovered Mr. Liu's continued access through its own investigation and "immediately took steps to ensure Mr. Liu's access was terminated," *id*. ¶ 60, and that upon discovering the authentication vulnerability it "quickly fixed" the bug, *id*. ¶ 5 n.1. By Apple's own account, then, the access it complains of was identified and shut off by Apple before it filed suit. An injury that Apple alleges it has already cured is not a plausible basis for the damages or the injunctive relief it seeks.

### D. The Court Should Decline to Exercise Supplemental Jurisdiction Over Apple's State Law Claims

Apple's state-law breach of contract claims against Defendants Liu and Tan (its Fifth And Sixth Claims) should also be dismissed. Without Apple's federal counts, these claims lack an independent basis for jurisdiction, as there is no diversity of citizenship between the parties. *See* Compl. ¶¶ 16-18, 25, 27. The Court should therefore decline to exercise supplemental jurisdiction over them. *See Patino v. Franklin Credit Mgmt. Corp.*, 2017 WL 635316, at *5 (N.D. Cal. Feb. 16, 2017) (dismissing state law claims where the plaintiff had failed to adequately plead a federal claim).

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Apple's Complaint with prejudice.

DATED: August 5, 2026

By       */s/ Andrew H. Schapiro*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Andrew H. Schapiro (*pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
Victoria B. Parker (Bar No. 290862)
Andrew M. Mather (Bar No. 345548)
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com
vickiparker@quinnemanuel.com
andrewmather@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
Lucas A. Hammill (*pro hac vice* forthcoming)
Jordan M. Nakdimon (*pro hac vice* forthcoming)
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com
lucashammill@quinnemanuel.com
jordannakdimon@quinnemanuel.com

Joseph E. Reed (Bar No. 323524)
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
joereed@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

DATED:  August 5, 2026

By _____ */s/ Kate Lazarus* _____
KWUN BHANSALI LAZARUS LLP

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**ATTESTATION**

I, Andrew H. Schapiro, am the ECF user whose ID and password are being used to file the above document. In compliance with Local Rule 5-1(i)(3), I hereby attest that Kate E. Lazarus has concurred in the filing of the above document.

By     */s/ Andrew H. Schapiro*
             Andrew H. Schapiro