Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (*pro hac vice*)
Steven Balcof (*pro hac vice*)
Ido Sadeh (*pro hac vice*)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com
koussayef@desmaraisllp.com
sbalcof@desmaraisllp.com
isadeh@desmaraisllp.com

Marie Delzell (SBN 367393)
DESMARAIS LLP
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 573-1900
Facsimile: (415) 573-1901
mdelzell@desmaraisllp.com

Atifah Safi (*pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20006
Telephone: (202) 451-4900
Facsimile: (202) 451-4901
asafi@desmaraisllp.com

*Counsel for Plaintiff Apple Inc.*

[Additional counsel listed in signature block]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC.,<br><br>Plaintiff,<br><br>v.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,<br><br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**PLAINTIFF APPLE INC.'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Judge**: Edward J. Davila<br><br>**Hearing Date**: October 1, 2026<br><br>**Time**: 9:00 a.m. |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................ 1
II. BACKGROUND ........................................................ 2
A. The Complaint ........................................................ 2
1. Chang Liu ........................................................ 2
2. Tang Yew Tan ........................................................ 3
3. OpenAI and io ........................................................ 4
III. LEGAL STANDARDS ........................................................ 5
IV. ARGUMENT ........................................................ 6
A. Apple Owns Specific Protectable Trade Secrets. ........................................................ 6
1. Apple Sufficiently Identifies Specific Trade Secrets That Defendants Misappropriated. ........................................................ 6
2. Apple Alleges Reasonable Measures To Maintain The Secrecy Of Its Trade Secrets ........................................................ 10
3. Apple Owns Its Trade Secrets ........................................................ 13
B. Apple Alleges Pervasive Misappropriation Of Apple's Trade Secrets. ................ 14
1. Defendant Liu Repeatedly Misappropriated Apple's Trade Secrets. ........ 14
2. Defendant Tan Repeatedly Misappropriated Apple's Trade Secrets ......... 17
3. OpenAI Repeatedly Misappropriated Apple's Trade Secrets Both Through The Actions Of Defendants Liu And Tan, And Through Its Own Independent Conduct. ........................................................ 20
C. Apple Sufficiently Alleges Injury And Ongoing Harm ........................................................ 24
D. Because Defendants Cannot Justify Dismissal Of The Federal Claims, They Cannot Justify Dismissal Of The State Claims ........................................................ 25
E. Even Defendants' Cases Granting Dismissal Gave Leave To Amend With More Specific Allegations. ........................................................ 25
V. CONCLUSION ........................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*7EDU Impact Acad. Inc. v. You*,
760 F. Supp. 3d 981 (N.D. Cal. 2024) ....................11

*Alta Devices, Inc. v. LG Elecs., Inc.*,
343 F. Supp. 3d 868 (N.D. Cal. 2018) ....................5, 8, 25

*Apple Inc. v. Rivos, Inc.*,
No. 5:22-CV-02637-EJD, 2023 WL 5183034 (N.D. Cal. Aug. 11, 2023) ....................12, 21, 24

*Autodesk, Inc. v. Zwcad Software Co.*,
2015 WL 2265479 (N.D. Cal. May 13, 2015) ....................19, 20, 21, 23

*Axis Imex, Inc. v. Sunset Bay Rattan, Inc.*,
No. C 08-3931 RS, 2009 WL 55178 (N.D. Cal. Jan. 7, 2009) ....................14

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
2018 WL 2298500 (N.D. Cal. May 21, 2018) ....................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................5, 14

*Beluca Ventures LLC v. Einride Aktiebolag*,
660 F. Supp. 3d 898 (N.D. Cal. 2023) ....................7

*BNF Distribution Enter., Inc. v. BA Distribution, Inc.*,
No. 25-CV-08527-AMO, 2025 WL 3724558 (N.D. Cal. Dec. 24, 2025) ....................11

*Capconvert, LLC v. Brown*,
2026 WL 1471880 (N.D. Cal. May 26, 2026) ....................13

*Cedars Sinai Med. Ctr. v. Quest Diagnostics Inc.*,
No. CV 17-5169-GW(FFMX), 2018 WL 2558388 (C.D. Cal. Feb. 27, 2018) ....................10

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ....................15, 16

*Cisco Sys., Inc. v. Chung*,
2020 WL 4505509 (N.D. Cal. Aug. 5, 2020) ....................24

*Cisco Sys., Inc. v. Chung*,
462 F. Supp. 3d 1024 (N.D. Cal. 2020) ....................8

**Page(s)**

*CleanFish, LLC v. Sims*, 2020 WL 4732192 (N.D. Cal. Aug. 14, 2020) .......... 7

*Cooper Interconnect, Inc. v. Glenair, Inc.*, 2015 WL 13722129 (C.D. Cal. Feb. 3, 2015) .......... 24

*Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012) .......... 14, 22

*Farhang v. Indian Inst. of Tech., Kharagpur*, 2010 WL 2228936 (N.D. Cal. June 1, 2010) .......... 21

*Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*, No. 19-CV-05611-PJH, 2020 WL 513287 (N.D. Cal. Jan. 31, 2020) .......... 8

*Flextronics AP, LLC v. Ricci*, 2026 WL 2227360 (N.D. Cal. Aug. 3, 2026) .......... 5, 7, 14

*Google LLC v. Point Fin., Inc.*, 2026 WL 579462 (N.D. Cal. Mar. 2, 2026) .......... 7

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .......... 15, 16, 17, 22

*MachiningCloud, Inc. v. Kennametal Inc.*, 2025 WL 1843236 (C.D. Cal. June 2, 2025) .......... 7

*Masimo Corp. v. Apple Inc.*, 2020 WL 6653652 (C.D. Cal. Oct. 13, 2020) .......... 9, 10

*Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69 (N.D. Cal. 2020) .......... 20, 21

*P2i Ltd. v. Favored Tech USA Corp.*, 2024 WL 4294652 (N.D. Cal. Sept. 24, 2024) .......... 7

*Palantir Techs., Inc. v. Abramowitz*, 2020 WL 9553151 (N.D. Cal. July 13, 2020) .......... 8, 13, 25

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081 (9th Cir. 2025) .......... *passim*

*Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028 (9th Cir. 2009) .......... 5

*Space Data Corp. v. X*, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) .......... 8, 25

**Page(s)**

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ........................................................................ *passim*

*Vendavo, Inc. v. Price f(x) AG*,
No. 17-CV-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) ..........................7, 8, 25

*WeRide Corp. v. Huang*,
379 F. Supp. 3d 834 (N.D. Cal. 2019) ........................................................................20

*Wisk Aero LLC v. Archer Aviation Inc.*,
2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) ..........................................................8, 16, 20

*x.AI Corp. v. OpenAI, Inc.*,
2026 WL 661938 (N.D. Cal. Mar. 9, 2026)...............................................................23

*x.AI Corp. v. OpenAI, Inc.*,
No. 25-CV-08133-RFL, 2026 WL 1718645 (N.D. Cal. June 15, 2026) ..........................18, 23

**STATUTES**

18 U.S.C. § 1839(3) ..............................................................................................5, 11

18 U.S.C. § 1839(5) ..............................................................................................16

Defend Trade Secrets Act ("DTSA") ........................................................................ *passim*

**RULES**

Fed. R. Civ. P. 12(b)(6)...........................................................................................5, 16, 17

## I. INTRODUCTION

Apple's Complaint details how OpenAI employees stole Apple's trade secrets for the benefit of OpenAI. Chang Liu exploited an authentication bug to raid Apple's confidential network repository for weeks after joining OpenAI—downloading dozens of confidential engineering files, including a detailed presentation on the manufacture and testing of Apple's main logic boards—and celebrated his unauthorized access in writing: "LOL … so funny." Tang Yew Tan, OpenAI's Chief Hardware Officer, used Apple's internal project codenames to pump interview candidates for information about unreleased Apple products and directed them to bring "[a]ctual parts" they worked on—including "[b]atteries," "SIP" (Systems-in-Package), "mlb" (multi-layer or main logic boards), and "shields"—to OpenAI for "show and tell." And OpenAI and io Products institutionalized the scheme by structuring interviews to extract Apple's confidential engineering and supplier information, encouraging candidates to bring "prototypes" and "CAD" files, coaching new hires to dodge Apple's exit procedures, and misleading a trusted Apple partner into performing Apple's proprietary metal-finishing process for OpenAI. Apple's Complaint is about specific individuals taking specific Apple trade secrets in specific ways.

