Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

David Eiseman (Bar No. 114758)
Jodie W. Cheng (Bar No. 292330)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
jodiecheng@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

[Additional counsel listed in signature block]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC.,

Plaintiff,

vs.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-CV-07078-EJD

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS APPLE INC.'S COMPLAINT**

Date: October 1, 2026 (Reserved)
Time: 9:00 a.m. P.T.
Courtroom: 4 - 5th Floor
Judge: The Hon. Edward J. Davila
Trial Date: None Set

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. APPLE CANNOT OVERCOME ITS FAILURE TO PLEAD TRADE SECRETS ........ 1

A. Apple Fails To Identify The Alleged Trade Secrets ........ 1

1. Apple's Post-Filing Trade Secret Disclosure Does Not Cure the Complaint ........ 1

2. The Complaint Fails to Identify Any Trade Secrets ........ 2

B. Apple Fails to Plead Reasonable Measures ........ 4

III. APPLE FAILS TO PLEAD MISAPPROPRIATION ........ 5

1. Apple Fails to Plead Misappropriation by Mr. Liu ........ 5

2. Apple Fails to Plead Misappropriation by Mr. Tan ........ 9

3. Apple Fails to Plead Misappropriation by OpenAI or io Products ........ 11

IV. APPLE FAILS TO PLEAD HARM ........ 13

V. THE COURT SHOULD DISMISS APPLE'S STATE LAW CLAIMS AS WELL ........ 14

VI. CONCLUSION ........ 14

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................ 13, 14

*Autodesk, Inc. v. ZWCAD Software Co.*,
2015 WL 2265479 (N.D. Cal. May 13, 2015) ........................................ 11

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ........................................ 13

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........................................ 7

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ........................................ 6

*Foam Supplies, Inc. v. Dow Chem. Co.*,
2006 WL 2225392 (E.D. Mo. Aug. 2, 2006) ........................................ 12

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........................................ 6

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
149 F.4th 1081 (9th Cir. 2025) ........................................ 2

*Schneider v. Cal. Dep't of Corr.*,
151 F.3d 1194 (9th Cir. 1998) ........................................ 1

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ........................................ 13

*UMG Recordings, Inc. v. Global Eagle Ent., Inc.*,
117 F. Supp. 3d 1092 (C.D. Cal. 2015) ........................................ 13

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ........................................ 12, 13

*Weiss Residential Research LLC v. Experian Information Solutions, Inc.*,
2020 WL 6555053 (C.D. Cal. Oct. 15, 2020) ........................................ 12, 13

*Wisk Aero LLC v. Archer Aviation Inc.*,
2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) ........................................ 1, 7, 11

**Statutes**

18 U.S.C. § 1839(3)(A) .......... 4

**Other Authorities**

Fed. R. Civ. P. 8 .......... 2, 3
Fed. R. Civ. P. 9(b) .......... 12, 13
Fed. R. Civ. P. 12 .......... 1, 3
Fed. R. Civ. P. 12(b)(6) .......... 1
Fed. R. Evid. 801(d)(2) .......... 6

# I. INTRODUCTION

Apple's opposition confirms, rather than cures, the Complaint's central defect. To state a DTSA claim, Apple must connect three propositions concerning the same information and the same Defendant: what the particular asserted trade secret is; why that information qualifies for protection; and how a defendant improperly acquired, disclosed, or used it. Neither Apple's Complaint nor its opposition ever completes that chain. Apple's supposed "trade secrets" are and remain vague categories and catch-alls, and Apple cannot substitute attorney characterization for missing facts.

Apple repeatedly asks the Court to infer essential acts that are not alleged. A request that a candidate bring "parts" becomes assumed receipt of confidential information. Pre-interview downloading becomes assumed disclosure during the interview. A question about an Apple project becomes assumed receipt of trade-secret information. And allegations concerning one person somehow become acquisition or use by another. Rule 12 permits reasonable inferences from alleged facts; it does not permit speculation to substitute for the missing act of misappropriation.

Apple has alleged circumstances it insists are suspicious. But that is a far cry from adequately alleging misappropriation. Because the Complaint does not plausibly connect a protectable trade secret to an acquisition, disclosure, or use by any Defendant, Apple's claims should be dismissed.

