Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

David Eiseman (Bar No. 114758)
Jodie W. Cheng (Bar No. 292330)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
jodiecheng@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

[Additional counsel listed in signature block]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 1

A. Tan's Departure From Apple and the Founding of io Products ........ 1

B. OpenAI's Development of a Hardware Device ........ 2

C. Apple's Inadequate Data Storage and Offboarding Procedures ........ 2

D. OpenAI's Recruiting Practices ........ 3

1. The OpenAI Consumer Hardware Interview Process ........ 3

2. Onboarding at OpenAI ........ 5

E. Defendant Liu's Departure from Apple for OpenAI ........ 5

F. Liu's Assistance to Former Colleagues at Apple ........ 7

G. Liu Did Not Download Anything From [redacted] For Use at OpenAI ........ 8

H. The Instant Proceeding and OpenAI's Good-Faith Negotiation ........ 9

LEGAL STANDARD ........ 10

ARGUMENT ........ 10

I. APPLE IS NOT ENTITLED TO INJUNCTIVE RELIEF ........ 10

A. Apple Is Unlikely to Prevail on Its Trade Secret Claims ........ 10

1. Apple does not assert any protectable trade secret ........ 11

2. Apple did not take reasonable measures to protect its information ........ 13

3. Apple fails to show unauthorized acquisition, use, or disclosure ........ 16

*i. Apple Fails to Demonstrate Misappropriation by Chang Liu* ........ 17

*ii. Apple Fails to Demonstrate Misappropriation by Tang Tan* ........ 19

*iii. Apple Fails to Demonstrate Misappropriation by OpenAI or io* ........ 21

4. Apple has not shown that any misappropriation caused or threatened harm ........ 23

B. Apple is Unlikely to Prevail on its Breach of Contract Claims ........ 24

C. Apple Cannot Show Irreparable Harm ........ 24

D. The Balance of Equities Weighs in Defendants' Favor ..........24
E. The Public Interest Counsels Strongly Against Relief..........25
II. APPLE'S PROPOSED ORDER IS UNDULY BROAD..........25
CONCLUSION ..........25

## TABLE OF AUTHORITIES

### Cases


*Advante Int'l Corp. v. Mintel Learning Tech.*,
2006 WL 1806151 (N.D. Cal. June 29, 2006) ........ 25

*Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*,
819 F. Supp. 2d 1001 (E.D. Cal. 2011) ........ 19

*Albert's Organics, Inc. v. Holzman*,
445 F. Supp. 3d 463 (N.D. Cal. 2020) ........ 10

*Apple Inc. v. Rivos, Inc.*,
2023 WL 5183034 (N.D. Cal. Aug. 11, 2023) ........ 22

*Arminak Sols., LLC v. 7-Eleven, Inc.*,
2017 WL 6888706 (C.D. Cal. Mar. 16, 2017) ........ 24

*Arthur J. Gallagher & Co. v. Tarantino*,
498 F. Supp. 3d 1155 (N.D. Cal. 2020) ........ 17

*Bombardier Inc. v. Mitsubishi Aircraft Corp.*,
383 F. Supp. 3d 1169 (W.D. Wash. 2019) ........ 22

*Buffets, Inc. v. Klinke*,
73 F.3d 965 (9th Cir. 1996) ........ 14

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ........ 24

*Cisco Sys., Inc. v. Chung*,
462 F. Supp. 3d 1024 (N.D. Cal. 2020) ........ 23

*CleanFish, LLC v. Sims*,
2019 WL 2716293 (N.D. Cal. June 28, 2019) ........ 25

*Dairy, LLC v. Milk Moovement, Inc.*,
2022 WL 584003 (E.D. Cal. Feb. 25, 2022) ........ 16

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ........ 24

*Edwards v. Arthur Andersen LLP*,
44 Cal. 4th 937 (2008) ........ 25

*ELT Sight, Inc. v. EyeLight, Inc.*,
2020 WL 7862134 (C.D. Cal. Aug. 28, 2020) ........ 16

*Formfactor, Inc. v. Micro-Probe, Inc.*,
No. 10-cv-3095, ECF No. 189 (N.D. Cal. June 7, 2012) .......... 15

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .......... 10

*Gemisys Corp. v. Phoenix Am., Inc.*,
186 F.R.D. 551 (N.D. Cal. 1999) .......... 15

*Hooked Media Grp., Inc. v. Apple Inc.*,
55 Cal. App. 5th 323 (2020) .......... 16, 22

*Insulet Corp. v. EOFlow, Co.*,
104 F.4th 873 (Fed. Cir. 2024) .......... 11

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020) .......... 11, 23

*Mallet & Co. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) .......... 11, 12

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) .......... 10

*Move, Inc. v. CoStar Group, Inc.*,
No. 24-cv-5607, ECF No. 98 (C.D. Cal. Sept. 23, 2024) .......... 24

*Nat'l Specialty Pharmacy, LLC v. Padhye*,
734 F. Supp. 3d 922 (N.D. Cal. 2024) .......... 23

*Navigation Holdings, LLC v. Molavi*,
445 F. Supp. 3d 69 (N.D. Cal. 2020) .......... 22

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 24

*P2i Ltd. v. Favored Tech USA Corp.*,
2024 WL 4294652 (N.D. Cal. Sept. 24, 2024) .......... 11

*Reworld Sumter Indus. 13 LLC v. VEP Env't LLC*,
2025 WL 2695014 (D.S.C. Sept. 19, 2025) .......... 23

*Winter v. NRDC*,
555 U.S. 7 (2008) .......... 10

*Wisk Aero LLC v. Archer Aviation Inc.*,
2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) .......... 22

*X.AI LLC v. Bonta*,
2026 WL 626926 (C.D. Cal. Mar. 4, 2026) .......... 11

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*,
898 F.3d 1279 (11th Cir. 2018) ........ 15

**Statutes**

18 U.S.C. § 1839(3) ........ 13

18 U.S.C. § 1839(3)(A) ........ 13

18 U.S.C. § 1839(5) ........ 17

## SUPPORTING DECLARATIONS

| Declarant | Title | Abbreviation |
|---|---|---|
| Crain, Andrew | Digital Forensics Expert | ("Crain Decl.") |
| Delman, Joel | Industrial Design Expert | ("Delman Decl.") |
| Freid, Robert G. | Manfucating and Supply Chains Expert | ("Freid Decl.") |
| Hutchinson, Melissa | Head of Recruiting, OpenAI Consumer Hardware division | ("Hutchinson Decl.") |
| Lampton, Victoria E. | Recruiting Manager, OpenAI Robotics division | ("Lampton Decl.") |
| Lee, Delwin | Member of Finance Staff, OpenAI | ("Lee Decl.") |
| Liu, Chang | Hardware Engineer, OpenAI Consumer Hardware division | ("Liu Decl.") |
| Moynihan, Mary Rose | Member of People and Recruiting Team, OpenAI Consumer Hardware division | ("Moynihan Decl.") |
| Peng, Alyssa | Member of Technical Staff, OpenAI | ("Peng Decl.") |
| Raychowdhury, Arijit | Electrical and Computer Engineering Expert | ("Raychowdhury Decl.") |
| Schapiro, Andrew H. | Attorney, Quinn Emanuel Urquhart & Sullivan, LLP | ("Schapiro Decl.") |
| Tan, Tang | OpenAI Chief Hardware Officer, Consumer Products | ("Tan Decl.") |
| White, David | Data Security Expert | ("White Decl.") |
| Yao, Y. Lawrence | Materials Science and Mechanical Engineering Expert | ("Yao Decl.") |
| Individual A | Member of Technical Staff, OpenAI | ("Indv. A Decl.") |
| Individual No. 1 | Member of Technical Staff, OpenAI | ("Indv. No. 1 Decl.") |

## INTRODUCTION

This dispute is a mess of Apple's own making, and it is trying to blame everyone else. Apple blames employees who left the company for taking their personal accounts with them—even though Apple encouraged them to use personal accounts for work. It blames employers who interview Apple employees for asking questions—even though those unremarkable questions are standard in tech and every other industry. It even blames loyal former Apple personnel like Chang Liu for responding to requests from former colleagues to help them find files to do their ***Apple*** work, and Tang Tan for telling individuals to ***follow*** Apple's rules.

