Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF ANDREW CRAIN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

**DECLARATION OF ANDREW CRAIN**

I, Andrew Crain, the undersigned, hereby declare and state:

## I. Introduction

1. I have been retained in this matter by the law firms of Quinn, Emanuel, Urquhart & Sullivan, LLP, and Kwun Bhansali Lazarus LLP, in connection with their representation of the Defendants in this case.

2. I am providing this declaration in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, dated August 3, 2026 (ECF No. 38) (the "Motion").

## II. Qualifications

3. I work as a Founding Partner of Sync Forensics, LLC ("Sync"), a consulting firm based in Lake Oswego, Oregon. Sync assists clients with digital forensics investigations and expert witness testimony.

4. I have more than 25 years of experience performing forensic imaging and analysis of a wide variety of electronic sources, such as computer hard drives and storage media, cloud storage and email accounts, messaging platforms, and more. I advise clients regarding e-discovery and forensics issues and provide expert testimony. I previously served as a Managing Director at BRG, a global consulting firm based in Emeryville, California. Prior to that I served as the Vice President of Forensics at Lighthouse eDiscovery, based in Seattle, Washington. Prior to that I held the same job at Discovia, another forensics and electronic discovery consulting firm based in San Francisco, California. Lighthouse acquired Discovia in 2017. Prior to Discovia, I worked as the Forensics Litigation Director for Bridge City Legal, based in Portland, Oregon, and as the Computer Forensics Lab Director at SafirRosetti, a security consulting, investigative and intelligence firm based in San Francisco.

5. I hold a J.D. from the University of Colorado School of Law and I am admitted to the California bar. I also hold private investigator licensing in California and Texas. Over the past 25 years, I have earned various certifications and completed computer forensics training courses offered by New Technologies, Inc., Guidance Software, AccessData, Blackbag, and Cellebrite, all of which are recognized leaders in the computer forensics industry.

6. Over the course of my career, I have led and conducted thousands of computer forensics investigations (often involving numerous computers, devices, online accounts, and massive amounts of data in a single case). These investigations arise under a wide variety of circumstances, including employment, intellectual property, trade secrets, fraud, economic espionage, and securities regulation. I have provided reports and executed affidavits and declarations describing my computer forensics analysis, and I have given both deposition and trial testimony. I have also served as a court-appointed neutral computer forensics examiner and spoken at seminars and lectures regarding computer forensics and the use of electronic evidence in legal proceedings and investigations.

7. A significant portion of my work relates to trade secrets cases, including matters involving allegations of misappropriation by departing employees. Over the course of my career, I have served as a consulting or testifying expert in hundreds of these disputes. I have been engaged as an expert witness for both plaintiffs and defendants in roughly equal proportion. I have also served numerous times as a forensic neutral examiner. As such, I am intimately familiar with the myriad ways that departing employees can exfiltrate data, the methods companies use to detect that activity, and the protections that companies commonly implement to mitigate this type of risk. I am currently participating in a Sedona Conference Trade Secrets Working Group that is developing a commentary providing guidance for employees who switch jobs.

8. Attached as Exhibit A is my curriculum vitae. It contains a description of my educational background, professional achievements, qualifications, publications, and prior expert testimony.

9. My billing rate in this matter is $825 per hour. My firm's compensation in this matter is not dependent on the substance of my testimony or the outcome of this matter.

## III. Evidence Preservation and Quarantine

10. My firm was retained in this matter shortly after the complaint was filed on July 10, 2026. My team worked with counsel to expeditiously quarantine various devices in the individual clients' possession, most of which were also forensically imaged. Attached as Exhibit B is my firm's

evidence tracking log detailing the various devices and accounts for Mr. Liu that have been quarantined and imaged.

## IV. <u>The Chang Liu iMac</u>

11. I understand that Mr. Liu possessed an Apple iMac computer (which was an Apple-issued device) for personal purposes until mid-March 2026, when he migrated his personal files from the iMac to a new Mac Mini he purchased.[1] I understand that as of the date that Mr. Liu resigned from Apple (January 22, 2026), the iMac was reassigned from Mr. Liu to Apple employee [redacted] in Apple's tracking system. I understand that Mr. Liu retained the iMac until he could finish setting up his new personal computer (the Mac Mini discussed in greater detail below), which he completed on March 11, 2026. Then, I understand that Mr. Liu returned the iMac to Apple through an Apple employee.[2] I understand this occurred within a week or two following the computer migration.[3]

12. I reviewed the Declaration of Daniel Roffman filed by Plaintiff in support of its Motion for a Preliminary Injunction (ECF No. 45) (the "Roffman Declaration"). The Roffman Declaration does not make any mention of this iMac that was previously used by Mr. Liu.

