Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,<br><br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF JOEL DELMAN**<br><br>Hon. Edward J. Davila<br>Courtroom 4<br><br>Hearing Date: Oct. 1, 2026<br>Hearing Time: 9:00 a.m. |

## I. INTRODUCTION

I, Joel Delman, declare as follows:

1. I am the founder and Chief Design Officer at Informed Innovation. My business address is 2176 W 24th Street, Los Angeles CA 90018. This declaration ("**Declaration**") summarizes my current opinions, which are subject to change depending on ongoing discovery and any additional information received.

2. At the request of the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn Emanuel**") as counsel for Defendants OpenAI Foundation f/k/a OpenAI Inc. and OpenAI Group PBC (together "**OpenAI**"), io Products, LLC f/k/a io Products, Inc. ("**io**"), and Tang Yew Tan ("**Defendants**") in the above-captioned litigation ("**Litigation**"), I hereby submit this Declaration in support of Defendants' Opposition Brief to Plaintiff's Motion for Preliminary Injunction.

3. I understand that my task is to review materials and offer my opinion, perspective and insights regarding this subject. I hold the opinions expressed in this report, which are based on information that is currently available to me. As my study of the case continues, I may acquire additional information that leads to new insights relevant to these opinions. With that in mind, I reserve the right to supplement this report if and when such additional information becomes known to me. I may also provide supplemental reports at a later date in response to arguments which may be proposed by Apple and/or Apple's experts.

4. I am being compensated at my usual and customary rate of $450 per hour for the preparation of this report. I have no financial interest in, or affiliation with, either the Defendants or Plaintiff in this matter, and my compensation is completely independent of the outcome of this litigation.

## II. BACKGROUND, EXPERTISE, AND PREVIOUS TESTIMONY

5. My *curriculum vitae*, which is attached hereto as **Exhibit A**, provides a description of my professional experience, including my academic and employment history, publications, awards, patents, and more. The following is a brief summary of my relevant qualifications and professional experience.

6. I earned a Master of Industrial Design degree from Pratt Institute in New York, and have been an industrial designer, design strategist, and inventor for the past 30 years. I most recently worked with the design consultancy Product Development Technologies LLC (PDT) since 1999, and served as PDT's Los Angeles Creative Director beginning in 2007.

7. Since PDT's acquisition in December 2017, I have continued my design practice through my consultancy Informed Innovation Inc. My work encompasses a broad range of activities related to product design and development, including strategic user research (to guide clients toward optimal design solutions), aesthetic and technological innovation, and high-level program management. I also provide expert witness and litigation support services in matters related to patent and trade dress litigation.

8. Prior to joining PDT I worked as a staff designer at the New York-based design consultancies Henry Dreyfuss Associates and Cousins Design, then upon moving to Chicago as Senior Designer with Zenith Electronics Corp. I currently serve as Chair of the Industrial Designer's Society of America's (IDSA) Design Protection Committee, and as an Associate Professor at ArtCenter College of Design in Pasadena, California.

9. Throughout my 30-year career in industrial design and product development I have been engaged to assist clients with a wide variety of design challenges, including numerous programs focused on consumer electronics for customers including Blackberry (Research in Motion), Motorola, Qualcomm, LG Electronics, Dell, Nokia and Kyocera, among others. My design practice has also involved the development of medical devices – home use, diagnostic and surgical – for clients including Olympus Medical, BARD Access Systems, Roche, Novartis and ConMed, personal care products for Kimberly Clark and Medela, office equipment for Swingline and Fellowes, exercise equipment for Nautilus, and toys for Fisher Price and Learning Resources, in addition to dozens of other designs for well-known clients.

10. Notably, and with respect to the matters most relevant to this case, I have been engaged as designer and program manager for projects involving the design of laptop computers, mobile phones and other consumer electronics featuring anodized aluminum housings, as well as

aluminum trim components utilizing various treatments, coatings and finishes for which I provided design solutions for my clients.

