Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,<br><br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF ROBERT G. FREID**<br><br>Hon. Edward J. Davila<br>Courtroom 4<br><br>Hearing Date: Oct. 1, 2026<br>Hearing Time: 9:00 a.m. |

## I. INTRODUCTION

I, Robert G. Freid, declare as follows:

1. I am President and Principal Consultant of Contract Manufacturing Consultants, Inc. My business address is 22722 29th Dr. SE, Bothell, Washington, 98021. This declaration ("**Declaration**") summarizes my current opinions, which are subject to change depending on ongoing discovery and any additional information received.

2. At the request of the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn Emanuel**") as counsel for Defendants OpenAI Foundation f/k/a OpenAI Inc. and OpenAI Group PBC (together "**OpenAI**"), io Products, LLC f/k/a io Products, Inc. ("**io**"), and Tang Yew Tan ("**Defendants**") in the above-captioned litigation ("**Litigation**"), I hereby submit this Declaration in support of Defendants' Opposition Brief to Plaintiff's Motion for Preliminary Injunction.

3. I am being compensated at my usual and customary rate for the preparation of this report, which is $650 per hour. In preparing this report, I received support from Keystone Strategy, a consulting firm, working under my direction and guidance. Neither I nor Keystone Strategy have any financial interest in, or affiliation with, either the Defendants or Plaintiff in this matter, and our compensation is completely independent of the outcome of this litigation.

## II. BACKGROUND AND EXPERTISE

4. My *curriculum vitae*, which is attached hereto as **Exhibit A**, provides a description of my professional experience, including my academic and employment history, publications, awards, patents, and more. The following is a brief summary of my relevant qualifications and professional experience.

5. I am the President and principal consultant of Contract Manufacturing Consultants (CMC), which is based in Bothell, Washington. At CMC, I regularly analyze and recommend suitable suppliers, contract terms with pricing formulas, performance measurement methods, IP protection, and inventory risk mitigation. My recent clients include X Corp., Western Digital, and Ingenico Group.

6. Before founding CMC in 1999, I worked for Solectron Corp., which at the time was the world's largest contract electronics manufacturer. I led all sales and program management

activities for its Washington State-based production subsidiary. Our services included circuit board assembly, integration of metals and plastics sub-assemblies, final configuration, and shipping.

7. For several years, I was a member of an Advisory Board for the University of Washington online master's degree program in Supply Chain Transportation and Logistics. I have also served as an expert witness in multiple disputes arising from breaches of contract, income tax, securities fraud, and production cost overruns in the contract electronics manufacturing industry.

8. I began my career as a manufacturing engineer with the General Electric Company and joined McKinsey & Company as a general management consultant after earning my MBA from Stanford University. I received a bachelor's degree in Industrial Engineering & Operations Research from the University of California, Berkeley.

9. In addition to the documents cited herein, a list of materials I considered in connection with rendering my opinion is attached as **Exhibit B**.

## III. SUMMARY OF EXPECTED TESTIMONY

10. I have been asked by counsel for Defendants to offer expert opinions responding to aspects of Plaintiff's Motion for Preliminary Injunction ("**Plaintiff's PI Motion**") and the Declaration of Rafael Dionello ("Dionello Decl."). To the extent I do not address certain statements in the Dionello Decl. or Plaintiff's PI Motion, it should not be assumed that I agree with such statements.

11. **Opinion #1: Apple's Relevant Supplier Relationships are Not Confidential.** Companies in the electronics industry routinely share suppliers, and such relationships are often discoverable through public supplier lists, regulatory filings, and industry reporting. Apple itself publishes a supplier list which includes [redacted], the supplier at the heart of Apple's metal finishing allegations.

12. **Opinion #2: Apple's Relevant Codenames are Not Confidential.** The codenames "[redacted]" and "[redacted]" are not confidential. Using concise codenames is a standard industry practice, and both these specific codenames and the products they refer to—[redacted] and [redacted]—have been extensively reported in the press, and even leaked by Apple itself.

