Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC.<br><br>Plaintiff,<br><br>v.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,<br><br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF MELISSA HUTCHINSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION** |

# DECLARATION OF MELISSA HUTCHINSON

I, Melissa Hutchinson, the undersigned, hereby declare and state:

1. I submit this declaration in support of Defendants' Opposition to Apple's Motion for a Preliminary Injunction (ECF No. 38) (the "Motion"). I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

## I. Relevant Background

2. I joined io Products in September 2024 to lead its recruiting team. When OpenAI acquired io Products in July 2025, io Products became OpenAI's Consumer Hardware division, for which I now lead recruiting.

3. Before joining io Products, I served as a recruiting professional at other technology companies, including Apple, where I worked from 2009-2015.

## II. OpenAI Consumer Hardware Division's Recruiting from Apple

4. Many of OpenAI's Consumer Hardware employees previously worked at Apple. I understand that the Consumer Hardware division often recruits candidates who worked at Apple because it seeks employees with strong skills and experience in that industry. Because Apple is one of the leading and largest consumer hardware companies in the world, from my experience its hardware alumni often possess strong skills and experience in this space, having worked at an almost unparalleled scale.

5. The recruiting team I manage and I often take certain steps to facilitate proactive measures new hires from Apple may take to remove any Apple confidential information from their devices before joining OpenAI. For example, I advise departing Apple employees to turn off their iCloud syncing before leaving Apple. I do so because, from my experience, Apple employees often use their personal iCloud accounts and devices for their work at Apple. Therefore, turning off iCloud syncing decreases the risk that Apple materials will inadvertently remain in the possession of the departing employee.

6. The recruiting team I manage and I make clear to new hires, including those coming from Apple, that OpenAI expressly prohibits bringing, sharing, or using any confidential information from former employers or any other company. That policy is memorialized in, for

example, new hires' offer letters. From my experience, this policy is further reiterated on a regular basis to OpenAI employees, including in periodic meetings with company leaders.

## III. Interviewing at OpenAI's Consumer Hardware Division

7. It is my team's general policy that before job interviews with OpenAI's Consumer Hardware division are scheduled, candidates are reminded not to bring or discuss anything confidential.

8. From my experience, during their interviews, candidates often discuss public information about their skills and experience. I understand that candidates sometimes also bring components of publicly available products or shipped parts as demonstrative aids for their interviews. I am not aware of any candidate who brought or discussed another company's confidential information or confidential objects during an interview at OpenAI.

9. I understand that Apple quotes a certain generic pre-interview guide to argue that OpenAI's Consumer Hardware division instructs candidates from Apple to bring Apple confidential information to their interviews. Mot. at 1, 4, 14 (quoting an email that appears at ECF No. 59-5). Apple is mistaken. First, this pre-interview guide was sent by recruiters with OpenAI's Robotics division. It was not used for recruiting for any consumer hardware positions at OpenAI. OpenAI's Robotics division has its own recruiting operation that is separate from recruiting within the Consumer Hardware division, which is handled by my team. Second, I have reviewed that document and did not identify any instruction regarding the confidential information of Apple or any other company.

## IV. Onboarding at OpenAI

10. Following the merger between io Products and OpenAI in July 2025, new hires within the Consumer Hardware division signed OpenAI offer letters in which they agreed to comply with any confidentiality obligations owed to prior employers. New hires sign a Confidential Information and Invention Assignment Agreement, attached to their offer letters, stating that "during the term of the Relationship [with OpenAI] and thereafter, I will not improperly use or disclose to OpenAI any Confidential Information or Trade Secrets, as defined under this Agreement ***of my***

***former employer(s) or any other person***, and I agree not to bring any such information onto OpenAI's property or place of business or ***expose any OpenAI employees to any such information***."

11. On certain previous occasions when, after interviewing with us, Apple employees have accepted job offers from OpenAI, I sent them a checklist detailing the steps departing Apple employees should take upon leaving Apple. I believed it would be helpful to encourage departing Apple employees to get an early start on the steps listed on the checklist, to increase the likelihood that the steps would be completed by the time a new hire joins OpenAI. I had no other intentions for sharing this document.

12. My intention in sharing this document with new hires was not to "help recruits evade detection" as Apple incorrectly alleges (Mot. at 1), and I do not see how this document could be used to achieve such a goal. To my recollection, the document consists of customary offboarding steps to be shared with departing employees, such as updating contact information, finalizing expenses and time entries, and reminding them to adhere to their confidentiality requirements, without greater detail on Apple's security protocols. Apple is therefore mistaken in arguing that my intention in sharing the checklist was "to help departing Apple employees avoid the checks and protections of Apple's exit processes" or "giv[e] them advance notice of Apple's security procedures—so they could evade them." *Id*. at 5, 14. In fact, I was trying to do the exact opposite and help our new hires shed all Apple materials before they start with us. One of my responsibilities as the head of recruiting for the OpenAI Consumer Hardware division is to take steps to prevent new hires from bringing confidential information from their prior employers to OpenAI. One of the proactive steps I took to achieve that objective was preemptively circulating the checklist, to make new hires leaving Apple aware of their offboarding tasks and the limited time they would likely have to complete them.

13. Specifically, I shared the checklist with new hires from Apple because, to my understanding, Apple follows a "walk out" policy, requiring employees who are leaving for competitors to be walked out of the building by their manager on or within days of their resignations. I understand that, as a result of Apple's policy, departing employees are often not afforded sufficient time to follow all the steps listed in the checklist. When I shared the checklist with new hires from

Apple, I often explained that I was doing so to help them prepare for the Apple exit process and get a head start on preparing to return any prototypes and devices.

14. To my recollection, the checklist itself did not contain any information that appeared confidential to me, and it was substantially similar to another exit checklist which I understand Apple filed publicly in this case. *See* ECF No. 42-9. I further understand that this is a document Apple employees can generally access, and that its purpose is to serve as a resource for departing employees consisting of things they need to know, and actions they need to take, before they exit. The document, to my understanding, does not contain any information about Apple's business or product development. From my experience, this checklist simply reflects customary, standard steps that employees leaving an employer should follow.

15. My team's recruiting has been negatively impacted by this litigation. I personally have identified several candidates who expressed anxiety about their applications after Apple filed its Complaint on July 10, 2026 out of what I understood as concern that Apple will target them if they make the transition. A preliminary injunction would likely further discourage and deter candidates who are currently working at Apple from applying, because they will not want to risk potential action by Apple or Apple seeking burdensome workplace restrictions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 31st day of August 2026 in Mountain View, California.

Signed by:
Melissa Hutchinson
9EAD4A179B0444F...

Melissa Hutchinson