Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF DELWIN F. LEE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

# DECLARATION OF DELWIN F. LEE

I, Delwin F. Lee, the undersigned, hereby declare and state:

1. I submit this declaration in support of Defendants' Opposition to Apple's Motion for a Preliminary Injunction in the above-captioned matter (ECF No. 38) (the "Motion"). I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am a Member of the Finance Staff at OpenAI and lead many of the business operations within OpenAI's Consumer Hardware division. I joined io Products in May 2024 and was one of its earliest employees. Like all io Products employees, I became an employee of OpenAI following OpenAI's acquisition of io Products in July 2025. My current responsibilities for OpenAI span business operations and finance. Prior to OpenAI's acquisition of io Products, I also had broad responsibilities within io Products in information technology, human resources, recruiting operations, and employee onboarding. In my role, I have been involved in OpenAI's personnel, technology, and operational processes. These responsibilities provide me with direct knowledge of OpenAI's workforce, technology and systems, and the resources necessary to implement and administer company-wide policies and operational changes.

## I. OpenAI's Hardware Program

3. The first hardware product OpenAI plans to bring to market (the "Device") is unlike anything currently in Apple's offerings or elsewhere on the market. The Device has been in development since 2024, and OpenAI expects to reveal the Device soon.

4. As part of that hardware development process, OpenAI has collaborated with a number of vendors and suppliers for electronic components and other materials necessary to build its forthcoming Device. OpenAI works with many of the same suppliers as the industry's other major players. The identities of the technology industry's main suppliers are broadly public knowledge.

## II. Expected Impact on OpenAI's Business if the Motion is Granted

5. I understand that Apple requests a preliminary injunction requiring the Corporate Defendants (as defined in the Complaint), among other things, to "collect, prepare full forensic

images of, and submit to forensic inspection (by Apple's counsel or a forensic vendor) all devices and other repositories" in their possession that may contain or previously contained Apple confidential information.

6. Based on my experience, as detailed below, OpenAI will suffer significant harm which cannot be remedied if the Motion is granted.

*a. <u>Economic Losses and Harm</u>*

7. OpenAI is not aware of any employees who possess Apple confidential information or trade secrets on any of their work devices, all of which were issued by OpenAI.

8. Accordingly, to comply with the injunction Apple requested in the Motion, OpenAI would potentially need to conduct a lengthy and costly search of the tens of thousands of devices used by thousands of employees for work. OpenAI employees have multiple company-issued devices. Based on my experience, this search would cost the company a substantial amount of money and require thousands of hours of work reviewing the contents of those devices, further increasing costs.

9. Additionally, I understand that Apple's Motion seeks unfettered access to devices and document storage repositories associated with the devices issued by OpenAI to its executives, engineers, researchers, and other employees. Allowing Apple such access is highly likely to expose Apple to OpenAI's privileged information, confidential information, and trade secrets. It would therefore give Apple access to proprietary OpenAI inventions and developments that could provide insight into OpenAI's ongoing product development. Such access is also highly likely to expose Apple to personal and privacy-protected information of OpenAI's personnel. To my understanding, given the nature and form of Apple's requested injunction, it would be extremely cumbersome if not impossible to filter out all of that information prior to turning the devices and repositories over to Apple.

10. The injunction would also require OpenAI to implement restrictions on how certain employees interact with one another or participate in particular projects. For example, even if the injunction applied "only" to the several hundred former Apple employees employed by OpenAI, it would still require aggressive segregation measures among ex-Apple and non-ex-Apple employees,

even where there is no basis to determine that the devices of the employees in the former category possess any Apple confidential information. The harm from such measures would be significant because OpenAI's research and development efforts frequently involve collaboration across teams and divisions. Segregating employees based on their prior employment as a proxy for potential exposure to Apple information would impose substantial burdens and stifle OpenAI's workstreams and processes. Consequently, projects that depend on collaboration among ex-Apple and non-ex-Apple employees could be suspended, restructured, or delayed—which would have serious consequences as OpenAI employs hundreds of former Apple employees.

11. Finally, OpenAI would be required to devote substantial resources to monitoring and enforcing compliance with the injunction. This would affect numerous employees as to whom I understand Apple makes no allegations. Those resources would otherwise be devoted to research, development, or other activities that advance OpenAI's business. In my experience, the cumulative cost of the steps discussed above would be substantial and immeasurable, and extend well beyond the cost of any single document collection or inspection exercise.

*b. Substantive Industry Harm*

12. The injunction would also interfere directly with OpenAI's substantive business operations and product development. In the highly dynamic AI industry, one of OpenAI's central competitive advantages is its consistent status as a first mover. OpenAI intends to be for AI hardware what it was for generative AI when it released ChatGPT: a standard-bearer.

13. To achieve that goal, I understand that OpenAI relies on relationships with its numerous business partners. Issuance of an injunction would create uncertainty concerning OpenAI's ability to proceed with planned projects with such third parties, who I understand are already deterred by Apple's might. For example, OpenAI's business partners are likely to reconsider or delay their work with OpenAI. Those disruptions would necessarily delay product development and launch timelines.

14. Such delays and uncertainty would also have an adverse effect on the morale of employees at OpenAI more broadly, even for those not involved in consumer hardware development. Because OpenAI does cross-disciplinary work, a hindrance to one division

necessarily has an effect on others. Employees would likely become frustrated if projects they are working on were delayed, restructured, or placed under unusual restrictions because of an injunction. This would likely cause employee attrition.

15. In view of the above, the consequences of the injunction Apple seeks would extend well beyond the injunction's life, even if it is ultimately lifted. In this rapidly evolving market, customers, partners, employees, and other stakeholders make decisions based on the present circumstances. From my experience, the results of such decisions have lasting effects that are not readily reversible, if at all.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 31st day of August 2026 in San Francisco, California.

Signed by:
Delwin F. Lee
40E8A1C26C15415...

Delwin F. Lee