Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF CHANG LIU IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

**DECLARATION OF CHANG LIU**

I, Chang Liu, the undersigned, hereby declare and state:

1. I submit this declaration in support of Defendants' Opposition to Apple's Motion for a Preliminary Injunction (ECF No. 38) (the "Motion"). I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

**I. Time at Apple**

2. I spent approximately eight years at Plaintiff Apple Inc. ("Apple"), from 2018 to 2026. I was an electrical engineer intern from January to August 2018. From February 2019 to September 2024, I was an electrical engineer, and from September 2024 to January 2026, I served as a Senior System Electrical Engineer. I worked on the iPhone product line. My last day at Apple was January 22, 2026.

3. At Apple, I worked on [redacted]

4. Over my years at Apple, I worked on numerous Apple-owned computers. As of my last day at Apple, I believe I had five Apple-owned computers: two very old laptops, two MacBook Pro laptops, and one iMac desktop computer I used to work from home.

5. Like many Apple employees, I used my personal iCloud account and Apple ID for my work at Apple. From my experience, Apple encourages employees to use their personal iCloud account, personal Apple ID, and personal phone number for work. In fact, to facilitate that use, Apple offered to expand my iCloud account with additional capacity (storage) at no charge to me, so that I could store both my personal and professional documents and information on my personal iCloud account. I accepted that offer. Accordingly, the majority of my work files were kept on my personal iCloud account, including documents I shared with other Apple employees or documents they shared with me. I also stored some of my Apple work files on a cloud repository for document storage called [redacted], which Apple employees use in conjunction with iCloud. My [redacted] account was associated with my Apple work email.

6. During my time at Apple, I never received any training or instructions for discontinuing use of iCloud or [redacted] for Apple work, including on how to remove all Apple work

information from my personal iCloud account after I left Apple. Nor have I received any training from Apple on transferring personal materials from a work device to a personal device after Apple employment ends.

## II. <u>OpenAI Interview Process</u>

7. In late 2025, I considered a professional move and entered an interview process with the OpenAI Consumer Hardware division. I knew several people at OpenAI who had previously worked with me at Apple, and I was excited to join them.

8. My discussions with the OpenAI team during the interview process focused on my personal fit into the company's culture. I was not asked about the technical details of my work at Apple. It was clear to me during the interviews that OpenAI was not interested in, and did not want me to divulge, any Apple trade secrets or confidential information. Nor was I asked about my technical skills, because my former Apple colleagues at OpenAI were already familiar with my capabilities.

9. On December 23, 2025, I received an offer letter from OpenAI to work in its Consumer Hardware division. That offer letter included a Confidential Information and Invention Assignment Agreement that made clear I should not bring any Apple confidential information with me when I leave, stating that "during the term of the Relationship [with OpenAI] and thereafter, I will not improperly use or disclose to OpenAI any Confidential Information or Trade Secrets, as defined under this Agreement of my former employer(s) or any other person, and I agree not to bring any such information onto OpenAI's property or place of business or expose any OpenAI employees to any such information." I signed that document on December 27, 2025.

10. I knew that once I gave notice to Apple and informed them that I was going to OpenAI, Apple would terminate my employment that day. I wanted to ensure as smooth a transition process as possible for my Apple colleagues who would be taking over my Apple work. In the week or so leading up to my notice date, I worked on gathering all my relevant work files into specific folders on my iCloud that I could then transfer to my Apple colleagues. Because the files were in my personal iCloud account, I believed they needed to be saved somewhere else so that they would remain available to my colleagues after I left Apple. On the afternoon of January 22, 2026 (after I

had given notice), I started to download the files onto one of my Apple-issued MacBook Pros and also started to upload the files to my work account on [redacted] I understand from the Roffman Declaration that according to Apple between January 21 and 23, 2026, over 100,000 documents were uploaded from my account to [redacted]. However, I knew that not everything on my personal iCloud was uploaded to [redacted] at that time.

