Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF ALYSSA PENG IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

# DECLARATION OF ALYSSA PENG

I, Yu-Ting "Alyssa" Peng, the undersigned, hereby declare and state:

1. I submit this declaration in support of Defendants' Opposition to Apple's Motion for a Preliminary Injunction (ECF No. 38) (the "Motion"). I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

2. I hold a Ph.D. from the University of Illinois. I interned at Apple for approximately six months before the COVID-19 pandemic. In 2021, I joined Apple full time after completing my Ph.D. I worked at Apple as a Power Integrity Engineer for approximately five years in total. My last day at Apple was April 16, 2026.

3. During my time at Apple, I had in my possession a number of Apple-issued devices. Like many Apple employees, I used my personal iCloud account and Apple ID for my work at Apple. From my experience, Apple encourages employees to use their personal iCloud account and personal Apple ID for work. In fact, to facilitate that use, Apple offered to expand my iCloud account with additional capacity (storage) at no charge to me, so that I could store both my personal and professional documents and information on my personal iCloud account. I accepted that offer. Accordingly, many of my work files were kept on my personal iCloud account, including documents I shared with other Apple employees or documents they shared with me.

## I. Chang Liu's Last Day at Apple

4. Chang Liu and I worked closely at Apple, and we were colleagues for approximately four and a half of the five years I worked at Apple. We also had a personal friendship outside of work, which we maintained after Liu left Apple to join OpenAI.

5. On January 22, 2026, Liu gave Apple notice of his resignation, and I understood that I would be taking over many of Liu's responsibilities after his departure because I was the only other person who had extensive knowledge about the project we had been working on together. I understood that Apple intended to walk Liu out the same day he gave notice. From my experience, this is a standard practice at Apple, whereby Apple immediately escorts employees out as soon as they give notice that they are moving to a new employer which Apple views as a competitor. I therefore tried to reach Liu that afternoon regarding a project Liu and I were working on together.

Liu responded at approximately 6:30 P.M. PT, before he was walked out of Apple's offices, and stated that he still had his computer with him and would be able to help. From my experience, departing Apple employees typically return their devices close to the end of their last day. I met with Liu at a lab at the Apple office soon after to finish that work. To my understanding, Liu was walked out by his Apple manager [redacted] at approximately 7:00-7:30 P.M.

**II. <u>Chang Liu's Assistance After His Departure</u>**

6. As I expected, after Liu left Apple, I took over several of his responsibilities. Because Liu was immediately walked out by Apple on the same day he gave notice of his resignation, I had no opportunity to get his guidance on the location of certain documents that were necessary for my work at Apple, or on how to perform certain tasks. Therefore, on several occasions before my last day at Apple on April 16, 2026, I asked Liu for such guidance. Liu was helpful and cooperative, and advised me on whom to speak with at Apple or where to search for documents. I understand that I was not the only Apple employee who reached out to Liu with questions about Apple work after Liu's departure. At no point in these conversations did I provide Liu with updates on Apple confidential projects, nor did I ever offer him any information of which he was not already aware.

7. Liu was consistently helpful, patient, and generous with his time. For example, on January 27, 2026, I asked Liu a series of technical questions, and he advised me whom at Apple I should direct these questions to. I further asked Liu where a certain Apple file of his was located on Liu's iCloud, since at the time Liu's documents were not yet added to a cloud storage I could access as Liu's Apple manager [redacted] had not yet successfully migrated Liu's files. A true and correct copy of an excerpt of Liu's and my LINE message exchange is attached as <u>Exhibit A</u>. A true and correct copy of the certificate of translation for those translated messages is attached as <u>Exhibit B</u>. To help with my request, Liu offered to log into his iCloud account using my device so that I could retrieve the documents. Ex. A at 1. Liu helped me log in later that evening. He further advised me to get a hard drive and the full set of documents from Liu's Apple manager [redacted], which would be better for security purposes. I understood that [redacted], as Liu's former manager, was supposed to have the complete set of documents. A true and correct copy of that iMessage exchange

is attached as Exhibit C. A true and correct copy of the certificate of translation for those translated messages is attached as Exhibit D.

