Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

[Additional counsel listed in signature block of accompanying opposition brief]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,<br><br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF ARIJIT RAYCHOWDHURY, PH.D.**<br><br>Hon. Edward J. Davila<br>Courtroom 4<br><br>Hearing Date: Oct. 1, 2026<br>Hearing Time: 9:00 a.m. |

10911-00024/18605111.5

## I. INTRODUCTION

I, Dr. Arijit Raychowdhury, declare as follows:

1. I am a professor of Electrical and Computer Engineering at the Georgia Institute of Technology. My home address is 1247 Cauley Creek Overlook, Johns Creek, Georgia. This declaration ("**Declaration**") summarizes my current opinions, which are subject to change depending on ongoing discovery and any additional information received.

2. At the request of the law firm Quinn Emanuel Urquhart & Sullivan, LLP as counsel for Defendants OpenAI Foundation f/k/a OpenAI Inc. and OpenAI Group PBC (together "**OpenAI**"), io Products, LLC f/k/a io Products, Inc. ("**io Products**"), and Tang Yew Tan; and the law firm Kwun Bhansali Lazarus LLP as counsel for Defendant Chang Liu (together with Tan, io Products, and OpenAI, "**Defendants**") in this case, I submit this Declaration in support of Defendants' Opposition to Plaintiff Apple Inc.'s ("**Apple**") Motion for a Preliminary Injunction.

## II. BACKGROUND, EXPERTISE, AND PREVIOUS TESTIMONY

3. My *curriculum vitae*, which is attached hereto as **Exhibit A**, provides a description of my professional experience, including my academic and employment history, publications, awards, patents, and more. The following is a summary of my relevant qualifications and professional experience.

4. I received a Bachelor of Engineering in Electronics and Telecommunication Engineering from Jadavpur University in India in 2001 and a Ph.D. in Electrical and Computer Engineering from Purdue University in 2007.

5. Following my undergraduate education, I spent approximately one and a half years in a research and development position at Texas Instruments and, after my Ph.D., I spent another six years in various research positions at Intel.

6. Early in my career, my work focused on low-power digital and mixed-signal circuit design and on interactions between circuits and emerging device technologies. My contributions included developing the world's first adaptive echo-cancellation network for integrated digital subscriber lines at Texas Instruments and foundational ultra-low-power memory and logic technologies at Intel Corporation that have been widely adopted.

7. Since January 2013, I have been on the faculty at the Georgia Institute of Technology. I am a full professor and have served since 2021 as the Steve W. Chaddick School Chair in the School of Electrical and Computer Engineering (ECE).). My research group develops energy-efficient digital and mixed-signal integrated circuits, including power delivery systems, power converters, signal processors, and AI accelerators, with an emphasis on architectural/circuit co-design and device-circuit interactions. I direct the Center for the Co-Design of Cognitive Systems (a JUMP 2.0 center[1]) and serve as site director for the DoD-sponsored SCALE[2] workforce program in SoC design. I also direct Georgia Tech's Center for Circuits and Systems and co-direct the Georgia Tech Quantum Alliance. I hold more than 27 U.S. and international patents and have authored over 250 peer-reviewed publications.

8. Over the last two decades I have contributed to various technologies in the area of energy-efficient design. I led an interdisciplinary team at Intel (2008-2012) to develop Intel's first ultra-low power Voice Recognition and Voice Activity Detection hardware – an edge-AI solution. We went from research, to prototyping, to high-volume production, and our solution was integrated in BMW's in-car infotainment system. I won Intel Lab's highest honor, the Divisional Recognition Award for my contributions to our solution.

9. I am the inventor of several linear voltage regulator topologies. My group's research and contributions in the area of linear regulators and high voltage regulators for power delivery to electronic systems – from data centers to mobile platforms have been widely adopted in the industry. I have worked extensively on buck and boost converters both in industry and academia. My experience includes the design of converters and novel converter topologies, prototyping in silicon, and the design of full systems on chip (SoCs) including on rigid and flexible substrates.

10. During my tenure at Texas Instruments, I worked extensively on power supply noise and its impact on analog circuits components, working to minimize the coupling of noise from

[1] JUMP 2.0 is a Semiconductor Research Corporation-led public-private partnership in cooperation with DARPA, co-sponsored by SRC, DARPA, the commercial semiconductor industry, and the defense industrial base.

[2] *What is Scale*, Purdue Univ. SCALE, https://scale.research.purdue.edu (NVIDITC-001049015).

digital to analog blocks. At Intel, I worked on various power converter designs – from research to high volume production. I have used standard design tools and software frameworks, including SPICE and worked with other engineers to design, prototype and productize PCBs that includes SoCs, power converters, and passives, among other components.

11. For my contributions to power delivery, management and system design, I received the Semiconductor Research Corporation's (SRC's) Technical Excellence Award, the highest technical award from the SRC. My contributions to power-efficient design and wide-spread integration into industrial products, also led to my elevation to IEEE Fellow in 2022 and to the National Academy of Inventors in 2026.

12. At Georgia Institute of Technology (Georgia Tech), as the director of the Center for the Co-Design of Cognitive Systems, which supports 21 faculty members and 150+ graduate students across 12 universities, I work with 15 semiconductor companies (Analog Devices, Inc., Arm Limited, Boeing, EMD Electronics (a Merck KGaA affiliate), GlobalFoundries, HRL Laboratories, IBM Corporation, Intel Corporation, MediaTek Inc., Micron Technology Inc., Qorvo, RTX Corporation, Samsung Electronics Co., Ltd., SK hynix Inc. and Taiwan Semiconductor Manufacturing Company Limited) and DARPA to advance the state-of-the-art in AI Hardware platforms and technologies. I have been a founding technical advisor to Rain AI, a San Francisco based start-up working to revolutionize brain-inspired AI computing. As a Georgia Tech faculty member, I work as a faculty-in-residence for Micron Technology Inc. where I provide expertise on power-management and system design for advanced memory subsystems that are used in AI datacenters. In 2025, I co-founded InfraVana, an AI hardware infrastructure startup, to accelerate the deployment of AI datacenter infrastructure. I serve as the COO and the Chief Scientist at InfraVana.

13. My honors include elevation to Fellow of the National Academy of Inventors 2026; IEEE Fellow in 2022; the Semiconductor Research Corporation Aristotle Award (2026); the Semiconductor Research Corporation Technical Excellence Award (2021); the IEEE/ACM DAC "Innovator Under 40" Award (2018); Georgia Tech's Roger P. Webb Outstanding Junior Faculty Award (2018); the Intel Young Faculty Award (2015); the NSF CISE Research Initiation Initiative

(CRII) Award (2015); and the Intel Labs Technical Contribution Award (2011). I have also received the Dimitris N. Chorafas Award and Purdue's College of Engineering Best Thesis Award (both 2007). My students and I have received numerous best-paper recognitions.

14. I have served as a Distinguished Lecturer for the IEEE Solid-State Circuits Society, as well as on technical and organizing committees for leading circuits and design conferences, and lead multi-institution efforts to translate research advances in low-power ICs into widely used technologies and workforce training.

15. I have served as an expert witness in in 4 prior matters. I have prior experience testifying specifically on cases involving analog and noise sensitive circuits, including an engagement for Analog Devices where I opined on noise sensitive analog to digital converters.

