Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF TANG YEW TAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

**DECLARATION OF TANG YEW TAN**

I, Tang Yew Tan, the undersigned, hereby declare and state:

1. I submit this declaration in support of Defendants' Opposition to Apple's Motion for a Preliminary Injunction (ECF No. 38) (the "Motion"). I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

## I. Professional Background and Career at Apple

2. I am a mechanical engineer and hold a master's degree from the Massachusetts Institute of Technology (MIT). I was hired directly from MIT to Plaintiff Apple Inc. ("Apple"), where I worked for approximately 24 years, from 1999 to 2024, most recently as Vice President of Product Design.

3. At Apple, I led the development of Apple products including the iPhone and Apple Watch. I started the iPhone product design team and led its work from the earliest concept and prototype stages through the iPhone 15. Over the course of my 24 years at Apple, I progressed from an individual contributor to a senior leader overseeing approximately 900 employees, including teams responsible for interconnects, system design, acoustics, and materials development.

4. I used Apple-issued devices for my work at Apple. When I joined Apple in 1999, cloud storage did not yet exist. After iCloud was later introduced, I used my personal iCloud account for my work at Apple, because Apple did not provide enterprise iCloud accounts to its employees who had started before the transition to cloud storage. During my time at Apple, I understood that Apple continued to encourage its employees to use their personal iCloud accounts and Apple IDs for their work at Apple.

5. To facilitate the use of my personal iCloud drive for work, Apple offered to expand my iCloud account with additional capacity (storage) at no charge for me, on the condition that I log into and connect my personal iCloud account to the Apple-issued devices I used for my work at Apple. I accepted that offer and stored both my personal and professional documents and information on my personal iCloud account, as Apple requested.

## II. Departure From Apple

6. In late 2023, I considered and ultimately decided to leave Apple. At the time, I was not yet sure whether I would retire or participate in a new business venture. My departure from Apple was announced in November 2023. I agreed with Apple's leadership that my last day of employment would be February 29, 2024, such that I would have sufficient time to work with Apple on a smooth exit, and that my last day in the Apple office would be February 2, 2024.

7. Shortly after my departure was announced, rumors began circulating that I had decided to join Jonathan (Jony) Ive in a new business. Those rumors were incorrect because, at the time, I had not yet made a decision about my next steps. But out of an abundance of caution and in coordination with other Apple leaders, I began to recuse myself from various Apple meetings, including executive meetings.

8. During the months after I gave Apple notice of my resignation and before I left Apple, I took active steps to remove Apple confidential information from my personal devices and accounts, and to return all Apple-issued devices in my possession. I did not want or need to retain Apple confidential information. I took diligent steps to ensure that all Apple information was removed from my personal devices, though it was a difficult task given the inherent commingling of Apple and personal information, created by Apple's policy of causing employees, including me, to use personal accounts for work.

9. Prior to leaving Apple, I used a tracking system called iTrack to find and return the Apple prototypes in my possession. Similarly, I used a tracking system called Enfold to find and return the Apple production units in my possession. Tracking the prototypes and production units in my possession was burdensome and took nearly two months. I understand that Apple logs serial numbers for such items and possesses a record of when each part was returned, and I recall Apple may have marked certain prototypes or production units as "lost." I also made substantial efforts to sever my phone number from the Apple plan. Based on my recollection, severing my phone number from the Apple plan was burdensome and required many stages of approval.

10. I was able to complete this complex and time-consuming offboarding process because Apple afforded me several months to plan my departure in coordination with other Apple

leaders. I understand that Apple employees typically do not have the same benefit because Apple follows a "walk out" policy, requiring employees who are leaving for competitors to be walked out of the building by their manager on or within days of their resignations. As a result of Apple's walk out policy, I understand that departing employees are not afforded sufficient time to thoroughly canvass and return all prototypes or production units in their possession, or to remove Apple information from their personal iCloud accounts and devices. I understand that Apple instead does not provide any meaningful offboarding period.

