Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

[Additional counsel listed in signature block of accompanying opposition brief]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC.,

Plaintiff,

vs.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF DAVID WHITE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Hon. Edward J. Davila
Courtroom 4

Hearing Date: Oct. 1, 2026
Hearing Time: 9:00 a.m.

# I. INTRODUCTION

I, David White, declare as follows:

1. I submit this declaration in opposition to the motion of Apple Inc. ("Apple" or "Plaintiff") for a preliminary injunction (the "Motion") on behalf of Chang Liu, Tang Yew Tan, OpenAI Foundation f/k/a OpenAI, Inc., OpenAI Group PBC, and io Products, LLC f/k/a io Products, Inc. (together with OpenAI Foundation and OpenAI Group PBC, "OpenAI," and together with OpenAI, Liu, and Tan, "Defendants") in the matter cited above. The opinions stated below are my own and are based upon my education, training, and professional experience, and upon the materials identified in this declaration.

## A. Qualifications

2. I am a Partner and Managing Director, in the Investigations, Compliance & Privacy practice group, and a senior founding member of the global Data Privacy and Security practice group at AlixPartners LLP ("AlixPartners"), a global management consulting firm headquartered in New York City, New York. I have been a Partner and Managing Director with AlixPartners since 2021. Before this I was a Director with AlixPartners since 2012, and a practicing commercial litigator for many years prior.

3. AlixPartners provides consulting and business advisory services in a variety of computation-intensive fields, including both criminal and civil litigation and government investigations, computer forensics, data privacy and information security, and restructuring and bankruptcy services. Notable recent engagements for me and the firm have included assisting a global social media company operating under a consent agreement with the United States Federal Trade Commission ("FTC") to develop and implement a comprehensive data privacy and security program and to report progress and findings to the FTC, and assisting a global technology company with a comprehensive review of its security controls.

4. I have provided digital forensics consultancy and expert witness services to government agencies, Fortune 100 corporations, and their attorneys for nearly twenty years. I hold a Juris Doctor (JD) from Vermont Law School and a Master of Laws (LL.M.) from the University of London, and earned a BA in Philosophy from Salve Regina University. I have been admitted to

practice in Massachusetts and California since 2001 and 2009, respectively, and I was a member of the Trial Bar of the United States District Court for the Northern District of Illinois. I am also a Certified Information Privacy Professional (CIPP/US and CIPP/E) certified by the International Association of Privacy Professionals ("IAPP").

5. A substantial portion of my practice consists of the design, assessment, and remediation of enterprise data privacy and information security programs. In the FTC consent-agreement engagement described above, my team and I were engaged to develop and implement the mandated privacy program, to conduct global privacy risk assessments across the company's products and business units, to perform product testing against the requirements of that program, and to report our progress and findings to the FTC. In other engagements I have assessed the privacy and data security compliance programs of numerous large global companies against their obligations under various state, federal, and foreign data security laws and regulations, and have worked directly with management to remediate the weaknesses my teams identified. This includes assessing corporate programs against international and domestic standards such as ISO and NIST.

6. I have also been engaged repeatedly to determine what data an enterprise holds, what risks such data pose, and how those risks are best managed and mitigated. This work has included consumer data mapping and technology testing across the enterprises of multiple global social media and technology companies, investigations tracing flows of sensitive and confidential information across corporate systems and third-party recipients, and fact-finding in response to regulatory enquiries as to data-handling and protection practices.

7. I have conducted numerous internal investigations of data security and privacy issues in complex corporate environments, including investigations of information misappropriation, data theft, and the inadvertent disclosure of confidential information. This includes numerous matters involving trade secret theft and inadvertent data disclosure, and I have gained deep experience regarding security controls related to employee access to company information and information systems.

8. I am a long-time member of the High Technology Crime Investigation Association ("HTCIA") and the American Society of Digital Forensics & eDiscovery ("ASDFED"). I am also an Infrastructure Liaison Officer in the InfraGard program of the United States Federal Bureau of Investigation and a member of its Cyber Finance Working Group ("CFWG"), and I previously served on the New England Bank Fraud Task Force of the United States Department of Justice.

9. I also routinely publish and present at professional conferences around the globe on topics relating to computer forensics, data privacy, and information security. For example, I have presented on the threat of economic espionage and the theft of intellectual property to the Bar Association of San Francisco.

10. I have been retained as an expert and have provided testimony in matters before federal and state courts in the United States, including this District, and in proceedings in the United Kingdom. These engagements have addressed use, protection, and security of corporate information; digital forensics and trade secret misappropriation; the operation and configuration of corporate information systems; and the technical aspects of financial fraud and digital assets.

11. A full copy of my CV is found at **Exhibit A**.

**B. <u>Engagement</u>**

12. I have been retained by counsel for Defendants to evaluate Plaintiff's assertions in support of its Motion that concern the design, scope, capability, and operation of the information security controls it implemented to protect the information Plaintiff claims as trade secrets in this action. In particular, I have considered the methodology and opinions set out in the Declaration of James Pooley (the "Pooley Declaration") and, insofar as they describe relevant policies, procedures, and forensic findings, the Declarations of Joy Ieyoub (the "Ieyoub Declaration"), Parin Patel (the "Patel Declaration"), Rafael Dionello (the "Dionello Declaration"), Jackie Hughes (the "Hughes Declaration"), and Daniel Roffman (the "Roffman Declaration").

13. AlixPartners is compensated for my time spent on this matter at an hourly rate of $1,225.00. Research and analysis for this declaration was also performed by AlixPartners personnel under my direction and guidance, and AlixPartners is compensated on an hourly basis for the time

of those professionals. Neither my compensation nor that of AlixPartners is contingent upon the opinions offered or the outcome of this matter.

### C. **Materials Considered**

14. In forming the opinions stated below, I considered the materials cited herein, which are listed in **Exhibit B**.

### D. **Express Limitations**

15. I have not been given access to, and have not examined, the systems and tools described in Apple's Motion or in the supporting declarations. These include Apple's [redacted] repository, its account deprovisioning tools, the iCloud@Apple system, its mobile device management, and its access logs. My opinions are therefore directed at the descriptions of those systems that Apple and its declarants have given. I take those descriptions at face value and address what they do and do not establish about the capability, scope, and operation of the controls at issue. My observations are not findings about how Apple's controls were in fact configured or operated.

16. The opinions stated below are based on the information available to me as of the date of this declaration, which at this stage in the proceedings does not include full discovery or depositions. Should additional documents, testimony, or other information become available, I may adjust or supplement my opinions as appropriate.

## II. **ANALYTICAL FRAMEWORK**

17. I understand the parties dispute whether the measures Apple took satisfy the applicable standard of reasonableness. I express no opinion on any legal question, and nothing in this declaration should be read as addressing such a question. Where the word "reasonable" appears below, I use it as an information security practitioner assessing whether an organization's security controls are suitably designed and operated so as to provide reasonable assurance that the organization's risk management objectives are achieved.

18. I agree with Mr. Pooley that the selection of appropriate security controls is contextual. What is adequate for one organization holding one category of information may be inadequate for another holding different information under different conditions. Pooley Decl. ¶ 17.

No control environment is free of residual risk, and no program, however well-constructed, eliminates all risk. Nothing in the opinions stated below rests on a contrary premise.