In response, Defendants' motion to dismiss relies on distortion, speculation, and improper extrinsic evidence. Defendants distort the Complaint by recasting its detailed allegations—verbatim messages, specific documents, and identified individuals—as generic complaints about "supplier relationships," "consumer products," and "routine recruiting," strawmen the Complaint never pleads. Defendants speculate that Mr. Liu's weeks of unauthorized downloading might have been "device syncing unknown to Mr. Liu," and that Mr. Tan retained Apple's "Need to Know" security document to help Apple. And Defendants resort to extrinsic evidence—extraneous messages, third-party websites, and attorney assertions about Apple's security measures—to tell a competing story, all of which is irrelevant on a motion to dismiss and, even when considered on the merits, does nothing to support dismissal. Simply put, Defendants do not grapple with the shocking allegations at the core of the Complaint.

## II. BACKGROUND

### A. The Complaint

Apple Inc.'s ("Apple") hardware trade secrets are the heart of the company. (Compl. ¶ 3.) They reflect a substantial investment of time and resources and are the foundation of Apple's products. A company with access to Apple's trade secrets could bypass the time and investments necessary to develop products and expertise independently and bring products to market faster and at lower cost. (*Id.* ¶ 41.) And by keeping new products confidential, Apple builds market anticipation, transforms its new product announcement into exciting events, and surprises its customers. (*Id.* ¶ 2.)

As a condition of employment, Apple employees sign an Intellectual Property Agreement ("IPA"), which details their confidentiality and non-disclosure obligations. (*Id.* ¶ 43.) Upon departure, the IPA prohibits employees from taking "any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information." (*Id.* ¶ 44.) Subject to those obligations, Apple entrusts its employees with its proprietary information. Defendants Chang Liu and Tang Tan—two former Apple employees—violated that trust.

#### 1. Chang Liu

Mr. Liu was a Senior System Electrical Engineer at Apple for eight years, and during that time, he worked on Apple's most sensitive product development programs. (*Id.* ¶ 4.) In January 2026, he left to join OpenAI. (*Id.*) Prior to his departure, Apple contacted Mr. Liu to sign Apple's confidentiality reminder, schedule an exit interview, and confirm that he had returned his Apple-issued devices and complied with other exit procedures. But Mr. Liu never responded. (*Id.* ¶ 4.)

Instead, within hours of leaving Apple, Mr. Liu told his former colleague Yu-Ting "Alyssa" Peng that he still had "another computer" he was planning to use to access Apple's confidential information. (*Id.* ¶¶ 5, 56.) On February 9, 2026—after he started at OpenAI—Mr. Liu discovered and exploited a rare, previously unknown authentication bug to access Apple's shared network folders. (*Id.* ¶ 5.) Rather than report the bug or protect Apple's confidential information, Mr. Liu shared his discovery with Ms. Peng: "LOL, I found out I can access the [network storage], so funny." (*Id.* ¶ 57.)

Then, over several weeks, Mr. Liu repeatedly exploited his illegal access to Apple's network and downloaded dozens of confidential hardware-related files. (*Id.* ¶¶ 5, 40, 58.) Specifically, he exfiltrated documents that reflect Apple's "hardware engineering and product design" information, including "manufacture and testing of MLBs (multi-layer or main logic boards)." (*Id.* ¶¶ 5, 40, 58.)

After leaving Apple, Mr. Liu maintained a close relationship with his former colleague, Ms. Peng, and he recruited her to join OpenAI. (*Id.* ¶ 56.) Prior to Ms. Peng's departure, Mr. Liu frequently elicited updates from her regarding Apple's active confidential projects, vendor decisions, and engineering details. (*Id.* ¶ 62.) Mr. Liu also coached Ms. Peng on how to "avoid trouble with the [Apple] security team" and advised her which confidential Apple material she should study before her OpenAI interview. (*Id.* ¶ 6.)

**2. Tang Yew Tan**

Tang Yew Tan worked at Apple for twenty-four years, most recently as Vice President of Product Design for iPhone and Apple Watch. Today he is OpenAI's Chief Hardware Officer. (*Id.* ¶ 8.) Apple entrusted Mr. Tan with its most sensitive projects, trusted partner relationships, proprietary manufacturing techniques, and unreleased products. (*Id.*)

Since joining OpenAI, Mr. Tan has knowingly used job interviews of Apple employees as another means to misappropriate Apple trade secrets. (*Id.* ¶ 9.) For example, he asked "[w]hat's the plan[?]" for an unannounced Apple product that he identified by Apple's secret codename. (*Id.* ¶ 9.) As another example, Mr. Tan encouraged current Apple employees to bring Apple product components to job interviews for "show and tell." (*Id.*) He specifically asked a current Apple employee to "bring some parts [she] worked on" such as "Batteries," "SIP" (Systems-in-Package), "mlb" (multi-layer or main logic boards), and "shields" and commented that it may "be good to show" other interviewers these Apple components. (*Id.* ¶ 70.) Mr. Tan even acquired an internal "Need to Know" Apple document that describes Apple's security procedures for employee departures. (*Id.* ¶ 73.) He and OpenAI have sent that information to departing Apple employees to give them advance warning of the security and forensic measures Apple uses to protect its confidential information. (*Id.*)

### 3. OpenAI and io

OpenAI was founded in December 2015 as a nonprofit organization. (*Id.* ¶ 35.) Since then, it has transformed into a commercial enterprise and "burn[ed] through cash at a historic pace." (*Id.*) To raise additional funds, OpenAI is preparing for an IPO, and its CEO, Sam Altman, is "under pressure from investors to show that the numbers work, while facing increasingly stiff competition from rivals." (*Id.*) Apparently, part of OpenAI's long-term profitability plan is the development and sale of hardware devices. (*Id.*) But OpenAI does not have the time necessary to develop a successful consumer hardware business. (*Id.* ¶ 38.) As a result, it has resorted to illegal shortcuts. (*Id.*)

OpenAI Foundation and OpenAI Group PBC (collectively, "OpenAI") and io Products, LLC ("io") (a subsidiary of OpenAI) have coordinated and condoned large-scale misappropriation of Apple's trade secrets. (*Id.* ¶ 36.) As discussed above, OpenAI employees have used the job interview process to incentivize and induce Apple employees to disclose Apple proprietary information in violation of their IPAs. OpenAI has been instructing Apple employees to bring "CAD/design artifacts" and "prototypes" to interviews and to divulge "subsystem and component selection," the "tools or methodologies you use for system integration, such as CAD software, simulation tools," and "Vendor selection and communication/collaboration with vendors." (*Id.* ¶ 10.)

In addition, OpenAI has intentionally used confidential Apple information to induce Apple's partners to disclose Apple trade secrets and violate their confidentiality obligations to Apple. (*Id.* ¶¶ 12, 79.) In one instance, OpenAI used confidential Apple information to approach one of Apple's trusted industrial design partners and get that partner to perform an Apple-proprietary, metal-finishing technique on products for OpenAI. (*Id.* ¶ 80.)

Apple raised its concerns with OpenAI in a February 23, 2026 letter, which stated that "[f]orensic evidence of Apple systems indicates that several former Apple employees[1] now at OpenAI

[1] OpenAI's suggestion that it was not aware of Apple's concerns or that those concerns were limited to a single individual (Mot. at 1) ignores the plain language of Apple's letter.

retained Apple's non-public, confidential, and proprietary information before they left." (Dkt. 47-1). OpenAI never responded to Apple's concerns. (Compl. ¶ 14).