# II. APPLE CANNOT OVERCOME ITS FAILURE TO PLEAD TRADE SECRETS

## A. Apple Fails To Identify The Alleged Trade Secrets

### 1. Apple's Post-Filing Trade Secret Disclosure Does Not Cure the Complaint

Apple spends much of its opposition (misguidedly) faulting Defendants for "resort[ing] to extrinsic evidence" in support of their motion. Opp. at 1; *see also id.* at 14-18. But when forced to defend the Complaint's deficient trade secret identification, Apple immediately reaches outside the four corners of its Complaint for extrinsic evidence, in the form of the purported trade secret disclosure it attached to its motion for a preliminary injunction. *Id.* at 8-9. That disclosure is not part of the Complaint and cannot cure its pleading deficiencies. "In determining the propriety of a Rule 12(b)(6) dismissal, a court ***may not*** look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't*

*of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis in original). *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *14 (N.D. Cal. Aug. 24, 2021) does not support Apple's position because the plaintiff there expressly incorporated its Section 2019.210 disclosure into the complaint. Apple did not do so here.

Regardless, even if the Court were to evaluate Apple's subsequent disclosures, it would make no difference because they do not cure the defects in Apple's Complaint. The examples Apple chose to highlight in its opposition illustrate the point well: they include generic descriptions of techniques without explaining what separates them from matters of general knowledge, two alphanumeric code names that Apple does not try to claim derive any value from being secret,[1] and the name of an Apple supplier whose identity as such is undisputedly public. Opp. at 8-9; *see* Mot. at 9 n.2; *see also* Dkt. 86. These are not even confidential; they are certainly not trade secrets.

2. <u>The Complaint Fails to Identify Any Trade Secrets</u>

Apple would not have reached outside the Complaint if it truly believed the Complaint's trade secret identification was adequate. Apple all but admits that it has not yet identified the alleged trade secrets, promising an "iterative process" of discovery, after which it will tell Defendants and the Court what the alleged trade secrets are. Opp. at 5, 8, 21 (citation omitted). Apple's reliance on *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081 (9th Cir. 2025), for the proposition that it is allowed to do that, goes too far. *Quintara* held that the DTSA does not incorporate CUTSA's particularized pre-discovery disclosure requirement and recognized that trade-secret identification may be refined through discovery. But it did not displace Rule 8. As *Mattson Technology, Inc. v. Applied Materials, Inc*. recently explained, "*Quintara* does not alter the fundamental pleading requirements under Rule 8," including fair notice of the trade-secret claim asserted. 2026 WL 1303361, at *4 (N.D. Cal. May 12, 2026).

[1] The point of a code name is to ***obscure*** the secret information, not to ***be*** the secret information. Even if these "code names" were confidential–and here, they were not–Apple offers no explanation as to how they would rise to the level of "trade secrets."

Other post-*Quintara* decisions in this District confirm the point. *Google LLC v. Point Financial, Inc*. held that allegations in "broad, categorical terms" merely describing types of potentially protectable information remain "insufficient to state a claim" under DTSA or CUTSA 2026 WL 579462, at *3 (N.D. Cal. Mar. 2, 2026) (citation omitted). And *Joby Aero, Inc. v. Archer Aviation Inc*. recognized that Quintara "was not a case directly about pleading DTSA claims" and that Rules 8 and 12 still require sufficient particularity and fair notice. 2026 WL 1625376, at *8 n.3 (N.D. Cal. June 5, 2026). As *Joby* explained, plaintiffs "may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *Id.*, at *8 (citation omitted). The court found a pleading sufficient as to specifically identified confidential negotiation details and deal terms contained in a named file, but insufficient as to broad categories such as "commercial strategy development," "regulatory strategies," "infrastructure strategy," and "technical information about Joby's aircraft and operations." *Id.*, at *9.

Apple's Complaint suffers from precisely those problems. Paragraph 40 lists broad types of information—"component architecture," "confidential testing data," "proprietary manufacturing processes," unidentified "specialized sub-suppliers and vendors," and "supplier relationships"—rather than defining the information Apple actually claims was misappropriated. Compl. ¶ 40. Apple responds that its "approach of identifying specific acts of misappropriation that fall within categories of trade secrets" is sufficient. Opp. at 7. But Apple's attempt to rely on acts, rather than identify its purported trade secrets, collapses two distinct questions: what the trade secret is and whether a Defendant misappropriated it.