If ever a case illustrated the maxim that "no good deed goes unpunished," this is it. Chang Liu responded to Apple employees' requests for assistance, for Apple's benefit, and finds himself accused of trade-secret theft. Tang Tan is accused of stealing intellectual property for telling employees to make sure they do not bring Apple prototypes or other devices with them. These former employees were trying to help Apple. And they were right that Apple needed help; its exit process is a mess. But rather than clean up that mess, Apple now tries to bully the employees who left. It is no wonder 400 of them chose new employment. Apple cannot stop the next 400 employees from leaving by filing baseless lawsuits. In California, employees have choices. They can leave a company like Apple that has struggled to adopt AI and move to an exciting startup that builds innovative products. Apple may not like those choices. But it cannot claim those choices are unlawful, and it cannot use its own sloppy procedures to blame others for its own mess.

## FACTUAL BACKGROUND

### A. Tan's Departure From Apple and the Founding of io Products

Defendant Tang Tan spent 24 years at Apple, most recently as Vice President of Product Design. Tan Decl. ¶ 2. He worked on hardware matters, including helping design the iPhone and the Apple Watch. *Id.* ¶ 3. In late 2023, Tan decided to leave Apple. He had not yet decided whether to retire or join a new business venture. Tan Decl. ¶ 6. He agreed with other members of Apple's leadership that his last day in Apple's office would be February 2, 2024. *Id.*

Before his departure, Tan worked diligently to return the Apple prototypes in his possession. He also sent a few non-confidential documents to his personal email. Tan Decl. ¶¶ 8-9, 11. These

included personal emails and notes, congratulatory emails from friends and colleagues (including a few Apple suppliers and vendors, whose identities are public knowledge), and his personal notes regarding public information discussed at a public consumer electronics conference. *Id.* ¶ 11. He also sent himself a copy of Apple's Managers' Checklist for departing employees. Apple employees can generally access the checklist; its purpose is to serve as a resource for departing employees, [redacted]. *Id.* ¶ 27; *see also* Hutchinson Decl. ¶ 12. The checklist is very similar to others that have been publicly available—a fact Apple appears to acknowledge by publicly filing one in this case. *See* ECF No. 42-9; White Decl. ¶ 69 n.16.

In late March 2024, Tan launched io Products with other former Apple leaders Jonathan Ive, Scott Cannon, and Evans Hankey. Tan Decl. ¶ 12. After several months of broad exploration, Tan and the other founders of io Products began prototyping new AI device form factors. *Id.* Tan did not meet with "OpenAI or its collaborators" to discuss meetings with a key Apple supplier prior to leaving Apple, as Apple alleges. Compl. ¶ 9; *see* Tan Decl. ¶ 13. Tan first met with OpenAI on March 8, 2024. *Id.* In October 2024, eight months after Tan left Apple, io Products and OpenAI entered into an exclusive partnership, and in May 2025, OpenAI announced its intention to merge with io Products. The merger closed in July 2025. *Id.* ¶ 14.

### B. <u>OpenAI's Development of a Hardware Device</u>

Following the 2022 release of ChatGPT, OpenAI has sought to develop hardware devices to make ChatGPT even more useful. OpenAI's first expected hardware product is a new type of consumer device that differs materially from known Apple products. Lee Decl. ¶ 3. Following OpenAI's acquisition of io Products, Tan became OpenAI's Chief Hardware Officer, Consumer Products. *Id.* ¶ 15. The Consumer Hardware Product Group is an independent division with its own location and recruiting operation. *Id.* OpenAI works with a number of suppliers common to the tech industry, including [redacted]. *See* Tan Decl. ¶ 30. OpenAI has told suppliers that personnel working on Apple matters should not also work on OpenAI matters. Tan Decl. ¶ 30.

### C. <u>Apple's Inadequate Data Storage and Offboarding Procedures</u>

Apple has an unusual policy that encourages its employees to use ***personal*** iCloud accounts to access Apple work documents and perform their work functions. Indv. No. 1 Decl. ¶ 13. Because

of that policy, employees at "all levels" used their "personal accounts to send substantive work communications over iMessage, and to save confidential Apple work files, like Keynote files, to their personal iCloud Drive accounts." *Id.* ¶ 14. This makes it very hard for departing and former employees to disentangle Apple information from their personal accounts. Apple instructs departing employees to "[m]ove" Apple-related documents to a designated folder within their personal iCloud drives. Ieyoub Decl. Ex. L at 3. Former employees report that, after they complied with that instruction, the iCloud software often automatically added some or all of those very documents back to the personal area of their accounts. Tan Decl. ¶ 21; Indv. No. 1 Decl. ¶ 19.

Compounding this problem is Apple's policy of requiring employees who are leaving for competitors to be walked out of the building by their managers immediately after, or within days of, their resignations. Among other things, departing employees are given insufficient time to return devices, prototypes, and production units in their possession, or to remove Apple information from their personal accounts and devices. Tan Decl. ¶ 18. The policy also leaves departing employees little opportunity to transfer their responsibilities. *See* Liu Decl. ¶ 15; Peng Decl. ¶ 6.

**D. <u>OpenAI's Recruiting Practices</u>**

A number of OpenAI employees previously worked at Apple. Hutchinson Decl. ¶ 4. These individuals are good fits at OpenAI because they have strong skills and experience in the consumer hardware industry. *Id.*

1. <u>The OpenAI Consumer Hardware Interview Process</u>

The OpenAI Consumer Hardware team reminds candidates not to bring or discuss anything confidential to their interviews. Hutchinson Decl. ¶ 7. Candidates do sometimes bring components of publicly available products or parts as demonstrative aids. *Id.* ¶ 8; Tan Decl. ¶ 24. Having a candidate explain their work on a released part or product helps the interviewers better understand the candidate's specific expertise and evaluate their knowledge. *Id.* ¶ 25(a). Apple quotes language from a generic interview guide used by the OpenAI Robotics recruitment team in support of the proposition that "Tan and others at OpenAI instructed candidates to bring 'parts or systems that you worked on [at Apple],' such as 'prototypes' and 'CAD/design artifacts.'" Mot. 4. That generic interview guide is not used for recruitment to any consumer hardware roles, at OpenAI's Consumer

Hardware division or otherwise. Lampton Decl. ¶ 5; Hutchinson Decl. ¶ 9. In any event, nothing in the document mentions Apple or any confidential information. Lampton Decl. Ex. A. The process described in that guide is common in the technology industry and is also called a "technical presentation." *Id.* ¶ 6. After the guide is sent, OpenAI recruiters call to instruct the candidate to "anonymize or abstract sensitive details," stay away from "the confidential business context," "strip[] out identifiers or proprietary data," and "check with [their] employer's policy before the interview," *id.* ¶ 7.

OpenAI Consumer Hardware employees never solicited Apple confidential information in any interviews. In [redacted], approximately [redacted] before OpenAI acquired io Products, Tan texted a candidate that it "might be helpful" to bring parts or systems that she had previously worked on. Tan Decl. ¶ 25(a). When the candidate responded that she can "probably bring a couple of shipped batteries," Tan said those would be "interesting." *Id.* "Shipped" means parts that are publicly available, were already released, and are non-confidential. *Id.* The candidate brought nothing non-public to her interviews. *Id.* In [redacted], Tan similarly advised a candidate from Apple to "[b]ring some parts" they worked on "***in the past***," meaning objects that were already released publicly. *Id.* ¶ 25(c) (emphasis added). The candidate responded that he "will check" if he has any "non-AOU units," which means public non-Apple-Owned Units, to bring. *Id.*

Apple also suggests Tan asked Apple employee Individual No. 1 about an Apple project in an effort to elicit unspecified Apple confidential information. Mot. 4, 16. In reality, Tan asked Individual No. 1 to consider the leadership hole he would be leaving behind at Apple if he left because Tan was familiar with the project Individual No. 1 was working on from his own time at Apple. Tan wanted Individual No. 1 to be sure he was willing to step away from the project and his team. Tan Decl. ¶ 28; Indv. No. 1 Decl. ¶¶ 10-11. The two did not discuss Apple confidential information, nor the substance of this project. Tan Decl. ¶ 28; Indv. No. 1 Decl. ¶ 8.