13. The Roffman Declaration and its Exhibit B provide a detailed discussion of activity logging associated with Mr. Liu from Apple's "third party cloud storage," [redacted]. For example, the Roffman Declaration asserts that between February 8, 2026 and April 27, 2026, Mr. Liu "downloaded" more than 240 files from [redacted], including at least 37 unique Apple files.[4] Those "downloads" are alleged to have taken place on the following dates: (1) February 8, 2026 (documents labeled 1-4); (2) February 10, 2026 (document labeled 5); (3) March 7, 2026

---

[1] Declaration of Chang Liu ("Liu Decl.") ¶¶ 18, 44.

[2] Liu Decl. ¶ 18.

[3] *Id.*

[4] Roffman Decl. ¶ 20.

(documents labeled 6-8); (4) March 11, 2026 (documents labeled 9-12); and (5) April 27, 2026 (documents labeled 13-37).[5] Given that Mr. Liu migrated the data from his iMac to his Mac Mini on March 11, 2026, the subset of downloads discussed in the Roffman Declaration between February 8, 2026 and March 11, 2026 would likely have occurred using the iMac computer.

14. Because Mr. Liu returned that iMac to Apple prior to this litigation and retaining my firm, I have not had access to the iMac. My expectation is that the iMac contains locally stored forensic evidence that could shed further light on any actions Mr. Liu took with respect to the files identified in Apple's "third party cloud storage" logs, as reflected in Exhibit B to the Roffman Declaration. Because I do not have access to the iMac, I am unable to determine what that forensic evidence shows. Given my understanding that Apple has possessed the iMac since March 2026, it is curious that Mr. Roffman either did not forensically analyze it or decided to omit his findings from his declaration.

## V. <u>Chang Liu's Mac Mini</u>

15. Mr. Liu began using his personal Mac Mini on March 11, 2026. Specifically, he used the Apple Migration Assistant[6] to transfer his personal information from his iMac to the new Mac Mini.[7] Apple's support webpage for the Migration Assistant feature indicates that it "transfers documents, apps, user accounts, and settings from one Mac to another."[8] Apple's Migration Assistant feature is straightforward to use, and guides the user through a set of simple steps, as shown below:

---

[5] Roffman Decl. ¶ 20.

[6] https://support.apple.com/en-us/102613

[7] Liu Decl. ¶ 44.

[8] https://support.apple.com/en-us/102613




16. In the case of Mr. Liu's iMac and Mac Mini computers, this migration process caused the locally-stored data on the iMac associated with Mr. Liu's [redacted] account to be copied to the Mac Mini.[9] This process required no additional steps from Mr. Liu other than setting up his Mac Mini with the Migration Assistant tool.

17. Relatedly, the Roffman Declaration states that Apple's deprovisioning process, conducted at the time of Mr. Liu's exit from Apple, failed to fully deactivate Mr. Liu's access to [redacted].[10] While the Roffman Declaration does not describe the deprovisioning error in any detail, based on my professional experience I suspect that the error related to an authentication token on

[9] For example, the Mac OS metadata field "Date Added" (which indicates when documents came to reside in a specific folder location on the Mac) shows March 11, 2026 for documents in the [redacted] folder structure on the Mac Mini.

[10] Roffman Decl. ¶ 20.

Mr. Liu's iMac allowing for access to the cloud storage site. An authentication token is essentially a digital credential that allows a user to stay signed into an account without the repeated use of the user's password. Apple's failure to revoke this token as part of its deprovisioning process likely caused the iMac to retain continued access to the cloud storage site after Mr. Liu's departure on January 22, 2026. Then, as part of the migration process from the iMac, this authentication token could have transferred from the iMac to the Mac Mini, allowing the Mac Mini to retain access to Apple's third-party cloud storage site (*i.e.*, [redacted]).

18. Exhibit B to the Roffman Declaration does not include a description or recitation of the authentication-related events that would allow me to determine when or how the Mac Mini first gained access to [redacted]. Nor does the Roffman Declaration specify when Apple learned of the deprovisioning error, nor when it was ultimately resolved.

19. As discussed above, my firm quarantined Mr. Liu's Mac Mini shortly after this lawsuit was filed, and has captured a forensic image of it. The original computer remains in my firm's possession.

*A. <u>Files Shown in Roffman Exhibit B as "Downloaded" on/after March 11, 2026</u>*

20. Because Mr. Liu set up the Mac Mini on March 11, 2026, I performed an analysis of that computer's forensic image with a specific focus on the "download" activity from [redacted] on or after that date, as indicated by Exhibit B to the Roffman Declaration (*i.e.*, the logging from Apple's "third party cloud storage").