11. For the above projects (and all design programs on which I have been engaged), I gained a comprehensive understanding of the intended users for each product I design, how they will use the product, and how my designs will be compared to other designs that consumers evaluate in their purchasing decisions. I possess a deep understanding of the research and strategy implemented in the development of these products, including to ensure that critical market opportunities and consumer needs and desires are addressed in the design process.

12. I have been named as inventor on over 40 issued and applied-for U.S. Patents. Approximately half of these patents and applications are design patents.

13. My design work has received awards and recognition from the Industrial Designers Society of America (which awards include, among others, the “IDSA 20/20 Award” recognizing twenty designers who contributed to the advancement of the design profession in 2020), the Chicago Athenaeum, the Consumer Electronics Association, the Toy Industry Association, ID Magazine and the Wall Street Journal, and has been featured in books aimed at educating design students about the profession.

14. Prior to entering the profession of industrial design, I graduated Harvard Law School and practiced corporate and securities law. I have not practiced or been barred as an attorney for at least the last 28 years. I do not provide any guidance or opinion as to the law, which I understand is the purview of the court. Rather, the opinions expressed and reasoning applied are those of an experienced industrial design consultant, viewing the relevant questions from the relevant perspectives and applying (as necessary) the law as it has been explained to me by counsel for Defendants.

15. In addition to the documents cited herein, a list of materials I considered in connection with rendering my opinion is attached as **Exhibit B**.

## III. SUMMARY OF EXPECTED TESTIMONY

16. I have been asked by counsel for Defendants to offer expert opinions responding to the Declaration of Paul Hatch ("**Hatch Decl.**"), dated August 3, 2026, the Declaration of Jackie Hughes ("**Hughes Decl.**"), dated August 3, 2026, and the Declaration of Rafael Dionello ("**Dionello Decl.**"), dated August 3, 2026, specifically to the extent they opine or discuss Apple's aluminum finishes (and Specification documents and processes that purportedly achieve those finishes).

17. **Opinion #1: Industrial Designers Like Mr. Hatch Typically Do Not Have Significant Experience in the Detailed Process Parameters for Metal Finishing.** The goal of professional industrial designers is to create useful and aesthetically pleasing products that will find broad acceptance with consumers. Industrial designers employ various methods to achieve that high-level objective, which includes selecting the look and feel of high-quality aluminum finishes for designs which would benefit from their inclusion. The specific parameters of the processes (such as the chemistry behind anodizing and desmutting solutions, machinery settings, and engineering of plating/coating materials) used to create these particular metal finishes, however, are typically left to persons in other disciplines, such as materials scientists, mechanical engineers, and manufacturing engineers.

18. **Opinion #2: Mr. Hatch and Apple's Other Declarants Do Not Show That Apple's [redacted]-produced Anodized Aluminum Finish is, on its Own, a Substantial Competitive Differentiator for Apple.** Apple is well known for creating electronics devices composed of high quality materials. But Apple is hardly alone in this achievement, as many other companies in the consumer electronics market also feature similarly high quality aluminum finishes in their products. Mr. Hatch and Apple's other declarants do not appear to supply any evidence beyond their own personal opinion that customers prefer Apple's finishes, or that Apple's finishes are distinct from the other high quality metal finishes on the market.

## IV. INDUSTRIAL DESIGNERS LIKE MR. HATCH TYPICALLY DO NOT HAVE SIGNIFICANT EXPERIENCE IN THE DETAILED PROCESS PARAMETERS FOR METAL FINISHING

19. Mr. Hatch and I both specialize in industrial design. *See* Hatch Decl., ¶¶ 5, 12-13. Merriam-Webster defines industrial design as "design concerned with the appearance of three-dimensional machine-made products." While this certainly captures the essence of the task which industrial designers focus on, I have often described the profession of industrial design as a combination of art and engineering, in which aesthetic considerations interact with the desires and needs of end-users and the marketplace, as well as the opportunities and constraints of technology and mass production.