13. **Opinion #3: To the Extent Apple's NDA Had Expired, Industry Practices Would Have Allowed [redacted] to Apply Processes It Used For Apple With Other Customers.** The [redacted] includes a term provision that appears, based on my industry experience and background, to lift [redacted] confidentiality obligations after ten years. While not conclusive from the information Apple supplied, Apple's metal finishing specifications attached to the Hughes Declaration (Exhibits A and B) appear [redacted]. To the extent Apple's NDA had expired, industry custom and practice would not have precluded [redacted] from sharing information regarding the aluminum finishing processes described in Exhibits A and B to the Hughes Declaration with other clients (which, to be clear, I have seen no evidence that this occurred here).

## IV. APPLE'S SUPPLIER RELATIONSHIPS ARE NOT CONFIDENTIAL

14. In my supply chain consultant work for electronics products companies, I often help companies develop sourcing and outsourcing strategies, including conducting qualification audits and evaluations on site at various contract manufacturers. I am deeply familiar with the supplier ecosystem in the electronics space.

15. In my experience, it is completely standard for several companies in this space to work with the same supplier, even when sourcing the same or similar components. The arrangement benefits everyone. Suppliers understandably do not want to do all their business with only a single company, who would hold significant leverage over them to divert orders or even threaten their company's livelihood were a dispute to arise. Customers also benefit from having suppliers who are diversified amongst many customers, for several reasons. For example, suppliers with several major customers may enjoy stronger financial health, may have existing employees who have experience in the type of work the customer hopes to perform, and may be more able to scale production upwards or downwards if there is an increase or a decrease in the customer's orders.

16. When hiring new suppliers, customers also frequently look for suppliers who have prior experience in the type of work the customer is trying to perform. Naturally, hiring "experienced" suppliers necessarily entails hiring suppliers who work for, or at least have in the past worked for, other product companies seeking similar services.

17. In part because the ecosystem generally benefits from having suppliers who perform work for multiple companies, the existence of supplier relationships within the electronics industry is often not especially difficult to ascertain. To the extent not prohibited by specific NDAs, suppliers may reveal the names of their customers to boost their industry credibility. Additionally, suppliers are often obligated to disclose major customers due to financial regulations. For example, SEC rules (and the rules of other global regulatory bodies) often require product companies to disclose major suppliers as part of their disclosure of financial dependencies and material risks. Import/export and shipping data, which is often public, may also reveal key supply relationships. Finally, several companies publish data on their environmental or sustainability efforts, which reveal details about the commitments made by the companies' suppliers.

18. Apple publicly reveals the existence of its supply relationships with a substantial number, if not all of its suppliers. For several consecutive years, Apple has published an annual "Supplier List" on its website. A true and correct copy of the current Supplier List is attached as **Exhibit C**.[1] Apple characterizes the list as containing the names and locations of suppliers that "represent[] 98 percent of our direct spend for materials, manufacturing, and assembly of our products worldwide."

19. Similarly, there is a dedicated Wikipedia page entitled "List of Apple Inc. suppliers," which reveals both supplier names and a list of areas that they work on. A true and correct copy of this Wikipedia article is attached as **Exhibit D**.[2]

20. I understand one of the suppliers at issue in this case is named [redacted]. In my opinion, [redacted] supplier relationship with Apple is not confidential. In fact, [redacted] is specifically listed on Apple's supplier list, *see* Ex. C at 12. [redacted] also appears in the "List of Apple suppliers" Wikipedia article, which specifically identifies [redacted] as a producer of

[1] *Supplier List*, APPLE, https://www.supplychainreports.apple/home/default.aspx

[2] *List of Apple Inc. suppliers*, WIKIPEDIA, https://en.wikipedia.org/wiki/List_of_Apple_Inc._suppliers

Apple Watch casings. It is publicly known that anodized aluminum is one of the most prominent materials used in Apple Watch casings.[3]

21. Based on my review of the supplier-related allegations in Apple's preliminary injunction motion and Complaint, I have seen no evidence that OpenAI has exploited any improper information about Apple's relationships with any of its suppliers. Both [redacted] and the suppliers mentioned in paragraph 37 of Apple's Complaint are listed on Apple's supplier list and have well-publicized relationships with Apple. Moreover, beyond [redacted], Apple does not offer evidence that any suppliers perform similar tasks for OpenAI as they do for Apple. The mere fact that OpenAI and Apple share a few common suppliers does not, in my opinion, create any inference of impropriety—indeed, given the large number of suppliers within Apple's supplier list and the relatively limited universe of major suppliers in the electronics space, some overlap between the companies' supply chains is to be expected.