**III. <u>My Last Day at Apple</u>**

11. On the morning of January 22, 2026, I gave notice of my resignation to Apple. On the evening of that same day, at approximately 7:00-7:30 P.M., I was escorted out of Apple's offices by my former manager, [redacted]. From my experience, this is a standard practice at Apple known as "walking out," whereby Apple escorts out employees often on the same day they give notice that they are moving to a company that Apple views as a competitor.

12. After giving notice and before I was "walked out" in the evening, I met with [redacted] about my departure. I was aware of a checklist for departing employees that was maintained on the Apple Human Resources website, and I reviewed the checklist with [redacted]. As far as I can recall, the checklist did not state anything about signing any additional documents. I did not receive a copy of that checklist, or any other checklist, from anyone at OpenAI prior to giving Apple notice of my resignation.

13. Neither [redacted] nor anyone else at Apple informed me of any requirements to conduct an exit interview or sign any documents related to my departure, either on my last day or at any time thereafter. (In fact, I had never heard of an "exit interview" at Apple prior to this litigation being filed.) I was only asked to participate in a meeting with [redacted], which I did. I understand that Apple makes allegations to the contrary in its Court filings, stating that Apple "contacted [me] to sign Apple's confidentiality reminder, schedule an exit interview, and confirm that [I] ha[ve] returned [my] devices and complied with other exit procedures," and that I "did not respond." Compl. ¶ 4; *see also* Mot. at 3. I do not understand these allegations, as I am not aware of any such requests or instructions from Apple.

14. Before being walked out by Apple on the same day I gave notice, I returned two very old laptops and two MacBook Pro computers I used for work. Because the downloads from my

personal iCloud account were still ongoing, I agreed with [redacted] to not sign out of my personal iCloud account on those devices nor perform a factory reset. I also left my [redacted] account signed in on the MacBook Pros. Later that day, [redacted] indicated that he was still trying to download the Apple work files that were stored on my personal iCloud account. He asked me in a text message if a 64 GB external drive would be sufficient for such files. I responded that it was more likely that closer to 200 GB would be required. A true and correct copy of an excerpt of [redacted] and my iMessage exchange is attached hereto as Exhibit A.

15. Because Apple required that I depart on the day I gave notice of my resignation, I did not have sufficient time to wind down my work, transfer my files, or hand off my responsibilities before leaving. When certain of my Apple colleagues expressed concerns about the team's ability to function given my immediate departure, I told them on the day of my departure that I would be willing to help them if they needed me, as I considered several of them my close friends and I cared about my work at Apple.

16. Late in the afternoon on the day I gave notice, while I was preparing to leave the Apple office, my friend and colleague Yu-Ting "Alyssa" Peng tried to reach me regarding a bench work on which we worked together at the time at an Apple lab. I was not surprised that Peng had questions for me because I understood that she would take over many of my responsibilities at Apple. I responded to Peng via text at approximately 6:30 P.M. that I still had my computer with me, as I was still in the office. I understand that Apple alleges in its Complaint that I had sent that text "[a]fter leaving Apple" and "[w]ithin hours of leaving Apple" and that I was "planning to use [that computer] to access Apple's confidential information[.]" Compl. ¶ 56. Apple is mistaken, because I sent that text at 6:30 P.M. on January 22, 2026, which was before I left Apple's offices that day. A true and correct copy of an excerpt of Peng's and my iMessage exchange is attached hereto as Exhibit B. A true and correct copy of the certificate of translation for those translated messages is attached hereto as Exhibit C. Apple's mistake might result from its confusion regarding the time zone. As Apple's own expert Roffman states in his declaration, I sent that text on January 22, 2026 and not after midnight on January 23, 2026. Roffman Decl. ¶ 18 ("The Coordinated

Universal Time (UTC) times used in Exhibit E are eight hours ahead of Pacific Time (PT), so the messages are from January 22, 2026 in Pacific Time").