8. The purpose of that exchange was for me to retrieve Apple materials stored on Liu's iCloud account, so that I could use such documents for my work at Apple. I shared no materials with Liu. Rather, he helped me access Apple documents I was authorized to access and needed for my work.

9. On January 28, 2026, Liu and I had another conversation in which I asked Liu a series of questions about my work at Apple. Ex. A at 2-3. We occasionally preferred to use LINE because iMessages can appear on any device connected to an Apple ID, including work devices. That means, for example, messages could have appeared on my work computer while I was doing a presentation and sharing slides to an audience. Further, at that time my understanding was that Liu's Apple manager [redacted] was logged into Liu's iCloud account and therefore had access to his iMessages. For that reason, we had no privacy in iMessages at the time, which bothered us because the majority of our exchange was personal.

10. On February 6, 2026, I asked Liu a question about an Apple vendor. He responded with the name of that vendor and noted that I should ask "[redacted]," two other Apple employees. Ex. C at 1-2. Our conversation and the documents concerned [redacted] that custom-designs its products for Apple. Liu was ultimately unable to find the information I requested.

11. On February 8, 2026, Liu texted me that he found documents I had previously asked him about, and sent me [redacted] filepaths to those documents so I could access them. [redacted] is a cloud repository for document storage which Apple employees use in conjunction with iCloud. Liu also advised me which documents he thought were especially important for my work at Apple. In that same exchange, Liu mentioned that he found it funny that he could still access his old Apple [redacted] account. We were both surprised that Apple did not disable Liu's [redacted] account upon his departure from Apple, and found it startling that Apple had not taken this basic step. Liu and I planned to speak that evening, after I finished speaking to my parents. When that call ended, I responded to

Liu that "I'm ready" to FaceTime (Ex. C at 2), and I called him a few minutes later. We did not discuss Apple work during that call.

12. On February 11, 2026, I asked Liu technical questions via text about [redacted] and [redacted]. Ex. C at 2-3.

## III. My Interest in OpenAI

13. After Liu departed from Apple, I was left with a significant amount of work for one person and was the only person on my team with substantial knowledge about my project, which caused me to feel stress and pressure. Additionally, in early February 2026, my team at Apple underwent a significant reorganization. In part because of these challenging circumstances, I decided to look for new work opportunities.

14. I began exploring the possibility of moving from Apple to OpenAI. On or about February 5, 2026, I reached out to [redacted], who is now my manager at OpenAI, to express my interest in a potential transition. During my initial meeting with [redacted], he made no mention of Apple confidential information and I did not offer any. Instead, [redacted] focus was on the culture at OpenAI and whether I would be a good fit.

15. In the weeks that followed, Liu helped me prepare for my potential OpenAI interview by conducting mock interviews with me and sharing helpful, publicly available documents. Ex. C at 3.[1]

16. In early March 2026, I received an email from OpenAI's human resources team, inviting me to interview formally. At my interviews, the focus was on cultural fit and meeting my potential teammates. I was not asked any questions regarding Apple's trade secrets or other confidential information, nor did I otherwise discuss these matters.

17. On February 27, 2026, Liu texted me that an Apple colleague of mine "fumbled" a question about an Apple project during an interview with Tang Yew Tan at OpenAI. Liu was

[1] The certified translation of this text is that Liu texted me "you can take a look if you have some time on the plane." This is a mistranslation. In fact, Liu told me that ***he*** would take a look if ***he*** had time on ***his*** flight.

referring to a question Tan asked an Apple employee regarding the leadership hole he would be leaving behind at Apple if he left, and what "the plan" would be for the Apple team if he departs. I understood Liu to be saying that, when that Apple employee failed to give an answer, Tan replied that he would need to "consider" that. Ex. C at 4. Liu did not indicate to me that the conversation between Tan and that Apple colleague concerned Apple confidential information.

18. On March 11, 2026, I received my offer from OpenAI. I then worked with OpenAI and counsel to get an employment visa.

19. After the visa was secured, on April 16, 2026, I gave Apple notice that I would be leaving to join OpenAI. That evening, I was escorted out of the building by my former manager and three former colleagues.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 31st day of August 2026 in Mountain View, California.

Yu-Ting Peng (Aug 31, 2026 14:29:01 PDT)

Yu-Ting "Alyssa" Peng