16. The attached **Exhibit B** lists the materials I considered in forming my opinions. I am being compensated at my customary rate of $1,000 per hour for the time I spend on this case, plus reasonable out-of-pocket expenses. My compensation does not depend upon the contents of this declaration, any testimony that I may provide, or the ultimate outcome of this case.

17. I hold my opinions to a reasonable degree of professional certainty. The information I have relied upon is the type of information that is typically relied upon in my fields of expertise. I reserve the right to revise my opinion if additional information, documents, or testimony provided by the parties becomes available that would cause me to amend or supplement my opinions here.

## III. SUMMARY OF EXPECTED TESTIMONY

18. I have been asked by counsel for Defendants to offer expert opinions responding to the Declaration of Ayman Fayed ("**Fayed Decl.**"), dated August 3, 2026; the Declaration of Parin Patel ("**Patel Decl.**"), dated August 3, 2026; and Apple's Motion for a Preliminary Injunction, dated August 3, 2026. To the extent I do not address specific statements in the Fayed Declaration, the Patel Declaration, or Apple's Motion for a Preliminary Injunction, it should not be assumed that I agree with such statements.

19. Based on my understanding of the definition of a "trade secret" in the Defend Trade Secrets Act. 18 U.S.C. § 1839(3), it is my opinion that the following trade secrets alleged by Apple are not trade secrets: [redacted]

[redacted] In my opinion, each of these alleged trade secrets is generally known, readily ascertainable, and/or does not derive independent economic value from being secret.

## IV. TECHNOLOGY OVERVIEW

### A. Display Power Management Integrated Circuits

20. Displays are a significant source of power consumption in smartphones and other portable electronic devices. Effective management of display power is therefore important in reducing overall system power consumption and extending battery life.[3]

21. A display is one of several device subsystems that may require multiple voltage rails at levels different from the main battery or system supply.[4] Power Management ICs (PMICs) are typically used to bridge this gap by converting the available supply voltage into the voltages required by system components. PMICs may integrate DC-DC converters, linear regulators, power sequencing functions, voltage programmability, monitoring, and control within a single device.[5]

22. Display PMICs are PMICs designed specifically to supply and control the voltage rails as well as supple bias voltages that are required by display panels and their associated driver circuitry. Depending on the display technology and system design, these devices may generate multiple positive and negative voltage rails, dynamically adjust output voltages, manage startup and shutdown sequencing, provide fault protection, and incorporate functions that reduce output noise

[3] Dash and Hu, How much battery does dark mode save? An Accurate OLED Display Power profiler for Modern Smartphones, The 19th Annual International Conference on Mobile Systems, Applications, and Services (MobiSys '21), June 24-July 2, 2021. https://dl.acm.org/doi/epdf/10.1145/3458864.3467682.

[4] Analog Devices, White-LED Boost Converter vs. Charge Pump. https://www.analog.com/en/resources/technical-articles/whiteled-boost-converter-vs-charge-pump.html.

[5] Microchip, Why Choose a PMIC? https://www.microchip.com/en-us/products/power-management/voltage-current-power-conversion/pmic-power-management-ics/pmic-technology-101.

and ripple that can in turn help reduce visible flicker.[6] Display PMICs are used in many applications, including smartphones, other portable consumer electronics, and automotive infotainment systems. Semiconductor manufacturers including Texas Instruments, Nexperia, Analog Devices, and STMicroelectronics offer PMICs suitable for displays.[7,8,9]

23. PMICs designed for displays in portable electronic devices have been publicly documented since at least 2006.[10] The technical challenges associated with display power management – including the generation and sequencing of display-specific voltage rails and, depending on the display technology, management of backlight intensity, brightness, contrast, and flicker – have likewise been addressed extensively in publicly available technical literature. The literature also describes established techniques for managing these considerations while balancing display power, power consumption, and system efficiency.[11,12]

### B. <u>Peak Power Management And Battery Age Modeling</u>

---

[6] Texas Instruments, Application Note, LCD Digital VCOM Using the DAC43701. https://www.ti.com/lit/an/slaae46/slaae46.pdf.

[7] "LCD & OLED display power & drivers", Texas Instruments (last visited Aug. 31, 2026), https://www.ti.com/product-category/power-management/lcd-oled-display-power-drivers/products.html#1293=LCD%20bias&.

[8] Nexperia, Nexperia Introduces New Display Power Management IC, https://efficiencywins.nexperia.com/efficient-products/nexperia-introduces-new-display-power-management-ic.

[9] STMicroelectronics, LCD/OLED display PSUs. https://www.st.com/en/power-management/lcd-oled-display-psus.html.

[10] Texas Instruments, TFT-LCD Power Supply Using the TPS65120 Single Inductor Quadruple-Output Power Supply, https://www.ti.com/lit/an/slvu172/slvu172.pdf.

[11] MPS, Power Management for Automotive Display Systems. https://www.monolithicpower.com/en/learning/mpscholar/automotive-electronics/auto-lighting-and-display-systems/power-management.

[12] Analog Devices, How to Design an Automotive TFT Display System. https://www.analog.com/en/resources/technical-articles/how-to-design-an-automotive-tft-display-system.html.

24. A battery's peak power delivery capability is the maximum output power it can sustain for a specified period without exceeding applicable current, voltage, state of charge (SOC), or other operating limits.[13] State of Power (SOP) is an estimate of available charging or discharging power over a defined time horizon.[14] A battery's SOP varies with factors including its SOC, temperature, internal resistance or impedance, chemistry, age, and the duration of the requested power.[15] Accurate estimation of SOP allows a power management system to determine how much power is available for intensive workloads while maintaining the battery and device within their operating limits.

25. Publicly available patents describe systems and methods for peak dynamic power management in portable electronic devices.[16] In order to accommodate functionalities of the device without oversizing the PMIC and battery, the device's available power can be allocated dynamically. A peak power management system may calculate and adjust the dynamic power thresholds so that the device's total power consumption remains within the available power supply capacity.

26. The effects of lithium-ion battery aging are directly observable in consumer electronic devices. Apple's own public user support documentation explains that as an iPhone battery chemically ages, its maximum capacity decreases and its impedance may increase, reducing its ability to deliver peak power. Because higher impedance produces a greater voltage drop under load, an aged battery may be unable to supply the instantaneous power required by the device. This requires the load circuit to reduce its power consumption using either software or hardware techniques, a technique also known as throttling. Apple further explains that iPhones evaluate battery impedance, state of charge, and temperature, and may dynamically manage the maximum performance of components such as the CPU and GPU to prevent unexpected shutdowns.[17]

---

[13] https://www.sciencedirect.com/science/article/pii/S036054421400142X.

[14] https://www.sciencedirect.com/science/article/pii/S2352152X26022498.

[15] https://www.sciencedirect.com/science/article/pii/S0378775304003593.

[16] https://patents.google.com/patent/US9652026B2/en?oq=US+9%2c652%2c026+B2+.

[17] https://support.apple.com/en-us/101575.

**C. Circuit Board Testing And Failure Analysis**

27. Testing of an assembled printed circuit board (PCB) is intended to identify manufacturing defects and verify that the board and its principal functions operate within specified requirements. Such testing is generally performed after the board is assembled and before or during its integration into the final product. It is well understood that the testing methodology, sequences, and bit patterns used for testing, as well as the testing equipment needed for the purpose, are specific to the design.