11. I did not forward myself any confidential Apple information prior to my departure from Apple. I may have forwarded myself non-confidential information such as travel rewards emails and personal emails or notes, such as ones containing personal health information. I also recall forwarding myself notes from people who emailed to congratulate me on my new role and offered to stay in touch, including suppliers and vendors—the identity of whom is public knowledge. I may have also forwarded myself a document containing my private notes regarding Apple's consumer electronics show conference, which are notes documenting a public event and consisting of public industry information. At no point did I forward myself anything that could be considered confidential information or an Apple trade secret.

## III. <u>The Founding of io</u>

12. In late March 2024, I launched io Products with Ive, Scott Cannon, and Evans Hankey. At the time, we did not yet have a plan to develop any particular product. Instead, we initially worked to understand our goals and curiosities in several different areas. After several months of broad exploration, io Products narrowed its focus and began prototyping different AI device form factors. In connection with that, we held discussions with OpenAI and other companies.

13. Apple is factually incorrect in alleging that, prior to leaving Apple, I met with OpenAI or its collaborators to discuss meetings with a key Apple supplier. Compl. ¶ 9. Ive first contacted me about potentially working together in July 2023. At the time, I understood that Ive knew OpenAI's Sam Altman and was broadly curious about exploring AI devices (among other areas). I did not think, at the time I launched io Products months after announcing that I would be

leaving Apple, that io Products and OpenAI would ultimately merge. To my recollection, I first met with OpenAI—together with my co-founders—on March 8, 2024, for an informal "meet and greet."

14. My io Products colleagues and I met with several parties who expressed interest in a partnership with io Products. In October 2024, eight months after I left Apple, io Products and OpenAI entered into an exclusive partnership. In May 2025, OpenAI announced its intention to merge with io Products. The merger closed in July 2025.

## IV. OpenAI's Consumer Hardware Employee Onboarding Process

15. Following the OpenAI-io Products merger, I assumed the role of OpenAI's Chief Hardware Officer, Consumer Products. Following the merger, io Products' employees became employees of OpenAI in its Consumer Hardware division, which works as a separate unit from a separate location, the Jackson Square neighborhood of San Francisco. Further, my title is OpenAI's Chief Hardware Officer, *Consumer Products*, and I am accordingly only in charge of the consumer hardware at OpenAI and have no involvement in the recruiting for, or development of, hardware outside of the Consumer Hardware division, including OpenAI's robotics, data center hardware, and silicon efforts. The Consumer Hardware division maintains its own independent recruiting operation, separate from recruiting for other parts of OpenAI's business.

16. I strive to recruit the best and brightest hardware engineers to OpenAI. Such professionals must possess a certain skillset and have certain experience to succeed in OpenAI's Consumer Hardware division. Because Apple is an industry leader in hardware development with no close second in terms of scale, it is unsurprising that a meaningful number of our consumer hardware employees joined from Apple. My focus is on candidates' skills, capabilities, and personalities. It is never on the confidential information of Apple or any other companies. Because OpenAI is building something new and different from anything Apple or any other company have ever developed before, such information is not only unwanted but also irrelevant.

17. Because I understood that Apple did not have a reliable, comprehensive exit protocol for departing employees, I have taken exceptional care to ensure that people the OpenAI Consumer Hardware division hires from Apple take early proactive steps to cleanse their personal devices from Apple information. The process is complicated for employees departing Apple, both because of the

immediate "walk out" policy and because many Apple employees use their personal iCloud accounts for work. From my experience, because of Apple's policy, its employees' personal devices and accounts often contain Apple information commingled with personal information, and it has proven hard to sever the two, especially within the same day. For this reason, I frequently remind recruits, as well as OpenAI employees in my division who recently left Apple, to proactively ensure they do not possess any Apple prototypes, production units, or confidential information. OpenAI regularly reminds employees not to bring or use any confidential information from their prior employers.