19. Mr. Pooley opines that reasonableness "should be evaluated in the context of the size and scope of a company's business." Pooley Decl. ¶ 17. I agree, and to the extent that the Court concludes that Mr. Pooley's view is correct, I note that Apple is one of the world's most valuable companies[1] and alleges that this action implicates what Apple claims are its "most sensitive trade secrets." Mot. at 1. Under Mr. Pooley's standard, then, Apple must be held to the most stringent standard of reasonableness, measured by what one of the world's largest companies should do to protect its supposedly "most sensitive trade secrets."

20. As the Pooley Declaration explains, the selection of security controls is the output of a process that weighs three factors: the risk that confidential information will be exposed inadvertently or without authorization, the value of that information, and the cost, in expenditure and inconvenience, of the precautions that would reduce that risk. Pooley Decl. ¶ 15. In designing and applying information security controls, each organization must weigh and balance these factors to decide which information to secure, the means by which to secure it, and the level of investment necessary to achieve its objectives.

21. The information security measures described in the Pooley Declaration represent Apple's recorded judgment about what its risk environment demanded. *See* Pooley Decl. ¶¶ 28 *et seq.* The measures Apple put in place were promulgated before this dispute arose by the party with the most complete information about the value of its confidential information, the threats to it, and the cost of protecting it.

22. Assessing a control against a documented risk management objective is a two-part exercise. The first part is whether the control is suitably designed to achieve the desired objective. The second is whether the control operated effectively throughout the period under review.

[1] *See, e.g.*, Daniel Howley, *Apple Tops $5 Trillion Market Cap, Only Second Company to Hit the Milestone*, Yahoo! Finance (July 28, 2026), https://finance.yahoo.com/technology/article/apple-tops-5-trillion-market-cap-only-second-company-to-hit-the-milestone-134013795.html.

Recognized approaches to control assessment, including conformity auditing under international standards such as ISO/IEC 27001 and the assessment procedures published by the U.S. National Institute of Standards and Technology ("NIST"), evaluate those questions separately, and evaluate each against the objectives the organization has itself defined and documented.[2] The distinction matters because the protective value of a control derives from its operation rather than from its documentation. A policy that is written but not applied, or an offboarding step that is prescribed but not enforced, confers no protection on sensitive information. Evidence that a measure exists is

---

[2] *See* NIST Special Publication 800-53, Rev. 5, Security and Privacy Controls for Information Systems and Organizations (Sept. 2020, updated Dec. 10, 2020), Control CA-2(d) (requiring the organization to assess controls "to determine the extent to which the controls are implemented correctly, operating as intended, and producing the desired outcome with respect to meeting established security and privacy requirements"); *id.*, CA-2 Discussion ("Organizations conduct assessments on the implemented controls as documented in security and privacy plans."); *see also* NIST Special Publication 800-53A, Rev. 5, Assessing Security and Privacy Controls in Information Systems and Organizations (Jan. 2022) (prescribing the examine, interview, and test assessment methods); ISO/IEC 27001:2022, cl. 9.2 (internal audits are conducted to determine conformity with the organization's objectives for its information security management system); AICPA, Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy (2017, rev. 2022) (stating that "ASEC has developed a set of criteria (trust services criteria) to be used when evaluating the suitability of the design and operating effectiveness of controls relevant to the security, availability, or processing integrity of information").

therefore not evidence that the measure operated.[3] Nor is it evidence that the measure was reasonable under the circumstances.

23. Applied to any particular control, this approach admits several possible findings. One possibility is that the control was appropriately designed to satisfy the risk management objective, and the organization's records show that it was effectively implemented. Another is that the control was appropriately designed, but the records indicate that it was not effectively implemented. A third possibility is that the control as designed was not capable of achieving the risk management objective. Evidence that Apple's practices did not meet its own written objectives requires no judgment on my part about what reasonableness demanded. A fourth possibility is that the available record does not permit an assessment of design or operation. Given the limitations described at paragraphs 15 and 16, *supra*, a number of my observations below are of this character, and I have identified them as such.

24. Where my review of the record suggests a gap between a documented risk management objective and conformity in practice, the weight that gap carries depends on three things. A gap carries more weight where a given security threat was specific and foreseeable rather than generalized, where the value ascribed to the relevant company information is high, and where a precaution not taken was relatively low in cost and effort.

---

[3] Mr. Pooley has stated the same proposition in his published work. Writing about *FMC Technologies, Inc. v. Murphy*, a Texas case in which he testified as an expert in 2021, and in which the jury found that a plaintiff maintaining a suite of written confidentiality policies had nonetheless failed to exercise reasonable security measures, he concluded that "if you create a rules-based framework for trade secret protection, you need to enforce it," and added the corollary that an organization should "only create rules that you reasonably expect the workforce to follow." James Pooley, *When Protecting Everything Means Protecting Nothing*, IPWatchdog (Nov. 28, 2023), https://ipwatchdog.com/2023/11/28/when-protecting-everything-means-protecting-nothing/id=170025/.

## III. METHODOLOGICAL FLAWS OF THE POOLEY DECLARATION

25. The Pooley Declaration suffers from methodological and analytical flaws that limit its value as an assessment of the reasonableness of Apple's information security controls.

26. First, the declaration does not consistently examine whether the controls it describes were in fact capable of achieving Apple's stated risk management objectives. While Mr. Pooley cites the core design principles underlying Apple's information security program and reproduces requirements from internal policy documents, Pooley Decl. ¶¶ 33-36, 44, 60, he does not ask what objective the governing requirement sets for a given control, whether the control as designed was capable of achieving that objective, or what risk remained where it was not. Without these considerations there is no benchmark against which the design adequacy of a control can be assessed, and Mr. Pooley's conclusions about the reasonableness of Apple's measures therefore do not rest on any applied standard.

27. Second, for those controls most directly implicated in the alleged misappropriation, the Pooley Declaration does not analyze whether they were implemented correctly or consistently. The declaration does not consider whether a given control was mandatory or discretionary, whether compliance was verified or enforced, or what happened when the control was not followed. In other words, it does not assess the extent to which Apple monitored and enforced its controls. An inventory of documented measures alone does not establish that those measures offered protection, because the protective value of a control lies in its real-world operation.

28. Third, the Pooley Declaration catalogs a series of information security controls and concludes that in aggregate they represent a "large suite of measures" and a "consistent, thorough, and disciplined approach to risk management." Pooley Decl. ¶ 77. He does not, however, address the information at issue in this dispute or the reasonableness of the measures which were applied, or selectively not applied, to it. Measured across all the types of information Apple holds, its program can appear robust in general terms. But the relevant factual question is whether Apple took reasonable measures to protect the specific information at issue.

## IV. DESIGN AND CONFORMANCE ANALYSIS

29. In the following subsections I examine the various information security measures set out in the Pooley Declaration and other related declarations and pleadings. My assessment of each measure proceeds in three respects. The first is whether the control is designed to achieve Apple's stated risk management objectives. The second is whether Apple's control specifies enforcement and/or verification mechanisms in a manner that makes compliance demonstrable. The third is whether the record shows that the control operated as specified. Each is a judgment within the ordinary competence of an information security practitioner, and I distinguish between them where the distinction affects my conclusions.