## III. LEGAL STANDARDS

"To survive a Rule 12(b)(6) motion, a plaintiff need only plead 'enough facts to state a claim to relief that is plausible on its face.'" *Flextronics AP, LLC v. Ricci*, 2026 WL 2227360, at *4 (N.D. Cal. Aug. 3, 2026) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he Court must 'accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable' to the non-moving party." *Id.* (quoting *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009)). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011).

The Defend Trade Secrets Act ("DTSA") protects as trade secrets information that (a) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by [another]," and (b) is subject to "reasonable measures" to maintain secrecy. 18 U.S.C. § 1839(3). Under the DTSA, a plaintiff must allege that it owns a trade secret, the defendant misappropriated the trade secret, and the misconduct harmed the plaintiff. *See Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018).

In the *Quintara* case, the Ninth Circuit recognized that "the federal DTSA does not require a plaintiff to identify with particularity its alleged trade secrets from the start." *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1085 (9th Cir. 2025). Rather, "whether a DTSA plaintiff has identified information that is sufficiently particular to constitute a trade secret . . . is a question of fact . . . [that] is usually a matter for summary judgment or trial." *Id*. Consistent with that framework, discovery in DTSA cases "entails an iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification."[2] *Id.* at 1088. Thus, plaintiffs "may have

[2] Unless otherwise noted, internal quotation marks and citations are omitted from quotes and any emphasis has been added.

commercially valid reasons to avoid being overly specific at the outset in defining their intellectual property." *Id.*

## IV. ARGUMENT

### A. Apple Owns Specific Protectable Trade Secrets.

#### 1. Apple Sufficiently Identifies Specific Trade Secrets That Defendants Misappropriated.

Defendants' assertion that they cannot identify the trade secrets at issue in this case is not credible. The Complaint identifies specific acts of misappropriation and the particular documents or materials involved. Each of those acts of misappropriation falls within the categories of trade secrets that Apple identifies in paragraph 40 of the Complaint. For example:

- "While employed by OpenAI, Mr. Liu … proceeded to select, access, and ***download dozens of confidential files*** from Apple's network repository … [including] a presentation concerning … ***MLBs (multi-layer or main logic boards)—complex circuit boards in Apple's hardware***" that "details the ***manufacturing process, testing workflows, data captured during testing and how to interpret it***," and "reflects years of accumulated testing experience and would be invaluable to anyone developing hardware." (Compl. ¶¶ 58–59.) Such "Component Technologies" and "Proprietary Testing, Validation, and Development Methodologies" constitute trade secrets. (*Id.* ¶¶ 40(c), 40(d).)

- Mr. Tan solicited information about "***a top-secret project for an unreleased new Apple product***" and Mr. Liu helped Ms. Peng prepare to "better handle questions" about that top-secret project during her interview at OpenAI. (*Id.* ¶ 65.) Mr. Tan did so by using "an internal project codename" to ask "What's the plan[?]" for the unannounced Apple product. (*Id.* ¶ 9.) Such "Hardware Engineering and Product Design" information is an Apple trade secret and "reflect[s] years of work and investment." (*Id.* ¶ 40(a).)

- Mr. Tan directed candidates to bring physical hardware components, "parts," and "product samples" for "show and tell" sessions. (*Id.* ¶ 70.) Apple quotes messages showing that Mr. Tan instructed an Apple employee to "bring some parts [she] worked on" such as ***"[b]atteries," "SIP" (Systems-in-Package), "mlb" (multi-layer or main logic boards), and "shields"*** and told her it may "be good to show" other interviewers these Apple components. *Id.* Such "Component Technologies" are Apple trade secrets and "cannot be readily ascertained through reverse engineering or independent research alone." (*Id.* ¶ 40(c).)

- "Former Apple executives at OpenAI including Mr. Tan have confidential knowledge of Apple's use restrictions and confidentiality arrangement[s]" with Apple's partners. (*Id.* ¶ 81.) Using this information, "OpenAI and its cohorts misled [one of Apple's] partner[s] to believe they had Apple's permission to have the partner carry out the ***confidential metal-finishing technique*** for OpenAI's benefit." (*Id.*) OpenAI thereby misappropriated Manufacturing Design, Industrial Design, and Process Engineering trade secrets concerning "metal-finishing" techniques. (*Id.* ¶ 40(b).) OpenAI also misappropriated

> trade secrets pertaining to Apple's Global Supply Chain Operations, Supplier Relationships, and Proprietary Business Operations by misappropriating "the identities and roles of specialized sub-suppliers and vendors who provide Apple with critical components and equipment." (*Id.* ¶ 40(e).)

Thus, while Defendants argue that Apple must identify trade secrets (Mot. at 7), Apple did precisely that. And of course, Mr. Liu, Mr. Tan, and OpenAI know better than anyone what confidential Apple information they have in their possession.

Apple's allegations in the Complaint far exceed the disclosures in the cases that Defendants rely on. (*Id.* at 7–8 (citing *CleanFish, LLC v. Sims*, 2020 WL 4732192, at *3 (N.D. Cal. Aug. 14, 2020)); *Google LLC v. Point Fin., Inc.*, 2026 WL 579462, at *3 (N.D. Cal. Mar. 2, 2026); *see also Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018); *P2i Ltd. v. Favored Tech USA Corp.*, 2024 WL 4294652, at *4 (N.D. Cal. Sept. 24, 2024)). None of Defendants' cases involved allegations concerning specific conduct by specific individuals, quoted communications, and particular documents. In 2025, after most of Defendants' cases were decided, the Ninth Circuit cautioned that "whether a DTSA plaintiff has identified information that is sufficiently particular to constitute a trade secret . . . is a question of fact . . . [that] is usually a matter for summary judgment or trial"—that is, not appropriate to be decided on the pleadings. *Quintara*, 149 F.4th at 1085.

In fact, Apple's approach of identifying specific acts of misappropriation that fall within categories of trade secrets has been repeatedly approved by courts in this district, both before and after *Quintara*. *See Flextronics AP*, 2026 WL 2227360, at *10 (finding that "such categories of information become sufficient[ ] . . . for purposes of stating a claim where the complaint alleges that these categories of information are contained within specific documents," like the many Mr. Liu illicitly downloaded (quoting *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023))); *MachiningCloud, Inc. v. Kennametal Inc.*, 2025 WL 1843236, at *3 (C.D. Cal. June 2, 2025) ("The fact that the FAC also includes other allegations with more general language does not undermine that notice."); *Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*, No. 19-CV-05611-PJH, 2020 WL 513287, at *7 (N.D. Cal. Jan. 31, 2020) ("But plaintiffs' complaint also includes more specific allegations. . . . The complaint's level of detail is therefore sufficient to ascertain at least the

boundaries within which the secrets lie and the scope of appropriate discovery."); *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1049 (N.D. Cal. 2020).

Defendants overstate the caselaw when they argue that the Court cannot look beyond the Complaint to "ascertain at least the boundaries ***within which*** the secret lies." (Mot. at 7 (citing *Palantir Techs., Inc. v. Abramowitz*, 2020 WL 9553151, at *18 (N.D. Cal. July 13, 2020) and *Space Data Corp. v. X*, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017))). The cases Defendants cite—*Palantir* and *Space Data*—considered whether trade secrets were sufficiently disclosed in the context of a motion to dismiss, but they did not hold that the analysis of whether there is sufficient notice must be limited to the Complaint. *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *14 (N.D. Cal. Aug. 24, 2021). Other cases explicitly address that issue and conclude that the requirement to "'identify the trade secret with reasonable particularity' . . . does not create a pleading requirement even in state court, it certainly does not govern the adequacy of the complaint in federal court. If anything, it supports the notion that plaintiffs cannot be expected to disclose publicly in the complaint the very secrets they are seeking to protect." *Alta Devices*, 343 F. Supp. 3d at 882 (quoting *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *4 n.3 (N.D. Cal. Mar. 23, 2018)). Then, in discovery, Defendants benefit from an "iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification." *Quintara*, 149 F.4th at 1088.