*Quintara* permits refinement of an adequately pleaded trade secret through discovery; it does not permit Apple to forego identifying trade secrets with any specificity at all. At minimum, Apple's categorical theories should not proceed. And even if the Court found any of Apple's alleged trade secrets adequately identified at the pleading stage, the complaint should still be dismissed because, as explained in more detail below, Apple fails to plausibly connect the identified information to acquisition, disclosure, or use by any Defendant.

**B. <u>Apple Fails to Plead Reasonable Measures</u>**

When Apple turns to its purported "reasonable measures," it makes the same fundamental mistake. Apple argues that "[t]he Complaint describes Apple's security measures in detail" and lists various generic measures Apple supposedly takes to protect "proprietary information" and "confidential information" in the abstract. Opp. at 10 (citation modified). For instance, Apple alleges that when it thinks something is a trade secret, or even just "Apple Confidential Information," it ensures that information is "stored in its secure network file repository, a third-party hosted cloud system that houses confidential engineering files, project documentation, and proprietary technical data," and maybe even keeps it in a "locked building[]" with "security cameras, guards, and other measures to control access to" the "physical facilities" in which the secrets are stored. Compl. ¶¶ 47, 49.

But the DTSA requires a plaintiff to plead that it took "reasonable measures" to maintain the secrecy of ***the information specifically claimed to be a trade secret***. 18 U.S.C. § 1839(3)(A). Apple has not pled that it took any particular measures with respect to any ***specific*** trade secrets (whatever they turn out to be). In fact, its Complaint shows the opposite. Apple does not—and cannot—allege that the documents it claims Mr. Liu took were kept in locked physical facilities; it alleges he was able to access them using his own Apple login credentials, which Apple had kept active after he left the company; Apple then asked him for help retrieving and identifying documents. Mot. at 14-17. Most of Apple's allegations against Mr. Liu claim that he accessed Apple confidential information at the request, and for the benefit, of a then-***Apple employee***. *Id.* Apple does not dispute that its "common practice" is to allow and even encourage employees to use their personal iCloud accounts for Apple work, including work involving alleged trade secrets. Mot. at 15 n.9. Nor does it dispute that an ***Apple manager*** reached out to Mr. Liu after his departure, and that the two texted about the Apple employee retaining access to Mr. Liu's iCloud account "for files." *Id.* at 15 (displaying Ex. A at 1). As explained below, these facts are fatal to Apple's misappropriation claim—but they also gut Apple's claim that it took "reasonable measures" to protect its purported trade secrets. Apple cannot both ask a former employee to access allegedly confidential documents for its benefit and then argue that it took reasonable measures to prevent

non-employees from accessing those documents. And of course, allowing or requiring employees to commingle Apple documents with their personal files on their personal iCloud accounts—accessible everywhere through personal devices—is wholly inconsistent with the idea that Apple believed those documents to contain trade secrets.[2]

In sum, Apple's own allegations demonstrate that, notwithstanding the general security measures it may employ elsewhere within the company, Apple failed to take reasonable measures to protect the secrecy of the specific documents it claims contain its alleged trade secrets in this case. Indeed, taking Apple's allegations as true, any documents Mr. Liu or Mr. Tan are alleged to have received were by definition not Apple trade secrets, because they were not subject to the measures Apple alleges it took to protect its purported trade secrets. That alone requires dismissal of Apple's trade-secret claims.

## III. <u>APPLE FAILS TO PLEAD MISAPPROPRIATION</u>

### 1. <u>Apple Fails to Plead Misappropriation by Mr. Liu</u>

As Defendants explained in their motion, the allegedly unauthorized downloads that Apple accuses Mr. Liu of making were in fact done at the direction of, and for the benefit of, Apple employees. Mot. at 14-17. Indeed, some of those files were downloaded ***by Apple employees*** using Mr. Liu's credentials to access his account. *Id.* at 15. Apple barely contests these points, asserting only—and without explanation or support—that Defendants' account "is an inaccurate description of different conduct, on a different system, at a different time." Opp. at 15. But Apple was careful to word its response in a way that does not deny the truth of what Defendants explained. Most notably, Apple does ***not*** deny that "Mr. Liu answered his former manager's questions or that Apple