Apple also implies that Individual No. 1 "began screenshotting and downloading information related to the highly confidential Apple project about which Mr. Tan inquired during his interview" at Tan's direction. Mot. 5. But the screenshots and downloads were entirely unrelated to his OpenAI interviews. Instead, consistent with his routine notetaking practice over

several years at Apple, he took screenshots of a Keynote file on his Apple work MacBook Pro to make sure that he would remember which file and slides he needed to review or work on, as part of his work for Apple. Indv. No. 1 Decl. ¶ 7.

2. Onboarding at OpenAI

New hires at the OpenAI Consumer Hardware division are required to sign offer letters that include robust protections of the trade secrets and confidential information of their previous employers. Among those is a Confidential Information and Invention Assignment Agreement, attached to their offer letters, stating, "I will not improperly use or disclose to OpenAI any Confidential Information or Trade Secrets, as defined under this Agreement of my former employer(s) or any other person, and I agree not to bring any such information onto OpenAI's property or place of business or expose any OpenAI employees to any such information." Hutchinson Decl. ¶ 10. On certain occasions when Apple employees have accepted job offers, Tan and others at OpenAI have sent them copies of the Managers' Checklist (described *supra* at 2), to help them prepare in advance to complete the steps in the checklist. *Id.* ¶ 11; *see also* Tan Decl. ¶ 25(b); Moynihan Decl. ¶¶ 9-10. They do so to facilitate compliance with Apple offboarding protocol, as the [redacted] due to Apple's hasty walk-out policy and other means by which it makes proper offboarding difficult. Roffman Decl. Ex. M.

**E. Defendant Liu's Departure from Apple for OpenAI**

Defendant Chang Liu worked at Apple between 2018 and January 2026, most recently as a Senior System Electrical Engineer. Liu Decl. ¶ 2. He worked on the iPhone product line. *Id.* During his time at Apple, Liu had various Apple-issued devices, including two old laptops, two newer MacBook Pro laptops, and one iMac desktop computer he used to work from home. *Id.* ¶ 4. Like most other Apple employees, he used his personal iCloud account and personal Apple ID for his Apple work. *Id.* ¶ 5. Accordingly, the majority of Liu's work files were kept on his personal iCloud account, including documents he shared with other Apple employees and documents they shared with him. *Id.* Liu also stored some of his Apple work files on a cloud repository called [redacted], which Apple employees use in conjunction with iCloud. *Id.* Liu's [redacted] access was associated with his Apple work email address. *Id.*

In late 2025, Liu interviewed for a role at OpenAI. Liu Decl. ¶ 7. Because Liu already knew several people at OpenAI, who were familiar with his technical skills and proficiency, his interviews were focused on his cultural fit. *Id.* ¶ 8. He did not talk about technical details of his work at Apple. *Id.* In late December 2025, Liu accepted a job at OpenAI. *Id.* ¶ 9. His offer letter included the Confidential Information and Invention Assignment Agreement described above.

Because Liu knew he would be "walked out" of the Apple office on the day he gave his notice, he spent the week before giving notice gathering all his relevant work files into specific folders on his iCloud that he could then transfer to his Apple colleagues. Liu Decl. ¶ 10. Liu wanted the documents stored on his iCloud to be available to his Apple team after his account was disabled, so he started to download the files onto one of his Apple-issued MacBook Pros and subsequently started uploading the files to his work account on [redacted]. *Id.*

On the morning of January 22, 2026, Liu gave notice of his resignation to Apple. Liu Decl. ¶ 11. He and his Apple manager, [redacted], reviewed a checklist for departing employees on the Apple Human Resources website. Liu Decl. ¶ 12; Ieyoub Decl. Ex. I.[1] Late in the afternoon on the same day, while Liu was preparing to leave the Apple office, his friend and Apple colleague Yu-Ting "Alyssa" Peng tried to reach him regarding a project on which the two had been working. Liu Decl. ¶ 16; Peng Decl. ¶ 5. At approximately 6:30 p.m., Liu responded to Peng via text that he still had his computer with him, as he was still in the office. Liu Decl. Ex. B at 1; Dkt. 91 at 7. After Liu met Peng to complete his final task at Apple, his manager [redacted] walked him out of the office on the evening of January 22. Before leaving, Liu returned both the MacBook Pro laptops he used for his Apple work. Liu Decl. ¶ 17. Because the downloads from Liu's personal iCloud account to his Apple [redacted] account were still ongoing and his manager wanted to download the same files to a hard drive, Liu agreed with the manager to not sign out of his personal iCloud account nor perform a factory reset. Liu also left his [redacted] account signed in on the MacBook Pros. *Id.* ¶ 14.

[1] Mr. Liu has no knowledge of the Motion's claims that he "failed to sign Apple's standard confidentiality reminder and did not respond to Apple's departure-related communications." Liu Decl. ¶ 13. Nor does Apple cite any evidence that the "communications" ever happened.

Because Liu had not had time to remove and transfer numerous personal files he wanted to retain from the iMac he kept at home, he returned that iMac in March 2026 through an Apple employee. Liu Decl. ¶ 18. Liu also used the iMac to respond to requests from his former Apple colleagues about Apple work, as discussed *infra*.

**F. Liu's Assistance to Former Colleagues at Apple**

In the months that followed, Liu routinely fielded questions from his former Apple colleagues, both substantive and concerning the location of certain documents and information.

After Liu left Apple, his manager remained logged in to Liu's personal iCloud account and tried to download the folder of Apple materials Liu had assembled there. On January 27, Liu asked him to at least sign out of Liu's iMessage account, as there might be "new company stuff showing up in that laptop." Liu Decl. Ex. A. Finally, on January 30, the manager confirmed that he had signed out of Liu's iCloud account. [redacted] was not the only Apple employee who asked for Liu's assistance downloading Apple documents from his iCloud after his departure. On January 23, [redacted] asked for Liu's assistance in retrieving certain Apple files that Peng needed for Apple work. Liu provided [redacted] with his iCloud credentials on the same day and logged out when she was finished on January 26. Liu Decl. Ex. D. On January 27, Peng, who had taken over many of Liu's responsibilities at Apple, asked Liu a series of technical questions regarding Apple work. Liu Decl. Ex. F at 1. Liu directed Peng to Apple employees who could answer her questions and offered to log into his iCloud account on her computer so she could download the documents onto her own. *Id.* Liu explained that it would be better for security purposes for Peng to seek the documents from [redacted], the Apple manager, as he was logged in to and using Liu's personal iCloud account to retrieve the documents.[2] Liu Decl. Ex. B at 1. But because the manager had not yet downloaded the documents, and Peng needed them for her Apple work, Liu allowed her to sign into his iCloud.

In the months following Liu's departure from Apple, many of his former Apple colleagues continued to reach out to him for his assistance. Mot. 3. Several of those instances are described

[2] Liu did not "coach" Peng on any scheme to bypass Apple security protocols. *Contra* Mot. 4. Liu helped her locate and access Apple documents to which she already had authorization.

in Liu's declaration, filed herewith. For example, on March 5, Liu's former manager added Liu to a group chat with several Apple employees. Liu Decl. Ex. H. [redacted] asked Liu a technical question about Apple work. Liu responded with [redacted] locations the team could search to find the answer. An Apple employee responded that this was "highly irregular" and asked to be removed from the group chat.