21. Exhibit B of the Roffman Declaration claims that Mr. Liu "downloaded" 37 unique Apple files between February 8 and April 27, 2026, and that 26 of those 37 downloads occurred on or after March 11 and April 27, 2026.[11] My forensic analysis of Mr. Liu's Mac Mini related to this

---

[11] The Roffman Declaration suggests that Mr. Liu "performed over 240" downloads from [redacted], but focuses his discussion on only 37 of them. My understanding is that these are the "Unique Apple Files." I further understand that Apple alleges that Mr. Liu misappropriated only 26 of those documents. *See* Patel Declaration ¶¶ 4-5.

set of "unique" 37 files identified multiple sources of forensic evidence consistent with the conclusion that Mr. Liu ***never opened, copied, or otherwise interacted with the files*** synchronized to the Mac Mini from Apple's "third party cloud storage." These findings corroborate Mr. Liu's account that any event recorded as a "download" on his Mac Mini occurred without his involvement or knowledge.[12] I address each of these findings in turn below.

22. By way of background, it is important to understand an element of how cloud storage platforms (such as [redacted]) typically interact with computers that are synchronized with the cloud account platform. In this context, synchronization means that the files in a cloud account are made available on, and kept in step with, a computer connected to that account. Platforms like [redacted] utilize "stubs" (or "placeholders") in order to save bandwidth and storage space on the computer to which the account's contents are being synchronized.

23. When a user signs into a cloud storage account using the locally-installed synchronization application, the service first creates "stubs" of the files contained in the cloud account. These "stubs" are functionally "placeholders." "Stubs" typically bear the same name as the files stored in the cloud, but in the first instance they do not actually download and store the files' substantive contents on the computer. As such, these "stubs" normally have a file size on the computer of zero bytes. Then, at whatever point in the future the user performs an action on the computer for a file in the cloud account (*e.g.*, opening, copying, attaching to an email), the cloud storage synchronization application will download the actual file contents to the computer. The [redacted] solution's "[redacted] Drive" service refers to this process as "files on demand."[13] In other words, prior to a user interaction with the document, it is not "downloaded" in the way the term is colloquially understood. The complete content of the document does not exist on the computer.

24. In the case of Mr. Liu's Mac Mini, I analyzed the forensic evidence related to each of the 37 "unique Apple files" the Roffman Declaration claims Mr. Liu downloaded. None of the

---

[12] Liu Decl. ¶ 47.

[13] [redacted]

37 documents bears a file size larger than zero bytes on Mr. Liu's Mac Mini. This finding supports the conclusion that Mr. Liu never interacted with those 37 documents on his Mac Mini in any way, such as opening them, copying them, or transferring them. Attached hereto as Exhibit C is a metadata listing of these 37 files, as stored on Mr. Liu's Mac Mini, demonstrating their file sizes of 0 bytes. The filenames and the 0 file sizes are also pictured below:

| Name | Size |
|---|---|
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |
| [redacted] | 0 |

*B.* *Metadata on the Mac Mini for the Files Identified in the Roffman Declaration*

25. As part of my investigation, I also examined a different metadata value on Mr. Liu's Mac Mini called "kmditemlastused," which specifically indicates when files on the computer were last opened.[14] I frequently analyze and rely on this metadata value for files stored on Apple computers in trade secret litigation cases, and the Roffman Declaration makes reference to this metadata value as well.[15]

26. Of the 37 "unique Apple files" identified on Roffman Exhibit B that were "downloaded" on or after March 11, 2026, this "kmditemlastused" metadata is blank for all but one of them. The lone exception is a file entitled "[redacted]." This file's "last opened" metadata value is March 11, 2026 at 23:20:41 (UTC), contemporaneous with Mr. Liu's migration from the iMac and *before* the file's "Date Added" value on the Mac Mini (*i.e.*, March 11, 2026 at 23:32:02 (UTC)). The likeliest explanation for this is that this document was opened from the iMac, just prior to its migration to the Mac Mini, and the "kmditemlastused" metadata for the file was migrated to the Mac Mini. To confirm that, however, I would need to analyze the iMac, which Mr. Liu returned to Apple and to which I therefore do not have access. My understanding is that Mr. Liu previously opened that document to assist a former colleague of his at Apple with her Apple work.[16]

27. In summary, the "kmditemlastused" metadata from Mr. Liu's Mac Mini is consistent with the conclusion that Mr. Liu did not open any of the 37 Unique Apple Files identified in paragraph 20 of the Roffman Declaration on his Mac Mini.

28. My team and I also examined the forensic images of Mr. Liu's other devices and accounts (*i.e.*, as detailed above in section III / exhibit B), looking for any additional copies of the

[14] https://developer.apple.com/documentation/coreservices/kmditemlastuseddate

[15] Roffman Decl. ¶ 44.