20. The ultimate goal of a professional industrial designer is to create useful and aesthetically pleasing products that will find broad acceptance with consumers, and commercial success for those who bring the products to market. To accomplish this end, a critical component of an industrial designer's skill set centers on his or her ability to understand the needs of consumers in the marketplace. Industrial designers often evaluate what general sorts of designs may be appreciated by consumers in a particular product, and review numerous prototypes of a prospective product's design to evaluate and refine their look and feel. They also specify the particular look and feel of products they design, and the components which comprise those products, which involves validating that the specified colors, textures and finishes capture the desired look and feel of the final design direction approved by their clients (or employer, if the designer works in-house at a firm such as Apple).

21. Industrial designers are generally not, however, responsible for determining the specific parameters for manufacturing processes used to achieve a particular finish. They may need to understand high level industrial process limitations or, in general, how a particular process may affect a design, but an industrial designer would rarely (if ever) be responsible for dictating the specific manufacturing process parameters. There are separate disciplines that study, for example, how to create the equipment/machines used for manufacturing or achieving the specific mechanical properties of a device (typically, mechanical engineering and manufacturing engineering), or how

to optimize for the technical properties of materials, such as metals, composites, and polymers, that may be used in a design (materials science or engineering). Of course industrial designers may gain some firsthand experience with aspects of these fields when working with individuals in these disciplines, but typically industrial designers do not determine or dictate these aspects of metal finishing.

22. Based on my read and understanding of Apple's materials, I understand that Apple alleges that the specific process parameters listed in paragraphs 45, 52, and 53 of the Hatch Declaration, and allegedly contained in Ex. A and Ex. B to the Hughes Declaration (hereinafter referred to as the [redacted] process or the [redacted] manufacturing processes), are Apple's "industrial design-related" trade secrets. Hatch Decl., ¶ 12. As an industrial designer, I have reviewed the trade secrets, and I do not believe that is an accurate characterization. Industrial designers may well have played a role in evaluating the aluminum produced by Apple's [redacted] process and determining that it met Apple's design requirements. But the sorts of process parameters contained in Ex. A and Ex. B are not usually the domain of industrial designers, and I would not expect an industrial designer to be a particularly well-versed authority on how prevalent those parameters may be in an industry generally.

23. I have reviewed Mr. Hatch's qualifications, and I believe he is well qualified as an industrial designer. But I do not see anything listed in his qualifications that suggests he has particular familiarity with aluminum manufacturing process parameters—indeed, neither his resume nor description of his qualifications appears to mention the word aluminum. I would not afford substantial weight to Mr. Hatch's opinions about what "companies in the consumer electronics industry closely guard" with respect to process parameters for achieving aluminum finishes. Hatch Decl. ¶¶ 31, 33, 34, 36, 38; *see also* Hatch Decl. ¶¶ 41, 49.

24. This does not mean that industrial designers lack important expertise concerning anodized aluminum components. To the contrary, industrial designers often play a central role in determining the desired cosmetic and tactile characteristics of such components and in evaluating whether a manufacturer has achieved those characteristics. I have personally participated in such activities, having helped to design cosmetic anodized-aluminum components in engagements for

major electronics manufacturers. During those engagements, our manufacturing partners produced multiple anodized-aluminum samples for our evaluation. But I was generally not concerned with the specific manufacturing process parameters used to produce those samples; my role was to evaluate the cosmetic characteristics of the samples and communicate to the manufacturer the appearance and feel we wanted it to achieve. I then reviewed successive samples and provided additional direction until we reached a finish that, in my judgment, satisfied the product's design requirements and our clients' expectations.

25. This experience is consistent with my understanding of the respective roles of industrial designers and manufacturing specialists such as mechanical engineers and materials engineers / scientists. An industrial designer is trained and possesses the professional experience to evaluate and specify the desired appearance and feel of an anodized-aluminum component, and can work iteratively with a manufacturer to achieve those characteristics, without necessarily having expertise concerning the detailed process parameters used to manufacture the component. Moreover, in my experience, there are several manufacturers who are capable of supplying anodized aluminum and similar components without being supplied detailed process parameters, such as those in Apple's Specifications, which can allow industrial designers to operate with less engineering support. Working with these partners and iterating on designs is the conventional and effective way of developing a high-quality aluminum finish for the products designed by industrial designers.