## V. SEVERAL OF APPLE'S CODEWORDS DO NOT APPEAR TO BE CONFIDENTIAL OR HAVE ECONOMIC VALUE

22. In paragraph 51 of Apple's Complaint, and in portions of its preliminary injunction motion, Apple describes its use of "code names" for products that are under development. In my experience, it is not unusual or unique to Apple or others to use codenames to describe prototypes or projects. Many major electronics product companies use such codenames in this manner which in themselves do not contain or convey trade secrets. Most of the codenames I have encountered take an extremely simple form, usually composed of a handful of alphanumeric characters.

23. In my experience, there are several reasons why products companies elect to use codenames. Codenames may be a useful shorthand to refer to a product or component that has not otherwise been given a name, even if the component itself is not something that is unknown or secret. Codenames may also be useful because they do not describe a particular product and therefore do not reveal any confidential information about it. For example, if I said a codename

[3] ShonMStudio – Everything About Apple, *Apple Watch Sport - Aluminum* (YouTube, Mar. 9, 2015), https://www.youtube.com/watch?v=4VOe_TtiPt0.

aloud in a crowded conference room, only individuals with existing knowledge of what that codename means might understand the trade secrets behind it. The idea behind codenames appears to reflect the recognition that, on some level, the codenames themselves may be disclosed, and yet any confidential projects they are meant to describe will remain a secret.

24. I have reviewed Apple's allegations related to codenames in Apple's preliminary injunction motion. Specifically, Apple appears to state that the codename "[redacted]" is itself confidential and describes a confidential Apple project, and also implies that the codename [redacted] is Apple confidential. I do not believe that either of these codenames is in any way confidential. In fact, both these codenames and the underlying Apple projects they describe have been widely reported on.

25. [redacted] is widely known to be a codename that Apple uses to describe its [redacted] project. There are dozens if not hundreds of Google results for this codename that are associated with Apple, dating back to well into 2025. For example, a post on the website "Morning Brew" dated September 13, 2025 describes how "[s]imilar to the Galaxy phones you always see advertised but rarely encounter IRL, Apple's foldable iPhone (code-named [redacted]) will open like a book, transforming from a phone to a small tablet, according to Bloomberg's Mark Gurman. Since The Information broke the news about Apple's origami foray last year, multiple analysts have predicted that it'll launch in September 2026 for ~$2,000." Attached hereto as **Exhibit E** is a true and correct copy of this article.[4]

26. Apple itself also recently leaked the [redacted] codename, along with several others. Media reporting on this leak from the website Hypebeast noted that the [redacted] codename "aligns with the long-rumored iPhone Ultra" which is "expected to be the brand's first foldable smartphone." Attached hereto as **Exhibit F** is a true and correct copy of this article.[5]

---

[4] Molly Liebergall, *Apple has a chance to make foldable phones* cool, MORNING BREW (Sept. 13, 2025), https://www.morningbrew.com/stories/2025/09/14/apple-samsung-foldable-phones.

[5] *Apple Leaks Unreleased Devices Weeks Ahead of Annual September Event*, HYPEBEAST, https://hypebeast.com/2026/8/apple-iphone-18-iphone-ultra-leak-from-macos-tahoe.

27. [redacted] is another Apple codename that has been widely revealed in public reports. In 2023, longstanding Apple blog MacRumors posted "An In-Depth Overview" of [redacted], which described it as a "haptic button" that would not "move when pressed." A true and correct copy of this article is attached as **Exhibit G**.[6] In April 2025, an Apple patent application disclosing such haptic buttons was published, and observers immediately connected it with [redacted]. A true and correct copy of a report from the website Apple Insider regarding this patent application is attached as **Exhibit H**.[7]

## VI. RESPONSES TO THE DIONELLO DECLARATION

28. In my supply chain work for electronics product companies, I frequently advise on issues related to manufacturing contracts. I would estimate I have reviewed at least three hundred manufacturing contracts over my thirty years as an executive and as a senior consultant in this industry. I am broadly familiar with the industry custom with respect to manufacturing contracts in the electronics industry.