17. I met up with Peng at a lab at the Apple office to attempt to finish one more task for Apple. After that, I returned the computer that I had referenced in my message to Peng and left the office. To be clear, I left Apple's office in the evening of January 22, 2026 without either of the MacBook Pro computers I used for work. Apple's allegations to the contrary are factually incorrect.

## IV. Other Devices

18. At home, I had an Apple-issued iMac I used to work remotely while I was at Apple. I had been very busy leading up to my last day at Apple, and had not had time to remove and transfer numerous personal files I wanted to keep that were on the iMac. I also used the iMac to respond to requests from my former Apple colleagues about Apple work. I returned that iMac in March 2026 through an Apple employee. I also had an Apple-issued iPhone 11 which I did not use for work, which I identified in a drawer in my home. I previously set up that old iPhone with a Chinese phone number and it is unlikely the device contains any Apple information. I provided that device to my counsel when this litigation commenced, and I understand that it has since been returned to Apple. I understand that Apple had not been tracking that device and nobody from Apple ever asked me about it until my counsel informed Apple's counsel of its existence.

19. In addition, in February 2026, a former Apple colleague loaned me an Apple-issued MacBook Pro as a favor, while I considered whether to purchase a personal laptop in addition to the desktop Mac Mini I had bought. I provided that device to my counsel when this litigation commenced, and I understand that it has since been returned to Apple. To my recollection, I only ever turned it on once or twice and never used it to access Apple information.

## V. Apple's Process of Migrating Materials From My Personal iCloud Account

20. After I left Apple, my Apple supervisor, [redacted], remained logged into my personal iCloud account and tried to download the folder of Apple materials I had assembled that was stored on that account. I understood that he was doing so to avoid deletion, and ensure preservation, of materials my former Apple team needed to use for their work at Apple.

21. On January 23, 2026, when I was no longer an Apple employee because I was immediately walked out the day before, [redacted] texted me: "I'm back in the office and restarting the airdrop as it didn't work." Ex. A. I responded that he "can also try to airdrop all other file in my apple iCloud folder," noting that "Those are mainly shared files from other people. I found important detail notes from time to time." *Id.* Later that evening, [redacted] texted me: "Your file transfer is a challenge." *Id.*

22. [redacted] further texted me on January 23, 2026 that his "plan is to complete the airdrop and then click the sad button in workday." *Id.* However, he later texted me that "I think I'm going to have to hit the workday button before I'm complete. I just got a weird message that is making me nervous . . . , so I am going to go hit the workday button now." *Id.* To the best I could understand, it appears to me that hitting the "workday button" means to terminate my access to Apple's systems or officially end my status as an Apple employee.

23. On January 26, 2026, four days after I left Apple, [redacted] was still logged into my personal iCloud account. I had tried to be patient and cooperative regarding [redacted]'s efforts to save the documents, but I was concerned that my former Apple manager still had access to my iMessages:

> ***Chang Liu***: "*Hey* [redacted] *hope everything is fine for copy pasting. You can keep my icloud connected if you still need more time. But might want to sign off my iMessage. As there might be my new company stuff showing up in that laptop*."
>
> [redacted]: "*Oh shoot. Sorry. Let me finish up tomorrow and log everything out. I won't look at anything else*."
>
> ***Chang Liu***: "*I am fine with you keep my icloud signed in for files. Just imessages might get you in trouble*."

*Id.*

24. Finally, on January 30, 2026, [redacted] texted me: "I just signed out of your iCloud account." *Id.*

25. [redacted] was not the only Apple employee who asked for my assistance downloading Apple documents from my iCloud after my departure. Below are two additional examples:

a. On January 23, 2026, Apple employee [redacted] asked for my assistance in retrieving certain Apple files that Peng needed for Apple work. I provided her with my iCloud credentials on the same day. Two days later, [redacted] stated that she had downloaded everything Peng needed for her work at Apple. Like with [redacted] I then asked [redacted] to sign out of my personal iCloud account on the Apple-owned MacBook I had returned, and [redacted] said she would after confirming that Peng did not need anything else. On January 26, 2026, I told [redacted] that I needed to log out of the iCloud account because "there's probably a lot of OpenAI-related stuff that got added." I then logged out of iCloud on the MacBook Pro that [redacted] was using to download my Apple work files. A true and correct copy of an excerpt of [redacted]s and my iMessage exchange is attached hereto as Exhibit D. A true and correct copy of the certificate of translation for those translated messages is attached hereto as Exhibit E.