28. Testing is ordinarily performed as part of the electronics manufacturing process by manufacturers, contract manufacturers, and their quality or test-engineering personnel. These practices are well established: industry organizations maintain widely used acceptance criteria, test methods, training, and certification programs for assembled electronics.[18]

29. Testing commonly begins with inspection of the completed assembly for manufacturing defects, including misplaced or missing components and defective solder connections. Different inspection methods may be used depending on whether the relevant features are externally visible or hidden beneath components. Boards may also be tested electrically to identify opens, shorts, incorrect component values, and other assembly or interconnection defects.[19,20,21]

---

[18] Institute of Printed Circuits (IPC) publishes standards such as IPC-A-610H: Acceptability of Electronic Assemblies, and IPC J-STD-001J-2024: Requirements for Soldered Electrical and Electronic Assemblies. https://webstore.ansi.org/standards/ipc/ipc610h2020, https://webstore.ansi.org/standards/ipc/ipcstd001j2024. It also publishes testing manuals such as, IPC-TM-650: TEST METHODS MANUAL, https://tsapps.nist.gov/publication/get_pdf.cfm?pub_id=905275.

[19] ACDi, Put Your Electronics Manufacturing Services Partner to the Test. https://www.acdi.com/electronics-manufacturing-testing-services/.

[20] Keysight, A Unified Approach to In-Circuit Testing (ICT) and Functional Test (FCT) Integration. https://www.keysight.com/de/de/assets/3124-1417/white-papers/A-Unified-Approach-to-In-Circuit-Testing-ICT-and-Functional-Test-FCT-Integration.pdf.

[21] OMRON Automation, "Enhancing Ball-Grid-Array (BGA) Inspection with Advanced IPC X-Ray Techniques" (Sept. 24, 2024), https://automation.omron.com/en/us/solutions/white-papers/enhancing-ball-grid-array-inspection.

30. For dense digital boards, standardized test-access architectures can permit electrical testing of connections that cannot readily be reached with mechanical probes. A board may then be powered and exercised to determine whether it performs its intended functions under defined conditions. Depending on the product, this can include testing power behavior, communications, interfaces, memory, and other subsystems.[22]

31. When an assembled PCB passes initial manufacturing tests but fails during subsequent operation, failure analysis may be performed to systematically evaluate the defect and determine its root cause.[23] Failure analysis typically proceeds from non-destructive or minimally destructive techniques such as visual inspection, various optical and X-ray based imaging techniques, electron microscope-based techniques, and electrical probing, to more destructive methods such as cross-sectional analysis, when necessary.[24]

**D. <u>Wireless Phone-To-Device Charging</u>**

32. Phone-to-device charging allows a battery-powered phone to transfer power to another electronic device without a separate wired charger. In a wireless charging implementation, the phone operates as the power transmitter, and the other device operates as the power receiver. Implementing this functionality involves more than transferring power between the devices. Relevant considerations include managing the transmitting phone's available battery power and charging load, controlling the amount of power transferred, maintaining transfer efficiency, aligning the transmitting and receiving coils, managing heat, and protecting against overvoltage, overcurrent, foreign objects, and other operating conditions.

---

[22] IEEE, P1149.1 Standard for Test Access Port and Boundary-Scan Architecture. https://standards.ieee.org/ieee/1149.1/10977/. *See also,* JTAG Technologies, Boundary-scan. https://www.jtag.com/boundary-scan/.

[23] NIH, Applying microscopic analytic techniques for failure analysis in electronic assemblies, https://pmc.ncbi.nlm.nih.gov/articles/PMC7818370/.

[24] NASA, Building Reliable Printed Circuit Boards – the Lessons Learned. https://ntrs.nasa.gov/api/citations/20190001381/downloads/20190001381.pdf.

33. Device-to-device wireless charging has been publicly known for many years. Patents and technical literature describing wireless power transfer between mobile devices date back to at least the early 2010s. For example, a Samsung patent describes mobile terminals that identify one another, exchange battery-state information, determine which device will supply and receive power, and then transfer power wirelessly. The disclosed battery-state information may include each device's remaining power, available power, charging requirements, and ability to supply power to another device.[25]

34. Wireless charging technology has also been implemented in commercially available products using the Qi wireless charging standard, which is an industry standard developed by the Wireless Power Consortium (WPC) for wireless power transfer between compatible devices and is designed to enable interoperability between wireless power transmitters and receivers from different manufacturers. The Qi specification also requires thermal testing and appropriate magnetic shielding to minimize heat buildup in both the transmitting and receiving devices during wireless power transfer.[26]

35. A particular variant of wireless charging is reverse wireless charging. Reverse wireless charging is a feature that lets your phone act like a wireless charging pad for another device. For example, Huawei, which is a Qi-certified product, introduced reverse wireless charging in the Mate 20 Pro, allowing the phone to wirelessly transfer power to other Qi compatible devices.[27] Huawei's documentation states that wireless reverse charging requires the phone's battery level to exceed 20 percent and that reverse charging will be disabled if the receiving device is removed for more than two minutes.[28] Similarly, Samsung also implemented this functionality through Wireless PowerShare in its Galaxy smartphones.[29] Samsung's documentation explains that a compatible

---

[25] https://patents.google.com/patent/US9246350B2/en.

[26] https://www.wirelesspowerconsortium.com/knowledge-base.

[27] https://www.slashgear.com/huawei-mate-20-pro-wireless-reverse-charging-hands-on-16550106/.

[28] https://consumer.huawei.com/en/support/content/en-us02234345/.

[29] https://www.samsung.com/ca/support/mobile-devices/galaxy-phone-wireless-powershare/

Galaxy phone can use its battery to wirelessly charge another Qi-compatible device, provided that the transmitting phone has at least a 30 percent charge and proper alignment of the devices' charging coils.[30]

36. These commercial implementations demonstrate that wireless phone-to-device charging, and associated considerations such as battery thresholds, role selection, coil alignment, power control, and operating protections, have been implemented and publicly described by multiple manufacturers. It also demonstrates that the processes and policies required to enable such phone-to-device wireless charging are specific to the electrical, mechanical, and thermal designs of the charging phone and the receiving device.

**E. <u>Flexible Printed Circuit Designs</u>**

37. Modern mobile devices are comprised of numerous circuit boards and other components that must be interconnected in compact, space-constrained enclosure. These devices commonly employ flexible printed circuits ("FPCs" or "flex circuits"), in which conductive traces are formed on thin, flexible, insulating substrates rather than the rigid composition of conventional printed circuit boards. Modern FPC technology can be traced at least to a patent filed in 1958 and issued in 1961, which disclosed a flat, flexible circuit enclosed within a flexible plastic insulating material.[31] The design and manufacture of FPCs are extensively documented in industry literature and public standards. For example, the Institute for Printed Circuits (IPC) maintains standards addressing both the design[32] and performance[33] of modern FPCs. These standards establish common design principles, material requirements, performance criteria, and testing methods that allow FPCs to be incorporated reliably into complex electronic products.

38. In modern mobile devices, FPCs are utilized to route power, data, and control signals among internal components, including circuit boards, displays, cameras, buttons, sensors, and

---

30 https://www.samsung.com/us/support/answer/ANS10002057/.

31 https://patents.google.com/patent/US2994058A/en.