18. Based on my experience, Apple frequently gives its departing employees insufficient time to return all Apple parts before leaving Apple. Instead, because Apple has no consistent exit protocol, that burden is often shifted to Apple's employees, who must figure out themselves how to get rid of Apple parts and information. From my experience, it takes substantial time to gather and return prototypes and other parts.

19. Apple is factually incorrect in alleging that I warned new hires not to tell Apple that they have taken jobs at OpenAI, so they can stay at Apple as long as they can in order to avoid scrutiny. Compl. ¶ 11. On the contrary, my hope was that employees would have enough time to complete all offboarding steps and cleanse their accounts from Apple information, knowing that once they give notice, Apple would likely immediately escort them out without allowing them to complete the offboarding procedures. I also wanted to be mindful about candidates' stock vesting dates, knowing that they have worked hard and made sacrifices for that compensation.

20. In advising departing Apple employees who are about to join OpenAI, I often tell them to return any prototypes and production units in their possession prior to giving notice, so they have sufficient time to ensure they have returned everything. I do that because, as I mentioned above, my experience is that Apple follows an immediate "walk out" policy and does not provide departing employees with sufficient time to complete these processes after giving notice. From my own Apple departure experience, I know that the process of tracking and returning prototypes and production units at Apple can be prolonged and burdensome.

21. From my experience, even diligent efforts by departing employees are not always sufficient to overcome Apple's broken employee exit process. For example, I understand that

iCloud recovery policy occasionally causes Apple documents to automatically repopulate in users' personal iCloud drives even after deletion. In contrast, because OpenAI strictly segregates work files from personal files, there is no such risk of cross-contamination between Apple information and OpenAI's devices or drives.

### V. <u>OpenAI's Consumer Hardware Interview Process</u>

22. I am very clear with individuals I interview or recruit to OpenAI that they should not bring any confidential information or parts into the interview, nor should they discuss any unreleased information about their current employers. The same holds true for Apple employees' interviews at OpenAI. I have never asked candidates to bring any confidential prototypes or other unreleased parts to interviews, or to otherwise discuss the confidential information of their current employer. In fact, I take proactive steps to ensure the opposite and instruct recruiters in my division and candidates to ensure that no such parts or information are being brought or discussed.

23. I understand that Apple quotes a certain generic pre-interview guide (which I understand to be ECF No. 59-5) and tries to make it seem to the Court as if I said the words written in that document. Apple is incorrect. The generic pre-interview guide from which Apple quotes is used by OpenAI's robotics recruiting team—with which I have no involvement—and is not used for recruiting within OpenAI's Consumer Hardware division. I do not recall even seeing that document before this litigation, and my division and I never used it. Further, based on my review of that document, Apple's allegations are unfounded. I understand that Apple alleges that this document asks candidates to bring confidential prototypes, "CAD/design artifacts," and "Technical Deep Dive" presentations from their work at Apple. Mot. at 14; *see also* Compl. ¶ 70. But nothing in that document mentions Apple or any confidential information. I have reviewed it and have not identified any instruction regarding the confidential prototypes or information of Apple or any other company. *See* ECF No. 59-5. Apple's allegations are therefore factually incorrect.

24. In fact, I have consistently told candidates ***not*** to bring in any undisclosed or recent product or parts, including CAD,[1] and I have instructed recruiters in my division to relay the same.

---

[1] "CAD" means Computer-Aided Design.

To demonstrate aptitude and work experience, I allowed candidates to bring ***public, already on the market, shipped*** physical materials from older devices they worked on. For example, if a candidate worked on a battery for an old, shipped device that was already publicly released, I would permit such a candidate to bring that device (or parts thereof) into their interview as a demonstrative tool to examine the candidate's professional skills. At no point did I solicit new parts or any undisclosed Apple product, CAD, prototypes, or any other Apple confidential information or objects.