30. The Pooley Declaration sets out Apple's core design principles, which state the company's risk management objectives. These include the <u>Principle of Least Privilege</u>, under which "[u]sers and systems must be only granted the minimum level of access and permissions necessary to perform their required functions"; <u>Defense in Depth</u>, under which "[m]ultiple layers of security controls should be implemented to protect confidential data, ensuring that the failure of a single control does not lead to a compromise"; <u>Secure Data Locations</u>, under which "Black and Ultra data must reside in physically and network-secured [Apple Information Security] approved Apple Environments to prevent unauthorized access"; and <u>Need-to-Know Access</u>, under which access is "granted only when essential for job function – based on necessity, not convenience." Pooley Decl. ¶ 60(ii), (iv), (v), (vi) (citing Hughes Decl. Ex. C (Core Design Principles) at 1) ("[Apple Information Security]" alteration in original). These are Apple's stated objectives, and they are the objectives against which the reasonableness of its controls is properly assessed.

31. As stated in a Sedona Conference commentary for which Mr. Pooley served as Co-Editor-In-Chief, "[t]he core inquiry is whether the measures were appropriate against the backdrop of the risk of loss and the perceived value of the information within the context of the specific company."[4]

---

[4] The Sedona Conference, Commentary on the Governance and Management of Trade Secrets, 24 SEDONA CONF. J. 429, 486 (2023).

**A. <u>Cloud Storage Repositories and Access Termination for Departing Employees</u>**

32. Apple asserts that Mr. Liu's unauthorized access to files in a third-party repository is at the heart of its Motion. Mot. at 3 n.1. The controls Apple applied to that repository are therefore central to the question of whether its protective measures were reasonable. Apple's allegations implicate two categories of control. The first is ***access control***: which people and which devices could reach the information Apple says is at issue, and under what conditions. The second is ***deprovisioning***: whether access ended when the authorization that had supported it ended. Apple's controls, as described in its declarations, were deficient in both instances. As explained below, Apple has not identified any technical controls that applied to the repository, and the non-technical measures it does describe were insufficient alone to meet its objectives. Furthermore, Apple appears to have relied on a single control to manage deprovisioning with neither any validation nor redundancy. This is a deficiency in design irrespective of whether the control happened to fail or not.

33. At the outset, the primary repository at issue is not explicitly named in Apple's Motion, nor in any supporting declaration. It is identifiable only from the [redacted] of Exhibit B to the Roffman Declaration. That exhibit is described as showing Mr. Liu's downloads from the repository, [redacted] Mr. Roffman states that between February 8 and April 27, 2026, Mr. Liu "performed over 240 downloads" involving "at least thirty-seven unique Apple files," and the exhibit contains [redacted] Roffman Decl. ¶ 20; *see id.* Ex. B.[5]

[5] At this stage, I have not examined Mr. Roffman's underlying forensic materials or independently validated the assertions in his declaration. Where I refer to the [redacted], I do so as a description of what Apple has put in the record rather than as a finding of my own. [redacted]. I reserve the ability to address those materials should it become necessary.

34. Neither Mr. Pooley nor Mr. Patel describes any of the specific technical access controls that applied to third-party applications generally or to [redacted] specifically. *Cf.* Pooley Decl. ¶ 38; Patel Decl. ¶ 79. The only [redacted]-specific measures in the record describe administrative policies. [redacted] Neither of these is a technical control that offers proactive protection from the wrongful disclosure of the information at hand.

35. Apple's [redacted]. Pooley Decl. Ex. F. Each such step is left to the employee, who is told that "[redacted] *Id.* Nothing indicates that Apple set any default configurations or that it monitored compliance to verify that these steps were taken in any instance. Apple's Core Design Principles state that users must be granted "the minimum level of access and permissions necessary to perform their required functions," and that access is granted "only when essential for job function – based on necessity, not convenience." Pooley Decl. ¶ 60(ii), (vi). Measures like these—which establish no default configuration, place each restriction in the discretion of the individual sharing the file, and are unaccompanied by any described monitoring or verification—do not reasonably achieve Apple's objectives, because whether access is confined to disclosed users depends entirely upon whether the sharing employee elects to so confine it.

36. The [redacted] produced with the Patel Declaration also does not include any technical access controls. Patel Decl. Ex. 39. It states that [redacted]."

But it is not even apparent from the plain text of the document whether this policy applied to [redacted]; neither Mr. Pooley nor Mr. Patel asserts that it did. Patel Decl. ¶ 79; Pooley Decl. ¶ 38. The same

set of [redacted], which is the more likely source of any rules governing a service such as [redacted]. Patel Decl. Ex. 39 (see sidebar). However, this section of the document was not included as a supporting exhibit, Mr. Pooley does not cite it, and I therefore could not consider it.

37. I therefore cannot identify any specific technical access control that Apple applied to the [redacted] environment from these exhibits. Without that context, it is impossible to conclude that Apple had adequate technical access controls in place for the information at issue in this case, and any conclusion to the contrary, including Mr. Pooley's, is not consistent with the information provided by Apple to support its Motion.

38. The record does describe one control that applied to the [redacted] environment and that operated at the time of Mr. Liu's separation: the withdrawal of his access. Yet, as described below, this control not only failed—its failure went undetected for months, Apple has not explained how widespread the failure was, and it appears this control was never sufficiently tested to begin with.

39. As part of its exit procedures, Apple's stated policy is to disable and prohibit further access to third-party cloud repositories. For [redacted] this was implemented through automated scripts that deprovision access on separation. Pooley Decl. ¶¶ 38-39. Mr. Liu left Apple on January 22, 2026. Roffman Decl. ¶ 18. A deprovisioning request was allegedly sent (through unnamed personnel) sometime after Mr. Liu left, but the scripts that purportedly ran in January 2026 did not actually revoke his access to the [redacted] platform. Roffman Decl. ¶ 21.[6] It is not clear whether this was a systemic failure or how many departing Apple employees were similarly not deprovisioned on exit.

---

[6] Apple's account of the failure rests on interviews with an unnamed manager in Apple's Information Systems and Technology team. Roffman Decl. ¶¶ 21-23; Pooley Decl. ¶ 39. That individual has not submitted a declaration, and the record contains no evidence corroborating the account. I accept it for the purpose of the analysis below and note only that the record provides no means of testing its accuracy or completeness.

40. A revocation request does not by itself result in termination of access. Deprovisioning has to address four items: the credential itself; sessions and tokens already issued under it; content already copied to devices or storage the organization does not administer; and entitlements held in systems that do not check the central directory at each access. The Crain Declaration[7] illustrates why the second and third of these require separate treatment: an authentication token issued on an Apple-issued device may persist after the underlying credential is revoked, and may then be carried onto a successor device through routine data migration, without further action by the user. Crain Decl. ¶¶ 16-17. None of them follows automatically from the others, which is why standard, industry-recognized control frameworks specify them separately.[8]

41. Here, on Apple's own account, the failure also fell into the fourth category. Apple revoked Mr. Liu's AppleConnect credential, but failed to withdraw the entitlement until some later unspecified date. Roffman Decl. ¶ 22. What evidently followed was not merely a session or token that outlived a revocation; the entitlement itself was never withdrawn, and Mr. Liu's account remained provisioned to the platform well after his separation. *See* Roffman Decl. ¶¶ 21-22.