Although the case has just begun, Apple has voluntarily served a trade secret disclosure with an enumerated list of trade secrets in support of its Motion for a Preliminary Injunction. Apple's trade secret disclosure (Exhibit H to the Henry Declaration) provides additional context for the trade secrets identified in the Complaint. (Dkt. 47-8.) With respect to the "unreleased new Apple product" (Compl. ¶ 65), Apple identifies the highly confidential form factor of a new hardware device and several specific hardware components that make it possible. (TS Disclosure ¶ 5.) With respect to misappropriated MLBs, Apple identifies "[redacted]." (*Id.* ¶ 25.) With respect to the proprietary finishing

techniques Apple identifies "[redacted]" and "[redacted]" (*Id.* ¶¶ 64, 65.) Relevant to Mr. Liu, Apple lists files that he stole by name and ties them directly to the trade secrets specified in Apple's complaint. (*Id.* ¶¶ 1, 12, 45, 67, 72, 77.) Relevant to Mr. Tan, Apple identifies the secret product codename [redacted] that he used to elicit Apple trade secrets about that product. (Dkt. 38 at 4, 14; Roffman Decl., Table 5.) Relevant to OpenAI and io, Apple identifies the trusted partner—[redacted] that they approached to misappropriate Apple's trade secret finishing technique and the codename for that technique [redacted]. (*Id.* at 5–6.) In sum, although the Complaint alone provides notice of Apple's trade secrets, the Motion for Preliminary Injunction and attached exhibits substantiate those claims and provide still more detail.

Defendants rely heavily on the out-of-district *Masimo* case to argue that the Court should ignore the allegations of specific acts of misappropriation concerning specific trade secrets because Apple also identified "categories" of trade secrets. (Mot. at 8 (citing *Masimo Corp. v. Apple Inc.*, 2020 WL 6653652, at *3 (C.D. Cal. Oct. 13, 2020))). But *Masimo* is inapplicable for several reasons. First, *Masimo* concerned a cause of action for trade secret misappropriation under the CUTSA. *Masimo*, 2020 WL 6653652, at *1. Since then, *Quintara*—a seminal Ninth Circuit case that Defendants cite extensively—has recognized that the DTSA, unlike the CUTSA, "does not require a plaintiff to identify with particularity its alleged trade secrets from the start." *Quintara*, 149 F.4th at 1085. Second, *Masimo* faulted the plaintiff for not identifying specific documents that contained the trade secrets at issue. *Masimo*, 2020 WL 6653652, at *4. Here, as discussed above, Apple has identified both the confidential documents that contain its trade secrets and physical hardware components. (*See, e.g.*, Compl. ¶¶ 59, 70, 73.) In fact, *Masimo* cites with approval, *Masimo*, 2020 WL 6653652, at *4, the *Cedars Sinai* case, which confirms that identifying the "specific confidential communications that allegedly contain . . . trade secrets . . . gives enough detail for [defendant] to prepare a defense . . . ." *Cedars Sinai Med. Ctr. v. Quest Diagnostics Inc.*, No. CV 17-5169-GW(FFMX), 2018 WL 2558388, at *6 (C.D. Cal. Feb. 27, 2018). Third, *Masimo* did not identify any

specific acts of taking. It involved a simple allegation that an executive left Masimo and joined Apple. *Masimo*, 2020 WL 6653652, at *1. Generic hiring stands in stark contrast to Apple's numerous and specific allegations of actual misappropriation. Likewise, Defendants' *Becton* case contained "no allegation that any of the defendants acquired, disclosed, or used any [trade secret] information." *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2018 WL 2298500, at *3 (N.D. Cal. May 21, 2018). Finally, in *Masimo*, the plaintiff filed an initial complaint with nothing but vague allegations, which the court dismissed. As the case continued, the plaintiff tried to refile the same vague allegations with extraneous examples that were still not tied to any specific conduct. *Masimo*, 2020 WL 6653652, at *2. In contrast, Apple conducted an investigation ***before*** filing suit, identified specific misconduct, and alleged that misconduct in its initial pleading.

#### 2. Apple Alleges Reasonable Measures To Maintain The Secrecy Of Its Trade Secrets.

Defendants' allegations that Apple did not take reasonable measures to protect its trade secrets are likewise not credible and rely on impermissible disputes about the merits.

The Complaint describes Apple's security measures in detail. For example:

- "As a condition of employment, Apple employees are required to sign an Intellectual Property Agreement ('IPA'), updated from time to time, which details their confidentiality and non-disclosure obligations." (Compl. ¶ 43.)
- "Apple reminds departing employees of their ongoing confidentiality obligations under the IPA and reminds them to return any Apple proprietary information before leaving Apple." (*Id.* ¶ 46.)
- "Apple ensures protection of its trade secrets and Apple Confidential Information stored in its secure network file repository, a third-party hosted cloud system that houses confidential engineering files, project documentation, and proprietary technical data, among other types of files." (*Id.* ¶ 47.)
- "Apple uses locked buildings, security cameras, guards, and other measures to control access to its physical facilities." (*Id.* ¶ 49.)
- "Apple goes to great lengths to ensure that its trusted business partners, including vendors, laboratories, and other companies in its supply chain, commit to stringent confidentiality obligations." (*Id.* ¶ 51.)

Such allegations exceed the pleading standard. *See, e.g.*, *7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 996 (N.D. Cal. 2024).

To challenge Apple's reasonable measure allegations, Defendants trivialize Apple's trade secrets as mere "supplier relationships" and then question whether all "supplier relationships" are confidential. (Mot. at 9.) Of course, Apple never alleged that all "supplier relationships" are trade secrets. Rather, Apple alleged that its "Global Supply Chain Operations, Supplier Relationships, and Proprietary Business Operations" secrets comprise:

> Confidential contractual arrangements with suppliers; supplier qualification and allocation strategies; logistics coordination processes that synchronize global component delivery at scale; and proprietary supplier relationships—including the identities and roles of specialized sub-suppliers and vendors who provide Apple with critical components and equipment.

(Compl. ¶ 40(e).) Apple safeguards those trade secrets through restrictive confidentiality agreements, requirements for vendors to implement strict security protocols, the use of codenames, and other protections. (*Id.* ¶ 51.) Secret information subject to those measures falls squarely within the protections of the DTSA. 18 U.S.C. § 1839(3); *BNF Distribution Enter., Inc. v. BA Distribution, Inc.*, No. 25-CV-08527-AMO, 2025 WL 3724558, at *17 (N.D. Cal. Dec. 24, 2025).

Defendants misappropriated Apple's trade secrets when, for example, they approached one of Apple's trusted partners "to have the partner carry out [a] confidential metal-finishing technique for OpenAI's benefit." (Compl. ¶ 81.) Defendants leveraged "knowledge of Apple's confidential relationships" (to know who to contact), "manufacturing and design processes" (to know of the metal-finishing process to use without authorization in the first place), and what "proprietary terminology" to use (to request the performance of that process for OpenAI's benefit). (*Id.* ¶ 79.) In this way, OpenAI used misappropriated trade secret information to induce one of Apple's partners to perform the secret metal-finishing technique that Apple developed "over many years to ultimately produce the finishes that define the look and feel of Apple products." (*Id.* ¶ 80.) That—as Defendants note—***some*** of Apple's "supplier relationships," like Foxconn, may be public is irrelevant. (Mot. at 9.)

Public awareness of certain Apple relationships does not bear on the sufficiency of Apple's reasonable measures to protect the non-public information that Defendants exploited and misappropriated. Defendants are improperly attempting to "speculate away the secrecy of Apple's trade secrets" at the pleading stage. *Apple Inc. v. Rivos, Inc.*, No. 5:22-CV-02637-EJD, 2023 WL 5183034, at *6 (N.D. Cal. Aug. 11, 2023).