---

[2] Ongoing events further undermine Apple's claim to take reasonable measures. One of the code names Apple's opposition cites as a trade secret recently "leak[ed]" because "Apple accidentally left the back door open in its latest software update." *Apple Leaks Unreleased Devices Weeks Ahead of Annual September Event*, Hypebeast (Aug. 20, 2026), https://hypebeast.com/2026/8/apple-iphone-18-iphone-ultra-leak-from-macos-tahoe.

employees accessed his personal iCloud account"—only that "[t]he Complaint does not allege" that those things happened. Opp. at 15. The reason Apple does not deny those things happened is as simple as it is obvious: Apple knows they did.

Apple tries to hide behind procedural arguments, invoking what it calls "extrinsic hearsay." Opp. at 14. As an initial matter, the text messages quoted from Apple employees within the scope of their employment are plainly not hearsay; they are party admissions. Fed. R. Evid. 801(d)(2). Nor are the statements offered for their truth: they show that Apple knew Mr. Liu still had access to his Apple account after he left, and that Apple exploited that access by asking him to help retrieve Apple files and, in some cases, downloaded the files itself, all of which negates Apple's contention of trade secret misappropriation. Mot. at 13-17. Apple's extrinsic evidence arguments fare no better. Apple does not dispute that the incorporation by reference doctrine allows the Court to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions." Mot. at 14 n.8 (quoting *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). Apple also does not question the authenticity of the text messages at issue. Nor can Apple deny that the Complaint refers extensively to Mr. Liu's communications with former Apple employees after leaving Apple, quoting those messages directly when it suits Apple's purposes. *See, e.g.,* Compl. ¶¶ 56-65. Apple instead argues that, because it chose to leave Mr. Liu's communications with a specific employee—his manager—out of the Complaint, it is entitled to hide those communications from the Court. Opp. at 14-15. Apple's overly narrow reading of the incorporation-by-reference doctrine would permit it to include the portions of Mr. Liu's text messages with Apple it likes while concealing the portions it does not. As Apple's cited case recognizes, the very purpose of the doctrine is to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). That is exactly what Apple is trying to do here.

Putting all that aside, Defendants' motion also showed that, even taking the Complaint's well-pleaded factual allegations (as distinct from attorney characterizations and legal conclusions) as true, the most they establish is that Mr. Liu "help[ed] one of his former colleagues locate

information from his own prior work at Apple." Mot. at 16. Apple does not address this at all, except to assert that it "does not have to foreclose all other explanations at the pleading stage." Opp. at 16 (quoting *Wisk*, 2021 WL 8820180, at *16). True enough. But Apple ***does*** have to show that its explanation is plausible. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). As Defendants' motion explained, the conduct Apple actually pleads (again, stripped of attorney characterizations and insinuations) is entirely innocent: Mr. Liu left Apple, his former colleagues reached out for help locating certain files, and he obliged. Mot. at 14-17; Compl. ¶¶ 55-67. That does not come close to a colorable misappropriation claim.

In an effort to spin this innocent conduct (which Apple induced) into a nefarious conspiracy, Apple relies on only three factual allegations from its entire 41-page Complaint. Opp. at 16. None supports a plausible inference of liability.

***First***, Apple claims that, based on a text message Mr. Liu sent "within hours of leaving Apple," he "knowingly retained a computer from which he could access Apple's confidential information." Opp. at 2, 16 (citing Compl. ¶ 56). But Apple got the time zone wrong. As Apple's own expert admits, this text message was sent on "January 22, 2026 in Pacific Time," though it appears "eight hours ahead" in "Coordinated Universal Time (UTC)." Dkt. 45 (Roffman Decl.) ¶ 18. In other words, Mr. Liu sent that text while still employed by Apple and while still at Apple's offices on his last day. *Id.; see also* Lazarus Decl. ¶¶ 2-5 and Ex. D. And even if Apple had not been mistaken, the retention of devices by departing employees is a natural consequence of Apple's policy of walking departing employees out the door the same day they give notice instead of affording them the customary two-week transition period. Mot. at 14 (citing Compl. ¶ 84). That hastiness predictably led to mistakes on Apple's part, including failing to disable Mr. Liu's access to Apple's cloud storage system. Mot. at 14 (citing Compl. ¶ 5). But Apple cannot use its own sloppy exit procedures as evidence of ill intent on the part of departing employees—let alone as evidence of misappropriation. And in all events, as Apple admits, Mr. Liu sent his "I still have another computer" message ***to an Apple employee*** on her "***Apple-issued work laptop***." Compl. ¶¶ 5, 56 (emphasis added). These are "the actions of an 'innocent' party" (*contra* Opp. at 16)—not someone trying to hide his conduct from Apple.