### G. Liu Did Not Download Anything From [redacted] For Use at OpenAI

On February 8, 2026, Liu happened to notice that he still had access to his [redacted] account on his iMac. Mystified that Apple had failed to disable his account, Liu texted Peng that he found it "funny." Liu Decl. Ex. B at 2. Contrary to Apple's assertion that Liu "celebrated" his access (Compl. ¶¶ 5, 57; *see also* Mot. 3, 14), Liu was surprised that Apple failed to disable his account when he left. *Id.* That night, Liu told Peng that he found documents she had been trying to find. Liu then sent Peng filepaths for those documents, without downloading them, so that she could access them.

That same night, Liu attempted to find information about which Peng had asked on February 6 related to [redacted]. Liu Decl. Ex. B at 1. Because the information could have been located in any number of documents, Liu accessed four documents from [redacted] to search for it. Those are documents 1 through 4 in paragraph 20 of the Roffman Declaration (ECF No. 45), and are irrelevant to Liu's work at OpenAI. Liu Decl., Add. 1 at 1. On February 10, Peng asked Liu a technical question over the phone about the [redacted]. To answer her question, Liu accessed document 5 in paragraph 20 of the Roffman Declaration. This document, too, is irrelevant to Liu's work at OpenAI. Liu Decl. ¶ 36. On March 4, Liu spoke to Apple employee [redacted], who had taken over some of his responsibilities at Apple when he left. [redacted] asked Liu a question on how to improve his performance at Apple in the [redacted]. Liu told [redacted] about public source videos and that he should run his own simulations and compare them to the results Liu had in similar simulations. Several days later, on March 7, Liu checked the [redacted] folder path for the simulation files so he could share it with [redacted]. To see if his documents were still accessible, Liu opened his [redacted] folder titled [redacted]. Those documents are labeled 6-8 in paragraph 20 of the Roffman Declaration. [redacted]

never followed up and the two did not subsequently discuss the files. Liu Decl. ¶ 43. In each instance, Liu was accessing documents—none of which have relevance to his current work at his new employer—on behalf of Apple employees, for Apple work purposes.

Finally, on March 11, Liu used Apple's Migration Assistant tool to set up a new personal Mac Mini he had purchased for himself. Liu Decl. ¶ 44. This was not an Apple-issued device. Liu used the tool to transfer personal files stored on the iMac he had used as an Apple employee. *Id.* Unbeknownst to Liu at the time, the Migration Assistant process transferred several Apple work applications, including [redacted], from his iCloud to his new Mac Mini. Crain Decl. ¶ 16; Liu Decl. ¶ 45. A forensic investigation has revealed that, contrary to Apple's assertion that Liu downloaded certain documents on March 11 and April 27, all 37 files Apple identifies as "Apple files" are ***zero-byte*** files on Liu's Mac Mini, strongly suggesting that Liu never opened, copied, or otherwise interacted with them. Crain Decl. ¶ 24. The forensic investigation is consistent with Liu's account that he did not intentionally download the files listed for March 11 and April 27. Those documents are labeled 9-37 in paragraph 20 of the Roffman Declaration.

### H. <u>The Instant Proceeding and OpenAI's Good-Faith Negotiation</u>

Apple never expressed its concerns to Liu or Tan, or to OpenAI about Liu or Tan, before filing this lawsuit. After the suit was filed, OpenAI nevertheless tried to work in good faith with Apple. OpenAI offered to support Apple's efforts to collect any Apple-owned devices possessed by OpenAI employees if Apple failed to collect such devices as part of an exit protocol, and to front-load document and device discovery. Schapiro Decl. Ex. A at 2. Apple refused, instead demanding unfettered access to OpenAI's devices and network and insisting that hundreds of OpenAI employees not named in the Complaint be subjected to an invasive and time-consuming interrogation, exposing Apple to the Corporate Defendants' privileged information, confidential information, and trade secrets. *Id.*; Lee Decl. ¶ 9. At the same time, Apple refused to specifically identify its trade secrets even on a preliminary basis, despite numerous requests from OpenAI, which would have allowed OpenAI to search for any such trade secrets in its possession and engage in any remediation.

OpenAI has been negatively impacted by this litigation: Since Apple sued, several candidates have expressed anxiety about their applications for employment at OpenAI out of concern that Apple will unfairly target them next. Hutchinson Decl. ¶ 15. This proceeding has also negatively impacted OpenAI's relationships with business partners who are also wary of retaliation by Apple. Lee Decl. ¶ 13.

## LEGAL STANDARD

Preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter v. NRDC,* 555 U.S. 7, 24 (2008). Accordingly, they may be awarded only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. That is especially true where, like here, the plaintiff seeks a mandatory injunction, or one which "orders a responsible party to 'take action'" as opposed to refraining from one. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). As the Ninth Circuit has "cautioned" time and again, a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Id.* (quotation omitted). Courts, therefore, will not award mandatory injunctions in "doubtful cases." *Marlyn Nutraceuticals*, 571 F.3d at 879. "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

## ARGUMENT

### I. APPLE IS NOT ENTITLED TO INJUNCTIVE RELIEF

#### A. Apple Is Unlikely to Prevail on Its Trade Secret Claims

Trade secret misappropriation has three elements: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 471 (N.D. Cal. 2020) (quotation omitted). None are established here.

1. Apple does not assert any protectable trade secret

A trade secret must be "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *P2i Ltd. v. Favored Tech USA Corp.*, 2024 WL 4294652, at *3 (N.D. Cal. Sept. 24, 2024) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020)). A plaintiff must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *X.AI LLC v. Bonta*, 2026 WL 626926, at *5 (C.D. Cal. Mar. 4, 2026) (emphasis in original) (quoting *InteliClear*, 978 F.3d at 658).

A plaintiff seeking an injunction must "establish the likelihood of its success on the merits for at least one, specifically defined, trade secret." *Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 881 (Fed. Cir. 2024). Setting forth "broad categories of [company] information" is insufficient. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380, 382 (3d Cir. 2021).

Apple flunks this test. Its Motion merely sets forth a list of generic categories that could encompass any information relating to development of any hardware product at any company. Mot. 1 (listing "hardware engineering, manufacturing and industrial design, component technologies, testing and development processes, and supply chain operations"). Because Apple has "not identif[ied] which [trade secrets] it referred to, nor did it describe any characteristics or properties contributing specific competitive value to [Apple] that could serve as a marker for separating [Apple's trade secrets] from publicly available information or generally known formulas in the industry," the Motion should be denied. *Mallet*, 16 F.4th at 384.

And the failure runs deeper. The Motion vaguely asserts that Apple's trade secrets constitute information specific to Apple products, but fails even to identify which Apple products are at issue. Mot. 10, 12, 18. Apple's categories thus do not help OpenAI or the Court ascertain the boundaries of the purported trade secrets. *See Insulet*, 104 F.4th at 881 (reversing preliminary injunction where plaintiff "advanced a hazy grouping of information that the court did not probe with particularity to determine what, if anything, was deserving of trade secret protection"); *see also id.* ("Finding that Insulet took measures to protect some unidentified 'set of information' is not the same as finding that Insulet took reasonable measures to protect specific information alleged to be a trade secret,

such as particular 'design drawings and specifications for each physical component and subassembly,' as the DTSA requires."); *Mallet*, 16 F.4th at 389 (vague injunction against trade secret misappropriation would "leave too much guesswork for the defendants to determine if they are engaging in activities that violate the injunction" (citation modified)).