[16] Liu Decl. ¶ 36.

37 "Unique Apple Files" that were "downloaded" between February 8, 2026 and April 27, 2026. This analysis did not identify any instances of any of the files being stored in any other locations as a result of being downloaded from [redacted] and then copied or saved elsewhere. We did not identify any forensic evidence showing that Mr. Liu copied or saved Apple documents via the retained [redacted] access.

29. To conclude, my forensic investigation corroborates Mr. Liu's testimony that he did not use his Mac Mini to open, copy, download, transfer, or otherwise interact with any of the 37 "unique" Apple files on which the Roffman Declaration focuses.

## VI. System Activity Can Cause [redacted] Logging to Record "Downloads" Events

30. Additionally, my team and I investigated whether there are circumstances in which automated events, without a manual user download, will record events labeled as "downloads" on [redacted]. I concluded that such circumstances do exist. This directly brings into question the conclusions drawn from Plaintiff's [redacted] logging, as discussed in Exhibit B of the Roffman Declaration.

31. In order to test the behavior of the logging from [redacted] (which is what Roffman Exhibit B consists of), my team and I procured a test instance of [redacted] Enterprise. We then populated an account in our test instance with a variety of files, consisting of various file types, and stored in a variety of subfolders. We then used the [redacted] Drive application on a new test Mac computer to authenticate to our [redacted] account.[17] Over the next several days, we performed several actions using our test Mac computer, and periodically re-exported the logging from our instance of [redacted], to determine and log what actions would trigger certain events.

[17] Our test Mac was running Mac OS 26.5.1, whereas Mr. Liu's Mac Mini was running Mac OS 26.5.2. By the time we performed our testing, Apple was offering an update to Mac OS 26.6.1. In the interest of time we did not attempt to upgrade our test Mac to 26.5.2, because that is not simple after the offered update from Apple exceeds that dot release. The release notes for Mac OS 26.5.2 (i.e., reflecting changes from 26.5.1) are available at: https://support.apple.com/en-us/127595.

32. Our testing revealed that adjusting the Mac Finder application's view preferences to "Gallery" and browsing inside the subfolders in our test [redacted] account caused "download" events to be recorded in the logging. Finder's Gallery view displays thumbnail views of the documents contained in the folder being displayed. In order to generate and display these thumbnails, the computer needs to "download" the file, without a user initiating the download. Apple's support documentation[18] explains:

> - *Gallery View* : Items are arranged in a row along the bottom of the Finder window. To browse the row, swipe left or right on the trackpad, or press the Left or Right Arrow key. As you browse, a large preview of the current item is shown above the row, with its details in the preview column.

33. Specifically, as part of our testing, on August 19, 2026 at 5:31 P.M. PT, I used Finder on our test Mac to navigate inside one of our test folders, entitled "Folder B_not empty." I had previously set Finder's view preference to "Gallery." This triggered our test Mac to download one of the test files in that subfolder. Pictured below is a screenshot of the Finder window on our test Mac, just after I navigated to this subfolder. Note that the file entitled "test_doc_memo" no longer has a small cloud icon next to it, signifying the file is no longer a "stub."




34. I then exported the logging from our test instance of [redacted], which confirmed that a "download" event had been recorded for the file entitled "test_doc_memo." Pictured below is an

[18] *See* https://support.apple.com/guide/mac-help/change-folders-displayed-finder-mac-mchldaafb302/mac

excerpt of the logging from our [redacted] test instance, corresponding to the "download" of the file entitled "test_doc_memo":

| Date | User ID | User Name | User Email | IP Address | Action | Affected |
|---|---|---|---|---|---|---|
| 8/19/2026 17:31 | 5.24E+10 | Andrew Crain | andy.crain@syncforensics.com | 50.125.92.192 | Download | test_doc_memo.docx |

35. This event could be triggered even if a user opened the wrong folder. In other words, the user need not have intended to access, much less open or download, the file that [redacted] records as having been "downloaded." Merely navigating through a folder in Finder using Gallery view can be sufficient to record a "download event" on [redacted].

36. Similarly, our testing revealed that [redacted]'s logging recorded "content accessed" events for files by simply using Finder to navigate to the folder in which they were stored. To be clear, this did not even require the use of Gallery view (which understandably must call the file from the cloud to generate and display thumbnails).

37. I note that the Roffman Declaration describes the [redacted] "content accessed" event as reflective of any number of user actions.[19] My testing rebuts that assertion, showing clearly that system processes on the Mac can cause "content accessed" events to be recorded in the [redacted] logging, rather than just "user actions."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 31st day of August 2026 in Lake Oswego, Oregon.

*Andrew Crain*

Andrew Crain

[19] *See* Roffman Decl. ¶ 20.