## V. **MR. HATCH AND APPLE'S OTHER DECLARANTS DO NOT SHOW THAT APPLE'S AT-ISSUE ANODIZED ALUMINUM FINISH IS A SUBSTANTIAL COMPETITIVE DIFFERENTIATOR**

26. In their declarations, Mr. Hatch, Mr. Dionello, and Ms. Hughes all offer the opinion that Apple's [redacted] metal process, or some variants thereof, produces a unique metal finish that competitively differentiates Apple as a company. Mr. Hatch describes the finish as a "distinctive finish" that "look[s], feel[s], and perform[s] in a way competitors cannot match." Hatch Decl., ¶ 68. Mr. Dionello indicates that this finish is a "hallmark of Apple's quality design," and that if it were lost, "Apple would lose the ability to distinguish its products in the market." Dionello Decl., ¶ 37.

Ms. Hughes opines that someone with Apple's [redacted] finishing process could "mimic Apple's signature look and feel of its commercial products, where no other company has succeeded." Hughes Decl., ¶ 30.

27. I note that establishing the value of an aluminum finish is not the same thing as establishing the value of a process for achieving or manufacturing that finish. As Mr. Hatch acknowledges, "different combinations of [process parameters] can yield final surfaces that look and feel the same." Hatch Decl., ¶ 57. Nothing in this section should be read as conceding that, if Apple's [redacted] manufacturing process does produce a valuable finish, then Apple's [redacted] process is itself valuable. Instead, my purpose in this section is limited to determining whether the evidence presented by Apple's declarants shows that the aluminum finish produced by the [redacted] process is itself a competitive differentiator for Apple.

28. I disagree that the evidence provided by Apple's declarants establishes that the [redacted] aluminum finish, considered on its own, provides Apple with significant competitive differentiation. In particular, these declarations do not (1) identify evidence demonstrating that consumers perceive the finish produced by Apple's [redacted] processes as distinctive or material to their purchasing decisions; (2) explain with specificity what characteristics of this finish distinguish it from other high-quality anodized aluminum finishes; or (3) meaningfully compare this finish with competing finishes on the marketplace. These considerations are significant to my opinion for the reasons discussed below.

29. There is no dispute that Apple has achieved extraordinary commercial success with products including the iPhone, iPad, and Apple Watch. But as an industrial-design matter, the success of a commercial product does not, by itself, establish that any one aspect of its exterior finish materially contributed to that success. Apple products combine numerous design elements, materials, hardware components, software and user interfaces, and manufacturing choices (not to mention a myriad of technical functionalities and features) into an integrated product. Their external surfaces alone may incorporate glass, plastics, and other metals beyond aluminum.[1] Even their aluminum finishes for many commercially successful products are made by processes other than the

[1] *See iPhone Air*, APPLE, https://www.apple.com/iphone-air/ (referencing titanium design).

[redacted] processes. *See* Hughes Decl., ¶ 11. Apple has not even shown that products incorporating aluminum finishes achieved using the asserted [redacted] manufacturing processes were more successful or valuable than its products that do not incorporate or use the asserted processes. The commercial success of Apple's products does not, without more, establish that consumers regard the specific finish produced by either of the manufacturing specifications (Ex. A and Ex. B of the Hughes Declaration) in particular as a significant reason to purchase Apple products, or as a significant source of their perceived quality.

30. The declarations do not identify evidence establishing such a connection. Mr. Hatch, Mr. Dionello, and Ms. Hughes do not, for example, identify consumer surveys, user testing, market research, purchasing data, or other evidence demonstrating that consumers perceive the relevant characteristics of the [redacted]-produced finishes as distinctive, that they prefer them to competing metal finishes, or that they consider them material to their purchasing decisions. Industrial designers routinely make qualitative judgments concerning the appearance, feel, and performance of materials. But the proposition advanced by Apple's experts goes much further: the declarants contend not merely that the [redacted] produce an attractive or high-quality finish, but that the resulting finish distinguishes Apple competitively and cannot be matched by competitors. I would expect an opinion concerning consumer or marketplace differentiation of that kind to be supported by some evidence connecting the particular finish to consumer perception or preference. The declarations identify none.