29. In my experience, provisions related to IP ownership and confidentiality are some of the most closely negotiated provisions in electronics manufacturing agreements. Brand owners such as Apple understandably seek to ensure their confidential information and trade secrets are not made public simply because they need to involve a third party manufacturer to build their product. Contractual restrictions are thus essential for protecting a brand owner or customer's IP and information, which if passed to the supplier without restriction, could generally be shared without the customer having any recourse.

---

[6] Marko Zivkovic, *Project Bongo: An In-Depth Overview of the iPhone 15 Pro's Canceled Haptic Buttons*, MACRUMORS (Sept. 20, 2023), https://www.macrumors.com/2023/09/20/iphone-15-haptic-button-overview/.

[7] Marko Zivkovic, *Apple wants to patent its once discarded haptic button design, known as 'Project Bongo'*, Apple Insider (Apr. 18, 2025), https://appleinsider.com/articles/25/04/18/apple-wants-to-patent-its-once-discarded-haptic-button-design-known-as-project-bongo.

30. On the other hand, manufacturing partners are eager to preserve their own IP and are loathe to agree to restrictions that compromise their ability to work for other clients. For these reasons, ownership and confidentiality provisions typically strike a delicate balance that is sufficient to protect the brand owner's legitimate needs, but not substantially broader, with the understanding that information from the brand owner/originator that is not explicitly protected by the agreement is generally fair game for the manufacturer to use.

31. Like all contracts, manufacturing agreements can also be affected by disparities in bargaining power between the parties. For example, owners of large brands, such as Apple, may be able to extract additional concessions from manufacturing partners, who may concede to additional restrictions to avoid jeopardizing significant business. I would expect the contracts of a company of Apple's size to be especially likely to protect any legitimate interest Apple has in its material.

32. I have reviewed the agreements between Apple and [redacted] that are attached to the Dionello Declaration and discussed by Mr. Dionello in paragraphs 15-26. Though I am not opining on the legal meaning of these contracts, I have reviewed these agreements from an industry perspective and based on my experience with supply chain management and supplier relationships. In doing so, I note below a few provisions that are not specifically called out in the Dionello Declaration.

33. Most significantly, the non-disclosure agreement between Apple and [redacted] (what Mr. Dionello calls the "[redacted]") includes a provision that an industry professional, such as myself, would understand to be [redacted]:

> [redacted]

Dionello Decl., Ex. A § 12 (emphasis added).

34. Notably, the two metal finishing specifications that Apple contends it provided to [redacted] For example, Exhibit A to the Hughes Declaration was [redacted], and was [redacted]

[redacted].[8] At minimum, the initial version of this specification [redacted]. Exhibit B to the Hughes Declaration was [redacted], and [redacted]. All versions of this specification appear to be [redacted].

35. The [redacted]. Further, I do not understand Apple or its declarants to contend that either of these specifications constitutes "[redacted]," "[redacted]

36. [redacted]

Dionello Decl., Ex. A § 14.

[8] Declaration of Y. Lawrence Yao, PhD ¶¶ 27-29.

37. As noted above, in industry, restrictions on the use of a brand's information are typically set by contract. To the extent that the confidentiality restrictions that Apple negotiated for expired, it would be industry custom and practice to understand that information would become free of restriction. To my knowledge, it would not be against any rule or industry custom for a supplier such as [redacted] to then use that information on behalf of a different client—though, to be clear, I do not see any evidence that establishes this occurred here.

38. Mr. Dionello also identifies two other agreements that he contends supply additional confidentiality restrictions, namely the [redacted]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 31st day of August, 2026 in Bothell, Washington, USA.

By ______________________

ROBERT G. FREID