b. Also on January 27, 2026, in text messages over the LINE messaging application, Peng asked me a series of technical questions regarding Apple work, and I told her who at Apple I thought could answer these questions. Peng also needed to access the files that were still on my iCloud, as [redacted] had not yet successfully downloaded them. I offered to log into my iCloud account on her computer so she could retrieve the documents and download them onto her computer. A true and correct copy of an excerpt of Peng's and my LINE exchange is attached hereto as Exhibit F. A true and correct copy of the certificate of translation for those translated messages is attached hereto as Exhibit G. I logged into my iCloud on Peng's computer later that night. To my understanding, this is the incident in which Apple alleges that I was using Peng's computer to access Apple's confidential information. Compl. ¶ 56. The contrary is true, as ***Peng*** accessed Apple materials stored on ***my*** iCloud account and retrieved them to her computer. Moreover, this allegation does not make sense to me because Peng was authorized to access all the files I had worked on while I was at Apple, and logging onto my iCloud account would not have granted her access that exceeded that which Apple provided her. Indeed, the files she wanted to access

were the same ones that [redacted] was trying to download from my iCloud account to make available to my former colleagues, including Peng. I had told Peng that it would be better for information security purposes for Peng to seek the documents from [redacted], the Apple manager, as he was logged into and using my personal iCloud account to retrieve the documents, as I explained above. *See* Ex. B at 1. To my understanding, that is the message Apple relies upon to allege that I "coached" Peng on how to "avoid trouble with the security team[.]" Mot. at 4. Apple's allegations are incorrect. I knew it would be better to get the documents from [redacted] but [redacted] still had not downloaded the documents, so to help Peng, I allowed her to log in with my credentials.

## VI. Work at OpenAI

26. Since January 27, 2026, I have been a hardware engineer and member of the technical staff in OpenAI's Consumer Hardware division.

27. My current work at OpenAI is different than the work I did at Apple. At OpenAI, my work concerns a nascent product and I focus primarily on the functionality of chargers and speakers. At Apple, in contrast, I focused on [redacted], an area which I do not work on at OpenAI.

28. I have never used any Apple confidential information or parts for my work at OpenAI. Nor have I ever used or relied upon any Apple documents or confidential information for my work at OpenAI. I have also never shared any documents or confidential information from the time I worked at Apple with anyone at OpenAI. I do not believe any such documents or information would have been relevant or helpful to the work I do in my current role.

29. When I have interviewed candidates for roles at OpenAI, I have never tried to solicit or even discuss any confidential information belonging to Apple or any other company. No candidate I have interviewed has offered any such information. During my time at OpenAI, I have been regularly reminded by OpenAI personnel not to use my previous employers' trade secrets or other confidential information. For example, I attended mandatory training sessions in which my colleagues and I were expressly instructed not to use confidential information from our prior

employers. These training sessions expressly addressed trade secrets and other forms of intellectual property.

## VII. Apple's Additional Requests for My Professional Assistance After My Departure

30. On multiple occasions during the months after I left Apple, my former Apple colleagues continued to reach out to me to seek assistance regarding their work at Apple, and asked questions about the projects I had worked on while at Apple. That included multiple questions from [redacted] my supervisor at Apple. I responded to my former Apple colleagues and cooperated with their requests because I considered them to be my friends. I also did so because I still cared about my Apple team's success and wanted to help. I understand that Apple is now using the assistance I provided against me, even though such assistance was repeatedly requested from me by Apple employees.