32 https://webstore.ansi.org/standards/ipc/ipc2223f2026.

33 https://webstore.ansi.org/standards/ipc/ipc6013e2021.

batteries. Compared with rigid boards or discrete wiring, FPCs can offer significant mechanical and packaging advantages: they are thin and lightweight, and can be bent, folded, or routed around other components. These characteristics allow designers to create compact, precisely routed interconnections within the limited internal space of a mobile device.

**F. <u>Buck-Boost Converters</u>**

39. A battery-powered electronic system may contain subsystems that require supply voltages higher or lower than the battery output voltage. Voltage converters are placed between the battery and those subsystems to generate the required voltages. A buck converter steps the battery voltage down to a lower voltage whereas a boost converter steps the battery voltage up to a higher voltage.

40. Batteries used in portable handheld electronic devices produce a range of voltages between minimum and maximum levels, depending primarily on their electrochemistry, state of charge (SOC), and operating conditions.[34,35] A subsystem may require a regulated supply voltage that falls within this range.[36] As a result, the battery voltage may sometimes be above the required subsystem voltage and sometimes below it. A buck-boost converter addresses this situation by operating in buck mode when the input voltage is too high and in boost mode when the input voltage is too low, thereby maintaining the required output voltage as the battery discharges.

41. Buck, boost, and buck-boost converters are collectively called switching converters. In 1976, Middlebrook and Cuk presented a unified approach for modeling the power stages of

---

[34] Battery University, BU-303: Confusion with Voltages. https://www.batteryuniversity.com/article/bu-303-confusion-with-voltages/.

[35] Grepow, What is the voltage of a LiPo battery? https://www.grepow.com/blog/what-is-the-voltage-of-a-lipo-battery.html.

[36] Microchip. https://www.microchip.com/en-us/products/wireless-connectivity/embedded-wi-fi/wi-fi-rf-front-end-components.

switching converters.[37] Their approach has since been discussed and applied widely in power electronics literature and textbooks.[38]

42. Switching converters commonly regulate their output using pulse-width modulation (PWM), or pulse-frequency modulation (PFM), or a combination of the two. In PWM operation, the converter generally switches at a fixed frequency and regulates its output by adjusting the duration of each switching pulse. PWM operation typically provides lower and more predictable output ripple and a faster response to changing loads. In PFM operation, the converter reduces the switching frequency or skips switching pulses when less power is required, reducing switching losses and improving efficiency at light loads. Many buck-boost regulators automatically transition from PFM at light loads to PWM at higher loads. Some also permit forced-PWM operation when lower ripple or a predictable switching frequency is preferred over maximum light-load efficiency.[39]

43. Off-the-shelf buck-boost converters are widely available from semiconductor manufacturers including Texas Instruments, Analog Devices, and Monolithic Power Systems, each of which offer multiple products with different input voltage, output voltage, current, efficiency, and control characteristics.[40] Electronics distributors such as Mouser and DigiKey likewise stock broad selections of buck-boost converters from multiple manufacturers.[41]

---

[37] Middlebrook, R. D., Cuk, Slobodan, A general unified approach to modelling switching-converter power stages. https://authors.library.caltech.edu/records/eyy0t-ate60.

[38] Robert W. Erickson, Dragan Maksimović, Fundamentals of Power Electronics, Third Edition, Springer, 2020.

[39] Understanding Mode Transitions for LMR33620/30 and LMR36006/15, https://www.ti.com/lit/an/snva857/snva857.pdf; Texas Instruments, TPS63810 and TPS63811 – 2.5-A Buck-Boost Converters with I2C Interface, https://www.ti.com/lit/ds/symlink/tps63810.pdf.

[40] https://www.ti.com/product-category/power-management/dc-dc-switching-regulators/dc-dc-converters/products.html#1129=Buck-Boost%3BBuck%20boost&, https://www.analog.com/en/product-category/buck-boost-regulators-controllers.html, https://www.monolithicpower.com/en/products/power-management/switching-converters-controllers/buck-boost.html.

[41] https://mou.sr/4wSDc7Y; https://www.digikey.com/short/01tdm0zm.

### G. NAND Flash Memory

44. NAND flash memory is a type of nonvolatile semiconductor memory that retains stored data even when power is removed.[42] It is widely used for storage in modern mobile electronic devices, as well as solid-state drives (SSDs), USB flash drives, and secure digital (SD) cards. Data within a NAND flash device is organized into pages, which contain multiple kilobytes of data, and blocks, which consist of groups of pages.[43] Three principal NAND operations are reading data from a page, programming (or writing) data to a page, and erasing an entire block.[44]

45. Read, program, and erase operations have different electrical and timing requirements, including different internal voltages, currents, and operation durations.[45] During a read operation, the device applies read voltages and senses if current flows through the selected memory cells to determine the stored data. During a program operation, elevated internal voltages move electrons into the cells' charge-storage material, changing their threshold voltages to represent the data being written. An erase operation uses a different voltage configuration to remove electrons from the charge-storage material across an entire block. These operational differences result in distinct power consumption profiles for read, program, and erase operations.

46. The NAND flash components within an electronic device must be incorporated into the system's overall power and energy budget.[46] Estimating NAND power consumption requires consideration of the expected mix of read, program, erase, idle, and standby operations, as well as factors such as operating current, execution time, interface speed, supply voltage, and the number of memory dies operating concurrently.[47] These inputs allow designers to estimate both average

[42] https://www.kioxia.com/en-jp/rd/technology/nand-flash.html.

[43] https://www.xeltek.com/resources/technical-articles/memory-device-types/nand-flash-programming/?srsltid=AfmBOorV8zHnNIbRdAKboBxm3zxhEoaSBQ2lbNg3qZtPZlPijI7Wrfn7.

[44] https://www.kioxia.com/en-jp/rd/technology/nand-flash.html.

[45] https://www.kioxia.com/en-jp/rd/technology/nand-flash.html.

[46] https://www.micron.com/sales-support/design-tools/nand-system-power-calculator.

[47] https://www.micron.com/sales-support/design-tools/nand-system-power-calculator.

consumption under representative workloads and the higher short-duration power demands associated with active NAND operations. The device's power delivery system must support those transient demands while maintaining stable operation during normal and idle conditions.

**H. <u>SPICE</u>**

47. Simulation Program with Integrated Circuit Emphasis (SPICE) is a general-purpose electrical circuit simulation program originally developed at the University of California, Berkeley, in the 1970s.[48] To simulate a circuit, an engineer specifies its components, component models and values, electrical connections, and input sources. SPICE can then calculate quantities such as voltage, current, and power and analyze circuit behavior under steady-state, transient, and frequency-dependent conditions.[49] SPICE performs these calculations using established principles of circuit theory, including Kirchhoff's current and voltage laws, together with mathematical models describing the behavior of individual components. Widely available SPICE implementations include LTspice,[50] PSpice,[51] HSPICE,[52] and ngspice.[53]

48. SPICE allows engineers to evaluate and refine electrical designs before constructing physical prototypes, reducing development time, material costs, and the number of prototype iterations. Engineers can vary parameters such as supply voltage, load, component values, and temperature to evaluate circuit behavior across a range of anticipated operating conditions.[54] The accuracy of the resulting simulations depends on the accuracy of the circuit description, component

[48] https://www.cadence.com/en_US/home/explore/spice-simulation.html.