25. I understand that Apple relies on certain text messages I have sent to allege that I instructed candidates to bring Apple prototypes and unreleased devices to interviews and to otherwise share Apple confidential information. I have reviewed these text messages and they reflect the opposite:

a. <u>Roffman Decl., Ex. L</u>: In this text message exchange from [redacted], approximately [redacted] before io Products' merger with OpenAI, I texted a candidate that it "might be helpful" to bring parts or systems that she had previously worked on. Roffman Decl., Ex. L. When she responded that she can "probably bring a couple of ***shipped*** batteries," I said those would be "interesting." *Id.* (emphasis added). "Shipped" means parts that are publicly available, were already released, and are non-confidential. Here, specifically, the candidate worked on a released [redacted] and I therefore suggested she bring a "SIP" which goes into the released [redacted].[2] During the candidate's next round of interviews, I made a similar recommendation. *Id.* As she stated in her text messages to me, the candidate did not bring anything to her interviews that was not already public. The reason I ask candidates to bring parts—always shipped, public ones—is that the team at OpenAI's Consumer Hardware division is interdisciplinary and includes a mix of professionals from software, hardware, design, mechanics, and other fields. Therefore, having a candidate explain their work on a released part or product helps the interviewers better understand the candidate's specific field of expertise and evaluate their skills

[2] "SIP" means System in Package.

and experience. From my experience, including my 24 years at Apple, this is all standard practice in job interviews at Apple and elsewhere in the tech industry.

b. <u>Roffman Decl., Ex. M</u>: In this text message exchange from [redacted], I suggested to an OpenAI consumer hardware recruit that he should "prepare" in advance of his exit from Apple, because "Apple will probably walk [him] out" immediately after he gives notice. Roffman Decl., Ex. M. I sent him "the manager's checklist," explaining that "this will give you time to plan" and "help you prepare." I sent these messages and the checklist because I wanted to make sure that the recruit has sufficient time to remove all Apple information from his personal accounts and ensure that he returns all prototypes, parts, and other Apple information before his departure. I often advise new OpenAI Consumer Hardware division hires leaving Apple—including the individual named in Roffman Decl., Ex. M—to proactively take charge and cleanse Apple confidential information. That is necessary because Apple does not take such steps itself, and instead rushes departing employees out immediately while their personal accounts often still contain Apple information. This is what I meant when I told this new hire that the "[redacted]." *Id.* Further, to my understanding, access to the manager's checklist does not provide departing Apple employees with any tools by which they can evade Apple's security protocols, and I did not send it with that intention. On the contrary, my intention was to ***facilitate compliance*** with the checklist despite Apple's policies making such compliance difficult. Further, I did not send that checklist to Chang Liu prior to his departure from Apple and, to my knowledge, nor did anyone else at OpenAI.

c. <u>Roffman Decl., Ex. R</u>: In this text message exchange from [redacted], I advised a candidate from Apple to "[b]ring some parts" they worked on "***in the past***," meaning objects that were already released publicly. Roffman Decl., Ex. R (emphasis added). The candidate responded that he "will check" if he has any "***non-AOU*** units," meaning ***<u>non</u>-Apple-Owned Units***, to bring. *Id.* (emphasis added). I

expressly stated I was referring to parts the candidates worked on "***in the past***," and it is clear from the messages that we both understood I was not referring to any parts the candidate was currently working on or any unreleased or otherwise confidential Apple parts. *Id*. (emphasis added).

26. I further understand that Apple implies, without directly alleging, that I instructed a candidate employed by Apple to take screenshots of his work at Apple in advance of his interview at OpenAI. Mot. at 5; Compl. ¶ 69. I have never instructed any candidate to take screenshots of their work at Apple, nor have I ever reviewed, discussed, or mentioned such screenshots in any interview. To the extent Apple alleges otherwise, it is mistaken.