42. Deprovisioning assurance requires two distinct validation activities. The first is validation at or before deployment, confirming that the deprovisioning request or script performs as designed. The second is verification at each separation, confirming that access was in fact withdrawn rather than merely requested. The second is the more material of the two, because an automated integration between an identity system and a third-party platform can operate correctly when first deployed and cease to do so afterward for reasons unrelated to the logic of the script—such as a change in how accounts are matched between the two systems. Validation solely at deployment of a general deprovisioning protocol does not detect a later break of that kind; only verification of the outcome at each separation does. Apple's declarations describe neither activity.

---

[7] Declaration of Andrew Crain in Support of Defendants' Opposition to Plaintiff Apple Inc.'s Motion for a Preliminary Injunction dated Aug. 31, 2026 ("Crain Declaration").

[8] See NIST SP 800-53, Rev. 5, controls AC-2 and AC-12; ISO/IEC 27001:2022, cl. 5.11 and 5.18.

43. Verification of the outcome would not have been burdensome. The result of the script is binary: either the account retains entitlement to the platform or it does not. Confirmation thus entails a single query against the platform for departing employees, and Apple had already determined that a subset of those employees warranted heightened exit procedures, namely hardware engineering personnel such as Mr. Liu, who worked on sensitive Apple initiatives [redacted]. *See* Ieyoub Decl. ¶ 15. Apple's declarations do not describe ***any*** regular monitoring of access to Apple data by accounts that were supposed to be deprovisioned.[9] I express no view on whether Apple performed validation or verification that its declarations do not describe. My observation is that the materials Apple submitted in support of its Motion, which form the record before me, do not establish that either occurred, and that the duration of the apparent failure is consistent with the absence of both.

44. I understand Mr. Liu retained access to his [redacted] account from at least February 8 to May 29, 2026. Roffman Decl. ¶ 20; *id.* Ex. B. Nothing in the record attributes Apple's discovery of his continued access to any routine information security processes that would ordinarily surface such a condition, namely testing, monitoring, alerting, periodic recertification of entitlements, or reconciliation against separation records.

45. Simple tools are available to Apple to monitor actual access to such a repository in real time. These tools can alert organizations to activity associated with deprovisioned accounts. There is no information proffered that indicates that any such tools were enabled and routinely monitored. However, it appears that Apple did have the capacity to log suspicious activity; [redacted]. Therefore, the information needed to identify the activity existed contemporaneously and was in Apple's possession. Yet there was

---

[9] *See* NIST Special Publication 800-53, Rev. 5, Controls CA-7 (continuous monitoring), AU-6 (audit record review, analysis, and reporting), and SI-4 (system monitoring); ISO/IEC 27002:2022, cl. 8.15 (logging) and 8.16 (monitoring activities). As to validation of implementation, see the authorities cited at note 2, *supra*, in particular NIST SP 800-53, Rev. 5, Control CA-2.

apparently no process by which Apple reviewed it for at least several months. I further understand that the Apple-issued iMac through which the earliest logged activity would have occurred has been in Apple's possession since March 2026, and that Apple's forensic declarant neither analyzes that device nor mentions it. Crain Decl. ¶¶ 12-14. The device best positioned to show what in fact occurred during the period of the deprovisioning failure has therefore been available to Apple throughout, and the record before me does not reflect what it shows.

46. The failure evidently was also not particular to Mr. Liu. It lay in the scripts Apple seemingly runs on every separation, and Apple had to check whether other similarly situated former employees were affected. Mr. Roffman reports that the defect "may have impacted a limited number of other former Apple employees," and that as of July 16, 2026, Apple "had not identified any other former Apple employees who exploited it as Mr. Liu did." Roffman Decl. ¶ 23. Apple does not say how many were affected, how it reached that determination, or whether the inquiry is complete. Apple's failure to identify the number of Apple employees whose [redacted] access was not deprovisioned on exit, and its failure to explain what specific [redacted] access these departed employees had after their departure or how they used it, is a material omission that has hindered my analysis. I reserve the right to supplement my opinions if and when Apple makes this information available.

47. Apple's own design principles call for Defense in Depth, so that "the failure of a single control does not lead to a compromise." Pooley Decl. ¶ 60(iv). The declarations describe no second layer directed at the deprovisioning failure. In my opinion, reliance upon a single deprovisioning script, without validation that the script actually operated as desired and without any additional controls to alert Apple to a failure or stop unwanted access, does not reasonably achieve the objective Apple's own Defense in Depth principle states—that "the failure of a single control does not lead to a compromise." Pooley Decl. ¶ 60(iv).

48. Finally, Apple states that the central allegations of its case do not concern unauthorized access to information held in iCloud. Mot. at 3 n.1. I nevertheless address iCloud@Apple briefly, since Mr. Pooley relies on it as an example of the measures on which his reasonableness assessment rests. *See* Pooley Decl. ¶ 37. Further, the record indicates that many files stored on [redacted] were initially stored on iCloud. *See* Declaration of Chang Liu in Support of

Defendants' Opposition to Plaintiff Apple Inc.'s Motion for a Preliminary Injunction dated Aug. 31, 2026 ("Liu Declaration") ¶ 10 (stating that upon leaving Apple, employee transferred files from iCloud to [redacted] Declaration of Individual No. 1 in Support of Defendants' Opposition to Plaintiff Apple Inc.'s Motion for a Preliminary Injunction dated Aug. 31, 2026 ("Individual No. 1 Declaration") ¶ 13 (same). The record also indicates that due to Apple's longstanding reliance on iCloud, many employees continued to use personal iCloud (and iMessage) accounts rather than fully converting to [redacted] and Slack after Apple deployed these third-party services. *See* Individual No. 1 Decl. ¶ 14.

49. iCloud@Apple [redacted]. Pooley Decl. Ex. B at 1-2. [redacted]. *Id.* As a result, Apple did not merely tolerate the mixing of work and personal storage; it incentivized and subsidized it. [redacted]—an account that the employee owned before joining Apple and would maintain control over after leaving Apple. *Id.*[10] The record also indicates that Apple only introduced the use of designated "Work" folders relatively recently. Individual No. 1 Decl. ¶ 15 (stating that Apple introduced this system "[a] few years ago"). Before that, "any Apple files saved to employees' personal iCloud accounts were simply intermingled with their personal files." *Id.*

50. Apart from two-factor authentication, Apple's measures for protecting information held in this repository are only advisory instructions to the employee: keep all work files in Apple

---

[10] Compare James Pooley, *'Reasonable Efforts' Require Care and Consistency*, IPWatchdog (June 27, 2022), https://ipwatchdog.com/2022/06/27/reasonable-efforts-require-care-consistency/, discussing *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952 (2d Cir. Mar. 9, 2022), where Mr. Pooley observed that a "basic surrender of control to a third party rendered irrelevant all of the technical measures that had been applied to secure the IT system."

Work folders; manually move into those folders any file saved elsewhere; and, on departure, make sure no Apple data is left outside them. Pooley Decl. ¶ 37 (citing Exs. B-D). Each is based on trust and depends on employee compliance.