Defendants also argue that "Apple's own Complaint says that it did not" take reasonable measures. (Mot. at 11.) But Defendants repeatedly mischaracterize the Complaint. ***First***, Defendants assert that allegations in the Complaint "suggest" that theft "has been happening for years, by potentially hundreds of its former employees." (*Id.* (citing Compl. ¶ 53).) That is unsubstantiated attorney argument. Moreover, Defendants' argument that misappropriation "has been happening . . . by potentially hundreds of [Apple's] former employees" now working at OpenAI is a tacit admission as to the potential scope of OpenAI's misconduct and demonstrates why it must be stopped immediately. (Mot. at 11.) ***Second***, Defendants argue they should not be held responsible for exploiting a previously unknown bug to download dozens of confidential files because Apple's security measures were not foolproof. (Mot. at 11.) But that is not the standard. Apple's Complaint explains how Defendants' misappropriation occurred despite Apple's reasonable measures: (1) this was a "rare, previously unknown authentication bug," (2) "Apple quickly fixed this bug," and (3) "the few other users affected by this bug do not appear to have accessed or stolen Apple's confidential information." (Compl. ¶ 5 & n.1.) ***Third***, Defendants blame Apple for supposedly allowing Mr. Liu, Mr. Tan, and other departing employees to take information from Apple. (Mot. at 11.) To the contrary, the Complaint describes the safeguards Apple has instituted to prevent such breaches and how Defendants willfully circumvented those safeguards. Mr. Liu and Mr. Tan were long-term employees who had earned Apple's trust, which made it even more shocking when they abused that trust by misappropriating Apple's trade secrets for OpenAI's benefit. (Compl. ¶¶ 4, 8, 12.) Even the quote that Defendants rely on—a statement from an Apple employee/OpenAI interviewee that he "***didn't even know we could*** take [those prototypes] from the office"—undermines Defendants' argument.

(Mot. at 11 (citing Compl. ¶ 9; *see also id.* ¶ 75(c))). His meaning is clear—he was "surprised people have brought" Apple parts to OpenAI interviews because he knew it was wrong. (Compl. ¶ 75(c).)

In short, all of Defendants' arguments on reasonable measures fail for two reasons. First, Defendants fail to appreciate that security measures do not need to be foolproof in the face of a determined bad actor, otherwise there could never be an actionable claim for trade secret misappropriation. *Capconvert, LLC v. Brown*, 2026 WL 1471880, at *6–7 (N.D. Cal. May 26, 2026). Second, they amount to an improper argument on the merits rather than accepting the allegations in the Complaint, as the Court must at this stage. *See Palantir*, 2020 WL 9553151, at *18 ("[W]hether [Plaintiff's] alleged efforts were reasonable under the circumstances is a question of fact that should not be decided on a motion to dismiss.").

#### 3. Apple Owns Its Trade Secrets.

Next, Defendants raise the dubious argument that Apple might not own its trade secrets. (Mot. at 11–12.) Although Defendants do not fully articulate this argument, they apparently assume that because Apple interacts with third parties, those third parties might own the trade secrets instead of Apple. The Complaint explicitly addresses that issue. First, Apple explains that its trade secrets encompass techniques performed in cooperation with vendors, suppliers, and partners. For example, Apple "often designs and customizes the specialized, proprietary machinery used in its suppliers' factories, ensuring it can protect the design and development of current and future products along with its cutting-edge manufacturing techniques." (Compl. ¶ 40(b).) As another example, Apple maintains "proprietary supplier relationships—including the identities and roles of specialized sub-suppliers and vendors who provide Apple with critical components and equipment." (Compl. ¶ 40(e).) Second, Apple explains that it exerts strict control over its innovations. For example, "[s]uppliers working with Apple must sign restrictive confidentiality agreements to ***protect Apple's innovations.***" (Compl. ¶ 51.) As another example, "Apple uses code names for projects to prevent leaks and requires suppliers to track all confidential materials, including by using proprietary chain-of-custody protocols for sensitive components." (*Id.*) These allegations are sufficient to show that Apple owns the trade secrets

at issue. *See, e.g.*, *Axis Imex, Inc. v. Sunset Bay Rattan, Inc.*, No. C 08-3931 RS, 2009 WL 55178, at *4 (N.D. Cal. Jan. 7, 2009) (finding that an assembly technique and the vendors involved in that technique could qualify as a trade secret).

**B. Apple Alleges Pervasive Misappropriation Of Apple's Trade Secrets.**

Defendants' arguments about the individual defendants ignore the legal standard on a motion to dismiss. Again and again, Defendants rely on attorney argument or extrinsic evidence, hypothesize about implausible explanations for a Defendant's "innocent" misconduct, and ask the Court to draw inferences in their own favor. That is not how a motion to dismiss works. As long as Apple has alleged "enough facts to state a claim to relief that is plausible on its face," Defendants' disagreement on the merits is irrelevant. *Flextronics*, 2026 WL 2227360, at *4 (quoting *Bell Atl.*, 550 U.S. at 570).

**1. Defendant Liu Repeatedly Misappropriated Apple's Trade Secrets.**

Central to Defendants' arguments about Mr. Liu is a purported message exchange between Mr. Liu and his manager. (Mot. at 15 (citing Ex. A).) According to Defendants, Exhibit A contains "correspondence between Mr. Liu and his former Apple colleagues, including his former Apple manager [and] shows Apple employees continuing to access Mr. Liu's personal iCloud account, downloading files from it, and asking him questions about its contents well after his departure." (*Id.*) Defendants try to justify relying on this extrinsic hearsay by citing caselaw for the proposition that "courts may take into account documents ***whose contents are alleged in a complaint*** and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." (Mot. at 14 n.8 (quoting *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (cleaned up)).) Yet Apple did not allege the contents of any conversation between Mr. Liu and his manager in the Complaint.[3] Thus, even under Defendants' formulation of the law, Exhibit A may not be considered. Indeed, the doctrine that Defendants seek to rely on is called the "incorporation-by-reference" doctrine because it applies only "if the plaintiff refers extensively to the document or the

---

[3] Similarly, Defendants' assertion about how Apple supposedly uses "personal iCloud accounts" (Mot. at 15 n.9) is attorney argument, unsupported by any evidence, and is not afforded any weight.

document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("[D]efendants [should not] use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims."). Apple did not rely on the document, and it does not form the basis for Apple's claims.

Even if Defendants' extrinsic evidence could be considered, it would not support dismissal. Defendants claim that Exhibit A shows that Mr. Liu's former manager asked him for help locating information and that "***Apple employees*** continu[ed] to access Mr. Liu's personal iCloud account." (Mot. at 15 (emphasis in original).) But that is an inaccurate description of different conduct, on a different system, at a different time. The Complaint does not allege that Mr. Liu answered his former manager's questions or that Apple employees accessed his personal iCloud account; it alleges that after his departure, Mr. Liu exploited an authentication bug to "access Apple's network storage[4]—a cloud-based file repository containing Apple's confidential [materials]," celebrated the discovery ("LOL . . . so funny"), and then spent weeks downloading dozens of confidential files while developing hardware for OpenAI. (Compl. ¶¶ 5, 57–59.) A manager's transition question is not authorization to raid Apple's confidential repository—and Defendants cite nothing suggesting that anyone at Apple knew of or approved such conduct. At most, Exhibit A offers an innocent explanation for conduct the Complaint does not accuse, while ignoring the problematic conduct. Tellingly, Defendants offer no justification for coaching an OpenAI candidate to study Apple's "top-secret project for an unreleased new Apple product" before her interview. (Compl. ¶ 65.)