***Second***, Apple makes much of Mr. Liu "laugh[ing] about having access to Apple's system," quoting a text he again sent ***to an Apple employee*** in which he allegedly wrote (as translated by Apple) "LOL, I found out I can access the [network storage], so funny." Opp. at 16 (alteration in original) (quoting Compl. ¶ 57). While Apple trumpets this quote as though it proves Mr. Liu's bad intent, it in fact does the opposite. As noted, had he intended to use his continued network access to steal Apple documents, he would not have sent that message to ***an Apple employee on her work-issued device***. Next, as Apple admits, Mr. Liu was "surpris[ed]" to find he could access the network storage—negating Apple's theory of intentional theft. Compl. ¶ 57. Finally, and perhaps most importantly, Apple omits the context of Mr. Liu's message. Ms. Peng, a then-Apple employee, had previously asked Mr. Liu for help locating certain key documents ***for her work at Apple***. Mr. Liu texted her to tell her he had found the documents, noting in passing that it was funny he still had access, and then sent her the filepaths—***not*** the files themselves. Lazarus Decl., Ex. D. Mr. Liu's efforts to help an Apple employee locate Apple documents for her work at Apple, at her request, and without downloading the documents himself, does not support a plausible inference of trade secret misappropriation.

***Third***, Apple claims Mr. Liu "coached Ms. Peng about how 'to avoid trouble with the security team.'" Opp. at 16 (quoting Compl. ¶ 63). Again, Apple provides no meaningful explanation of how that supports an inference of liability under its theory, which focused on Mr. Liu's alleged downloading of Apple files. And again, Apple leaves out vital context: Mr. Liu's former Apple manager was in the process of downloading the contents of Mr. Liu's personal iCloud storage for Apple's use and benefit. Ms. Peng asked Mr. Liu about the location of certain Apple documents, also for Apple's use and benefit. Mr. Liu suggested that, instead of him sending her the documents, it would be easier for her to get them directly from Mr. Liu's former manager "to avoid trouble with the security team." Lazarus Decl., Ex. D. In other words, he was encouraging her to ***comply*** with best practices, not evade them. None of this supports a plausible inference of trade secret theft.

What Apple's Complaint actually alleges—and what the documents that Apple selectively excerpted actually show—is that Mr. Liu accessed and downloaded certain documents ***at the request***

***of Apple for use of its employees in their work at Apple***, and in some cases those Apple employees used his credentials to download the documents themselves. Apple's claim against Mr. Liu simply is not plausible.

2. <u>Apple Fails to Plead Misappropriation by Mr. Tan</u>

Apple's misappropriation claims against Mr. Tan suffer from similar defects: because Apple can allege only innocuous facts, it relies on argument and insinuation as it tries to alchemize them into something nefarious. But, at the end of the day, Apple has not alleged—and still does not identify—a single specific trade secret that it alleges Mr. Tan acquired, disclosed, or used.

In its opposition, Apple mischaracterizes Defendants' argument as claiming that the Complaint does not allege Mr. Tan received "any information." Opp. at 18. Not so. What the motion explained is that "Apple's Complaint does not allege that any candidate actually disclosed ***an identified trade secret***, let alone that Mr. Tan received one." Mot. at 19 (citation modified); *see also id.* at 17 ("[I]t never identifies any particular trade secret, at any level of detail, that Mr. Tan supposedly acquired, used, or disclosed"). That Apple's opposition fails even to address that point is fatal: the DTSA protects trade secrets, not "information" or even "confidential information."