Apple also fails to show that the information it identifies is not generally known or readily ascertainable through proper means. In fact, that information has been the subject of numerous public disclosures and general knowledge in the field—as even its own experts acknowledge. *See, e.g.*, Yao Decl. ¶¶ 12–13, 24–26, 30–31, 36–42, 51, 55, 72 (regarding processes and techniques for anodized aluminum); Freid Decl. ¶¶ 11, 14–21 (regarding public disclosures of Apple's supplier relationships), ¶¶ 12, 22–27 (regarding public disclosures of Apple codenames, including [redacted]); Raychowdhury Decl. ¶¶ 92-99 (regarding competitors and Apple launching wireless phone-to-device (i.e., [redacted]) charging), ¶¶ 52-55, 66-71, 82-86, 126-36, 143-52, 158-66, 172-73 (regarding power and battery management, failure testing, and power components)). *Compare with*, *e.g.*, Hatch Decl. ¶¶ 22–36, Exs. B-D, G, J, I (describing generally known processes and techniques for anodized aluminum). For the metal finishing process parameters that Apple alleges to be its "industrial design-related" trade secrets (Hatch Decl. ¶ 12), Apple's declarants appeared not to have analyzed whether they are in fact secret, and Apple's expert lacks the experience or qualifications to opine on the issue. Yao Decl. ¶¶ 32–35, 44-45, 85–91; Delman Decl. ¶¶ 17, 19–23. As one example, Apple alleges that "a defining feature of the proprietary finishes … is that they all use a specific blast media, [redacted], prior to anodizing." Hatch Decl. ¶ 40. But this is no secret; [redacted] blast media is a common catalogue item and even Apple's use of [redacted] blast media for its metal finishes is known in the industry. Yao Decl. ¶ 51(a)–(e).

Nor has Apple demonstrated that it is likely to prove that any of the information, including the specific metal finishing processes and parameters, derives independent economic value from being secret. Yao Decl. ¶¶ 15, 73–80; Delman Decl. ¶¶ 18, 26–39. Rather, Apple (and its declarants) allege that it is the end result, i.e., the "look, feel, texture, and durability" of the finished metal—rather than the specific claimed processes and parameters that it asserts are trade secrets—that is somehow valuable. *Id.*; Hatch Decl. ¶ 73; Dionello Decl. ¶¶ 9, 10. But as even Apple's

purported expert admits, this end result can be achieved through numerous processes and techniques, and is not exclusively tied to the specific parameters and steps of the alleged Apple processes. Hatch Decl. ¶ 57 ("This limitation is compounded by the fact that different process parameter combinations can produce visually similar end results. For example, different combinations of temperature, dwell time, chemistry, and current can yield final surfaces that look and feel the same."); Yao Decl. ¶¶ 15, 77–79. Indeed, that end-result finish, which can be observed from the countless Apple products in production and on the market, cannot derive independent economic value from being secret precisely because the finish is capable of being reverse engineered. Yao Decl. ¶¶ 56–72. In other words, the only aspect that Apple alleges has value is readily ascertainable from proper means. *Id.*

Apple's claim that its alleged trade secrets regarding power components and management would allow an unauthorized user to avoid the "time and expense" of development is wrong for similar reasons. Fayed Decl. ¶ 74. These techniques can be derived from publicly available products without need for confidential records. Fayed Decl. ¶ 107 ("A shipped product embodies the winning alternative."); Raychowdhury Decl. ¶¶ 52-55, 66-71, 92-99, 126-136, 143-152, 158-166. Moreover, Apple's development work would not be useful in the development of non-Apple products. *Id.* ¶¶ 56-64, 72-80, 118-24, 137-41, 153-56, 167-70. For instance, [redacted]. *Id.* ¶¶ 57-59, 138, 154. Those [redacted] *Id.* ¶¶ 57-59, 138, 154-55.

Thus, Apple has failed to allege a single protectable trade secret.

2. <u>Apple did not take reasonable measures to protect its information</u>

Under the DTSA, a required element of a trade secret is that the owner "has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3). The evidence shows Apple failed to do so. Tellingly, Apple says much about its ***general*** security program, but little about measures it took regarding ***the trade secrets it actually asserts*** in this case. That dooms Apple; 18 U.S.C.

§ 1839(3)(A) requires a trade secret owner to have "taken reasonable measures to keep ***such information*** secret." (emphasis added).

Apple's offboarding process shows Apple was reckless, not reasonable. As with other Apple employees departing for competitors, Liu was escorted out the same day he gave notice. Ieyoub Decl. ¶¶ 22-23. Although Apple claims to be concerned about the security of its confidential information as hundreds of employees leave for OpenAI, Apple itself made those employees' offboarding ***less*** secure by skipping an orderly offboarding. Apple's same-day walkout policy creates more security issues than it solves—especially given that Apple does not control the iCloud accounts that its employees use for work, and since it failed to deprovision [redacted] accounts or even test that its deprovisioning system worked. *See* White Decl. ¶¶ 43, 45-47. Liu's rushed exit, along with Apple's failure to securely maintain its digital systems, inevitably combined to create a situation in which Liu's Apple co-workers were without knowledge about the Apple files they needed—and Liu, now at OpenAI, was the only one with such knowledge. *See* Liu Decl. ¶¶ 25, 30-36; *id.* Sections VII-VIII, X. Liu kept access not through any scheme of his own but due to Apple's failure to remove his access to [redacted] and due to Apple's iCloud policies. *See* Pooley Decl. ¶¶ 37-39.

Troublingly, what Apple characterizes as Liu's "exploit[ation]" of a "bug," Mot. 16, was nothing of the sort—it was a simple failure by Apple both to remove his [redacted] access and, for months, to even check whether it had done so. *See* White Decl. ¶ 38. And even if there was a "vulnerability" subject to "exploit[]," Mot. 13, Apple failed to follow the standard for reasonable measures that its own expert set out: "Defense in Depth," whereby "[m]ultiple layers of security controls should be implemented to protect confidential data" so that "the failure of a single control does not lead to a compromise." Pooley Decl. ¶ 59(iv); White Decl. ¶ 47. Apple's failure to comply with its own policies for protective measures precludes its trade secret claim. *See Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) (affirming denial of trade secret claim where employees took job manuals home "even though they were supposed to be kept in the manager's office when not being used").

Apple did not merely fail to secure [redacted]—it ***encouraged*** Liu to continue using it for Apple's benefit. Apple never trained employees on [redacted] exit protocols, Liu Decl. ¶ 6, and its rushed offboarding required Liu's former co-workers to ask where to find [redacted] files after Liu already left,

*e.g.*, *id.* Sections VIII, X. Apple cannot ask a former employee to continue accessing allegedly confidential Apple documents and then claim to have taken reasonable measures to protect the secrecy of those documents. *See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300-01 (11th Cir. 2018) (no secrecy where plaintiff made "verbal statements" that information should not be distributed but "with no instruction" on "how to secure the information" on "cellphone or personal laptop"); Order, *Formfactor, Inc. v. Micro-Probe, Inc.*, No. 10-cv-3095, ECF No. 189 (N.D. Cal. June 7, 2012) (granting summary judgment against plaintiff that "allowed/authorized" defendant to "back up FormFactor data onto external hard drives" and "did not request that [defendant] return any FormFactor data when he tendered his resignation and left the company").

Apple's failure to protect files in [redacted] is consistent with its longstanding failure to secure iCloud. White Decl. ¶¶ 49-52. Inexplicably, Apple incentivizes its employees' use of ***personally owned and controlled*** iCloud accounts to access confidential work files. [redacted] Worse, Apple's strategy for keeping its confidential files on these personal accounts segregated from personal files was merely to instruct employees to "manually" move them into a "Work" folder so that access to the folder can be removed upon an employee's departure. Pooley Decl. ¶ 37 (emphasis added). Telling tens of thousands of employees to manually move every confidential file they download—often by default into a personal folder, Indv. No. 1 Decl. ¶ 15—is not a serious effort at securing those files, especially on accounts Apple does not control. White Decl. ¶¶ 50-52.