31. The declarations also do not explain with specificity what allegedly makes any [redacted]-produced finish competitively distinctive. Metal finishes can be evaluated and compared along numerous aesthetic and functional dimensions, including texture, gloss, color consistency, reflectivity, tactile qualities, scratch resistance, durability, and other characteristics. Yet the declarations do not identify which characteristic, or combination of characteristics, supposedly differentiates the finish produced by the [redacted] manufacturing processes from finishes available elsewhere in the industry. Instead, they merely characterize Apple's finish using generalized terms such as "distinctive" and "high quality." *E.g.*, Hatch Decl. ¶ 65. Mr. Hatch also describes Apple's brushed aluminum as "durable," *see id.*, but elsewhere describes anodized aluminum generally as

durable. Hatch Decl. ¶ 22. Without identifying the particular characteristics said to distinguish a [redacted]-produced finish, there is no meaningful basis in these declarations to evaluate the assertion that competing manufacturers cannot achieve a comparable result.

32. I also understand Ms. Hughes to state that Apple's [redacted] process is [redacted]. Hughes Decl., ¶ 9. Ms. Hughes states that the "[redacted] (or the [redacted] manufacturing processes to achieve those finishes) to production. *Id.* That fact does not establish that the finishes produced by Apple's [redacted] manufacturing processes lack value. It does, however, make the assertion that the process presently provides Apple with significant competitive differentiation more difficult to reconcile with Apple's actual product offerings, absent additional evidence or explanation. Ms. Hughes does state that "[i]f a competitor were to learn about these processes, specifically [redacted], a competitor would be vastly closer to achieving finishes like [redacted]" that Apple does use. *Id.* But my understanding of Apple's misappropriation allegations is not that Defendants *learned* the process, but that one manufacturer *performed* it for them. *See* Dionello Decl., ¶¶ 38-41. Ms. Hughes's opinion appears to assume that Defendants actually learned the process parameters, and therefore, it does not appear connected to Apple's allegations.

33. Producing a high-quality anodized finish is different from producing a finish that, by itself, provides significant competitive differentiation. High-quality anodized-aluminum finishes are used in numerous premium consumer products made by companies other than Apple.

34. For example, Hewlett Packard has used anodized aluminum in its computer designs for years. The HP ProBook 400 series, a mid-range line from around 2018, featured an anodized aluminum case.[2] More recently, the HP OmniBook X Flip portable computer features a

[2] *HP ProBook 450*, HEWLETT-PACKARD, https://www.hp.com/us-en/shop/mdp/laptops/probook-450.

"Sandblasted anodized finish" in "Meteor silver aluminum."[3] Tom's Hardware, in reviewing the device, specifically praised its "Impeccable build quality."[4] I have personally been engaged on laptop designs for Dell's XPS line of computers, as well as mobile phone designs for Motorola and LG Electronics, which incorporated extremely high-quality anodized aluminum finishes.

35. Several models of Samsung's signature Galaxy line of phones have used anodized aluminum. For example, the Galaxy S6 and Galaxy S6 edge feature an anodized aluminum alloy created through "20 precise and delicate steps."[5]

36. Anodized aluminum is likewise used in premium audio products. For example, Bang & Olufsen states on its website that it began to "experiment with aluminum 70 years ago" and has produced high-quality matte aluminum looks.[6] Several of Bang & Olufsen's current offerings appear to utilize anodized aluminum, such as its "Beoplay HX" headphones, which are widely available for $749.[7]

37. Several camera makers are known to have achieved persistent and high-quality anodized aluminum finishes. For example, legendary camera maker Leica has often used black

---

[3] HP OmniBook X Flip 2-in-1 14 inch Laptop Next Gen AI 14-fk0121AU, Silver, HEWLETT-PACKARD, https://www.hp.com/my-en/shop/hp-omnibook-x-flip-2-in-1-laptop-next-gen-ai-14-fk0121au-d4qp4pa.html.