31. As demonstrated in the examples below, in the months following my departure from Apple, I was often asked by Apple employees for the location of certain Apple-related documents on my and others' [redacted] drives. Typically, I would direct the Apple employee to other individuals at Apple who knew the answers to their questions. On other occasions, as described below, I would personally direct the Apple employee to the documents they were looking for. For certain larger documents, I needed to briefly open the document to identify that page number. More often, however, I would rely on my memory. Below are several examples:

a. On January 27, 2026, [redacted] asked me a series of technical questions about his work at Apple, noting that he was asking me because I was "the best[,] [e]ven if you don't work here anymore." I answered his questions. *See* ECF 59-2 at 2.

b. On January 28, 2026, Peng asked me via text message certain questions about Apple work. Ex. F at 2-3. I further understand that Apple alleges that Peng and I used "the LINE Messenger app" to "avoid detection." Mot. at 4. LINE is a very popular messaging app in several East Asian countries. I preferred to use LINE in some instances because iMessages can appear in any device connected to an Apple ID, including work devices. That means, for example, messages could have appeared on Peng's work computer while she was doing a presentation. Further, [redacted] was still

logged onto my iCloud account on one of my returned Apple computers. Roffman focuses on a text in which I [redacted]. Therefore, we had no privacy in iMessages at that time, and the majority of our exchange was personal and not about Apple work.

c. On February 2, 2026, a former Apple colleague of mine named [redacted] accidentally sent me a shared document related to his Apple work. [redacted] immediately informed me that he meant to send the document to another individual named Chang at Apple, and asked me not to review the document. I agreed, and never opened the document. *See* Roffman Decl. Ex. G.

d. On February 6, 2026, Peng asked me a question about an Apple vendor. I responded with the name of that vendor and noted that Peng should ask "[redacted]," two of my other former Apple colleagues. I also told Peng that I had a general idea of where certain files were located, but without looking I could not provide a more specific location. Ex. B at 2. Our conversation and the documents concerned [redacted] that custom-designs its products for Apple. The [redacted] Apple used were customized for its use case, and are not relevant to my work at OpenAI. Thus, this exchange with Peng is irrelevant to my work at OpenAI.

e. On February 13, 2026, [redacted] texted me a technical question, noting that "just in case [I] don't have enough work," he "need[s] some help." He then asked me a question on Apple-related work and sent me an image of a [redacted] I helped him. *See* ECF No. 59-2 at 4.

**VIII. <u>Access to [redacted] to Respond to Apple Employees' Requests</u>**

32. On February 8, 2026, I told Peng that I was able to find documents that she had asked me to help her locate on February 6. I then sent Peng filepaths to those documents so that she could

access them. I also explained to Peng which documents I believed to be especially important for purposes of her work at Apple, per her questions. Ex. B at 2.

33. That night was the first time I discovered I could still access my [redacted] account from my iMac. I opened the File Application folder on the computer and noticed that [redacted] was still connected. Accordingly, Apple is factually incorrect in alleging that I had any intentional [redacted] activity—with downloads or otherwise—between my departure date and February 8, 2026. As explained above, at that time certain Apple employees were using the MacBook Pros I returned on my last day, where my [redacted] account was logged in.

34. At several points in its Motion and elsewhere, Apple refers to a text I sent Peng in which I mention that I found it funny I could still access [redacted] and suggests I was "celebrating" my access. Compl. ¶¶ 5, 57; *see also* Mot. at 3, 14. That is incorrect. I was not celebrating the fact that I still had access to [redacted], nor would I have any reason to, since I did not want or need the documents on my Apple [redacted] account. I simply found it surprising I could still access [redacted] because we understood that Apple would disable the account and it was startling that Apple had not taken this basic step. Peng and I were planning to talk that night, but I knew she was talking to her parents. When she was finished speaking with her parents Peng texted me she was "ready" to FaceTime, and she called me a few minutes later. Ex. B at 2. My understanding is that this is the text message Apple refers to in paragraph 57 of its Complaint and page 14 of the Motion. To the extent Apple alleges that the above messages mean anything other than the above, Apple is mistaken. I did not "celebrate[]" my access to [redacted] as Apple baselessly alleges. ***To be clear: at no point did I use my access to my Apple*** [redacted] ***account or any documents or information stored therein in connection with my work at OpenAI, or for any purpose other than responding to requests from Apple employees***.