[49] https://www.cadence.com/en_US/home/explore/spice-simulation.html.

[50] https://www.analog.com/en/resources/design-tools-and-calculators/ltspice-simulator.html.

[51] https://www.cadence.com/en_US/home/tools/pcb-design-and-analysis/analog-mixed-signal-simulation/pspice.html.

[52] https://www.synopsys.com/implementation-and-signoff/ams-simulation/primesim-hspice.html.

[53] https://ngspice.sourceforge.io/.

[54] https://resources.pcb.cadence.com/pspiceuserguide/11-parametric-and-temperature-analysis.

models, and operating assumptions, but SPICE provides a well-established method for identifying potential design issues and comparing design alternatives before physical testing.

## V. APPLE'S ALLEGED TRADE SECRETS ARE NOT TRADE SECRETS

49. In Apple's Motion for a Preliminary Injunction and supporting documents (in particular, the Fayed Declaration and the Patel Declaration), Apple alleges that certain Apple documents embody Apple trade secrets, including documents relating to [redacted].

50. For the reasons discussed below, it is my opinion that none of Apple's alleged trade secrets are trade secrets.

### A. Alleged [redacted] Trade Secrets

51. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] documents (Patel Exs. 1-2). According to Mr. Patel and Dr. Fayed, these documents disclose [redacted]

---

[55] Fayed ¶ 43 [redacted]

[56] Fayed ¶ 43 [redacted]

[57] Fayed ¶ 43 [redacted].

[redacted]

1. <u>Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.</u>

52. The alleged [redacted] trade secrets regarding [redacted] are readily ascertainable through Apple's released products. The [redacted] in commercially sold Apple products. The underlying document references [redacted].[63] Given that [redacted] (as discussed in the section on alleged [redacted] trade secrets below), the [redacted] are likely earlier and have been manufactured and released. Further, neither Mr. Patel nor Dr. Fayed asserts that [redacted]

---

[58] Fayed ¶ 43 [redacted]

[59] Fayed ¶ 43 [redacted]

[60] Fayed ¶ 43 [redacted]

[61] Fayed ¶ 43 [redacted]

[62] Fayed ¶ 43 [redacted]

[63] Ex. 1 at 108, 348, 553.

[redacted]"[64] The on-sale Apple products can be disassembled. The [redacted] can be removed, and the architecture can be examined through a teardown, chip delayering, imaging, and electrical measurements.

53. The alleged [redacted] trade secrets regarding [redacted] are readily ascertainable through [redacted]. [redacted] are generally known or readily ascertainable.

54. The alleged [redacted] trade secrets regarding [redacted] are generally known or readily ascertainable. The [redacted] is generally known, and the results of the testing are readily ascertainable. [redacted][65] This is standard in the industry. [redacted].[66] And the

---

64 Fayed ¶ 110.

65 Patel Ex. 1 at 229, 258.

[redacted]

industry uses [redacted].[67] [redacted].

55. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. <u>Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.</u>

56. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

57. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. The [redacted] are only valuable to Apple and do not extend beyond Apple products. [redacted]. [redacted]. [redacted]. [redacted] cannot be

---

[redacted].

immediately dropped into, and improve, another product. The value of [redacted] does not translate outside of Apple's own products.

58. Similarly, the alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. The [redacted] are only valuable to Apple and do not extend beyond Apple products. [redacted] takes into account all the unique aspects of the targeted Apple product, e.g., chips, components, firmware, operating system, and other specs or features. This [redacted] cannot be used to develop other Apple products, let alone any non-Apple products, because other Apple products and non-Apple products have a different set of chips, components, firmware, operating system, and other specifications or features. [redacted] Because [redacted] are irrelevant outside of Apple.

59. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted] are only valuable to Apple and do not extend beyond Apple products. For instance, [redacted] means that Apple needed something unique to fit the particular Apple product.[69] Moreover, the [redacted] concern components that are dependent on the surrounding modules in the Apple product. By way of example, [redacted].[70] [redacted]. [redacted] are irrelevant for non-Apple products,

[68] Patel Ex. 1 at 2, 10, 108, 146, 440, 500, 620, 660, 720, 800.

[69] Patel Ex. 1 at 10, 108, 146.

[70] Patel Ex. 1 at 10.

because the components cannot be easily removed from of the Apple product and dropped into a non-Apple product. To the extent that these [redacted] are relevant outside of Apple, the resulting component in the on-sale product can be examined. [redacted]

60. The [redacted] are also not valuable outside of Apple. As discussed above, the [redacted] are specific to Apple. [redacted] are not relevant for non-Apple products.

61. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. The [redacted] documents do not disclose [redacted]. With no disclosure of any [redacted], there is no value in the alleged trade secret. To the extent there is [redacted], the [redacted] This is not transferrable outside of Apple products.

62. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted].[72] [redacted] As a result, [redacted]

[71] Patel Ex. 1 at 10, 60, 85-94.

[72] Patel Ex. 1 at 348, 553.

[redacted] are only useful for comparing against prior versions of the same Apple product, not against non-Apple products or even different Apple products.

63. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted]. [redacted]. For instance, [redacted]. The [redacted] is not applicable to other [redacted]. The value of [redacted] does not translate outside of Apple products.

64. For these reasons, it is my opinion that the [redacted] trade secrets do not derive independent economic value from not being generally known or readily ascertainable.

**B. Alleged [redacted] Trade Secrets**

65. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] documents (Patel Exs. 4-5). According to Mr. Patel and Dr. Fayed, these documents disclose [redacted]

[73] Fayed ¶ 51 [redacted]

[redacted][74] [redacted]

[redacted][75] [redacted][76]

1. Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.

66. The alleged [redacted] trade secrets regarding p[redacted] are generally known.

67. The utility of [redacted] is understood in the industry. [redacted].[77] [redacted]

[74] Fayed ¶ 51 [redacted]

[75] Fayed ¶ 51 [redacted]

[76] Fayed ¶ 51 [redacted]

[77] [redacted]

[redacted]

[redacted].

68. The alleged [redacted] trade secrets regarding [redacted] are generally known. [redacted]

69. The alleged [redacted] trade secrets regarding [redacted] are generally known. [redacted]

70. [redacted] is common in the industry.[81] Apple has filed patents with Mr. Patel as the named inventor, on "battery

---

[redacted]

path impedance compensation."[82] [redacted]. [redacted]. [redacted]. In the Fayed Declaration and Patel Declaration, the [redacted]. [redacted]. Using such [redacted] is generally known.

71. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.

72. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

73. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret.

74. The alleged [redacted] trade secrets' [redacted] are only valuable to Apple and do not extend beyond Apple products. [redacted] [redacted] [redacted]

[82] [redacted].

[83] Patel Ex. 4 at 35, 40-42, 86-89.

[redacted]. [redacted] is not applicable to other Apple products or non-Apple products.

75. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret.

76. The alleged [redacted] trade secrets' [redacted] are only valuable to Apple and do not extend beyond Apple products. [redacted].

77. The alleged Peak Power trade secrets regarding [redacted] do not derive independent economic value from being secret. The underlying Apple documents do not disclose [redacted]. [redacted]

[84] Patel Ex. 4 at 13, 20, 35, 40-42, 66.

[85] Patel Ex. 4 at 35, 40-42, 86-89.