27. I understand that Apple also alleges that I improperly retained the Apple managers' departure checklist. Compl. ¶ 73. There is nothing confidential in the checklist itself, and it is substantially similar to another checklist Apple filed publicly in this case. *See* Ieyoub Declaration, Ex. I, ECF No. 42-9. I understand that at least one other substantially similar checklist is available on the internet. I further understand that this is a document Apple employees can generally access, and that its purpose is to serve as a resource for departing employees consisting of things they need to know, and actions they need to take, before they leave. The document, to my understanding, does not contain any information about Apple's business or product development. My intention in sharing this document with new hires was not to "help recruits evade detection" as Apple alleges, Mot. at 1, and I do not see how this document could be used to achieve such a goal, especially since Apple intends it to be reviewed by all departing employees. To my recollection, the document consists of customary offboarding steps such as updating contact information, finalizing expenses and time entries, and reminding them to adhere to their confidentiality requirements, without greater detail on Apple's security protocols. Knowing that Apple's "walk out" policy leaves employees with insufficient time to properly offboard, I wanted to assist new hires by ensuring they prepare in advance to complete the steps in the checklist.

28. Next, I understand that Apple alleges that I used an Apple internal project codename for an unannounced product "to elicit still more trade secrets from job candidates[.]" Compl. ¶ 9; *see also* Mot. at 4, 16. Specifically, I understand that Apple alleges, based on text messages between

Chang Liu and Alyssa Peng (filed as Roffman Decl., Ex. E) that a then-current Apple employee "fumbled" when I asked him during an interview "what's the plan" for a "top-secret" Apple project. Compl. ¶ 9; *see also* Mot. at 4-5. Apple's allegations are mistaken and misleading. In fact, I asked the candidate to consider the leadership hole he would be leaving behind at Apple if he left. I was familiar with the project he was working on from my time at Apple, and assumed that this person had a pivotal role in that project. I therefore wanted the candidate to be sure he was willing to step away from his team at Apple to join OpenAI, because I thought his departure could be challenging for his team and this project at Apple. At no point did I solicit, nor did we discuss, any Apple trade secrets or anything relating to the substance of this project. In fact, my focus in the interview was to test the candidate's cultural compatibility and whether his personality would be a fit at OpenAI. I typically only ask technical questions at interviews in which the candidate is a mechanical engineer like me. This candidate was not a mechanical engineer and I therefore did not discuss technical questions with him at the interview.

**VI. <u>Suppliers</u>**

29. I understand that Apple alleges that, before leaving Apple, I forwarded myself information about Apple's suppliers. As I explained above, I did not forward myself any Apple trade secrets—regarding suppliers or otherwise—before leaving Apple or at any time thereafter. I further understand that Apple alleges that "knowledge" about Apple's suppliers was used to cause a supplier to "use one of Apple's proprietary metal finishing processes" for io Products or OpenAI. Mot. at 1. I am not aware of any facts that fit Apple's allegations. I have never used any Apple confidential information at io Products or OpenAI, and I have never implied that any supplier should use Apple confidential information in their work for io Products or OpenAI (or their affiliates). As to the identity of Apple's suppliers, to my knowledge such information is publicly available, including in Apple's own public documents.

30. In fact, my colleagues and I have informed multiple suppliers that io Products and OpenAI do not want the same personnel working on Apple projects to also work on io Products and OpenAI projects. As one example, [redacted]

[redacted]

31. To be clear, I have never used, nor do I intend to use, any Apple confidential information or parts at io Products or OpenAI (or their affiliates), including in product development, supply-chain, hiring, recruiting, or communications. In fact, I have taken great care to prevent any Apple information from tainting my work for io Products and OpenAI projects. I have no need or desire for Apple's purported trade secrets.

32. For example, io Products / OpenAI has developed its own metal finishing techniques and processes that are used for io Products and OpenAI projects, including aluminum components. [redacted] io Products / OpenAI also developed its own target colors (dye techniques) for its projects' aluminum parts. [redacted] Like with the development of our aluminum finish, no confidential Apple processes or techniques were used to develop the unique colors/dyes used for io Products and OpenAI projects.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 30th day of August 2026 in Palo Alto, California.

Tang Yew Tan
Tang Yew Tan (Aug 30, 2026 23:22:15 PDT)

Tang Yew Tan