51. The declarations describe no technical means for Apple to prevent its confidential work files being saved elsewhere, to detect this when it happens, to verify that such files were later moved, or to confirm at departure that none remained outside of Apple's control. In practice, the control is reduced to reliance on a decision by the person it is meant to govern.

52. There are additional gaps and limitations in the design of iCloud@Apple that created further opportunities for Apple information to be stored outside authorized repositories or to remain accessible to an employee after separation. For example, I understand that even after the rollout of designated "Work" folders, "files created on Apple work computers would save by default to employees' personal iCloud Drive folders rather than to the Apple Work folder"; users "had to manually select the Apple Work folder every time they created a new file"; and "if a user saved a file to their personal iCloud Drive folder, and then shared the file with a colleague, it would get saved to the colleague's personal iCloud Drive folder rather than the Apple Work folder," with the result being that "it was difficult if not impossible to then move that shared file from the colleague into the Apple Work folder." Individual No. 1 Decl. ¶ 15. There were also issues with the replication of shared documents across devices and issues with the deletion of documents after departure. *See also* Pooley Decl. Ex. B at 3 (instructing employees not to "sign in to your linked Apple Account (personal or work-specific) on any device that other people can access because your confidential Apple work files automatically transfer to those devices"); Individual No. 1 Decl. ¶ 19 (discussing "common problem among former Apple employees whereby they would delete Apple work files from their personal iClouds only to find that iCloud had repopulated the messages within

their accounts"). It appears that Apple was aware of the problems associated with using iCloud as a repository for internal information for many years.[11] And the record shows this.

53. Finally, I note that [redacted]. Pooley Decl. Ex. B at 4; Ex. C at 1. [redacted]. Pooley Decl. Ex. F at 4. While the relationship between these two classification systems is not explained, Apple's documentation suggests that it maintains systems subject to tighter access controls for its most sensitive categories of data, yet that those controls simply were not applied in the same ways, if at all, to the [redacted] and iCloud environments.

**B. <u>Disclosure Central and DisclosureBot</u>**

54. As further part of his assessment, Mr. Pooley identifies two internal tools Apple deploys with the intent of preventing confidential information from reaching unauthorized recipients. Disclosure Central holds records of who is "disclosed" (meaning cleared for disclosure) on a project, and DisclosureBot is an interface through which that record can be checked by users of collaboration tools such as email. Pooley Decl. ¶ 35. Mr. Pooley states that employees "can use" DisclosureBot for Mail and "can 'check users and group disclosure directly via [Apple's] Disclosure Central.'" *Id.* (alteration in original) (quoting Patel Decl. Ex. 34).

55. DisclosureBot for Mail appears to operate as a discretionary check, with no indication that its use was mandatory or enforced. Neither the Pooley Declaration nor the policies on which it relies state that either tool could block a transmission through technical means, that either was protected against being bypassed or overridden, or that a message sent without consulting

[11] *See* Aaron Tilley, *How an Apple iCloud Policy Fueled Employee Leaks Ahead of OpenAI Suit*, The Information (Aug. 3, 2026), https://www.theinformation.com/articles/apple-icloud-policy-fueled-employee-leaks-ahead-openai-suit (reporting that Apple introduced the Work folder feature to iCloud in the late 2010s, but that former Apple employees continue to find they retain access to internal Apple files after their departure).

the tool would be flagged, quarantined, or delayed. DisclosureBot for Mail therefore depends entirely on the employee choosing to use it. Such a control cannot prevent a deliberate disclosure to an unauthorized recipient, because the person it is meant to warn is the person who decides whether to consult it.

56. As to conformance, the record does not establish that either tool operated as Apple's requirements direct. Apple's declarations do not state that use of DisclosureBot is recorded, monitored, or reported, that failure to use it is detected, or that Apple verified installation of the DisclosureBot for Mail extension. I also understand that Apple has alleged that employees were able to email work documents to personal email accounts as another means of misappropriating Apple information. Compl. ¶¶ 7, 9. Apple's declarations do not state whether personal email addresses can be, or ever were, listed as cleared recipients in Disclosure Central, and Mr. Pooley does not address the point. On the record before me, Apple has not established that these controls achieved the objective it set for them—that information reach only disclosed recipients.

### C. Physical Security Controls and Prototype Handling Protocols

57. The Pooley Declaration describes Apple's physical security measures at some length, even though Apple does not allege that anyone obtained unauthorized access to a restricted area. Access to buildings where confidential projects are developed is controlled and monitored, and is restricted by floor and by room according to the employee's assigned work. Entry requires pre-approval and the employee's badge. *See* Pooley Decl. ¶ 42; Patel Decl. ¶ 74. Visitors must check in with reception or security, sign a nondisclosure agreement unless pre-approved, and remain escorted by an Apple employee throughout the visit. Pooley Decl. ¶ 43; Patel Decl. ¶ 75. Data storage hosted on Apple-owned servers must sit behind at least two layers of physical security, be reachable only through designated checkpoints, be enclosed by barriers that block both access and line of sight, and be audited regularly, including physical inspections and review of access logs and CCTV footage. Pooley Decl. ¶ 44.

58. The physical security controls Mr. Pooley describes are the strongest component of the program Apple appears to have put in place—but they also illustrate by comparison the degree to which Apple's electronic security controls are significantly lacking. Apple's physical security

controls are mandatory rather than advisory, and they turn on technical entitlements Apple issues and can withdraw. For the [redacted]. Patel Decl. Ex. 27 at 1. Enforcement and verification are each stated in the control itself rather than left to inference.

59. These measures show that Apple has the capability and the operational discipline to build controls that are enforceable and verifiable. Apple knows how to create security controls that are mandatory, knows how to manage entitlements, and knows how to review and surveil activity. Apple appears to do this for physical security. It failed to do this for electronic security.

60. I also note that this shows that Apple adds logging and review as part of a control where it intends the control to be verifiable. *See* Patel Decl. Ex. 27 at 1. Where Apple treats a path as high risk, its controls do not stop at simply instructing employees what to do or not do; they specify technical enforcement and review within the control itself. This was done for ***physical*** security. Inexplicably, it was not done at Apple for ***digital*** security.

61. Moreover, even Apple's physical security measures appear to implement incomplete and asymmetrical protections. The measures described above govern what ***enters*** Apple's facilities. However, they stop there and do not equally apply to what ***leaves*** them. For egress, Apple's controls with regard to recovery of prototypes and company devices again appear functionally dependent on employee trust and compliance.