Defendants misinterpret *Century Aluminum* to argue that Apple's allegations "must tend to exclude innocent explanations." (Mot. at 16, 20–21 (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)).) *Century Aluminum* was a securities case that turned on facts leading to two possible explanations "only one of which can be true and only one of which results in liability" as a matter of logic. 729 F.3d at 1108. In other words, *Century Aluminum* merely stands for

---

[4] The network storage from which Mr. Liu accessed and downloaded confidential documents is not iCloud and is not permitted for storage of personal information.

the proposition that the alleged conduct must be more than "possible," it must be "plausible." *Id.* In fact, *Century Aluminum* itself recognizes that, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, *both of which are plausible*, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id.* at 1108 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)) (emphasis in original). Other cases confirm that the plaintiff "does not have to foreclose all other explanations at the pleading stage. It just needs to plausibly plead misappropriation." *Wisk*, 2021 WL 8820180, at *16. And "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja*, 899 F.3d at 998.

Setting aside Defendants' misinterpretation of the caselaw, Defendants cannot plausibly argue that Mr. Liu was acting "innocently." He knowingly retained a computer from which he could access Apple's confidential information ("I still have another computer"), (Compl. ¶ 56), he laughed about having access to Apple's system ("LOL, I found out I can access the [network storage], so funny"), (*id.* ¶ 57), and he coached Ms. Peng about how "to avoid trouble with the security team" (*id.* ¶ 63.) These are not the actions of an "innocent" party. As for Defendants' speculation that "some" of Mr. Liu's activity was the result of "device syncing unknown to Mr. Liu" (Mot. at 16), that is inconsistent with Apple's allegations that he laughed about having access and selectively downloaded key files for weeks. (Compl. ¶¶ 57–58.)

Finally, Defendants argue that Mr. Liu did not "use" Apple's trade secret information. (Mot. at 17.) As an initial matter, "use" is not required to show misappropriation; acquisition or disclosure also satisfies the statute. *See* 18 U.S.C. § 1839(5) (defining misappropriation as "acquisition of a trade secret" or "disclosure or use of a trade secret"). But setting that aside, the Complaint does indeed allege that Mr. Liu used the information he misappropriated. Mr. Liu accessed, downloaded, and used Apple confidential hardware-related files while developing hardware products for OpenAI. (Compl. ¶¶ 60, 62.) The misappropriated files provided Mr. Liu with a stream of active, confidential Apple project details and engineering data that directly informed his work on OpenAI's competing hardware.

(*Id.* ¶ 62.) He also coached an active Apple employee on how to secretly exfiltrate proprietary engineering files from Apple workstations. (*Id.* ¶¶ 63–65, 67.)

**2. Defendant Tan Repeatedly Misappropriated Apple's Trade Secrets.**

Just like with Mr. Liu, Defendants rely on speculation about Mr. Tan's motivations to excuse his misconduct. In fact, Defendants concede that Apple's reading of Tan's conduct is "equally plausible." (Mot. at 20.) That concession dooms Defendants' position. *Starr*, 652 F.3d at 1216 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, ***both of which are plausible***, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

First, Defendants try to trivialize Mr. Tan's misconduct as requests for "publicly available" components from "released consumer products." (Mot. at 18.) That is not what the Complaint alleged. Nor is that supposed in any of the extrinsic evidence Defendants attach to the Motion. Mr. Tan did not ask candidates to bring parts anyone can buy; he directed a then-Apple employee to bring "some parts [she] worked on" such as "[b]atteries," "mlb" (multi-layer or main logic boards), and "shields"—internal components from her confidential Apple work, for "show and tell" before the OpenAI hardware team. (Compl. ¶ 70.) No one needs "show and tell" for "consumer products" that are, as Defendants put it, "widely available and in the public domain." (Mot. at 18.) Plus, hours before one interview with Mr. Tan, a candidate was screenshotting and downloading files about a highly confidential Apple project that Mr. Tan then probed during the interview. (Compl. ¶ 69.) On a motion to dismiss, the reasonable inference from these allegations—that Mr. Tan solicited and obtained Apple's confidential hardware information—belongs to Apple.

Defendants cite Exhibit B[5] to argue that Mr. Tan asked Apple employees for information related to only "shipped" parts. (Mot. at 18 (citing Ex. B).) Presumably, Defendants infer that "shipped" refers to parts shipped to consumers, and further that all the functionality of those parts must be public. Defendants are not entitled to such inferences on a motion to dismiss. But even if

[5] Unlike Exhibit A, which is improper extrinsic evidence, *supra* Section IV.B.1., Exhibit B contains messages that Apple relies on in the Complaint. *See Khoja*, 899 F.3d at 1002.

Defendants were given those inferences, the full text of the message Defendants rely on undermines their position. The message provides: "piece parts of a shipped product is ok too. ***some folks*** have done that." (Ex. B.) However, if "some folks" limited their discussion to "shipped parts," then others did not. That is unsurprising because OpenAI "instructs candidates to bring 'CAD/design artifacts' and 'prototypes' from their recent work at Apple" and asks them questions "at such a level of detail that requires revealing Apple's confidential information." (Compl. ¶ 75(b); *see also* Dkt. 59-5.) On top of that, OpenAI "asks Apple's employees to divulge their 'subsystem and component selection' and information about Apple's 'tools or methodologies you use for system integration, such as CAD software, simulation tools.'" (Compl. ¶ 75(b).) This is not "standard industry interviewing practice." (*Cf.* Mot. at 18.) And Defendants' *x.AI* case held only that asking about "technical aspects" of prior work did not support a claim; it did not involve directing candidates to bring physical Apple components, pre-interview downloads and screenshots, or solicitation of unreleased-product details by internal codename. *x.AI Corp. v. OpenAI, Inc.*, No. 25-CV-08133-RFL, 2026 WL 1718645, at *2 (N.D. Cal. June 15, 2026).

Defendants argue that it does not matter that Mr. Tan used "internal project code names" when he interviewed OpenAI candidates. (Mot. at 18.) To make this argument, Defendants rely on a website that supposedly shows "publicly accessible" Apple codenames. (Mot. at 19.) As argued above, Defendants' reference to extrinsic evidence—including purported disclosures of codenames that Apple has not confirmed—is improper. Even setting that aside, however, Apple did not simply allege the use of "codenames" in the abstract. Rather, Apple alleged that Mr. Tan used "'***internal*** project codenames' to ask, 'What's the plan[?]' ***for an unannounced Apple product***" to obtain confidential information about the project. (Compl. ¶ 9.) Defendants cannot dispute Apple's allegations by taking the word "codename" out of context.

Defendants also argue that Apple did not allege Mr. Tan disclosed or received any information. Defendants are wrong. Mr. Tan "email[ed] himself information about Apple's suppliers." (Compl. ¶ 9.) Mr. Tan's use of "internal project codename[s]" and "Apple's confidential information" allows

him to "gain access to even more insider knowledge." (Compl. ¶ 9.) And Mr. Tan's (and OpenAI's) interview procedures were structured to "require[] revealing Apple's confidential information" such as "CAD/design artifacts" and "prototypes." (*Id.* ¶ 75(b).) Just before an interview with Mr. Tan, a candidate took screenshots of a "highly confidential Apple project." (*Id.* ¶ 69.) Mr. Tan was an executive at OpenAI using all of that information as "Chief Hardware Officer." (*Id.* ¶ 68.) Clearly, Mr. Tan both disclosed and received Apple's confidential information while at OpenAI. In any case, "as discovery has not yet commenced, it would be unreasonable to require a plaintiff to demonstrate the precise ways in which Defendants may have used [their] trade secrets, given that ***Defendants are the only ones who possess such information.***'" *Autodesk, Inc. v. Zwcad Software Co.*, 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015).