Apple alleges Mr. Tan asked candidates to bring hardware components to interviews. Opp. at 17 (citing Compl. ¶ 70). But the Complaint does not (and Apple has no basis to) allege that any candidate ever actually brought Mr. Tan any nonpublic component; nor does it identify any trade secret embodied in such a hypothetical component; nor does it allege what information Mr. Tan supposedly obtained. Instead, Apple speculates that the interviews "would disclose Apple's proprietary technologies" (Compl. ¶ 70); that the parts were from the candidate's "confidential Apple work" (Opp. at 17); and that "[n]o one needs 'show and tell' for 'consumer products' that are [] 'widely available and in the public domain'" (Opp. at 17 (citation omitted)). Those arguments cannot withstand scrutiny: what Apple calls "show and tell" was "a common and innocuous request that a candidate discuss or display his prior work"; the point was not to gain information about publicly available products, it was to allow the candidate to explain his work on those products as an illustration of his knowledge and proficiency. Mot. at 18. But that is all beside the point, because, as explained above, it is not enough for Apple to argue its way into a trade-secret case by claiming

that some (unidentified) trade secret surely "must have" been disclosed in some (unspecified) meeting simply because Apple says so.

Next, Apple misreads the text exchange attached to Defendants' motion as Exhibit B. "[S]hipped" parts should be afforded its natural meaning: shipped to customers and therefore public. *Contra* Opp. at 17. Worse still, Apple ***admits*** that Mr. Tan has said that only "some folks" brought even ***publicly*** available parts to interviews. (Here, Apple is left with no choice but to ask this Court to reach for an implausible alternative reading of a straightforward text. Opp. at 18. But, read in context, Mr. Tan's meaning was clear: "some folks" bring parts to interviews, and when they do, those parts are "shipped," meaning public. Dkt. 60-3.) Once again, Apple does not identify a single part that it claims is a trade secret, explain what measures it took to protect that part, or allege that Mr. Tan or anyone else at OpenAI or io Products ever solicited that part from a candidate. Mot. at 18.

Apple's allegations concerning project code names suffer the same defect. Apple claims Mr. Tan used "internal Apple project codenames to ask, 'What's the plan?' for an unannounced Apple product." Opp. at 18 (citation modified). Putting aside that Apple has not tried to explain how the codenames themselves could meet the definition of a trade secret and that Apple's internal codenames regularly become public (Mot. at 19, n.11, *supra* n.2), the fundamental issue is the same: Apple does not identify a single piece of confidential information, let alone an identified trade secret, that it claims Mr. Tan solicited or received during any of these interviews.

Apple's allegations about pre-interview downloading or Mr. Tan's pre-departure emails fare no better. Apple does not allege that Mr. Tan knew of or requested the downloading, saw any downloaded material, or what, if anything, the candidate disclosed to him. And its allegation that he emailed himself "information about Apple's suppliers and internal summaries of the consumer electronics industry," Compl. ¶ 9, identifies no particular email, attachment, supplier term, specification, or other information that Apple alleges constituted a trade secret.

Lastly, Apple claims Mr. Tan improperly used an internal Apple document describing offboarding procedures. Opp. at 19. Apple does not claim that the document is itself a trade secret, or that Mr. Tan somehow used the document to obtain any specific trade secrets. *Id.* Thus, even if

Apple were granted the inference that Mr. Tan's possession of this document were somehow evidence of some generalized nefarious intent (an inference to which it is not entitled), Apple would still have failed to plead a claim for trade secret misappropriation. Mot. at 20-21.[3]

3. Apple Fails to Plead Misappropriation by OpenAI or io Products

The Complaint's allegations as to OpenAI and io Products fail as well.

***First***, Apple argues that its "allegations against Mr. Liu and Mr. Tan can[] be attributed to OpenAI and io." Opp. at 20. But the cases Apple cites bear no resemblance to the facts here. The allegations in *Wisk* were that the corporate defendant Archer—having hired employees alleged to have taken "roughly 5,000 files from Wisk's systems … through non-Wisk networks," including "many files embodying trade secrets at issue" as listed in Wisk's 2019.210 disclosure—was then "able to put together a relatively comprehensive presentation [] that set out virtually all important concepts underlying the Maker aircraft in … a suspiciously short timeframe." 2021 WL 8820180, at *15. That those "allegations together, with all reasonable inferences drawn in plaintiff's favor, plausibly impl[ied]" liability in *Wisk* (Opp. at 20 (citation modified)) does not mean Apple's much different allegations imply liability here. Unlike in *Wisk*, Apple does not tie its allegations against OpenAI or io Products to any specific alleged trade secret (even if it had identified any). Just as importantly, Apple alleges nothing like the "implausible development timeline" on which the *Wisk* court relied. 2021 WL 8820180, at *15. *WeRide Corp. v. Kun Huang* similarly relied on an unrealistic development timeline in finding that the corporate defendant knew or should have known of the alleged misappropriation. 379 F. Supp. 3d 834, 850 (N.D. Cal. 2019). And Apple cites *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479 (N.D. Cal. May 13, 2015) only for the