For both iCloud and [redacted], Apple's security measures with respect to offboarding departing employees put the burden on the employees themselves. *See id.*; *accord* Ieyoub Decl. ¶ 3. Tellingly, Apple's declarations show that for certain Apple information not at issue here, the company takes measures more stringent than those in place with respect to iCloud and [redacted], which undermines Apple's argument that this case involves its "most sensitive trade secrets." Mot. 1; *see* White Decl. ¶ 19. Apple's adoption of voluntary, suggested protective policies regarding iCloud and [redacted] does not meet the test for reasonable protection. *See Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 559 (N.D. Cal. 1999) (alleged trade secrets were not reasonably protected even though there was a confidentiality "marking provision" because it was not used in practice).

Even when departing employees do comply with Apple's onerous instruction to manually transfer years' worth of files, Apple routinely fails to remove their access to those files after they leave. Indv. No. 1 Decl. ¶ 13. And here, Apple affirmatively kept the contents of Liu's folder active because it was the only way for his manager and the rest of his team to carry on with their work. Liu Decl. ¶¶ 14, 22-25. In one instance, [redacted] texted Liu a technical question, accompanied by a sensitive Apple diagram, writing "[j]ust in case you don't have enough work, I need some help." ECF No. 59-2. Such conduct by a plaintiff is dispositive. *See Dairy, LLC v. Milk Moovement, Inc.*, 2022 WL 584003, at *2 (E.D. Cal. Feb. 25, 2022) (no likelihood of success where former employee "himself sent a report to" defendant); *see also Hooked Media Grp., Inc. v. Apple Inc.,* 55 Cal. App. 5th 323, 333 (2020) (granting summary judgment for defendant Apple where plaintiff "intentionally disclosed much of the information"), *publication ordered* (Sept. 30, 2020); *ELT Sight, Inc. v. EyeLight, Inc.*, 2020 WL 7862134, at *21 (C.D. Cal. Aug. 28, 2020) (no likelihood of success where claimant "demonstrated a willingness to share this information" with defendant).

Even in Apple's telling, Liu left for OpenAI, did not sign a "Confidentiality Reminder," retained an Apple-owned device at his home for at least a month, and retained access to [redacted] for at least four months, yet Apple did nothing. *See* White Decl. ¶¶ 74-76. Apple does not allege that Liu's retention of a device and alleged failures to comply with (inconsistently enforced) exit procedures caused any alarm whatsoever. *See* White Decl. ¶ 69. Given this total failure to secure Apple information, it is no wonder that Tan sought to protect incoming OpenAI hires by telling them to plan their departures ahead of time. *See* Tan Decl. ¶¶ 25(b), 27.

Apple's purported protective measures related to [redacted] fare no better: the information relevant to the [redacted] allegations is more than [redacted] and thus outside the scope of Apple's confidentiality agreement with [redacted]. White Decl. ¶ 84; Freid Decl. ¶¶ 13, 28–38.

In sum, continued access to Apple information by former employees is a feature of Apple's practices, not a "bug." That is not a company reasonably protecting claimed trade secrets.

3. <u>Apple fails to show unauthorized acquisition, use, or disclosure</u>

The DTSA defines "misappropriation" as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means,"

or the unauthorized "disclosure or use of a trade secret" acquired by improper means. 18 U.S.C. § 1839(5); *see also Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1172 (N.D. Cal. 2020) (same). The Motion is barren of any non-speculative "evidence" of misappropriation.

*i. Apple Fails to Demonstrate Misappropriation by Chang Liu*

Apple's argument that Chang Liu misappropriated its trade secrets collapses under scrutiny. Apple first alleges that Liu "failed to sign Apple's standard confidentiality reminder and did not respond to Apple's departure-related communications" during his final day at Apple. Mot. 14. But Liu met with his manager, [redacted], on January 22 and the two went over the checklist for departing employees without discussing any additional requirements. Liu Decl. ¶ 12. Nor does Liu recall any communication from Apple requesting that he sign any confidentiality reminder. *Id.* ¶ 13.

Next, the Motion claims that Liu "downloaded dozens of documents comprising thousands of pages of Apple's trade secrets and proprietary information from Apple's cloud-based storage" while working at OpenAI. Mot. 14. That argument is baseless for several reasons.

Apple suggests Liu downloaded 37 total documents, but only relies on 26 for purposes of its Motion. *See* Roffman Decl. ¶ 20 (37 alleged downloads); Patel Decl. ¶ 5 (26 documents allegedly containing trade secrets). None of these documents are relevant to Liu's current work at OpenAI, which focuses on functionality of chargers and speakers. *See* Liu Decl. ¶ 27. And many of these documents relate to older Apple products, some of which were released almost a decade ago. *See* Liu Decl. Addendum 1. In any event, there is a benign, ***corroborated*** explanation for each alleged download event:

a. February 8, 2026 – Peng, still at Apple, was looking for information relating to [redacted]. Liu Decl. ¶ 35. Because the information could have been located in any number of documents, Liu accessed four documents from [redacted] to search for it. Liu and Peng exchanged contemporaneous text messages about these questions. Liu Decl. Ex. B at 2. These are documents 1-4 in paragraph 20 of the Roffman Declaration.

b. February 10, 2026 – Peng again had a technical question related to an Apple supplier. To answer her question, Liu accessed the document labeled 5 in paragraph 20 of the Roffman

Declaration. The following day, Peng asked Liu a follow-up question via text about that document and related information. Liu Decl. Ex. B at 2-3.

c. March 7, 2026 – On March 4, 2026, Apple employee [redacted] asked Liu how to improve in the power electronics domain. Liu Decl. ¶ 43. Liu directed him to public videos and told him he should run simulations and compare Liu's prior simulations. *Id.* On March 7, Liu checked his [redacted] folder titled Archive Simulations to see if there were simulation files that [redacted] could use. *Id.* Those are documents 6-8 in paragraph 20 of the Roffman Declaration.

d. March 11, 2026 – Liu used Apple's Migration Assistant tool to set up his personal Mac Mini, which likely automatically transferred [redacted] data to the Mac Mini. A forensic investigation has revealed that these documents all have a file size of 0 bytes, strongly suggesting they were never opened, copied, or interacted with on the Mac Mini, corroborating Liu's account that any such downloads occurred without his knowledge or involvement. Crain Decl. ¶ 24; Liu Decl. ¶¶ 44-46. Those documents are labeled 9-12 in paragraph 20 of the Roffman Declaration.

e. April 27, 2026 – As with the March 11 "downloads," a forensic investigation has revealed that these documents all have a file size of 0 bytes, strongly suggesting they were never opened, copied, or interacted with on the Mac Mini. Crain Decl. ¶ 24; Liu Decl. ¶¶ 46-47. These documents originated almost exclusively from shared [redacted] folders of other members of his Apple team, [redacted] and [redacted], the latter of whom left Apple approximately two years ago, and concern dated technology. *Id.* ¶ 47. Those are documents 13-37 in paragraph 20 of the Roffman Declaration.

Ultimately, on the rare occasion Liu even accessed a document from [redacted], the flow of information went only in one direction: ***from*** Liu ***to*** Apple. Correspondence between Liu and his former Apple colleagues shows Apple employees continuing to ask him substantive questions about their Apple work, well after his departure. *See*, *e.g.*, Liu Decl. Exs. B, H; ECF No. 59-2. Indeed, Liu's former Apple manager expressly told Liu he "need[ed] some help" on an Apple project. ECF No. 59-2. On another occasion, Liu allowed [redacted] to stay signed in to his iCloud account so he could continue downloading and copying materials from Liu's time at Apple. Liu Decl. Ex. A.

In sum, there is no evidence that Liu accessed any Apple information through improper means or for any improper purpose. *See Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1026 (E.D. Cal. 2011) (denying preliminary injunction where "it appears clear that there is no allegation" that defendant "obtained the Trade Secrets by improper means"). It is unsurprising that Apple is unable to identify any evidence of misappropriation by Liu because, as Liu attests, Liu has no use for Apple confidential information. Liu's focus at OpenAI is on "the functionality of chargers and speakers." Liu Decl. ¶ 27. That is entirely unrelated to any work Liu did for Apple, and his Apple documents would therefore be of no help for his OpenAI work. *Id.*

Apple also alleges that Liu "coached" Peng on "preparing for an OpenAI interview using Apple information." Mot. 14. But Liu shared only publicly available resources. Liu Decl. ¶ 38; Ex. B at 3.