[4] Charles Jefferies, *HP OmniBook X Flip 14 Review: Premium design, middling performance*, TOM'S HARDWARE (Jul. 26, 2026), https://www.tomshardware.com/laptops/hp-omnibook-x-flip-14-review.

[5] *Forming Glass, Metal Frame – The Art of Craftsmanship in the Galaxy S6*, Samsung (Mar. 2, 2015), https://news.samsung.com/global/forming-glass-forging-metal-the-art-of-craftsmanship-in-the-galaxy-s6.

[6] *Aluminum | B&O,* BANG & OLUFSEN, https://www.bang-olufsen.com/en/us/story/aluminium.

[7] *Beoplay HX – Over Ear Headphones | B&O*, BANG & OLUFSEN, https://www.bang-olufsen.com/en/us/headphones/beoplay-hx?variant=beoplay-hx-goldentone.

anodized aluminum in its lenses, including on the forthcoming Summilux-SL 50 f/1.4 ASPH lens.[8] The Sony RX100 MK VII camera, which features a black anodized aluminum exterior shell in an apparent matte finish, is another example. One reviewer with years of experience analyzing camera products describes this camera as a "premium camera for premium people who deserve the best of the best."[9]

38. Even luxury jewelry makers, such as Bulgari, have incorporated anodized aluminum into their products. For example, the Bulgari Aluminum Series Watch uses an anodized aluminum case.[10] These watches retail for over $3,000.[11]

39. As the above examples show, producing high-quality anodized-aluminum finishes is an achievable goal. Numerous brands have been successful in producing such finishes. These finishes may not be identical in appearance to Apple's, but consumers nevertheless perceive them as high quality and desirable. With more time for analysis, I would expect to be able to identify specific finishes on the market that I believe are comparable to finishes achieved by the asserted [redacted] manufacturing processes specifically.

40. To reach the conclusion that Apple's anodized aluminum finishes produced by the [redacted] manufacturing processes significantly differentiate its products, I would expect to see some analysis identifying the characteristics that supposedly distinguish the [redacted]-produced finishes and some evidence that consumers perceive and value the asserted differences. I have seen no such

---

[8] *Summilux-SL 50 f/1.4 ASPH*, LEICA, https://leica-camera.com/en-US/photography/lenses/sl/summilux-sl-50mm-f1-4-asph-black-anodized-finish?srsltid=AfmBOoon91DsziVc_ltC_6zD1h4qeyZ8fuDpU5D89KnNjFzAVd_leXX7.

[9] Ken Rockwell, *Sony RX100 MK VII*, https://www.kenrockwell.com/sony/rx100-vii.htm.

[10] Mark Kauzlarich, *Hands-On Bulgari's New Aluminium Limited Editions Are Summer-Ready*, HODINKEE (June 5, 2023), https://www.hodinkee.com/articles/hands-on-bulgari-aluminium-limited-editions.

[11] *Bvlgari* Aluminum Watch, BULGARI, https://www.bulgari.com/en-us/watches/bvlgari-aluminium?srsltid=AfmBOoqJDYdkhafE8EhifoX9GPtmgVmv_OKAEilcck6PygCcHmOLYS0X.

analysis in the Hatch, Dionello, and Hughes Declarations, and frankly, in light of the number of manufacturers that have achieved high-quality aluminum finishes in recent years, it is not clear that Apple could provide such evidence. On the evidence presented, I therefore do not find a sufficient basis to conclude that Apple's [redacted]-produced aluminum finish, considered on its own, is a significant competitive differentiator for Apple.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 31st day of August, 2026 in Hanover, New Hampshire.

By ______________________________

JOEL DELMAN