35. Still on the same day, I had some downtime from my OpenAI work and I wanted to try to provide Peng with further assistance. I therefore attempted to find the information Peng was looking for regarding [redacted] company I mentioned above. *See* ¶ 31(d). Because the information could have been located in any number of documents, I accessed four documents from [redacted] to search for it. Those are documents labeled 1 through 4 in the attached Addendum 1 and in

paragraph 20 of the Roffman Declaration (ECF No. 45). I was ultimately unable to answer Peng's questions on this matter.

36. On February 10, 2026, Peng asked me a technical question over the phone about the [redacted]. To answer her question, I accessed the document labeled 5 in Addendum 1 and in paragraph 20 of the Roffman Declaration. This document, too, is irrelevant to my work at OpenAI. The following day, Peng asked me a follow-up question via text about that document and related information. Ex. B at 2-3.

## IX. <u>**Peng's Interest in OpenAI**</u>

37. During conversations when I shared that I was thinking of seeking another job, Peng shared with me that she was also exploring the possibility of moving from Apple to OpenAI.

38. When Peng reached the interview process at OpenAI, I assisted her with preparation by conducting mock interviews and sharing publicly available documents to be used for interview preparation. On February 22, 2026, I texted Peng that I was "downloading some info" to help her prepare for her interview and work at OpenAI. I downloaded that document from Monolithic Power Systems's ("MPS") website, with the goal of helping Peng prepare for the interview. MPS is a silicon chip vendor that publishes educational resources on its website. It was a public document I found using a Google search; it was not an Apple document and did not come from any Apple accounts. I had downloaded the file because I was about to board a plane to China and wanted to review it while in flight. Ex. B at 3.[1] I understand that this is the message Apple refers to in paragraph 65 of its Complaint, in allegations Apple makes "on information and belief."

39. Apple is factually incorrect in alleging that I provided Peng with confidential information in connection with her interviews. Neither Peng nor I downloaded any documents from my iCloud or [redacted] accounts on February 22, 2026. Further, Peng was an Apple employee at the time and had access to Apple confidential information.

[1] The certified translation of this text is that I texted Peng "you can take a look if you have some time on the plane." This is a mistranslation. In fact, I told Peng that *I* would take a look if *I* had time on the plane.

40. Several days later, on February 27, 2026, I messaged Peng that an Apple colleague of hers "fumbled" a question about the Apple [redacted] project. I was referring to a question Tang Tan asked [redacted] about the leadership hole he would be leaving behind at Apple if he left, and what "the plan" would be for the Apple team and its participants once he departs. Ex. B at 4. I had heard about that exchange from [redacted] I never thought that this conversation between Tang and [redacted] involved any Apple confidential information or trade secrets.

41. My intention was not to "coach" Peng on preparing for her interview, as Apple alleges. Mot. at 14. Rather, I was discussing the interview between Tan and [redacted] to relay [redacted] concern for the Apple team I left behind when I joined OpenAI. As I told Peng, [redacted] was "starting to feel anxious about not knowing how to handle some of his subordinates," and I wanted to share that with Peng. *Id.*

**X. <u>Apple Employees Add Me to an Apple Group Chat and Continue to Ask for Help</u>**

42. On March 5, 2026, [redacted] added me to a group chat with Apple employees [redacted] asked me a technical question about Apple work. I responded with [redacted] locations the team could search to find the answer and the names of individuals whom I believed could help. Apple employee [redacted]-[redacted] responded that this was "highly irregular" and asked to be removed from the group chat. In response, [redacted] said he added them all to the thread "for awareness," and that they should continue the conversation "internally." A true and correct copy of that iMessage exchange is attached hereto as <u>Exhibit H</u>.