[86] Patel Ex. 4 at 95 [redacted], 97 [redacted] *see also* Fayed ¶ 51 [redacted].

[redacted] no independent economic value can be derived from the information in the documents.

78. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret.

79. The alleged [redacted] trade secrets' [redacted] are only valuable to Apple and do not extend beyond Apple products. [redacted] [redacted]. [redacted]. [redacted]. [redacted].[88] As discussed above, each [redacted] is specific to a particular Apple product. The value of [redacted] to Apple does not translate to products outside of Apple.

80. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

## C. Alleged [redacted] Trade Secrets

81. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] document (Patel Ex. 6). According to Mr. Patel and Dr. Fayed, this document discloses [redacted]

[87] Patel Ex. 4 at 95, 97, 106.

[88] Patel Ex. 4 at 95 [redacted]

[89] Fayed ¶ 54 [redacted]

1. Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.

82. The alleged [redacted] trade secrets regarding [redacted] are readily ascertainable through Apple's released products. The [redacted] that can be reversed engineered through [redacted] in commercially sold Apple products. Although the underlying [redacted] document relied on by Dr. Fayed is [redacted] [redacted] [redacted]. Further, neither Mr. Patel nor Dr. Fayed asserts that these [redacted]. Only the [redacted][91] The on-sale Apple products can be disassembled; the [redacted] can then be removed, and the [redacted] can be examined through a teardown and imaging.

83. The alleged [redacted] trade secrets regarding [redacted] are generally known.[92] [redacted]. [redacted].[93] [redacted]

---

90 Patel Ex. 6 at 1.

91 Fayed Decl. ¶ 110.

[redacted]

[redacted]

[redacted]. [redacted]. [redacted]

84. The alleged [redacted] trade secrets regarding [redacted] are generally known. The [redacted] listed in the underlying document are commercially [redacted] Even the images depicting those [redacted] are stock photos that are available online. Because those [redacted] are common in the industry, the ability to use such [redacted] and the use cases are well known. To the extent that is not the case, the [redacted] come with instruction manuals, or there is public information on how to use them.

85. The alleged [redacted] trade secrets regarding [redacted] are generally known or readily ascertainable. The [redacted] that are common in the industry:

---

[redacted]

[95] Patel Ex. 6 at 46-49.

[redacted].[96] Because the [redacted],[97] and because the [redacted] are generally known as discussed above, following the [redacted] is readily ascertainable.

86. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.

87. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

88. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted].[99] The [redacted], that are unique to Apple products, has no value outside of Apple.

89. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. To the extent the [redacted] are not readily ascertainable [redacted], the

[96] Patel Ex. 6 at 21 ([redacted]), 30-32 ([redacted]), 33 ([redacted]), 36 ([redacted]), 51 ([redacted]).

[97] Patel Ex. 6 at 21, 30-33, 36, 51.

[98] Ex. 6 at 79 ([redacted]).

[99] Ex. 6 at 9-10.

[redacted] Additionally, there is no indication that [redacted] are more valuable than [redacted] known in the industry. For instance, the underlying document relied on by Dr. Fayed does not mention [redacted]. Apple-specific [redacted] with no clear benefit are not valuable outside of Apple.

90. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

**D. Alleged [redacted] l Trade Secrets**

91. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] document (Patel Ex. 8). According to Mr. Patel and Dr. Fayed, this document discloses [redacted]

1. Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.

92. The alleged [redacted] trade secrets regarding [redacted] are generally known. This is often referred to as [redacted].

---

[100] Patel Ex. 6 at 35-42, 51, 53, 57-60.

[101] Patel Ex. 6 at 53 ([redacted]).

[102] Patel Decl. ¶¶ 53-54; Fayed Decl. ¶ 57 [redacted]").

[103] Patel Decl. ¶¶ 53-54; Fayed Decl. ¶ 57 [redacted]

[104] Fayed Decl. ¶ 57 [redacted]

93. This [redacted] is well developed in smartphones already. [redacted] is already well-known for smartphones.

94. Alongside other smartphone companies providing this feature, Apple itself filed a patent on the feature and has already incorporated the feature into its products. [redacted]

---

[redacted]

[redacted]

95. The alleged [redacted] trade secrets regarding [redacted] are readily ascertainable through Apple's released products. As discussed above, Apple released this [redacted]. The [redacted] can be extracted through testing. For instance, [redacted]. [redacted]

96. The types of [redacted] that are described in the underlying document relied on by Dr. Fayed are also generally known. [redacted]

[112] [redacted]

[redacted]

[redacted].

[115] Patel Ex. 8 at 91; *see also* Patel Ex. 8 at 91 [redacted].

[redacted]

97. Moreover, public standards incorporate [redacted]. [redacted] Apple's own descriptions of its [redacted], [redacted] render the [redacted] generally known.

98. In paragraph 56 of the Fayed Declaration, Dr. Fayed asserts that the [redacted] But as discussed above, Apple filed a patent on the feature and released a [redacted] feature.

[116] Patel Ex. 8 at 103.

[redacted]

99. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.

100. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

101. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. Although Dr. Fayed asserts that the alleged [redacted] trade secrets are [redacted][121] the alleged [redacted] trade secrets are [redacted] The underlying document relied on by Dr. Fayed references [redacted].[122] As discussed in the section on the alleged [redacted] trade secrets below, the [redacted] because of the alleged [redacted] trade secrets has likely been lost due to other smartphone manufacturers surpassing the technology.

102. Further, nothing in the alleged [redacted] trade secrets indicates that the [redacted] are better than the [redacted] in competitor smartphones (e.g., Samsung's PowerShare and Google's Battery Share). The Apple documentation details [redacted] Further, Dr. Fayed does not [redacted] If competitors executed the system better, there is little or no value in Apple's proposed design.

103. The alleged [redacted] trade secrets' [redacted] are also Apple specific, and do not translate to non-Apple products. The underlying document relied on by Dr. Fayed lists

[121] Fayed Decl. ¶ 56.

[122] Patel Ex. 8.

[redacted] do not provide value to others outside of Apple.

104. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted]. As discussed above, [redacted] in smartphones is well developed. [redacted]. [redacted] Smartphones will work with or without this feature. The well-developed and unnecessary nature of the feature means that knowledge of additional rejected features has little to no value.

105. In paragraph 59 of the Fayed Declaration, Dr. Fayed asserts that [redacted]" As discussed above, the smartphone market has already arrived at an acceptable solution. Additional investigative engineering and feasibility testing has little to no value where a commercially acceptable solution is already available.

106. In paragraph 80 of the Fayed Declaration, Dr. Fayed asserts that [redacted]

---

[123] Patel Ex. 8 at 22 [redacted]).

[redacted] Feasibility groundwork has no value for [redacted]. The smartphone market has already determined that [redacted] is not only feasible, but also capable of being implemented in a commercially successful way. As discussed above, several smartphone manufacturers, including Apple itself, have released [redacted], and continue to support the feature.

107. In paragraph 92 of the Fayed Declaration, Dr. Fayed asserts value in [redacted] with the alleged [redacted] trade secrets' [redacted] The smartphone market already has several proven designs. Focusing on one of those publicly available designs would provide a better headstart than anything provided by Apple's rejection data for an [redacted] feature.

108. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

### E. <u>Alleged [redacted] Trade Secrets</u>

109. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] documents (Patel Exs. 9-18). According to Mr. Patel and Dr. Fayed, these documents

disclose [redacted]

1. Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.

110. The alleged [redacted] trade secrets regarding [redacted] are readily ascertainable through Apple's released products.

111. The [redacted] are fixed into Apple products. A subset of [redacted] documents—Patel Exs. 9-14—are f[redacted] The rest of the [redacted] documents—Patel Exs. 15-18—are flexible [redacted]

112. [redacted].

[124] Patel Decl. ¶¶ 59 [redacted]

[125] Patel Decl. ¶ 61 [redacted] Fayed Decl. ¶ 60 [redacted]

[126] Fayed Decl. ¶ 60 ([redacted]

[127] Patel Decl. ¶¶ 60 [redacted]"), 62 [redacted]); Fayed Decl. ¶ 60).

[128] *E.g.*, Patel Ex. 9 at 10; Patel Ex. 10 at 10.

113. As indicated in the names of the alleged [redacted] documents themselves ("[redacted]"), [redacted]. [redacted]. Therefore, the disclosed [redacted] have likely been incorporated into released Apple products.

114. In his declaration, Mr. Patel did not state that these [redacted] Instead, Mr. Patel states that [redacted] Further, neither Mr. Patel nor Dr. Fayed asserts that these [redacted]. Only the [redacted]

115. Because the [redacted] have likely been incorporated into released Apple products, the designs can be extracted by examining the [redacted] in those products. The [redacted] documents detail [redacted]. Such [redacted] by pulling out the [redacted] from a released Apple product and measuring that [redacted]. For a more accurate extraction of those dimensions, several [redacted] could be measured and using the average, median, or otherwise most common statistical measures of dimension. The [redacted] documents also detail [redacted]. These [redacted] can be extracted through the same

---

[129] Patel Decl. ¶ 58 [redacted]

[130] Patel Decl. ¶ 58.

[131] Fayed Decl. ¶ 110.

manner, except by pulling out several [redacted] of the same kind and comparing [redacted] across the set. The maximum and minimum for each [redacted]. The exact [redacted], can be extracted through measuring the [redacted] in the released Apple products.

116. The [redacted] trade secrets regarding [redacted] are generally known or readily ascertainable. [redacted]. [redacted] is generally known. In paragraph 108 of his declaration, Dr. Fayed asserts that [redacted] But as discussed above, the [redacted] can be recovered from on-sale products. On-sale products [redacted]. By examining several compliant products, the underlying [redacted] that are found across the on-sale products.

117. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. <u>Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.</u>

118. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

---

[132] Patel Decl. ¶ 60.

119. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. The [redacted] are only relevant to the Apple product incorporating the specific [redacted]. Such a [redacted] cannot be dropped into, and improve, another product for connecting other components. Therefore, the value of Apple's [redacted] do not translate to non-Apple products.

120. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. The [redacted] files do not disclose [redacted]. [redacted] is not valuable.

121. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. As discussed above, [redacted] is common in engineering work. And neither the documents relied on by Dr. Fayed nor Dr. Fayed himself establish that [redacted].

122. In paragraph 74 of the Fayed Declaration, Dr. Fayed states that a [redacted] I disagree with respect to Apple's alleged trade secrets. As discussed above, only Apple can obtain value from the use of the alleged [redacted] trade secrets. The alleged [redacted] trade secrets are [redacted] in Apple products. As a result, the alleged trade secrets are dependent on the specific ecosystem of components and modules in Apple products. Each of Apple's alleged trade secrets are intended to solve [redacted] that are specific to Apple products and do not translate to products or ecosystems outside of Apple.

123. In paragraph 95 of the Fayed Declaration, Dr. Fayed states that [redacted] These value statements are non-specific and fail to identify any aspect of Apple's version control process and protocol that is unique

124. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

**F. <u>Alleged [redacted] Trade Secrets</u>**

125. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] documents (Patel Exs. 20-21). According to Mr. Patel and Dr. Fayed, these documents disclose [redacted]

1. <u>Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.</u>

126. The alleged [redacted] trade secrets regarding [redacted] are generally known or readily ascertainable through Apple's released products.

[133] Fayed Decl. ¶ 63 [redacted]

[134] Fayed Decl. ¶¶ 63 [redacted] 94 [redacted]

127. Dr. Fayed acknowledges that [redacted] are publicly known.[135]

128. The schematics of [redacted] for Apple are no different than a standard [redacted].[136]

129. The [redacted] [redacted] The alleged [redacted] trade secrets reference several model numbers for the [redacted] embodying the alleged [redacted] trade secrets.[140]

130. The [redacted] are readily ascertainable.

131. The [redacted] are likely in released products. [redacted]

---

135 Fayed Decl. ¶ 103 [redacted].

136 Patel Ex. 21 at 9 ([redacted]).

137 Patel Ex. 20 at 36; Patel Ex. 21 at 4-5.

1[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] The documents also appear to reference [redacted]

132. Further, neither Mr. Patel nor Dr. Fayed asserts that [redacted] Only the [redacted]

133. [redacted] can be extracted from the [redacted] in the released products. The [redacted] can be extracted by (a) examining the components attached to the [redacted] on the [redacted], and (b) examining the internals of the [redacted] through teardown and imaging. The parameters can be extracted by (a) [redacted], or (b) [redacted]. Examining and testing the [redacted] from a released product will reveal [redacted].

134. To the extent the parameters in the alleged [redacted] trade secrets include [redacted], those [redacted] can also be extracted from the [redacted] in the released products. [redacted].

---

[141] Patel Ex. 21 at 4 ([redacted]).

[142] Patel Ex. 21 at 4-5.

[143] Fayed ¶ 110.

135. In paragraph 108 of the Fayed Declaration, Dr. Fayed states that [redacted] I disagree. As discussed above, the [redacted]. [redacted]

136. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.

137. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

138. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted] are designed to support Apple's unique set of module and components in its products. In other words, Apple finds value in [redacted] because the [redacted] solves Apple-specific problems. [redacted] Without a substantial amount of effort and expense, a [redacted] in an Apple product cannot be used in another product. [redacted] that

[144] Patel Ex. 20 at 8.

most customers want and use, and publicly sells those converters on its website.[145] The value of Apple's [redacted] does not translate beyond Apple's own products.

139. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. [redacted] are not helpful to anyone outside of Apple for the reasons stated above.

140. In paragraph 74 of the Fayed Declaration, Dr. Fayed asserts that a [redacted] Contrary to Dr. Fayad's statement, and as discussed in above, only Apple can benefit from the use of the alleged [redacted] trade secrets. Those alleged trade secrets are [redacted] in individual Apple products and, therefore, are dependent on the specific ecosystem of components and modules in those products. Each of Apple's alleged [redacted] trade secrets are intended to solve particular problems in those products and do not translate to products or ecosystems outside of Apple.

141. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

### G. <u>Alleged [redacted] Trade Secrets</u>

142. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] file (Patel Exs. 22). According to Dr. Fayed, this document discloses a [redacted]

---

[redacted]

[146] Fayed Decl. ¶ 63 [redacted]

1. <u>Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.</u>

143. The alleged [redacted] trade secrets regarding [redacted] are generally known or readily ascertainable through reverse engineering.