62. Apple does maintain systems for tracking these items. Prototypes are tracked in a system called iTrack and production units in a system called Enfold; Apple logs serial numbers for such items and retains a record of when each item was returned. Declaration of Tang Yew Tan in Support of Defendants' Opposition to Plaintiff Apple Inc.'s Motion for a Preliminary Injunction dated Aug. 31, 2026 ("Tan Declaration") ¶ 9.[12] In practice, the work of determining which units

---

[12] Apple has not produced any control governing the return of prototypes, [redacted].

were outstanding, locating them, and returning them was performed by the departing employee: Mr. Tan describes that exercise as burdensome, stating that it took him nearly two months, and recalls that Apple may have marked certain prototypes or production units as "lost." Tan Decl. ¶ 9. A record identifying an item as outstanding, without a corresponding obligation on the company to retrieve it or consequences on employees for failing to return it or to keep the tracking systems up to date, is not operating as a functioning control.[13]

[13] I note that when discussing Apple's physical security measures, Mr. Pooley references Apple's allegations that Defendant Tan asked OpenAI recruits about "unreleased" Apple products and told them to bring in parts they worked on in the past. Pooley Decl. ¶ 47; *see* Mot. at 4-5. Apple has not provided details regarding which parts or products were allegedly brought to interviews, which it should be able to at least partially reconstruct by mapping the timeline of employee departures for OpenAI against assets listed in their possession in iTrack or Enfold or through geolocation features. Nor have Apple's declarants explained in their own words what controls applied to such assets or how they operated in practice. There is therefore no basis in the record to assess the design suitability or operation of those controls. Further, based on my experience, questions asking for concrete examples of a hardware engineering candidate's previous work are common during job interviews in the technology industry, including at Apple. *See, e.g.*, *Apple Hardware Engineer Interview*, Blind (Aug. 8, 2017), https://www.teamblind.com/post/apple-hardware-engineer-interview-s81g6ptk (describing Apple interview as involving request that hardware engineering candidate "map out or draw the solutions you designed to solve complex problems" and identify "the specific tools, processes used, and the details (as granular as you can get) of past work"); *Get a Job at Apple: Interview Process and Top Questions*, Exponent, https://www.tryexponent.com/blog/apple-interview-process (last visited Aug. 27, 2026) ("Some

63. Assessed by design, Apple built its most enforceable and most verifiable controls around entry to its facilities, but it did not extend that same technical enforcement and review to the recovery of its prototypes. Assessed by conformance, recovery depended upon the diligence of the departing employee rather than upon Apple's tracking systems, with the result that prototypes remained outside Apple's possession with no apparent effort by Apple to recover them and no apparent consequence for their non-return.

### D. Contracts, Training, Designation, and Codenames

64. The Pooley Declaration describes the contractual and educational measures Apple incorporates into its information security program. These include the Intellectual Property Agreement each employee signs before starting, the annual Business Conduct Policy and associated training, and the secrecy training sessions run by Apple's New Product Security team. Pooley Decl. ¶¶ 48-58.

65. Training is a necessary element of an information security program, but it is not sufficient on its own. Its effectiveness depends on employees choosing to apply it in their daily work. Under the weighing described at paragraph 20, *supra*, the greater the value of the information and the greater the risk to it, the less a control that depends solely upon the discretion of the person it is intended to govern can be relied upon to achieve the objective set for it.

66. Apple's Motion and the Pooley Declaration also describe Apple's use of project code names in product development as a security control, and treat the code names themselves as confidential information. Mot. at 4; Pooley Decl. ¶ 56.

67. Code names are not, however, a form of access control. A code name is simply a mask that obscures underlying information from a person who encounters it. A code name is designed to be used openly in communication. If an outsider intercepts the code name, they can see and say the word, but they have no idea what the actual project comprises. A code name does not determine who can reach the underlying information, and it confers no protection once the

---

[Project Manager] interviewees have been asked to give a 'deep dive' presentation about past projects they have completed in other roles.").

underlying information is in a person's hands. Its protective value therefore depends upon the compartmentation surrounding the underlying information rather than upon the code name itself. Where a code name operates as a substitute for compartmentation rather than as a supplement to it, the result is a designation that signals secrecy without actually conferring it.

68. The knowledge of a codename is also not the same as knowledge of a secret. A simple internet search for the code names of unreleased Apple products will surface a long list of these. That is because Apple's project code names and internal device identifiers routinely appear in material Apple itself distributes to the public. The technology press frequently examines releases of updated versions of Apple's operating systems for references to unannounced products. In August 2026, for example, the release version of macOS Tahoe 26.7 was reported to contain references to unreleased home devices, iPhones, iPads, AirPods, and Macs; some of the code names had appeared in earlier software releases and carried new feature flags, while others had not been

seen before.[14] This is not a recent development.[15] A designation that is recovered from a company's own publicly distributed software and published to a general audience, year after year, is not in my opinion functioning as a confidentiality control. A code name may still serve internal purposes, including compartmenting discussion among employees who do not need to know a project's subject matter. But on this record the code names themselves were not closely held, and knowledge of a code name therefore does not establish knowledge of any specific confidential information.

**E. <u>Separation and Offboarding</u>**

69. The Pooley and Ieyoub Declarations describe Apple's separation procedures. A departing employee is instructed to return Apple-issued devices, badges, and other Apple-owned equipment, to remove Apple data from personal devices, and to sign a Confidentiality Reminder

---

[14] *See* Juli Clover, *macOS Tahoe 26.7 Is Full of References to Unreleased Apple Products*, MacRumors (Aug. 17, 2026), https://www.macrumors.com/2026/08/17/macos-26-7-unreleased-apple-devices/ (publicly reporting on codenames associated with unreleased versions of Apple products, including multiple unreleased iPhone models, including "iPhone Air 2 (v62)," "iPhone 18 Pro (v63)," "iPhone 18 Pro Max (V64)," "iPhone 18 (V67)," and "iPhone Ultra (V68)"). A similar article in December 2025 also reported on Apple's codenames for unreleased devices. *See* Juli Clover, *Apple Leak Confirms Work on Foldable iPhone, AirTag 2, and Dozens More Devices*, MacRumors (Dec. 15, 2025), https://www.macrumors.com/2025/12/15/apple-leak-unreleased-devices-codenames/ (publicly reporting on codenames for unreleased versions of Apple products, including multiple unreleased iPhone models such as "iPhone 17e - V159, iPhone Air 2 - V62 (software predates Apple's decision to delay the launch), iPhone 18 Pro - V63, iPhone 18 Pro Max - V64, Foldable iPhone - V68").

[15] *See* Arnold Kim, *Next Generation iPhone Model Revealed in Firmware*, MacRumors (Jan. 28, 2009), https://www.macrumors.com/2009/01/28/next-generation-iphone-model-revealed-in-firmware/.

acknowledging that the obligations of the Intellectual Property Agreement continue after employment ends. Pooley Decl. ¶ 64; Ieyoub Decl. ¶ 14. [redacted] receive [redacted] and departing employees a "Checklist for Employees Leaving Apple." Ieyoub Decl. ¶ 14; *id.* Exs. H, I.[16] The People Business Partner team separately conducts exit interviews, which Ms. Ieyoub describes as directed at obtaining "insight into reasons for attrition." *Id.* ¶ 16.[17] Apple describes these procedures as "a critical element of our overall strategy for protecting our trade secrets." Pooley Decl. ¶ 65 (quoting Ieyoub Decl. Ex. J at 2).

70. The employee checklist that appears in Exhibit I to the Ieyoub Declaration is a current version of a document Apple has revised over time. I have reviewed an earlier version from 2020 which appears in the public record of another proceeding involving Apple (the "2020

---

[16] In my opinion, there is nothing substantive in the manager's checklist—which was filed under seal—that does not appear in the checklist for employees. Both enumerate standard offboarding tasks, for example, ensuring the departing employee has submitted their resignation in the appropriate system, verifying whether the departing employee is subject to a legal hold, reporting and approving vacation time, returning Apple-owned property, and the like, and both discuss confidentiality reminders. *Compare* Ieyoub Decl. Ex. H, *with id.* Ex. I.