Defendants next attempt to defend Mr. Tan's use of an internal Apple document bearing a "Need to Know" designation that describes offboarding procedures for Apple's managers ("Manager Offboarding Procedures"). Defendants speculate that the Manager Offboarding Procedures might be handed to all departing employees and therefore may not be confidential. (Mot. at 20.) But once again, Defendants do not address the full context of the allegations in the Complaint. The Manager Offboarding Procedures are directed to Apple's "managers." (Compl. ¶ 73.) The procedures are not just a reminder to any departing employees; rather they "detail[] security processes Apple uses to protect the company's confidential information when one of its employees is leaving." (*Id.*) OpenAI personnel now view Apple's "Need to Know" Manager Offboarding Procedures as "a checklist that Tang put together" to "provid[e] them with advance notice of Apple's forensic and security checks." (*Id.*) All these facts support Apple's allegations against Mr. Tan. And in response, Defendants admit a dispute on the merits, arguing that "[t]he opposite is true, and at least ***equally plausible***" and a "***plausible inference*** is that Mr. Tan ***might*** have a document describing offboarding procedures to ensure former employees complied with those offboarding procedures." (Mot. at 20–21.) Defendants' admission that Apple's position is "equally plausible" is dispositive. *Starr*, 652 F.3d at 1216.

**3. OpenAI Repeatedly Misappropriated Apple's Trade Secrets Both Through The Actions Of Defendants Liu And Tan, And Through Its Own Independent Conduct.**

Defendants' attempts to defend OpenAI and io are meritless.

***First,*** Defendants argue that Apple's allegations against Mr. Liu and Mr. Tan cannot be attributed to OpenAI and io. Yes, they can. Mr. Liu's and Mr. Tan's conduct is intertwined with OpenAI as a whole. Mr. Liu colluded with another former Apple employee, Ms. Peng, to funnel Apple's confidential information about "Apple's active confidential projects, vendor decisions, and engineering details" to OpenAI. (Compl. ¶ 62.) Mr. Liu was part of Mr. Tan and OpenAI's scheme to pump interview candidates for information about "a top-secret project for an unreleased new Apple product." (*Id.* ¶ 65.) Mr. Tan, for his part, is an executive at OpenAI—its Chief Hardware Officer. (*Id.* ¶ 68.) His improper attempts to obtain information about Apple's hardware are "emblematic of how OpenAI has been unlawfully extracting confidential Apple information through its recruiting processes more generally." (*Id.* ¶ 72; *see also id.* ¶ 70.) Mr. Liu's and Mr. Tan's misconduct did not occur in isolation; they have acted in their capacity as OpenAI's agents, for OpenAI's benefit, with other OpenAI employees. "The[se] allegations together, with all reasonable inferences drawn in [plaintiff's] favor, plausibly imply" that OpenAI had sufficient knowledge to be liable for misappropriation. *Wisk*, 2021 WL 8820180, at *15; *see also Autodesk*, 2015 WL 2265479, at *6 (finding that the plaintiff is not required to detail all uses of trade secret in the complaint). Moreover, actions by senior leadership—such as Mr. Tan, OpenAI's Chief Hardware Officer—can independently be imputed to the company. *WeRide Corp. v. Huang*, 379 F. Supp. 3d 834, 850 (N.D. Cal. 2019).

Defendants' cases are clearly distinguishable. In *Navigation Holdings, LLC v. Molavi*, unlike here, the plaintiff failed to allege that the defendants had knowledge of misappropriation. 445 F. Supp. 3d 69, 79 (N.D. Cal. 2020). Yet *Navigation* recognized that "[c]ourts have found the knowledge element sufficiently alleged where the plaintiff pleads facts to substantiate the defendant's knowledge." *Id.* As set forth above, Apple alleges that not only did OpenAI ***know*** of Mr. Liu's and Mr. Tan's misappropriation, but that OpenAI was an ***active participant*** in furthering their activities.

(*See, e.g.*, Compl. ¶¶ 75–83.) Further, *Navigation* explains that the knowledge standard can be met, for example, when a misappropriated document is "clearly marked" as confidential. 445 F. Supp. 3d at 79. Here, Apple has identified documents spanning "over a thousand pages" that were "expressly labeled as confidential" that Mr. Liu illicitly downloaded. (Compl. ¶¶ 58, 64.) Such allegations were missing in the case of *Farhang v. Indian Inst. of Tech., Kharagpur*, 2010 WL 2228936, at *15 (N.D. Cal. June 1, 2010). And in *Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034, at *8 (N.D. Cal. Aug. 11, 2023), the Court found no dispute that the defendant discouraged the use of the plaintiff's trade secrets—the opposite of what Apple alleges here.

Defendants repeatedly seize on three words from the Complaint, that Apple has "virtually no visibility" into OpenAI's internal conduct, as if Apple confessed to pleading blind. (Mot. at 2, 22, 24.) Yet Defendants omit the first half of the sentence: "While Apple's ongoing investigation has provided insights obtained from its own systems, Apple has virtually no visibility ***into what has been happening behind closed doors at OpenAI and io.***" (Compl. ¶ 54.) The detailed allegations in the Complaint are the result of Apple's internal investigation. What Apple cannot yet see is how Defendants are using what they took inside OpenAI because, as in many trade secret cases, "Defendants are the only ones who possess such information." *Autodesk*, 2015 WL 2265479, at *6. That is not a pleading defect; it is why trade secret identification is an "iterative process" refined in discovery. *Quintara*, 149 F.4th at 1088. Until then, Defendants cannot profit from concealing their misconduct.

***Second***, OpenAI cross-applies its arguments about Mr. Tan, which fail for the reasons set forth in Section IV.B.2. As an executive at OpenAI, Mr. Tan's specific conduct, (*see* Compl. ¶¶ 69–70), was "emblematic of how OpenAI has been unlawfully extracting confidential Apple information through its recruiting processes more generally," (*id.* ¶¶ 75–78). OpenAI's only new argument is that Apple is never named in "a pre-interview guide that Defendant OpenAI ***allegedly*** provided to ***certain*** of its interview candidates." (Dkt. 59-3; Mot. at 22–23 (citing Ex. C).) Exhibit C cannot be considered; it is vouched for only by outside counsel, who lacks personal knowledge and hedges that

the document was "allegedly" provided to unidentified "certain" candidates. This never establishes that this guide, in this form, is what was sent to the candidates described in the Complaint. With its authenticity unestablished, it cannot be incorporated by reference. *Khoja*, 899 F.3d at 1001–02; *Davis v. HSBC Bank Nev.*, N.A., 691 F.3d 1152, 1160 (9th Cir. 2012). Regardless, Defendants' reliance on the guide proves nothing: it says nothing about the Apple components Mr. Tan and others at OpenAI directed candidates to bring (Compl. ¶ 70) and omitting Apple's name is meaningless where OpenAI structured interviews with Apple employees to elicit detail "that requires revealing Apple's confidential information." (Compl. ¶ 75(b).) If anything, the omission serves to "conceal the misuse and misappropriation." (Compl. ¶ 85.) Defendants cannot displace Apple's plausible account on a motion to dismiss. *Starr*, 652 F.3d at 1216.

***Third***, Defendants recognize that Apple makes direct allegations that OpenAI misappropriated trade secrets related to a "multi-step metal-finishing" technique. (Mot. at 23.) However, Defendants claim that such allegations are "too vague and generalized to state a plausible claim for misappropriation." (*Id.*) Not so; Apple's allegations are factual, plausible, and extensive. Apple alleges its "proprietary metal alloys, metal-finishing techniques, and material specifications" are trade secrets. (Compl. ¶ 40(b).) "Apple developed its proprietary, multi-step metal-finishing techniques over many years to ultimately produce the finishes that define the look and feel of Apple products." (Compl. ¶ 80.) Apple works with a "trusted Apple partner" "on industrial design services and experimentation, including metal-finishing techniques." (*Id.*) "The partner is bound by agreements with Apple that include use restrictions and confidentiality obligations prohibiting it from doing for other companies the confidential work it does for Apple and from using certain facilities for anyone but Apple." (*Id.*) Nevertheless, "[f]ormer Apple executives at OpenAI including Mr. Tan have confidential knowledge of Apple's use restrictions and confidentiality arrangement with this partner." (*Id.* ¶ 81.) OpenAI and its cohorts abused this confidential information to have the partner carry out the confidential metal-finishing technique for OpenAI's benefit. (*Id.*) Those detailed allegations are more than sufficient on a motion to dismiss.