[3] Notably, the "at least equally plausible" quote from Defendants' motion, Mot. at 20, applied ***only*** to this specific issue: whether Mr. Tan had the Apple offboarding document to ensure departing Apple employees complied with it, or as some unexplained means of avoiding Apple's supposed confidentiality protections. Defendants have never admitted that Apple's allegations against Mr. Tan as a whole are plausible. They are not.

uncontroversial idea that "the plaintiff is not required to detail ***all*** uses of [the] trade secret in the complaint." Opp. at 20 (emphasis added). That is true, but has nothing to do with Apple's failure to plausibly detail ***any*** such uses in its Complaint here. Mot. at 21-22.

***Second***, Apple makes the same failed arguments described above (*supra* at 9-11) regarding the Corporate Defendants' interviews of Apple employees. These allegations are downstream from Apple's allegations against Mr. Tan, and fail for the same reasons discussed above. Most fundamentally, the Complaint never alleges that Mr. Tan, or anyone else at OpenAI or io Products, actually received any specific trade secrets from the Apple employees they interviewed (because they did not).

***Third***, Apple relies on what it calls "direct allegations that OpenAI misappropriated trade secrets relating to a 'multi-step metal finishing' technique." Opp. at 22 (citation omitted). Apple repeats generic, conclusory allegations from the Complaint (*id.*), but never addresses the central flaw Defendants' motion identified. Specifically, even assuming Apple is right that (1) it has a confidential supplier, (2) the supplier performs a process for Apple that could qualify as a trade secret, and (3) the supplier performed that process for OpenAI in breach of the supplier's agreements with Apple, that is an issue between the supplier and Apple. Mot. at 23.

The only thing purporting to convert that issue into a misappropriation claim against OpenAI is Apple's conclusory assertion that OpenAI "misled" the supplier into believing it "had Apple's permission to have the [supplier] carry out the confidential metal-finishing technique for OpenAI's benefit." Compl. ¶ 81. That is an allegation of fraud, and thus Apple was required to plead it with particularity. Fed. R. Civ. P. 9(b). Because "[f]raud allegations may damage a defendant's reputation regardless of the cause of action in which they appear," they are "properly subject to Rule 9(b) in every case," so that "allegations [] of fraudulent conduct must satisfy the heightened pleading requirements of" that rule. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-05 (9th Cir. 2003). "Rule 9(b) applies to [] trade secret claims" where the plaintiff alleges that the defendant "misappropriated its trade secrets by misrepresentation." *Weiss Residential Research LLC v. Experian Information Solutions, Inc.*, 2020 WL 6555053, at *5 (C.D. Cal. Oct. 15, 2020); *see also Foam Supplies, Inc. v. Dow Chem. Co.*, 2006 WL 2225392, at *14 (E.D. Mo. Aug. 2, 2006)

("[W]here a plaintiff alleges fraud as the improper means by which a party misappropriated trade secrets, Rule 9(b)'s particularity requirement applies."). And where Rule 9(b) applies, "[t]he complaint must identify the 'who, what, when, where, and how' of the fraudulent misconduct, 'as well as what is false or misleading about' it, and 'why it is false.'" *Weiss*, 2020 WL 6555053, at *5 (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).

Apple's Complaint fails to satisfy Rule 9(b)'s requirements. It simply asserts that "OpenAI and its cohorts misled the partner to believe they had Apple's permission to have the partner carry out the confidential metal-finishing technique for OpenAI's benefit." Compl. ¶ 81. It does not specify who at OpenAI (or possibly one of "its cohorts") made the misleading statements, what the statements were, when they were made, where, how, or what was misleading about them. The "OpenAI and its cohorts" vagueness alone dooms Apple's claim because a party claiming fraud must plead "the identities of the parties to the misrepresentations." *Weiss*, 2020 WL 6555053, at *5 (quoting *UMG Recordings, Inc. v. Global Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1106 (C.D. Cal. 2015)); *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)).