With respect to any allegation that Liu failed to return his iMac, Liu did not have "time to remove … personal files" he wanted to keep and returned it within weeks of his departure. *Id.* ¶ 18. This was a direct result of Apple's inadequate offboarding policy, whereby Liu was given only one day to "wind-down [his] work, transfer [his] files, [and] hand off [his] responsibilities." *Id.* ¶ 15. Accordingly, there is no evidence that Liu misappropriated Apple trade secrets.

*ii. Apple Fails to Demonstrate Misappropriation by Tang Tan*

Apple's accusations against Tan boil down to only three specific allegations: that he asked job candidates about unreleased Apple products, that he directed candidates to bring hardware components for "show and tell" sessions, and that he retained and circulated to recruits an Apple Managers' Checklist for departing employees. Mot. 14.

All three claims are baseless. As for the accusation that Tan used Apple "codenames for an unannounced project … during interviews to probe for Apple proprietary information," Mot. 4-5, Tan is "very clear" with candidates that they should not discuss "any unreleased information about their current employers," Tan Decl. ¶ 22. Apple's allegation lacks specifics about the particular candidates involved in the alleged interaction, the specific question asked, or even whether the candidate answered the alleged question. Mot. 4-5, 16. With regard to the sole even remotely specific allegation of this type—that Tan used an "Apple internal project codename" to inquire

about an unannounced Apple product (Mot. 1)—Tan's recollection is that he asked a job candidate to consider the leadership hole he would be leaving behind at Apple if he left. Tan Decl. ¶ 28. At no point did he solicit, nor did the two discuss, any Apple confidential information. *Id*. Tan was working to Apple's benefit, ensuring that the candidate was prepared for an orderly transition of his responsibilities at Apple. In any event, no codename was ever used (Indv. No. 1 Decl. ¶ 9), and even if one were, the codename itself is public information and does not describe the Apple project with which it is associated. White Decl. ¶ 68; Freid Decl. ¶¶ 25-26.

The accusation that Tan directed candidates to bring hardware components for "show and tell" sessions proves nothing, as Tan consistently tells candidates ***not*** to bring undisclosed or recent products, allowing candidates to only bring old, shipped, publicly available demonstratives such as old iPhone X batteries. Tan Decl. ¶ 24. And candidates are reminded before interviews not to bring or discuss anything confidential. Hutchinson Decl. ¶ 7; Tan Decl. ¶ 24. Apple relies on a mischaracterization of a generic pre-interview guide that Tan has never used or seen. *Id*. ¶ 23. That guide pertains only to ***non-consumer-hardware roles*** and makes no mention of Apple or confidential information. *Id*.

Not only does Apple's "evidence" on this point fail to support its argument, it exculpates Tan. Apple attaches two text threads between Tan and job candidates, alleging that both are evidence that Tan solicited Apple trade secret information. He does nothing of the sort in either. In the first, from [redacted] (about a year before io Products' merger with OpenAI), Tan told a candidate it "might be helpful" to bring parts or systems she worked on to her interview as demonstrative aids. Tan Decl. ¶ 25. In response, the candidate confirmed the mutual understanding that she could "bring a couple of ***shipped*** batteries" to the interview. *Id.* (emphasis added). In other words, it was understood that the candidate would bring parts that had already been publicly released and were not confidential. The Motion omits that crucial context. *See* Mot. 4, 14. About a month later, the same candidate had another interview. In advance of the interview, Tan texted her, [redacted] Roffman Decl. Ex. L. Nothing in the texts indicates that Tan wanted the candidate to bring anything confidential. Rather, he wanted her to do the same thing as before—bring only public parts. *See* Tan Decl. ¶ 25(a).

In the second, Tan texted a candidate in [redacted] that he should "[b]ring some parts" he worked on "***in the past***." Id. ¶ 25(c) (emphasis added). The candidate responded that he will check if he has any "non-AOU units"—non-Apple Owned Units—to bring to the interview. *Id.* The candidate noted what was obvious: that he could not bring any Apple confidential materials to the interview. Tan did not ask him to: he is "very clear with individuals [he recruits] that they should not bring any confidential information or parts into the interview." Tan Decl. ¶ 22.

Finally, the accusations about retaining and distributing a confidential Apple document (Mot. 14-15) are baseless. The Managers' Checklist Apple cites contains no confidential information, nor any information that would plausibly assist a departing employee in "evading" Apple's security protocol. White Decl. ¶ 69 n.16. The document consists of [redacted]. *See* Roffman Decl. Ex. N. That is not a trade secret. And in fact Apple filed a similar checklist publicly in this very case. White Decl. ¶¶ 69-70; Tan Decl. ¶ 27 (citing Ieyoub Decl. Ex. I). The evidence also fails to show that Tan or other OpenAI employees "distribut[ed] Apple's departure checklist to their recruits" so they could "evade" Apple's security procedures. Mot. 14. Tan explained to a new hire that he was sending the checklist because "Apple will probably walk [him] out" of the building on the day he resigned. Tan Decl. ¶ 25(b). Tan was ensuring that OpenAI's new hire would be able to effectively close out his time at Apple. His "intention was to ***facilitate compliance*** with the checklist." *Id*.

Tan has more than rebutted Apple's accusations against him—he has instead shown that he has gone out of his way ***not*** to misappropriate his former employer's confidential information.

*iii. Apple Fails to Demonstrate Misappropriation by OpenAI or io*

Apple's allegations against OpenAI fail as well. Most fundamentally, Apple's claims depend on its allegations against Liu and Tan and fail for the same reasons. Apple barely tries to make a showing specific to OpenAI, focusing entirely on allegations limited to Liu and Tan as individuals. *See* Mot. 15 (devoting four total lines to allegations against OpenAI and io). Such individualized allegations against employees are insufficient to establish a likelihood of success on

claims against their employer. "To the extent Apple seeks to impute the Individual Defendants' alleged misappropriation to [OpenAI], it has not stated a cognizable basis for doing so." *Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034, at *8 (N.D. Cal. Aug. 11, 2023); *see, e.g., Hooked Media Grp.*, 55 Cal. App. 5th at 332 (granting summary judgment for defendant Apple on trade secret claim where plaintiff showed only that its former employee accessed trade secrets "while in Apple's employ"); *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 79 (N.D. Cal. 2020) (dismissing complaint against corporate defendants where it improperly based its "trade secret misappropriation claims on [an employee's] conduct, without differentiating what each specific [corporate] Defendant is alleged to have done"). In a tacit admission of this deficiency, the Motion claims, without evidence, that all misappropriation was "performed by OpenAI personnel within the scope of their employment at OpenAI, by its partners for OpenAI's benefit, or at OpenAI's direction and encouragement." Mot. 15. This argument fails as a matter of fact and law. The Motion offers no evidence that OpenAI directed or encouraged any misappropriation of Apple trade secrets. On the contrary, the record is rife with evidence that, at a systemic and institutional level, OpenAI has gone out of its way to avoid inadvertent and undesired exposure to sensitive Apple information. *See* pp. 3-5, *supra*. Viewed against these facts, Apple's Motion is nothing more than an invitation to inappropriately infer misappropriation based solely on OpenAI's employment of former Apple employees. That is improper. *See Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *24 (N.D. Cal. Aug. 24, 2021) ("Merely hiring a competitor's former employees—even when they possess the former employer's trade secrets—cannot demonstrate misappropriation on its own."); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1182 (W.D. Wash. 2019) (similar).