43. The day before, on March 4, 2026, I spoke to Apple employee [redacted], who took over some of my responsibilities at Apple when I left and was my friend. He asked me a question on how to improve his performance at Apple in the [redacted]. I told him about public source videos and that he should run his own simulations and compare them to the results I had in similar simulations. However, I did not tell him exactly where to find the simulation files among my Apple work documents. I expected he would follow up after he had made some progress. Several days later, on March 7, 2026, I checked the [redacted] folder path for the simulation files so I could share it with [redacted]. To see if my documents were still accessible, I checked my [redacted] folder titled [redacted]. Those documents are labeled 6-8 in Addendum 1 and listed in paragraph

20 of the Roffman Declaration. However, [redacted] never followed up and we did not subsequently discuss the files or folder path.

### XI. The Migration Assistant

44. On March 11, 2026, I used Apple's Migration Assistant tool to set up a new personal Mac Mini I purchased for myself. This new device was not issued by Apple, nor was it provided to me in the scope of my previous employment at Apple. I used the tool to transfer over personal files that were stored on my Apple-issued iMac.

45. I now understand that, unbeknownst to me at the time, the Migration Assistant process had the effect of transferring several Apple work applications over from my iCloud to my new personal Mac Mini, including Apple's VPN tool called "[redacted]" and the [redacted] application. I was surprised to learn that the application had transferred over, and even more surprised that I remained logged in through my Apple work credentials.

### XII. The Alleged [redacted] Downloads

46. Apple alleges that I intentionally downloaded "dozens" of Apple documents from Box and used them for my work at OpenAI. These allegations are false and baseless. ***To be clear: I never downloaded any documents from the Apple [redacted] storage following my departure from Apple for my personal or professional use. Nor did I ever use any documents or information from that storage for my work at OpenAI, or share such documents or information with anyone at OpenAI. After I departed from Apple, my <u>only</u> intentional use of the Apple [redacted] storage was to respond to requests for help from Apple employees.***

47. Aside from the few documents I accessed to assist my former Apple colleagues with their Apple work (described in § VIII above), to the extent these [redacted] downloads occurred, they happened without my intentional involvement or knowledge. I have reviewed the list of documents Apple alleges that I downloaded on those dates, and am unfamiliar with most of them. Most of these documents originated from the [redacted] folders of senior members of my Apple team, [redacted], the latter of whom left Apple approximately two years ago. These folders were shared with me, but I was not and am not aware of any such downloads occurring, and never opened those documents. To be clear: I never used these documents for any of my work at

OpenAI. In all events, I understand that most of these documents concern dated Apple technology unrelated to anything OpenAI is developing.

48. I reviewed the list of 37 "unique Apple files" the Roffman Declaration asserts I downloaded between February 8, 2026 and April 27, 2026. My impression is that it is an eclectic list of documents not linked to one another. For example, several of these documents pertain to [redacted] devices that were shipped and released [redacted], and reflect dated technology. I cannot think of any reason for me to download them, aside from responding to questions about Apple work from my former Apple colleagues. The chart attached hereto as Addendum 1 describes the nature of each document, and clarifies why these documents are irrelevant to my current responsibilities at OpenAI. To be clear: I never used a single one of these documents for my work at OpenAI.

## XIII. Conclusion

49. In the months between my departure from Apple and this litigation, I never downloaded or accessed any files from Apple's servers for use at OpenAI. The flow of assistance at all times went ***from*** me ***to*** Apple, not the other way around. To the extent the alleged [redacted] downloads from March 11 and April 2026 occurred, such downloads were unknowing and unintentional. I have not used or accessed those documents.

50. While at Apple and even after leaving Apple, I have consistently done my best to act in ***service*** of Apple and follow its directions and requests, communicated to me by my former Apple manager and other Apple employees. I have never shared any confidential documents or information from Apple with anyone at OpenAI, nor have I used such documents or information for my work at OpenAI.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 31st day of August 2026 in San Mateo, California.

Chang Liu (Aug 31, 2026 11:49:04 PDT)

Chang Liu