144. [redacted] are publicly known. For instance, [redacted].[147]

145. The allegedly [redacted] of the alleged [redacted] trade secrets is [redacted] The alleged [redacted] trade secrets reference the [redacted].[148] [redacted]

146. The [redacted] disclosed in the alleged [redacted] trade secrets are readily ascertainable.

147. The [redacted] are in released products. The underlying document relied on by Dr. Fayed is [redacted], and the document is a [redacted]

---

[redacted]

148 Patel Ex. 22 at 1 ("[redacted]").

[redacted]

150 Patel Ex. 22 at 1.

[redacted]

148. Further, neither Mr. Patel nor Dr. Fayed asserts that this [redacted]. Only the [redacted]

149. Any [redacted] in the alleged [redacted] trade secrets can be extracted from [redacted] in the released Apple products. The [redacted] can be extracted by (a) examining the [redacted], and (b) examining the [redacted] through teardown and imaging. The [redacted] can be extracted by [redacted], or [redacted]. Examining and testing the [redacted] from a released Apple product will reveal any [redacted]

150. To the extent the parameters in the alleged [redacted] trade secrets include [redacted], those [redacted] can also be extracted from the chips in the released Apple products. As discussed above, [redacted] can be extracted through examining and testing several [redacted] from released products. [redacted]. This means that the [redacted] can be extracted by determining the maximum and minimum of various [redacted]. Examination and testing of several [redacted] can recreate the underlying [redacted].

151. In paragraph 108 of the Fayed Declaration, Dr. Fayed states that [redacted] But as discussed above, the [redacted]

[152] Fayed ¶ 110.

[redacted] can be recovered from compliant products. [redacted] By examining several compliant products, the underlying [redacted] can be determined from the extremes that are found across the compliant products.

152. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.

153. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

154. The alleged [redacted] trade secrets regarding [redacted] are only valuable to Apple and do not extend to non-Apple products. The [redacted] to support Apple's unique set of module and components in its products. In other words, Apple finds value in [redacted] because the [redacted] solves Apple-specific problems. Without expending substantial effort and incurring significant expenses, a [redacted] in an Apple product cannot be used in another product. [redacted] that most customers want and use, and publicly sells those chips on its website.[153] Any value in Apple's [redacted] does not translate beyond Apple's own products.

155. In paragraph 74 of the Fayed Declaration, Dr. Fayed states that a [redacted] This is not true for the Apple's alleged [redacted] trade secrets. As discussed in above, only Apple can obtain value from the alleged [redacted] trade secrets because those

---

[redacted]

alleged trade secrets are [redacted] within Apple products and are dependent on the specific ecosystem of components and modules in Apple's products. Each of Apple's alleged [redacted] trade secrets are intended to solve [redacted] that are specific to Apple products and do not translate to products or ecosystems beyond Apple.

156. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

**H. <u>Alleged [redacted] Trade Secrets</u>**

157. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] file (Patel Ex. 23). According to Dr. Fayed, this document discloses [redacted]

1. <u>Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.</u>

158. The alleged [redacted] trade secrets regarding [redacted] are generally known.

159. [redacted]. [redacted]. [redacted]. Mobile devices often rely on a battery to power its

---

[154] Fayed Decl. ¶ 64 [redacted]

[155] Fayed Decl. ¶ 64 [redacted]

subsystems, and not a constant unlimited supply of power, such as through an outlet or charger. Mobile devices also have multiple subsystems competing for power, and, in [redacted], the mobile devices are taking on the [redacted]. [redacted]. [redacted].

160. The alleged [redacted] trade secrets regarding specific [redacted] are readily ascertainable through reverse engineering.

161. The alleged [redacted] trade secrets are likely incorporated in released products. [redacted]. [redacted] As discussed above, therefore, those products have likely been manufactured and sold by Apple. [redacted] are more likely to have been manufactured and sold.

162. Further, neither Mr. Patel nor Dr. Fayed asserts [redacted] Only the [redacted]

163. [redacted] can be extracted from the released products with those budgets. [redacted]

[156] Fayed ¶ 110.

164. The alleged [redacted] trade secrets regarding [redacted] are generally known or readily ascertainable through Apple's released products.

165. The referenced [redacted] is a common data point in [redacted] specifications and can be extracted through testing [redacted] in released products. The referenced [redacted].[157] This is common in [redacted].[158] Moreover, [redacted]. The [redacted] is generally known or readily ascertainable through reverse engineering.

166. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known or reasonably ascertainable.

2. Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.

167. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

168. The Apple-specific [redacted] are only valuable to Apple and do not extend beyond Apple products. [redacted]. [redacted] are dependent on the operating system and unique subsystems in its products. Therefore, because [redacted] is tailored to its own products, that framework does not provide value to non-Apple products.

---

[157] Patel Ex. 23 at 4, 7, 25.

[redacted]

169. The alleged [redacted] trade secrets regarding [redacted] do not derive independent economic value from being secret. To the extent the [redacted] is dependent on Apple products, the [redacted] are not valuable to non-Apple products. The referenced [redacted] But if [redacted] but also on the Apple product's chip, components, and operating system. All those dependencies are specific to the target Apple product and render the [redacted] inapplicable to non-Apple products that do not share those same dependencies.

170. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

## I. Alleged [redacted] Trade Secrets

171. The alleged [redacted] trade secrets refer to the alleged trade secrets disclosed in the [redacted] files (Patel Exs. 24-26). According to Dr. Fayed, these files reflect [redacted]

### 1. Apple's alleged [redacted] trade secrets are generally known or readily ascertainable.

172. The alleged [redacted] trade secrets regarding [redacted] are generally known. [redacted]

---

159 Patel Ex. 23 at 4, 7, 25.

160 Fayed Decl. ¶ 65 [redacted].

[redacted] are well known in the industry, and [redacted] are a well-known way to model circuits. [redacted], is an expected and common use of [redacted]

173. For these reasons, it is my opinion that the alleged [redacted] trade secrets are generally known.

2. <u>Apple's alleged [redacted] trade secrets do not derive independent economic value from being secret.</u>

174. To the extent any of the alleged [redacted] trade secrets are not generally known or readily ascertainable, it is my opinion that such alleged trade secrets do not derive independent economic value from being secret.

175. Apple has not demonstrated that these [redacted] files have any independent economic value. Dr. Fayed merely describes the [redacted] files as [redacted]. [redacted]. [redacted]. [redacted]. [redacted] Moreover, Dr. Fayed does not describe [redacted]. [redacted] has no value.

---

161 *See, e.g.*, Patel Exs. 24-26.

162 Fayed Decl. ¶ 65.

163 Patel Ex. 25 ([redacted]).

176. In paragraph 82 of the Fayed Declaration, Dr. Fayed states [redacted]

177. For these reasons, it is my opinion that the alleged [redacted] trade secrets do not derive independent economic value from being secret.

## VI. CONCLUSION

178. In sum, it is my opinion that Apple has not established that the following alleged trade secrets are trade secrets: [redacted] In my opinion, each of these alleged trade secrets is generally known, readily ascertainable, and/or does not derive independent economic value from being secret.

179. I reserve the right to supplement these opinions as discovery proceeds and as I review additional materials, including Apple's sealed filings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 31st day of August 2026 in Johns Creek, GA.



By ______________________________

Arijit Raychowdhury, Ph.D.