[17] Compare James Pooley*, Lessons from the Levandowski Case: Reimagining the Exit Interview as Risk Management*, IPWatchdog (Oct. 30, 2022), https://ipwatchdog.com/2022/10/30/lessons-levandowski-case-reimagining-exit-interview-risk-management/, where Mr. Pooley has noted that exit interviews are "the company's last clear chance to both assess the risk represented by the employee's leaving and to clarify expectations about how they should behave to protect the sensitive information they've been exposed to" and that "[o]ne way to [dig deeper] is a forensic examination of the employee's computer and recent history of system usage, including – ahem – unusual or excessive downloading of files."

Checklist").[18] The two versions are organized the same way and in places contain identical language, which permits a comparison of individual instructions.

71. Several of the revisions bear on the repositories discussed in Section IV.A, *supra*. The 2020 Checklist contained no direction to sign out of iCloud on devices being returned to Apple, and no direction to confirm that no Apple corporate data remained outside the designated Apple Work folders; the version in Exhibit I adds both. *Compare* 2020 Checklist, *with* Ieyoub Decl. Ex. I at 2. These revisions indicate that Apple had identified the condition described in Section IV.A, *supra*—that Apple work product was accumulating in storage Apple did not fully administer, and persisted there after an employee left. Apple's response to that condition was to add further instructions of the same character as those already in place: each is addressed to the departing employee, each depends on that employee electing to comply, and none is accompanied by any means for Apple to determine whether it was carried out. The revisions therefore did not change the nature or degree of control Apple could exercise to ensure the return of its internal files, which is the deficiency identified in Section IV.A, *supra*, rather than a remedy for it.[19]

72. Apple's declarations also describe [redacted]. Ms. Ieyoub states that [redacted] and that the enhanced procedures were provided to [redacted]

[18] Checklist for Employees Leaving Apple, reproduced in a memorandum concerning Apple's employee handbook and confidentiality policies submitted in proceedings before the National Labor Relations Board, https://web.archive.org/web/20230316202111/https://gjovik.co/wp-content/uploads/2023/02/gjovik-apple-nlrb-handbook-memo.pdf (archived Mar. 16, 2023).

[19] Apple also filed another version of the checklist for departing members of the same team as Mr. Liu. The controls in that version are likewise limited to employee attestation that they have returned company files in a variety of locations and media, including iCloud. *See Apple Inc. v. Rivos, Inc.*, No. 5:22-cv-02637-EJD (N.D. Cal.), ECF Nos. 24-3 (Ex. C), 24-4 (Ex. D) (filed May 20, 2022).

[redacted] Ieyoub Decl. ¶ 15. Under those procedures Apple's security, human resources, and business teams "work together to swiftly provide the departing employee with a 'Confidentiality Reminder' for signature," a link to book an exit interview with a Global Security team, and directions for returning Apple-issued devices. *Id.* Apple states that [redacted] *Id.*

73. Assessed by design, many of the offboarding steps described above are trust-based instructions addressed to the departing employee. The employee is asked to return devices, to remove Apple data from personal devices, to sign the Confidentiality Reminder, and to book the Global Security exit interview. Apple's declarations describe no verification or enforcement counterpart to any of them. They do not describe confirmation that access was in fact revoked rather than requested to be revoked; confirmation that Apple material was in fact removed from personal devices or personal accounts; any forensic or technical examination of a departing employee's devices or accounts; or any escalation triggered by the non-completion of a step.

74. Here Apple's pleadings demonstrate the insufficiency of the [redacted] exit protocol. Ms. Ieyoub states that Mr. Liu gave notice on January 22, 2026, and that he was exited that same day. Ieyoub Decl. ¶¶ 22-23. She further states that as part of his one-day exit, his manager walked him through the exit checklist, and at some point in the day Apple personnel sent him written requests to sign the Confidentiality Reminder, schedule the Global Security exit interview, and return his Apple-issued devices. Ieyoub Decl. ¶ 22. She states that he "did not respond to the Apple Security Group's email and [S]lack message regarding exit procedures, failed to sign Apple's Confidentiality Reminder, failed to schedule a Global Security exit interview, and was otherwise unresponsive to Apple's departure-related communications." *Id.* She also states that he exited Apple the same day and started at OpenAI relatively soon thereafter. *Id.* ¶ 23. Thus, it appears that Apple knew, on the day of Mr. Liu's departure, that Mr. Liu was leaving [redacted]

[redacted]. Yet, Apple's declarations describe no escalation or asset-recovery step taken in response.

75. Indeed, Apple's efforts at asset recovery appear to have been lacking. Mr. Liu states that the Apple-issued iMac he had used to work from home was not collected until March 2026—roughly two months later—and it was returned informally, through another Apple employee, rather than through any recovery process. Liu Decl. ¶ 18. Apple's own asset records did not reflect that condition: I understand that the iMac was reassigned in Apple's tracking system from Mr. Liu to another Apple employee as of his resignation date, while the device in fact remained in Mr. Liu's possession for approximately seven more weeks. Crain Decl. ¶ 11. An asset record that reports a device as recovered when it has not been does not verify the outcome it purports to track, which is the same deficiency identified in Section IV.A, *supra*. Mr. Liu likewise recounts that he discovered an Apple-issued iPhone 11 in his home, which no one from Apple had ever inquired about before or after his departure. It was returned only after his counsel disclosed its existence to Apple's counsel in this litigation. Liu Decl. ¶ 18.

76. It thus appears that Apple's enhanced exit protocol is not operating as an actual control. Apple designed the enhanced protocol [redacted]. Ieyoub Decl. ¶ 15. On the facts Apple's declarations recite, the protocol did not reasonably achieve the objective Apple set for it—rather than take the time required to conduct offboarding steps prior to exit, Apple's process put the exit first, and then did not follow up on steps that could not be completed in that compressed offboarding timeframe.

77. The more fundamental issue is that two of Apple's design choices worked directly against each other. The first is the [redacted]. Ieyoub Decl. ¶ 15. The second is that recovery of Apple material depends on the departing employee's cooperation returning equipment and removing Apple data from personal devices and accounts. Ieyoub Decl. ¶ 14. A [redacted] is coherent where the work product sits in repositories Apple administers, because ending the employee's access then separates the person from the data. Where the material sits ***outside*** Apple's administration—

as it did for iCloud, for physical devices, and potentially even for [redacted] access that Apple failed to decommission—the same act severs Apple's relationship with the only person able to enforce its controls, while leaving the material where Apple cannot reach it. Indeed, it appears to me that under the best of circumstances it would be difficult, if not impossible, to complete the items on either offboarding checklist in a matter of hours when Apple invoked its [redacted] procedures. Ieyoub Decl. ¶ 15. Speed of cutoff and completeness of recovery are thus traded against one another, and Apple's declarations do not indicate that the trade was recognized, still less that it was reconciled in a way reasonable to protect the supposedly valuable information at issue.