Defendants' remaining arguments are unpersuasive. Defendants argue that Apple did not provide every possible detail about OpenAI's malfeasance. That is not required, or realistic, at the pleading stage before Apple has taken discovery. *Autodesk*, 2015 WL 2265479, at *6. Defendants argue that Apple "does not allege that OpenAI acquired, used, or disclosed an identified trade secret." (Mot. at 23.) But that is simply untrue; Apple alleges that OpenAI acquired information about the identity of the provider and the metal-finishing technique from former Apple employees who disclosed it to OpenAI and then used the trade secret to "carry out the confidential metal-finishing technique for OpenAI's benefit." (Compl. ¶ 81.) Defendants complain that Apple did not engage in hypothetical speculation about whether Apple's partner "would have refused to perform the technique" absent OpenAI leading this partner to believe it could do so. (Mot. at 23.) Yet such conjecture is not required on a motion to dismiss and OpenAI does not cite any authority holding otherwise.

Defendants conclude their arguments about OpenAI with the self-serving statement that "OpenAI has no need or desire for any information involving the hardware design or supply chain for Apple's products. It is seeking to make hardware that is untethered by traditional interfaces such as Apple's and is unlike any known Apple product." (Mot. at 23 (citing Compl. ¶ 36 n.9).) For this assertion—which is irrelevant to the sufficiency of Apple's pleading—Defendants cite an article titled, "The Mystery of OpenAI's New Hardware Device." (Compl. ¶ 36 n.9 (citing https://techtime.news/2025/07/30/openai/).) Defendants ask the Court to infer from this "Mystery" that Apple's trade secrets "have no application to a different company's different device." (Mot. at 24.) Such speculation is impermissible on a motion to dismiss. In any case, the value of Apple's trade secrets can be plausibly inferred from the lengths to which Defendants have gone to acquire them. Finally, Defendants quote the *x.AI* case to argue that Apple "was required to have completed its investigation of its claims before filing suit, not after." (Mot. at 24 (citing *x.AI Corp. v. OpenAI, Inc.*, 2026 WL 661938, at *1 (N.D. Cal. Mar. 9, 2026)) (cleaned up).) Apple did. Apple conducted an internal investigation, identified the misappropriated documents and incriminating messages, and set forth those specific allegations in the Complaint. Further investigation will come from discovery.

### C. Apple Sufficiently Alleges Injury And Ongoing Harm.

Defendants argue that Apple has not sufficiently alleged injury or ongoing harm. (Mot. at 24–25.) That is not true. As explained above, Defendants repeatedly misappropriated trade secrets and proprietary information from Apple. That would allow a company to "bypass years of independent research and development, skip the capital expenditure required to build genuine expertise, and bring products to market faster and at lower cost—harming the value of Apple's investments." (Compl. ¶ 41; *see also id.* ¶¶ 97, 110, 123, 136 (explaining the harm that Defendants' misappropriation has caused and is continuing to cause).) Further, OpenAI's repeated misappropriation demonstrates that such "misconduct is normalized and exemplified by leadership" and causes ongoing harm to Apple. (*Id.* ¶ 13.) That is why Apple promptly moved for a preliminary injunction to put a stop to OpenAI's behavior. (Dkt. 38.) Further, "harm is presumed when proprietary information is misappropriated." *Rivos*, 2023 WL 5183034, at *9 (citing *Cisco Sys., Inc. v. Chung*, 2020 WL 4505509, at *9 (N.D. Cal. Aug. 5, 2020)). Defendants provide no "basis to depart from the well-established presumption of harm once the first two DTSA prongs have been established." (*Id.*)

Defendants' reliance on *Cooper Interconnect, Inc. v. Glenair, Inc.*, 2015 WL 13722129 (C.D. Cal. Feb. 3, 2015) is misplaced. As the *Rivos* case recognized, "the court [in *Cooper*] found no harm because the complaint had *affirmatively* alleged that the defendants had fully complied with the plaintiff's demand and deleted all trade secrets in their possession and in backups." *Rivos*, 2023 WL 5183034, at *9 (emphasis in original). Unlike in *Cooper*, Apple has not alleged any facts that would preclude a finding of harm. To the contrary, Apple has alleged that Defendants continue to possess Apple's trade secrets and use them for OpenAI's benefit. (*See* Compl. ¶¶ 56–66, 69–73, 75–76, 79–85.) Such allegations are sufficient at the pleading stage. *See Rivos*, 2023 WL 5183034, at *9 (allegations of "how the [trade secrets] could enable a competitor to catch up to Apple's advanced . . . market lead with a fraction of the research" show that harm has been "extensively described"). As for Defendants' argument that "the access it complains of was identified and shut off by Apple before it filed suit" (Mot. at 25), that does not address OpenAI's continued use of the materials Defendants

took, nor does it address other ways OpenAI seeks to misappropriate Apple's trade secrets, such as OpenAI's continued efforts to obtain Apple confidential information from interview candidates.

### D. Because Defendants Cannot Justify Dismissal Of The Federal Claims, They Cannot Justify Dismissal Of The State Claims.

Defendants argue that if the Court dismisses Apple's DTSA claims, it should also dismiss Apple's breach of contract claims. Defendants do not provide any independent basis for dismissing Apple's contract claims, arguing solely that they rise and fall with the DTSA claims. Nor do Defendants address the merits of Apple's contract claims. Because Apple's DTSA claims are well pleaded, Defendants' derivative attack on the contract claims fails as well.

### E. Even Defendants' Cases Granting Dismissal Gave Leave To Amend With More Specific Allegations.

Apple's Complaint sufficiently alleges every element of its DTSA claims against all Defendants. However, even if the Court were to grant Defendants' Motion as to any of Apple's claims, Apple should be granted leave to amend its Complaint. "[L]eave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith." *Alta Devices*, 343 F. Supp. 3d at 876. None of these conditions apply, nor have Defendants argued that they do. The case is in its infancy, Apple has not amended the Complaint, and Apple's preliminary injunction motion demonstrates that Apple has the evidence to substantiate its allegations. (*See generally* Dkt. 38.) Indeed, the cases Defendants rely on to argue for dismissal grant leave for the plaintiff to amend the complaint—often repeatedly. *See, e.g.*, *Palantir*, 2020 WL 9553151, at *19 (dismissing Fourth Amended Complaint with leave to amend); *Space Data*, 2017 WL 5013363, at *1; *Vendavo*, 2018 WL 1456697, at *1.

## V. CONCLUSION

For all the above reasons, Apple respectfully requests that the Court deny Defendants' Motion in its entirety.

Dated: August 19, 2026

/s/ Karim Z. Oussayef
Karim Z. Oussayef

Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
Vanessa K. Sim (SBN 341107)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com
vanessa.sim@weil.com

Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
Nicole Elena Bruner (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com
nicole.bruner@weil.com

Heather Blacklaws (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
600 Congress Avenue, Suite 2170
Austin, Texas 78701
Telephone: (512) 487-1480
Facsimile: (512) 487-1520
heather.blacklaws@weil.com

Nina Shapiro (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
nina.shapiro@weil.com

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (*pro hac vice*)
Steven Balcof (*pro hac vice*)

Ido Sadeh (*pro hac vice*)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com
koussayef@desmaraisllp.com
sbalcof@desmaraisllp.com
isadeh@desmaraisllp.com

Marie Delzell (SBN 367393)
DESMARAIS LLP
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 573-1900
Facsimile: (415) 573-1901
mdelzell@desmaraisllp.com

Atifah Safi (*pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20006
Telephone: (202) 451-4900
Facsimile: (202) 451-4901
asafi@desmaraisllp.com

*Attorneys for Plaintiff Apple Inc.*