Because Apple has failed to plead the fraud it alleges, the Court should "'disregard' those averments, or 'strip' them from the claim," and then "examine the allegations that remain to determine whether they state a claim." *Vess*, 317 F.3d at 1105. With the allegation that OpenAI "misled" the Apple supplier stripped from the claim, all that is left is a contract dispute between Apple and its supplier. *Supra* at 12; Mot. at 23. Apple's claim of trade secret misappropriation against OpenAI and io, therefore, must be dismissed.

## IV. <u>APPLE FAILS TO PLEAD HARM</u>

Defendants' motion explained that "Apple does not allege that it lost a sale, a supplier, a customer, or an employee it wished to keep; that any Apple product was delayed, degraded, or made more expensive; or that the value of any identified secret declined by any amount." Mot. at 24-25. Apple does not meaningfully dispute any of that, instead citing only to paragraphs of the Complaint containing conclusory, boilerplate allegations of harm. Opp. at 24 (citing Compl. ¶¶ 97, 110, 123, 136). "Threadbare recitals of the elements of a cause of action" cannot withstand a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor does *Apple Inc. v. Rivos, Inc.* support

Apple's position. There, this Court found that Apple had "extensively described the harm that would result if its trade secrets were to be disclosed," citing a ***sworn declaration*** from an Apple employee with detailed statements to that effect. 2023 WL 5183034, at *9 (N.D. Cal. Aug. 11, 2023). This Court also relied on the fact that "there [were] no affirmative allegations in the [complaint] that would preclude a finding of harm." *Id.* Here, there are allegations in the Complaint—or at least in documents that Apple references in, but does not attach to, the Complaint—that preclude such a finding. Apple does not dispute that its outside counsel attempted to contact OpenAI regarding Apple's alleged concerns in February (Compl. ¶ 14), confused two Asian last names, emailed the wrong person as a result, and then incorrectly said it had spoken to OpenAI's general counsel. Mot. at 1. Nor does Apple dispute that, after OpenAI responded and identified the issue, Apple apologized for the mix-up, indicated the issue was being resolved, and then sat silent for five months before filing its complaint. *Id.* That is not the behavior of a company that believes itself to be facing irreparable, or any, harm.

## V. THE COURT SHOULD DISMISS APPLE'S STATE LAW CLAIMS AS WELL

Apple fails to even address the substance of Defendants' argument that, if the Court dismisses Apple's DTSA claims, it should decline to exercise supplemental jurisdiction over Apple's state-law breach of contract claims. Mot. at 25; Opp. at 25. Instead, Apple merely repeats its incorrect argument that "Apple's DTSA claims are well pleaded." Opp. at 25. The parties thus seem to agree that, if Apple's DTSA claims fall, its breach of contract claims fall as well.

## VI. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Apple's Complaint with prejudice.

DATED: August 26, 2026

By */s/ Andrew H. Schapiro*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Andrew H. Schapiro (*pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

David Eiseman (Bar No. 114758)
Jodie W. Cheng (Bar No. 292330)
Victoria B. Parker (Bar No. 290862)
Andrew M. Mather (Bar No. 345548)
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
jodiecheng@quinnemanuel.com
vickiparker@quinnemanuel.com
andrewmather@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
Lucas A. Hammill (*pro hac vice*)
Jordan M. Nakdimon (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com
lucashammill@quinnemanuel.com
jordannakdimon@quinnemanuel.com

Joseph E. Reed (Bar No. 323524)
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
joereed@quinnemanuel.com

*Attorneys for Defendants*
*OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

DATED: August 26, 2026

By /s/ Kate E. Lazarus

KWUN BHANSALI LAZARUS LLP

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**ATTESTATION**

I, Andrew H. Schapiro, am the ECF user whose ID and password are being used to file the above document. In compliance with Local Rule 5-1(i)(3), I hereby attest that Kate E. Lazarus has concurred in the filing of the above document.

By *_/s/ Andrew H. Schapiro_*
Andrew H. Schapiro