With respect to Apple's allegation that the "Corporate Defendants … targeted Apple's partners … to extract Apple proprietary information," including the asserted metal finishing processes (Mot. 5), Apple has shown no evidence that (1) the Corporate Defendants engaged in any such "targeting" or eliciting of information or (2) actually "extracted" Apple proprietary information. *E.g.*, Yao Decl. ¶¶ 81–84; Freid Decl. ¶¶ 11, 14-21. Instead, Apple's allegation regarding Corporate Defendants' alleged targeting and eliciting of information rests entirely on

vague and useless double-hearsay. Dionello Decl. ¶¶ 38–40. That is, Apple admittedly relies on gossip it received from two unsworn individuals (who have never worked directly with OpenAI) that they allegedly heard from some other anonymous unsworn individuals that Apple's supplier had used Apple's metal finishing processes for OpenAI. *Id*. These out-of-court statements are not evidence, let alone the type of evidence that can substantiate a claim of misappropriation by itself, much less an injunction. Yet that is the complete basis of Apple's allegation that OpenAI misappropriated "Apple's proprietary industrial design techniques." Mot. 5; Dionello Decl. ¶¶ 38–40. The Corporate Defendants have no desire or need for Apple's industrial design techniques, as they have developed their own standard metal finishes and colors (and the techniques to achieve those results) through extensive trials and iterative refinement, not any Apple confidential information. Tan Decl. ¶¶ 31–32; *see also id*. at ¶¶ 29–30. But in any event, even if Apple's unsubstantiated double-hearsay were credited, [redacted] at the time of the alleged misappropriation. Freid Decl. ¶¶ 13, 28–38; White Decl. ¶ 84.

The cases Apple cites are inapposite. In *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1057 (N.D. Cal. 2020) (cited at Mot. 15), the court considered at the pleading stage whether the plaintiff "adequately alleged that [an individual] acted within the scope of his employment" while misappropriating trade secrets. Similarly, in *Reworld Sumter Indus. 13 LLC v. VEP Env't LLC*, 2025 WL 2695014, at *15 (D.S.C. Sept. 19, 2025) (cited at Mot. 15), the plaintiff offered many specific uses of its confidential information, including "a multimillion-dollar contract" with a client, "diversion of a California kiln project" with a client, and "pursuit of opportunities with" and "solicitation of" two other specific clients. In contrast, Apple does not point to a single thing the Corporate Defendants ***actually did*** with any allegedly misappropriated information. Mot. 13-16.

4. <u>Apple has not shown that any misappropriation caused or threatened harm</u>

Apple cannot show that any misappropriation "caused or threatened damage" to Apple. *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 929 (N.D. Cal. 2024) (quoting *InteliClear*, 978 F.3d at 658). Apple only vaguely asserts that "[i]f others were to have access to Apple's trade secrets, they would gain significant unearned advantages." Mot. 12. Apple

does not claim it lost a sale, a supplier, a customer, or an employee it wished to keep; that any Apple product was delayed, degraded, or made more expensive; or that the value of any identified secret declined by any specific amount. Apple's vague claims fail to establish a likelihood of damage or threatened damage.

**B. Apple is Unlikely to Prevail on its Breach of Contract Claims**

Apple alleges Liu and Tan each violated his intellectual property agreement ("IPA") with Apple. Those claims fail for the same reasons that doom the DTSA claims.

**C. Apple Cannot Show Irreparable Harm**

Though the Ninth Circuit has yet to address the impact of the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) on courts' power to presume irreparable harm in trade secrets cases, several courts have found the presumption is "no longer good law." *Arminak Sols., LLC v. 7-Eleven, Inc.*, 2017 WL 6888706, at *2 (C.D. Cal. Mar. 16, 2017); *see*, *e.g.*, *Move, Inc. v. CoStar Group, Inc.*, No. 24-cv-5607, ECF No. 98 (C.D. Cal. Sept. 23, 2024), adopted ECF No. 100 (C.D. Cal. Sept. 23, 2024). This Court should do the same.

"Speculative injury" is not enough. Rather, "a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Apple cannot do so here: OpenAI has no interest in or use for Apple's trade secrets or confidential information. *See* pp. 12-13*, supra*. Apple's own conduct also betrays its position. Apple has known about the conduct at issue since at least February 2026, but waited over five months to file its Motion. Such delays "impl[y] a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

**D. The Balance of Equities Weighs in Defendants' Favor**

The Motion should also be denied because the balance of equities weighs strongly toward defendants. An injunction would harm defendants in a variety of ways: (1) it would disrupt the work of hundreds of OpenAI employees who are developing OpenAI products, costing substantial money and work time, *see* Mot. i; Lee Decl. ¶¶ 8, 10; (2) it would result in leakage of OpenAI confidential information to Apple, *id.* ¶ 9; and (3) it would create uncertainty around OpenAI's business partners, impacting product operations, *see id.* ¶¶ 13-14. Conversely, there would be little

harm to Apple if the Motion is denied. First, there is no evidence, and indeed assurances from defendants to the contrary, that Apple's confidential information or trade secrets were acquired or will be used or disseminated over the course of this litigation and beyond. *See*, *e.g.*, Tan Decl. ¶¶ 16, 17, 31. Further, OpenAI has already offered to cooperate with Apple to support Apple in assuaging Apple's concerns. *See supra* at 9-10. The balance of equities favors defendants.

### E. The Public Interest Counsels Strongly Against Relief

Apple is trying to delay the development of OpenAI hardware (because it fears OpenAI's product might reduce demand for Apple's) and to stem the departure of Apple employees. That is decidedly against the public interest. An injunction would also harm California's "settled legislative policy in favor of open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008); *see also CleanFish, LLC v. Sims*, 2019 WL 2716293, at *5 (N.D. Cal. June 28, 2019) (denying injunctive relief in trade secret case where plaintiff's motion "plainly conflicts with the public interest in promoting healthy employee mobility and competition"). Here, a preliminary injunction would chill employee mobility. *See* Hutchinson Decl. ¶ 15. Accordingly, the public interest counsels against granting the Motion.

## II. APPLE'S PROPOSED ORDER IS UNDULY BROAD

If the Court is inclined to grant an injunction, it should significantly narrow Apple's proposed order. Items four and five of Apple's proposed preliminary injunction are especially overbroad because they seek mandatory relief. While the allegations in the Motion relate almost exclusively to two OpenAI employees, Apple demands that all Defendants submit to third-party inspection, and turn over all devices in their custody that may have ever contained unspecified Apple "trade secrets." Notice of Motion. This would require a highly invasive and gratuitously disruptive search. *See* Lee Decl. ¶¶ 8-9. Witch hunts of that nature require "concrete evidence of concealment or destruction of evidence sufficient to conclude that a forensic examination of the vast scope [Apple] proposes is warranted." *Advante Int'l Corp. v. Mintel Learning Tech.*, 2006 WL 1806151, at *1 (N.D. Cal. June 29, 2006). Apple cannot make such a showing.

## CONCLUSION

Apple's request for a preliminary injunction should be denied.

DATED: September 1, 2026

By /s/ Andrew H. Schapiro

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Andrew H. Schapiro (*pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

David Eiseman (Bar No. 114758)
Jodie W. Cheng (Bar No. 292330)
Victoria B. Parker (Bar No. 290862)
Andrew M. Mather (Bar No. 345548)
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
jodiecheng@quinnemanuel.com
vickiparker@quinnemanuel.com
andrewmather@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
Lucas A. Hammill (*pro hac vice*)
Jordan M. Nakdimon (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com
lucashammill@quinnemanuel.com
jordannakdimon@quinnemanuel.com

Joseph E. Reed (Bar No. 323524)
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
joereed@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

DATED: September 1, 2026

By *Isl Kate E. Lazarus*

KWUN BHANSALI LAZARUS LLP

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**ATTESTATION**

I, Andrew H. Schapiro, am the ECF user whose ID and password are being used to file the above document.

By *_/s/ Andrew H. Schapiro_*
Andrew H. Schapiro