78. Apple's Checklist for Employees Leaving Apple also contains a requirement that itself creates a critical security weakness. A bullet labeled "Passwords" instructs employees to aggregate plaintext credentials, including privileged ones, into a document in the third-party repository at issue in this case. Ieyoub Decl. Ex. I at 2. That is contrary to even the most basic information security standards,[20] even for an unsophisticated company. Apple offered no secure vault, encrypted password manager, or restriction on sharing privileged credentials. Neither this document nor [redacted] instructs the invalidation of credentials after handover. The process simply transfers credential knowledge without extinguishing the departing employee's copy of it. Apple's documented exit process therefore institutionalizes exactly the post-departure credential-validity condition at issue here.

79. The instruction in Exhibit I is also not the original design of this control. The 2020 Checklist simply directed departing employees to "[p]rovide your manager with access to your work systems (such as system administrator, screen savers, and file servers) and other applicable systems used," without specifically directing the manner. Exhibit I therefore reflects a documented regression, meaning a revision to an existing control that leaves the organization less protected than the version it replaced.

---

[20] *See* NIST Special Publication 800-53, Rev. 5, Control IA-5 (authenticator management) (requiring that authenticator content be protected from unauthorized disclosure and modification); ISO/IEC 27001:2022, cl. 5.17 (authentication information).

80. Finally, I understand that Apple accuses Mr. Tan of sending the sealed checklist to Apple employees he was recruiting to join OpenAI, allegedly in an effort to help them evade Apple security procedures. *See* Mot. at 5; Roffman Decl. ¶ 14 & Exs. M, N (referencing same checklist). As noted above, substantially similar versions of the checklist were already available in the public domain by 2023, when the 2020 Checklist was archived. Furthermore, in my opinion, there is nothing in the checklists that would assist a person intending to evade Apple security procedures. In fact, given the low likelihood that the checklist can be completed in a matter of hours, it is probable that the recipient of such a checklist would be more, not less, likely to successfully complete a departure that actually complies with Apple's stated policies.

**F. <u>Apple's Suppliers</u>**

81. Mr. Pooley's declaration also discusses Apple's agreements with its suppliers, particularly its agreements with [redacted]. Pooley Decl. ¶¶ 67-76. Mr. Pooley appears to conclude that these agreements constitute reasonable measures to protect the alleged trade secrets that were at issue when, according to Apple, [redacted] improperly performed a purportedly proprietary Apple metal-finishing process called "[redacted]" for OpenAI. *See id.*; Mot. at 5-6. Apple does not explain the circumstances surrounding the supposed performance of the [redacted] process for OpenAI, other than to say [redacted]'s personnel simply "were led to believe they had permission to do this." Dionello Decl. ¶ 39. Yet it is unclear from the record how this belief came about. Apple's declarations do not describe what [redacted] personnel were told, by whom, or when, and do not identify any measure directed at preventing a supplier's personnel from forming such a belief over the course of a [redacted]. The record therefore does not permit me to assess whether the measures Apple applied to that risk were suitably designed or operated as intended.

82. In any case, it is unclear whether Apple's [redacted] even encompasses the alleged trade secrets in this case. *See* Dionello Decl. Ex. A. The bare fact of a confidentiality agreement is insufficient to establish reasonable measures; what matters is the details of any such agreement.

83. Mr. Pooley states that the confidentiality agreement applies to "[redacted]" Pooley Decl. ¶ 68. This list does not seem to include the performance of services where no methodology or tooling is disclosed to the recipient.

84. [redacted]; *see also id.* ¶ 9 (stating that [redacted]); Dionello Decl. ¶ 8 (stating that Apple began working with [redacted] in [redacted]).[21] The clause runs from the date of disclosure to the recipient rather than

---

[21] [redacted] Mr. Dionello claims that "[t]he requirements outlined in the [redacted] are substantively the same as the requirements outlined in

from the date a specification was authored, and neither Apple nor its declarants identify when any of this material was disclosed to [redacted]. It is therefore unclear whether the confidentiality agreement—the measure Mr. Pooley relies upon to establish reasonableness—applies to the disclosure alleged here at all.

85. [redacted] *See* Pooley Decl. ¶ 21 ("[A] company's decision not to endure the cost of certain security measures can sometimes be taken as a reflection of its view that the relevant information is not sufficiently important or valuable, or that the risk it faces is relatively low."). The ten-year limitation recognizes the common principle in information security that the value of information, along with the associated harm of disclosure, diminishes over time.

[redacted] Moreover, Mr. Pooley points to [redacted] with Apple as additional measures. Pooley Decl. ¶ 68. But Mr. Pooley does not say whether Apple has ever [redacted]

[redacted] More fundamentally, Apple reserved to itself the means of verifying [redacted]'s compliance. Its [redacted] with [redacted] grants Apple rights [redacted]. *See* Dionello Decl. Ex. C § 12.3. Neither Apple's Motion nor its

---

the [redacted] provided to [redacted]." *Id.* ¶ 31. But no documentation or other evidence is offered to support this, and I am left only to assume that the substance of a 2026 policy applied prior to 2025.

declarations state that Apple ever exercised those rights, conducted [redacted], or otherwise verified that the contractual protections Mr. Pooley cites were operating as designed. As set forth at paragraph 22, *supra*, evidence that a measure exists is not evidence that the measure operated. Where an organization identifies a risk significant enough to warrant contractual controls and audit rights, and then does not use the verification mechanism it built, the record does not establish that the control achieved its objective.

[redacted]

[redacted]. *See* Section IV.A, *supra*. [redacted]

[redacted]

## V. CONCLUSION

90. Measured across the full range of information Apple holds, the information security program described in the Pooley Declaration includes many capable controls, and I do not suggest otherwise. My opinions concern the controls Apple applied to the material identified in [redacted] the Roffman Declaration and to the repositories in which that material resided. As to those controls, and on the record presently available to me:

- Apple has not identified any technical access control applied to the [redacted] environment. The measures it does describe are administrative and discretionary, with no described default configuration, monitoring, or verification. I am therefore unable to conclude that access to that repository was confined in a manner that achieves the objectives stated in Apple's Least Privilege and Need-to-Know Access principles.

- The single control Apple describes as having operated at separation—withdrawal of access—was neither validated nor accompanied by any compensating layer, and it did not operate as designed. On Apple's account of the activity recorded in its logs, its failure persisted undetected for several months. A control of that design does not reasonably achieve the objective stated in Apple's Defense in Depth principle.

- The disclosure-checking, training, contractual, code name, and offboarding measures Apple describes depend upon discretion by the individual each is intended to govern, and Apple's declarations do not establish that any of them was monitored, verified, or enforced. As Apple's stated objectives were that information reach only disclosed recipients and that Apple material be removed at separation, Apple's measures do not reasonably achieve those objectives.

- Where Apple assigned high risk to a particular path—such as physical access to secure data storage areas—its requirements specified technical enforcement and periodic review within the control itself. Apple's controls did not specify comparable enforcement or review for the digital repositories in which the material at issue was stored, shared, and reached after separation.

- Apple's supplier measures are directed at categories of information and conduct that Apple has not shown to encompass the performance of the [redacted] process for a third party, and Apple has not established that the [redacted] as to the material at issue when the alleged conduct occurred. Apple describes no instance in which it invoked the [redacted], and the facility and digital requirements Apple imposes on suppliers do not address the conduct alleged. I am therefore unable to conclude that the supplier measures Apple describes reasonably achieve the objective of preventing the disclosure or use at issue here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 31st day of August, 2026, in Los Angeles, California.

By David J. White
David White