Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC.,

Plaintiff,

vs.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF Y. LAWRENCE YAO, PH.D.**

Hon. Edward J. Davila
Courtroom 4

Hearing Date: Oct. 1, 2026
Hearing Time: 9:00 a.m.

## I. INTRODUCTION

I, Dr. Y. Lawrence Yao, declare as follows:

1. I am a Professor Emeritus of Mechanical Engineering at Columbia University. My business address is 220 S. W. Mudd, 500 West 120th Street, Mail Code: 4703, New York, NY 10027. This declaration ("**Declaration**") summarizes my current opinions, which are subject to change depending on ongoing discovery and any additional information received.

2. At the request of the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn Emanuel**") as counsel for Defendants OpenAI Foundation f/k/a OpenAI Inc. and OpenAI Group PBC (together "**OpenAI**"), io Products, LLC f/k/a io Products, Inc. ("**io**"), and Tang Yew Tan ("**Defendants**") in the above-captioned litigation ("**Litigation**"), I hereby submit this Declaration in support of Defendants' Opposition Brief to Plaintiff's Motion for Preliminary Injunction.

3. I am being compensated at my usual and customary rate of $800 per hour for the preparation of this declaration. In preparing this declaration, I received support from Keystone Strategy, a consulting firm, working under my direction and guidance. Neither I nor Keystone Strategy has any financial interest in, or affiliation with, either the Defendants or Plaintiff in this matter, and our compensation is completely independent of the outcome of this litigation.

## II. BACKGROUND AND EXPERTISE

4. My *curriculum vitae*, which is attached hereto as **Exhibit A**, provides a description of my professional experience, including my academic and employment history, publications, awards, patents, and more. The following is a brief summary of my relevant qualifications and professional experience.

5. I joined Columbia University in the Department of Mechanical Engineering in 1994. For the next 30 years, I held various academic positions, including serving as Chair of the department from 2005-2011. For 5 years before joining Columbia University, I was a lecturer at the University of New South Wales in Sydney, Australia, in the School of Mechanical and Manufacturing Engineering.

6. I served as the Director of the Advanced Manufacturing Laboratory at Columbia University from 1994 until retirement in 2024. My research focused on the processing and

characterization of a variety of industrial materials. I have worked extensively with aluminum alloys, titanium, stainless steels, other advanced alloys, polymers, and various amorphous materials. I have researched and developed processes for material surface treatment and modification (these include texturing, scribing, and hardening), material removal, shaping, and surface finish, as well as advanced techniques for processing materials, including thermal, energy-beam (Laser), chemical, and electrochemical modifications. I have taught undergraduate and graduate-level courses on materials and manufacturing processes for many years, covering various surface treatments and finishes, including aluminum anodizing. Several of my PhD students have dedicated research in the manufacturing of aluminum alloys. I have also designed manufacturing systems for processing materials, with a focus on automation and robotics.

7. In addition to material processing and manufacturing, my research also focused on materials characterization techniques and their development. Working at Columbia's Shared Material Characterization Laboratory, I applied several advanced techniques to understand the physical and chemical properties of materials. These include, for example, material surface topology mapping via atomic force microscopy, material composition, and microstructure analysis using techniques such as energy dispersive X-ray spectroscopy and X-ray diffraction, surface oxide analysis via X-ray photoelectron spectroscopy, and material finish analysis using optical techniques.

8. My research activities were continuously funded by the National Science Foundation (NSF) during the entire period. I also received research funding from other government sources, including the National Institute of Standards and Technology (NIST), and from industrial sources, such as GE Global Research.

9. I have made meaningful impacts and was well regarded in the manufacturing research communities. I held many leadership positions, including serving as past President of the North American Manufacturing Research Institute of the Society of Manufacturing Engineers and as past Chair of the Manufacturing Engineering Division of the American Society of Mechanical Engineers (ASME). I also received many prestigious awards, including the Blackall Award and the Milton Shaw Manufacturing Research Medal from ASME. I also had the honor of serving as Editor-in-Chief of the Journal of Manufacturing Science and Engineering of ASME from 2012 to 2022.

10. I received my bachelor's degree from Shanghai Jiao Tong University, China, and MS and PhD from the University of Wisconsin-Madison, all in mechanical engineering with a concentration in manufacturing. In addition to the documents cited herein, a list of materials I considered in connection with rendering my opinion is attached as **Exhibit B**.

## III. SUMMARY OF EXPECTED TESTIMONY

11. I have been asked by counsel for Defendants to offer expert opinions responding to the Declaration of Paul Hatch ("**Hatch Decl.**"), dated August 3, 2026; Sections I and II of the Declaration of Jackie Hughes ("**Hughes Decl.**"), dated August 3, 2026; and Plaintiff's Motion for Preliminary Injunction ("**Plaintiff's PI Motion**"), dated August 3, 2026. To the extent I do not address certain statements in the Hatch Declaration, the Hughes Declaration, or Plaintiff's PI Motion, it should not be assumed that I agree with such statements.

12. **Opinion #1: Much of the information that Mr. Hatch identifies as Apple trade secrets concerning its aluminum finishing processes is publicly known or readily ascertainable through proper means.** Apple has publicly disclosed significant information concerning the materials, techniques, and processes it uses to finish aluminum components, and additional information is available through industry literature and other public sources. Mr. Hatch does not appear to have adequately considered these disclosures in determining whether the information he identifies is actually secret.

13. **Opinion #2: The [redacted] Specifications largely describe aluminum-finishing materials, techniques, and process parameters that are publicly known, conventional, or substantially similar to established industry practices.** Many of the materials and process steps identified in these specifications are disclosed in public literature, including literature concerning Type II anodizing, or in Apple's own public materials. The specifications also [redacted].

14. **Opinion #3: Significant information concerning Apple's aluminum finishing processes can be determined, narrowed, or inferred through the reverse engineering of**

**finished products.** Established analytical techniques can reveal information concerning an aluminum product's alloy composition, surface characteristics, anodized layer, gloss, and other properties relevant to determining how the product was manufactured. Publicly available information concerning Apple's materials and manufacturing processes would provide additional guidance to a person or manufacturer attempting to reproduce or understand those processes.

15. **Opinion #4: Mr. Hatch has not established that Apple's alleged metal-finishing process trade secrets derive independent economic value from being kept secret.** Much of the value identified by Mr. Hatch is attributable to the well-known benefits of anodized aluminum generally. Mr. Hatch does not establish that any competitive advantage derives specifically from information Apple has actually maintained as secret, including because he concedes multiple aluminum finishes processes can produce the same result.

16. **Opinion #5: The evidence relied upon by Mr. Hatch does not establish that OpenAI or io Products used or received Apple's alleged metal-finishing trade secrets.** The evidence on which Mr. Hatch relies concerning the alleged use of an [redacted] process consists of attenuated accounts and does not establish that the [redacted], or the allegedly secret parameters contained in those specifications, were used. Moreover, Apple's use of [redacted]—the feature that Mr. Hatch and Ms. Hughes identify as [redacted]—has been publicly disclosed.

17. **Opinion #6: The opinions offered by Ms. Hughes do not alter my conclusions concerning the alleged secrecy, reverse engineering, or economic value of Apple's metal-finishing processes.** Although Ms. Hughes has substantial experience in metal finishing, her declaration does not adequately account for public disclosures concerning Apple's processes or for information that can be obtained through analysis of finished products. Her opinions therefore do not change my conclusions regarding the opinions offered by Mr. Hatch.

## IV. RESPONSES TO THE HATCH DECLARATION

### A. Response to "Technical Background"

18. In paragraphs 21 through 38 of his declaration, Mr. Hatch provides an overview of several aluminum finishing processes and techniques. I agree with Mr. Hatch's apparent conclusion

that the techniques described in these paragraphs are well-known and generally understood in the field.

19. Aluminum finishing is essential for many aluminum-based components because aluminum is a "soft" metal. Raw aluminum wears quickly when placed in an everyday environment and will quickly lose its color, corrode, dent, or stain in response to normal patterns of use. Because of this, it is typically necessary to enhance the durability of aluminum's exterior layer before using it in an outward-facing surface of a consumer product. This process of improving the exterior layer of the aluminum is generally known as "aluminum finishing."

20. Mr. Hatch extensively discusses one aluminum finishing technique known as "anodizing." Anodizing has been well-known for decades. It was first used at commercial scale around the 1920s, and achieved widespread popularity from at least the years following World War II, including notably as an architectural or construction material.[1]

21. Anodizing is an obvious aluminum finishing technique to consider when attempting to give aluminum a "natural metal" finish or when using aluminum for consumer products. Anodizing works by hardening the natural protective layer created when aluminum is exposed to oxygen, forming an enhanced protective layer that effectively becomes part of the metal itself. Paragraph 26 of the Hatch Declaration sets out well-known aspects of the anodizing process.

22. Because anodizing alters the surface structure of the metal itself, anodizing typically produces a "metallic" finish, though dyes can be added during the process to alter the color of the aluminum. These dyes are absorbed into the aluminum itself, meaning that even if the aluminum is scratched, it will typically retain its color (so long as the scratch does not reach through to the aluminum core underneath).

23. This aspect of anodizing can be contrasted with other aluminum finishing techniques, such as coating the aluminum with a layer made of a non-aluminum material that essentially sits on

[1] Hatch Decl., Ex. D, J.M. Runge, *The Metallurgy of Anodizing Aluminum, Connecting Science to Practice* (Springer 2018) at 41-43, 99. Note: all citations to this source adopt the pagination of the original book.

top of the aluminum core.[2] For example, automobiles often use coated aluminum on their body panels: these coatings are specifically designed to protect the aluminum from environmental hazards (e.g., driving quickly through the rain, dust, salt, etc.). An issue with coating techniques is that the coating can scratch off if, for example, the coated aluminum scrapes against another hard object. Therefore, coatings are known to be less suitable if the cosmetic appearance of the aluminum is a substantial concern and a device will be frequently scuffed, dropped, or scratched as part of its everyday use.

24. Anodized aluminum has been widely used in the consumer electronics space and, indeed, was well understood in this area long before the original iPhone. As early as the 1950s, companies like GE were producing transistor radios with anodized aluminum exterior finishes.[3] Somewhat more recently, the Motorola RAZR V3, first released in 2004, three years before the original iPhone, notably had an anodized aluminum shell.[4] This model was the most popular phone on the U.S. market for much of 2005 through 2008, until eventually being overtaken by the iPhone 3G (which itself had a case that was largely composed of plastic).[5]

---

[2] Though beyond the scope of this declaration, it should be noted that anodizing and coating are not necessarily mutually exclusive processes; a coating can be applied to anodized aluminum.

[3] Robert Davidson, *1957 GE P-715/716*, TRANSISTOR RADIOS AROUND THE WORLD, https://www.abetterpage.com/wt/us/GE715.html; radioOantiks, *1957 General Electric P716 First Rechargeable Transistor Radio*, at 0:43 (YouTube, Aug. 10, 2018) https://www.youtube.com/watch?v=sWH7qEbtupc.

[4] Walter S. Mossberg, *Handsome New Phone By Motorola Is Skinny, Sleek - - and Expensive*, THE WALL STREET JOURNAL (Nov. 5, 2004), https://www.wsj.com/articles/SB109952133305764095; *Motorola RAZR V3 – Full Phone Specifications*, GSM ARENA, https://www.gsmarena.com/motorola_razr_v3-853.php.

[5] Marguerite Reardon, *iPhone 3G crowned most popular phone in U.S.*, CNET (Nov. 10, 2008), https://www.cnet.com/tech/mobile/iphone-3g-crowned-most-popular-phone-in-u-s/; Joshua

25. Because of the length of time that anodizing has been known, anodizing has, to a significant extent, become commoditized. There are several well-known ways of producing anodized aluminum for various different commercial applications. For example, the United States Military's MIL-A-8625F specification, originally released in its current form on September 10, 1993, discloses six different types of anodized coatings for aluminum and aluminum alloys with non-architectural applications.[6] Though the specification is fairly high level and was originally intended mostly for aerospace use, it has become something of a baseline that is used in both industry and academia, and various process parameters and best practices have developed based on the classes set forth in this specification.[7]

26. In paragraphs 29-38, Mr. Hatch describes a number of steps that can be taken while manufacturing anodized aluminum. I agree with his general description of these steps, such as blasting, chemical preparation, chemical polishing, anodizing, coloring, and sealing, and agree with his apparent conclusion that these are well-known, somewhat fundamental steps in producing anodized aluminum. As described in more detail in the next section, I disagree that Mr. Hatch has any clear basis to conclude that "companies typically keep" certain parameters relating to each of these steps a secret.

### B. <u>Response to "Apple's Metal Finishing Processes Are Trade Secrets" - General</u>

---

Topolsky, *iPhone 3G overtakes the RAZR as best-selling domestic handset*, ENGADGET (Nov. 10, 2008), https://www.engadget.com/2008-11-10-iphone-3g-overtakes-the-razr-as-best-selling-domestic-handset.html.

[6] Assist-QuickSearch Document Details - MIL-PRF-8625, DEFENSE LOGISTICS AGENCY, https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=7074.

[7] *See, e.g.*, Hatch Decl., Ex. D, *The Metallurgy of Anodizing Aluminum*, at 165-168; *Secrets of anodizing with the Anodizing Reference Guide*, ALUMINUM ANODIZERS COUNCIL, https://www.anodizing.org/anodizing-reference-guide/.

27. In paragraphs 39-54 of his declaration, Mr. Hatch examines two specifications attached to the Declaration of Jackie Hughes (the [redacted] which is Exhibit A to the Hughes Decl., and the [redacted] which is Exhibit B to the Hughes Decl.).

28. The changelog of the [redacted] indicates that its first revision was complete on [redacted]. Since [redacted], the [redacted], on [redacted], to "[redacted]"—a change that appears to affect just a handful of requirements [redacted], mainly specifying [redacted].

29. The changelog of the [redacted] indicates that [redacted] was complete on [redacted], with [redacted]. The [redacted] is word for word identical with the [redacted] in many places, with the most substantial difference between them being that the [redacted]. *See* [redacted] at 8-9. Mr. Hatch reviews these two specifications and opines that he believes some of the information disclosed within them constitutes Apple's trade secrets.

30. Specifically, it is my understanding from Mr. Hatch's declaration that he opines that [redacted]

31. [redacted]

[redacted]

32. Fundamentally, it is unclear what methodology, if any, Mr. Hatch applies in identifying what he opines to be a protectable trade secret. Mr. Hatch provides no outward indication that, for example, he performed a search to determine whether these metal finishing parameters within the [redacted] or [redacted] are disclosed in public literature, or even made efforts to determine whether they are disclosed by Apple itself. As such, beyond reliance on his general experience, it is not certain what basis he used to determine these processes are, in fact, secrets, not generally known in the field, or not readily ascertainable through proper means, which I understand to be requirements for a trade secret.

33. At most, Mr. Hatch in paragraphs 29-38 states that, in his experience, several different parameters are "typically ke[pt]" secret by unidentified "[c]ompanies." *See* Hatch Decl. ¶¶ 31, 33, 34, 36, 38; *see also* Hatch Decl. ¶¶ 41, 49 (describing how the [redacted] and the [redacted] are "the kind of document[s] that companies in the consumer electronics manufacturing industry closely guard . . ."). Though I am not offering a legal opinion, I understand that the key question is not whether that type of information is "typically ke[pt]" secret by various companies, but whether the specific information in question is actually generally known or readily ascertainable through proper means, whether it derives independent economic value from not being known, and whether it is the subject of reasonable efforts to maintain its status as a trade secret. For example, a single company within a field may choose to publicly reveal information that is "typically ke[pt]" secret by other companies in that field, and, as a result of the company's public disclosure, the information would not be trade secret. As described below, in at least some cases, Apple (as well as others in the field) has publicly disclosed the information that Mr. Hatch opines is "typically ke[pt]" as a secret.

34. It is also unclear exactly what expertise Mr. Hatch is applying when determining what information is "typically ke[pt]" secret by these "companies." Mr. Hatch's "entire career" has been spent in the "industrial design industry." Hatch Decl. ¶ 5. While industrial designers may have experience with aluminum parts or components, whether because they are involved in

specifying the look and feel of certain aluminum pieces to be used in a commercial product or even if they are more deeply involved in tuning the processes to achieve that desired look and feel,[8] neither Mr. Hatch's CV nor his description of his qualifications in paragraphs 1-11 of his declaration describes any experience with aluminum components for consumer electronic devices or developing the processes/techniques for achieving particular finishes of aluminum components; indeed, the word "aluminum" does not appear anywhere in Mr. Hatch's background. Mr. Hatch does not appear to specifically describe what experience he has that led him to draw a reliable conclusion about what these "companies" typically reveal vis-à-vis their aluminum finishing processes and techniques.

35. In paragraphs 42 and 50, Mr. Hatch also references the statement of an Apple employee and opines that "I understand that Apple has not published the [redacted] and has only shared this specification under a confidentiality agreement with suppliers." Mr. Hatch does not appear to have reviewed these confidentiality agreements or determined whether they continue to apply to the [redacted] or the [redacted]. For purposes of my analysis below, I have assumed that Mr. Hatch is correct that the two Apple documents in question, Ex. A and Ex. B to the Hughes Declaration, have only been shared pursuant to confidentiality agreements that remain in force. If the court were to determine otherwise, however, it is my understanding that Apple's techniques likely could not qualify as trade secrets, and my analysis below would be made largely redundant.

36. Apple, in fact, reveals its aluminum finishing processes to the public in a considerable amount of detail. One notable example I located is a promotional video that depicts an aluminum finishing process used on the Apple Watch.[9] The narration in this video and the images of the process in action reveal many of the contours of Apple's aluminum finishing process.

---

[8] *See also* Declaration of Joel Delman ("Delman Decl.") ¶¶ 19-25.

[9] ShonMStudio – Everything About Apple, *Apple Watch Sport - Aluminum* (YouTube, Mar. 9, 2015), https://www.youtube.com/watch?v=4VOe_TtiPt0. Apple may have removed their original post containing this video, but it remains widely available through archival copies.

37. For example, from the 0:28 to the 1:16 mark in the video, the narrator describes how Apple had created a new alloy for its aluminum, combining raw aluminum with magnesium and zinc. The video shows Apple smelting this aluminum alloy and then pouring it into a mold to produce cylindrical ingots.

38. Other disclosures by Apple provide further color regarding the aluminum alloys that Apple uses. For example, U.S. Patent App. Ser. No. 2020/0239990A1, assigned to Apple, Inc., describes "Aluminum Alloys with High Strength and Cosmetic Appeal." The patent application refers to the 6063 aluminum alloy, which has "been used for fabricating enclosures for electronic devices" but has "relatively low yield strength" and "may dent easily," and discloses a "7xxx series aluminum alloy[]" with "increased hardness, improved cosmetic appeal, and/or more efficient processing parameters." *Id.* at [0003], [0033]. The disclosed alloy is made by adding zinc and magnesium to the aluminum in specific ratios. *Id.* at claim 1. A true and correct copy of this patent application as downloaded from the U.S.P.T.O. is attached as Exhibit C.

39. Returning to the video, from the 1:19 to 1:26 mark, the narrator describes the extrusion process, where the cylindrical ingots are pushed through a die to create a long, continuous piece of aluminum. A machine called a Coordinate Measuring Machine is subsequently shown checking for any defects in the extruded aluminum.

40. From the 1:36 to 1:43 mark in the video, the narrator indicates that each piece of aluminum is "textured with microscopic zirconia beads to achieve a consistent satin finish." (after being "machined" and "buffed"). This clearly refers to the "blasting" step of the metal finishing processes, which Mr. Hatch describes at paragraph 29. The images appear to picture a device that sprays beads at an Apple Watch casing from several simultaneous directions at once so as to leave an even texture across the face of the Watch enclosure.



41. Finally, from the 1:43 to 1:52, the narrator describes how "anodizing creates a hard, clear outer layer that helps protect against dings and scratches." The watch enclosures are shown being anodized on a custom rack designed to fit each enclosure in close proximity:



42. Even this video alone shows Apple's aluminum manufacturing process in a considerable amount of detail—detail that would be, in my opinion, useful to someone attempting to mimic Apple's aluminum finishing process. I do not intend to opine that this video reveals everything about Apple's aluminum finishing process, or even that it discloses every element of what Mr. Hatch indicates is a secret from paragraphs 39 to 54 of his declaration. However, between these videos and other public sources discussed in more detail below, there is a considerably larger body of public knowledge regarding these processes/techniques than Mr. Hatch acknowledges.

**C. Response to "Apple's Metal Finishing Processes Are Trade Secrets" – [redacted]**

43. In this section, I respond specifically to Mr. Hatch's opinions in paragraphs 39 through 54 regarding the "confidential information" in the [redacted] and [redacted]. I conclude that much of what Mr. Hatch labels "confidential information" cannot be a trade secret.

44. In paragraph 41 of his declaration, Mr. Hatch opines that the [redacted] "reflects years of proprietary development" and "is the kind of document that companies in the consumer electronics industry closely guard." I incorporate my analysis in paragraphs 33 to 36 above. In particular, it is unclear what methodology Mr. Hatch applies to reach these conclusions

and it is equally unclear what expertise Mr. Hatch has to opine on the approximate development timeline for an aluminum finishing process. Indeed, as noted, Mr. Hatch does not appear to claim he has worked on a project that substantially involved aluminum finishing before.

45. Mr. Hatch also does not appear to have conducted any analysis to determine how Apple produced the [redacted], and thus, based on the materials Mr. Hatch said he reviewed, I do not see a basis for him to reliably conclude that developing the [redacted] took two or more years. Indeed, the contents of a completed specification, without more, do not disclose the amount of time and effort that has gone into developing an aluminum finishing process. An aluminum recipe may be the product/result of any number of trials/experiments, which would naturally impact or even determine the amount of time, effort, and resources required for development. A process specification could also reflect information largely derived from a vendor, a handbook, or the knowledge of a subject matter expert that took mere minutes to transcribe.

46. Notably, according to its changelog, the [redacted] Dionello Decl. ¶ 11. It therefore is not a given that Apple spent [redacted] developing the initial [redacted]—such a timeline would be in tension with [redacted].

47. In paragraph 42 of his declaration, Mr. Hatch opines that "I understand that Apple has not published the [redacted] and has only shared this specification under a confidentiality agreement with suppliers." I incorporate my opinion in paragraph 35 above.

48. In paragraph 43 of his declaration, Mr. Hatch describes the [redacted] at a high level, including by indicating that [redacted] To the extent Mr. Hatch contends that this acronym is confidential to Apple, it is not: indeed, one of Apple's own patent applications publicly acknowledges this abbreviation. *See* US Pat. App. Serial No. 2021/0087656A1 at [0019]. A true and correct copy of this patent application as downloaded from the U.S.P.T.O. is attached as Exhibit J.

49. In paragraphs 47 and 48 of his declaration, Mr. Hatch similarly describes the naming convention for [redacted] with [redacted] referring to the color of the finish and [redacted] referring to the [redacted]. While it is again unclear if Mr. Hatch contends the [redacted] name is a secret, I note that the name [redacted] and is not itself confidential to Apple. For example, [redacted].[10]

50. In paragraphs 49 and 50, Mr. Hatch effectively repeats his analysis in paragraphs 41 and 42, but in this instance applies them to the [redacted]. I incorporate my analysis from the preceding paragraphs.

51. The bulk of Mr. Hatch's analysis regarding which portions of the [redacted] and [redacted] he believes are trade secrets appears in paragraphs 44 through 46 and paragraphs 51 through 54 of his declaration. In these paragraphs, he applies his "experience" to determine which aspects of each specification constitute trade secrets. Again, it is unclear what methodology Mr. Hatch is actually applying. I respond to several of Mr. Hatch's conclusions about which aspects of these specifications constitute trade secrets below:

a. [redacted]

---

[10] Sparrow AF-720, BENJAMIN MOORE, https://www.benjaminmoore.com/en-us/paint-colors/color/af-720/sparrow; Sparrow 780F-4, BEHR, https://www.behr.com/colors/color-detail/780f-4.

b. As noted above in paragraph 40, Apple's promotional videos reveal that its aluminum finishing process involves "textur[ing] with microscopic zirconia beads." This clue alone provides significant evidence regarding the blasting material Apple uses. A search for "microscopic zirconia beads," along with the words "aluminum finishing", identifies [redacted]

d. [redacted]

---

[11] [redacted]

[12] *Id.*

[13] [redacted]

[14] [redacted]

[redacted]

[redacted]

e. [redacted]

[redacted]

g. [redacted]

h. [redacted]

i. [redacted]

[15] I note that, with a relatively modest amount of additional time, it would likely be possible to determine a near-exact chemical composition of Apple's actually-used alloys. Various spectral analysis techniques have been developed to determine the composition of metallic components. I discuss some of these techniques in more detail in paragraphs 56 to 71, *infra*.

[redacted] *See* Hatch Decl. ¶ 33; *see also id.* at n.21 (quoting source that reads "Chemical polishing (or chemical brightening) prior to anodizing is widely used to produce a bright finish on aluminum").

j. U.S. Patent No. 10,392,718, covering a process for "Anodization and Polish Surface Treatment" and assigned to Apple, describes how a "chemical polishing process may be utilized." *Id.* at 9:1-12. The first example given of a polishing solution is phosphoric acid, and the patent also describes how "a combination of phosphoric acid and nitric acid, a combination of phosphoric acid and sulfuric acid, or a combination of phosphoric acid, nitric acid and sulfuric acid" may be used. *Id.* at 9:47-53. [redacted]

k. Other steps potentially referenced by Mr. Hatch, [redacted], are also widely associated with the finished aluminum Apple produces. [redacted]

[redacted]

l. [redacted]

m. Though the MIL-A-8625F specification itself does not define a particular process for achieving Type II anodizing, widespread attempts to implement this standard have led to the release of considerable public knowledge about what is typical for a Type II anodizing process.

n. Mr. Hatch's own sources reveal a considerable amount of detail about the typical parameters used during Type II anodizing. *The Metallurgy of Anodizing Aluminum* by Jude Mary Runge, who is one of the foremost authorities on anodized aluminum, includes a section on "Type II or Technical Anodizing." *See* Hatch Decl., Ex. D at 165-68. The section specifically describes: (1) use of the aluminum 6063 alloy; (2)

[16] Nat'l Ass'n of Architectural Metal Manufacturers & Nat'l Ornamental & Miscellaneous Metals Ass'n, *Metal Finishes Manual for Architectural and Metal Products*, AMP 500-06 (2006) at 1-7.

anodizing at "'room temperature,' from 20 to 25 °C"; (3) using "[l]ower current densities" of "1.0-1.5 A/dm$^2$; and (4) using a sulfuric acid concentration of 120 to 275 g/L. [redacted] Mr. Hatch does not acknowledge this [redacted]

o. The "Aluminum Anodizers Council," an industry trade group, also publishes a reference guide to several stages of Type II Sulfuric Acid anodizing.[17] By simply specifying that a "matte" finish is required and that the desired aluminum result should be "decorative"—both of which are observable from Apple's finished aluminum—[redacted] A true and correct copy of this reference guide is attached as Exhibit H.

p. Other online sources appear to have mapped out Type II anodizing in even greater detail. For example, one chemical supplier, Alliance Chemical, publishes on its website a detailed guide to Type II anodizing that I've attached as Exhibit I.[18] [redacted] For example:

---

[17] *See supra* n.7, *Secrets of anodizing with the Anodizing Reference Guide*, ALUMINUM ANODIZERS COUNCIL.

[18] Andre Taki, *Sulfuric Acid Anodizing (Type II) Explained*, ALLIANCE CHEMICAL (May 12, 2025), https://alliancechemical.com/blogs/articles/sulfuric-acid-anodizing-type-ii-explained?srsltid=AfmBOooys_bSlpXlgP0lkB_X6vY2iE6EdGsjPydHgBBwtdNf2o2QTFQ.

[redacted]

iv. [redacted]

vi. [redacted]

q. Consistent with the observation that Apple's parameters closely match industry standards, Apple's own patents reveal substantially the same parameters. For example, [redacted]

r. In sum, the particular parameters of Apple's aluminum finishing process discussed by Mr. Hatch, and even combinations of the parameters, are extremely similar to the well-known steps for performing Type II anodizing.

52. These process parameters, of course, could still be valuable if Apple had found ways to optimize the ranges known in industry, but beyond general references to experimentation, neither Mr. Hatch nor Apple's other declarants offer much explanation that would suggest this is the case.

To the contrary, portions of the [redacted] and [redacted] seem to undermine this conclusion by [redacted]

53. [redacted]

* * * * *

54. I understand that I was disclosed as an expert on August 12, 2026, but that Apple did not approve my access to its sealed filings under the protective order until August 26, 2026, five days before this declaration was due. Accordingly, the opinions expressed in this declaration reflect my analysis based on the materials available to me and the investigation I have been able to conduct within that timeframe. Based on that investigation, I have already identified substantial publicly available information concerning the materials, techniques, and process parameters that Mr. Hatch characterizes as Apple trade secrets.

55. Based on the materials I have been able to review, it is my opinion that Apple's aluminum finishing processes are considerably less secret than Mr. Hatch suggests. As discussed above, significant aspects of those processes, such as Apple's use of [redacted], its use of [redacted], or most of the anodizing process parameters specified in the [redacted] or [redacted], are either

directly disclosed by Apple or other public sources or are meaningfully similar to values that are widely known in academia and industry.

**D. <u>Response to "Apple's Metal Finishing Processes Cannot Be Reverse Engineered"</u>**

56. In paragraphs 55 through 60 of his declaration, Mr. Hatch offers the opinion that the metal finishing processes in the [redacted] and [redacted] cannot be reverse engineered from a finished anodized aluminum product.

57. For purposes of this section and the following section, it is important to disentangle two concepts that Mr. Hatch addresses but sometimes appears to amalgamate: the ***process*** for finishing aluminum, or the recipe used, and the ***result of that process*****,** or how the finish itself looks and feels to the end user. The purported trade secrets that Mr. Hatch identifies lie in the ***process*** for finishing aluminum. The ***result*** produced by this process is undeniably not a trade secret—anyone who purchases an aluminum-based iPhone or Apple Watch can tell how it feels and inspect it using any equipment of their choosing—and I do not understand Mr. Hatch to contend otherwise.

58. Mr. Hatch's opinion in paragraphs 55 through 60 of his declaration is effectively that, from merely inspecting the resulting finish of the aluminum, it would not be possible to conclusively determine the ***process*** by which the aluminum had been finished. But if it were easy to inspect the ***finish*** of the aluminum and arrive at some process that reliably creates that finish, then the particular ***process*** used to make the sample that was inspected may not have any particular value. I address this in more detail in the next section.

59. Turning specifically to Mr. Hatch's reverse engineering opinions, I believe that he overlooks several details in opining that Apple's aluminum finishes cannot be reverse engineered. Perhaps most notably, Mr. Hatch overlooks that anyone attempting to recreate Apple's aluminum manufacturing process would not need to start from scratch. As described in paragraph 51 above, there is a considerable amount of public information available about Apple's aluminum manufacturing process that would give someone attempting to reverse engineer this process a substantial head start.

60. For example, in paragraphs 56 and 58, Mr. Hatch devotes a considerable amount of discussion to the idea that "[t]he choice of which type of blast media to use, the choice of media supplier, and the choice of which particular variety of that supplier's blast media to use all reflect Apple proprietary knowledge" and apparently cannot be reverse engineered. But as noted in paragraph 51(a)-(e), Apple itself discusses its use of microscopic zirconia beads, and information about the specific beads used appears to have been published. Anyone attempting to reverse engineer Apple's [redacted] could benefit from this knowledge and determine that [redacted] is the blast media used, without reverse engineering.

61. In addition to this baseline public knowledge which I discuss above, someone attempting to reverse engineer Apple's aluminum technique would have many additional tools at their disposal—some of which Mr. Hatch appears to acknowledge, at least implicitly. There are several widely-known, commercially available tools that permit someone in the metals and materials science field to obtain a considerable degree of information from a finished aluminum product, including information that can be used to draw inferences about the process that created it.

62. Below, I outline a few techniques that could be used to reverse engineer an aluminum finish, such as the aluminum finishes used in Apple's consumer products, and techniques used to achieve such aluminum finishes.

63. A key technique is called a **Metallographic Cross Section**. This involves cutting the metal to obtain a view through its edge, and subsequently running tests on its cross section, which may allow greater visibility into the layers formed through the anodizing process. After preserving the sample in another material, it is then possible to run tests on the cross section, including using some of the following techniques.

64. Another technique is called **Energy Dispersive X-Ray Spectroscopy,** or **EDS** for short. This technique works by directing an electron beam at a specific metal sample. When this sample comes into contact with the electron beam, it produces X-rays that indicate the elements

present in the sample and their relative quantities. Below is an image of an aluminum sample that has been analyzed using EDS.[19]




65. EDS would be very useful for determining the composition of an aluminum alloy. For example, it would be possible to determine whether the aluminum alloy had traces of zinc and magnesium, as Apple indicates is the case for its custom Apple Watch alloy in the video discussed in paragraphs 36 through 42. This provides significant indication as to the contents and recipe of the alloys that Apple uses. Indeed, despite apparently contending these alloys are a trade secret in paragraphs 45 and 52, Mr. Hatch notably does not argue that Apple's alloy compositions are not discoverable through reverse engineering. *See* Hatch Decl. ¶ 55.

---

[19] Ashish Gupta et al., *Structure Property Correlation of In Situ Reinforced Al-based Metal Matrix Composite via Stir Casting*, MATERIALS PERFORMANCE AND CHARACTERIZATION, 2020, Vol. 9, No. 1, at 29.

66. Another useful technique that can be used with a Metallographic Cross Section is called **Scanning Electron Microscopy**, or SEM, which can show the metallic microstructure and defects of the cross section at a resolution better than 1 nanometer. If more detail is needed, there are other techniques, such as **Transmission Electron Microscopy**, that can operate at an even greater resolution. Using Metallographic Cross Sections and SEM or a similar microscopy technique, considerable information about an aluminum sample can be obtained. For example, it would be possible to find evidence regarding whether the aluminum had been [redacted]. Using a SEM, one could look specifically at the layer between the oxide layer added through the anodizing process and, based on its relative smoothness or roughness, obtain evidence concerning what [redacted] had been applied. A Metallographic Cross Section would also reveal the "[redacted]" of the layer created by anodization, which could then be easily measured. Mr. Hatch claims these [redacted] are a trade secret (*see* Hatch Decl. ¶ 45, bullet 1); however, these [redacted] could easily be deciphered by using SEM on an aluminum cross section from a finished product.

67. Another useful analysis technique is the use of a **Gloss Meter**. A gloss meter directly measures the gloss level of a finished aluminum product, which is usually measured in Gloss Units. [redacted] (*see* Hatch Decl. ¶ 45, bullet 1), but they are often directly observable from the finished aluminum product, so long as a few different samples are used.

68. Additionally, **Atomic Force Microscopy (AFM)** provides precise 3D topographical maps at the nanometer scale. AFM can reveal the shape, size, and spacing of nanopores generated by the anodizing process on the aluminum oxide surface. Such precise morphological data are known to correlate with anodizing process parameters, such as anodizing voltage, electrolyte temperature, acid concentration, and current density. For instance, AFM maps pore size distribution and thus the center-to-center distance between adjacent nanopores. The interpore distances are

shown to scale with the applied anodizing voltage.[20] Additionally, AFM can measure the width of the top surface of individual pore openings. The pore diameter is heavily governed by field-assisted chemical dissolution at the oxide-electrolyte interface. If the pores are relatively small, it can indicate low electrolyte temperature and low acid concentration, and thus slow dissolution.[21] By calculating the ratio of pore area to the total mapped area, AFM yields a precise estimate of surface porosity. Porosity is strongly linked to the stable transport of ions across the barrier layer. Larger porosity relates to high current density, while more compact, tightly packed structures indicate low current density.[22]

69. To complement the above techniques, **X-ray Photoelectron Spectroscopy (XPS)** and **Fourier Transform Infrared Spectroscopy (FTIR)** can be introduced to gain more insights and narrow down process conditions. For Type II anodizing of 6063, XPS can provide insights into many aspects of the surface film chemistry. XPS also provides information about magnesium (Mg) and silicon (Si) in the anodizing film. This is particularly interesting for the [redacted] alloy because its Mg-Si chemistry and microstructure can influence the resulting anodic film. In fact, in one of my own research projects, I successfully studied copper oxides using XPS, quantified two types of oxides in the surface film, and inferred process conditions.[23]

---

[20] Yuan Yuan Zhu et al., *AFM, SEM and TEM Studies on Porous Anodic Alumina*, NANOSCALE RES LETT. 2010 Jan 26;5(4):725–734. DOI: 10.1007/s11671-010-9538-9; D.H. Choi et al., *Measurement of the Pore Sizes for Anodic Aluminum Oxide (AAO)*, CURRENT APPLIED PHYSICS, Volume 6, Supplement 1, August 2006, Pages e125-e129.

[21] *Zhu et al*, *supra* n.20

[22] Nafiseh Hassanzadeh et al., *Influence of Anodizing Parameters on Pore Diameter of Anodic Aluminum Oxide (AAO) Films Using Taguchi Design*, ARABIAN JOURNAL FOR SCIENCE AND ENGINEERING, March 2013, 38(6):1305-1312. DOI:10.1007/s13369-013-0593-2

[23] Zhang, J., *Effect of Pulsing Parameters on Laser Ablative Cleaning of Copper Oxides*, J. APPLIED PHYSICS, 99, 064902, 2006.

70. FTIR complements the XPS discussed above. It elucidates molecular bonding, sulfate, and seal chemistry, among other characteristics.[24] High-resolution FTIR measurements on Type II anodic films have shown that the IR chemistry can change substantially from the metal/oxide interface toward the outer surface, including changes in sulfate and hydroxyl features.[25] Therefore, a combination of EDS/SEM/AFM/XPS/FTIR can be used to correlate film morphology and chemical signatures with process conditions. Such combinatorial approaches have demonstrated success in assessing process conditions. For example, my research group combined FTIR with wide-angle X-ray Diffraction to investigate crystallinity change induced by laser irradiation[26] and combined FTIR with diffusivity measurement to investigate the composite curing process.[27]

71. These techniques are accessible to those in the field. For example, Columbia has a laboratory called the Shared Material Characterization Laboratory that includes most of these tools, including EDS, SEMs, AFM, XPS, FTIR, and other apparatuses.[28] Manufacturers and companies

---

[24] J. P. O'Sullivan et al.; Infra-*red spectroscopic study of anodic alumina films*, TRANS. FARADAY SOC. 1969; 65 535-541. https://doi.org/10.1039/TF9696500535.

[25] Jude M. Runge and Aaron J. Pomis, *Understanding Aluminum Anodic Oxide Film Formation*, Finishing and Coating (Oct. 10, 2023), https://finishingandcoating.com/index.php/anodizingcat/1757-understanding-aluminum-anodic-oxide-film-formation.

[26] A. Bhatla, and Y.L. Yao, *Effect of Laser Surface Modification on Crystallinity of poly (lactic acid)*, ASME TRANS. J. OF MANUFACTURING SCIENCE AND ENGINEERING, Oct. 2009, Volume 131, Issue 5, 051004.

[27] D. Bian et al., *Interlaminar Toughening of GFRP, Part I: Bonding Improvement through Diffusion and Precipitation*, ASME TRANS. J. OF MANUFACTURING SCIENCE AND ENGINEERING, Vol. 139, No. 7, 2017, 071010-1.

[28] *See Shared Metal Characterization Laboratory*, COLUMBIA NANO INITIATIVE https://cni.columbia.edu/smcl.

that specialize in aluminum manufacturing would likely be aware of these techniques and have access to some of the relevant measurement equipment.

72. When considering both what has been publicly disclosed and the possibility of obtaining further information through reverse engineering, much of what Mr. Hatch labels confidential is actually ascertainable through legitimate means. Below, I have included a chart that reveals how one could determine most aspects of the [redacted] process that Mr. Hatch opines is a trade secret:

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

**E. <u>Response to "Apple's Metal-Finishing Processes Have Independent Economic Value From Being Kept Secret"</u>**

73. In paragraphs 61 through 68, Mr. Hatch opines that Apple's metal finishing process derives independent economic value from being kept secret. Once again, I disagree with much of Mr. Hatch's analysis.

74. Again, it is important in this section to keep in mind the difference between the ***process*** and the value of the ***result*** in this section. Most of Mr. Hatch's analysis in paragraphs 61 through 68 focuses on the value of the finished aluminum result created by Apple's process—specifically, that this finished aluminum enhances "a product's durability" and customers' "everyday experience" with it. Hatch Decl. ¶ 63. I disagree with this approach, for several reasons. First, much of the "value" Mr. Hatch attributes to the resulting finished aluminum product appears

more accurately attributed to anodized aluminum generally, and not Apple's specific process for creating it. Second, even assuming Apple's particular resulting finish is valuable, Apple fails to show that competitors could not replicate that finish through other proper means or that Apple's process for achieving this finish is in some way superior to these alternatives. Third, even assuming Mr. Hatch establishes that Apple's particular way of creating finished aluminum is valuable, he fails to specifically attribute that value to information that is actually maintained by Apple as a trade secret, as opposed to the know-how of its manufacturing partners, information Apple has patented, and other possible triggers.

75. Many of the benefits that Mr. Hatch attributes to Apple's aluminum finishing process are more rightfully attributed in my view to anodized aluminum generally. For example, in paragraph 61, Mr. Hatch discusses the drawbacks of "[b]are aluminum" that are solved by anodizing, and in paragraph 62, Mr. Hatch discusses how "[a]nodizing addresses these limitations, creating a more durable product" by creating a "ceramic-like oxide" layer "rather than a metal." But these are well-known properties of anodizing itself, not anything specific to Apple's finishing processes. As noted above in paragraphs 20 to 26, (and as apparently acknowledged by Mr. Hatch in paragraphs 22 to 38 of his declaration), anodizing is an extremely well-known process that has been used commercially for nearly a century, and used in consumer electronics for upwards of fifty years. The fact that anodized aluminum in general is a valuable finishing approach does not appear to show that Apple's purported trade secrets themselves are valuable—anodizing is fundamentally an extremely well-known metal finishing technique.

76. Similarly, as described above in, *e.g.*, paragraph 51(k), achieving a matte or satin-like finish on aluminum (*see* Hatch Decl. ¶ 62) is achievable through well-known techniques. I have reviewed the Declaration of Joel Delman, an industrial designer, who sets forth several examples of other consumer electronics manufacturers who have achieved high-quality finishes, including matte or satin finishes, for their devices.[29]

[29] *See* Delman Decl. ¶¶ 33-38.

77. Even if the metal finishing processes described in the two Apple Specifications somehow do produce a superior ***result*** beyond other anodization and finishing processes used for different consumer electronic devices, however, it is my opinion that this fact alone is not sufficient to establish there is independent economic value of the ***metal finishing process*** used to create that finish.

78. In illustrating this point, it is useful to consider Mr. Hatch's admissions in paragraph 57 that "different process parameter combinations can produce visually similar end results," and "different combinations of temperature, dwell time, chemistry, and current can yield final surfaces that look and feel the same." In other words, it is Mr. Hatch's opinion that it is entirely possible to achieve a single anodized aluminum finish (or at least one that is indistinguishable to most consumers) through multiple distinct processes and parameters. In this case, I have seen no evidence that the processes in Apple's Specifications are independently valuable when, by Mr. Hatch's own acknowledgement, other processes "can produce visually similar end results" and "final surfaces that look and feel the same."

79. Mr. Hatch's declaration is devoid of any details that suggest that Apple's process is superior to any other way of obtaining a comparable finish. At most, he refers generically to the value in "producing a target finish *consistently*" and doing so "part after part, with minimal defects and minimal variation." Hatch Decl. ¶ 66. But he does not appear to have reviewed any raw data on the efficacy of Apple's process, and none is provided by Apple's declarants or in Apple's documents. On the present record, it appears speculative to conclude that there is anything particularly effective about Apple's [redacted] or [redacted], particularly when considering the number of high quality products on the market that are discussed in the Delman Declaration.

80. And even if Apple's process were considered superior, because he does not consider what is publicly disclosed about the process or what is generally known in industry, Mr. Hatch does not consider whether that value is attributed to elements of the process that have been publicly disclosed, elements of the process that have been patented, or elements of the process that are actually secret. For example, Mr. Hatch and Ms. Hughes both attribute significant value to Apple's

use of [redacted], but Apple's use of this blasting media does not appear to be a secret. Hatch Decl. ¶ 40; Hughes Decl. ¶¶ 8-9. Similarly, Mr. Hatch places weight on Apple's specific parameters, but he appears to view these parameters in isolation, and not as simply as (at most) variants on the well-known Type II anodizing process. To the extent there is value in Apple's process, Mr. Hatch does not establish that it is independent economic value that is derived from the secrecy of any actually secret portions of the process.

**F. <u>Response to "OpenAI and io Products Misappropriated Apple's Trade Secrets"</u>**

81. In paragraphs 69 through 73 of his declaration, Mr. Hatch opines that "OpenAI, including through io Products or its affiliates, received the benefit . . . of Apple's confidential, proprietary [redacted] metal finishing process" and associated trade secrets. I disagree that the evidence he relies on supports this opinion.

82. I have seen no evidence that any of the aluminum to be used in Defendants' upcoming devices will be produced using the processes described in [redacted]. Notably, as discussed above, even if the look and feel or texture of Defendants' aluminum resembled that of some Apple aluminum product, that would not mean that the [redacted] was used.

83. Mr. Hatch's contrary opinion relies exclusively on paragraphs 69 through 73 of the Dionello Declaration. Mr. Dionello does not identify anyone who personally observed either process being performed. Rather, he recounts what two former [redacted] employees allegedly told him that other, unidentified [redacted] employees had allegedly told them. Even assuming those statements are true, I note that all that paragraph 38 of the Dionello Declaration claims is that the "[redacted] metal finishing process" was used. It does not state that the "[redacted]" metal finishing process or the "[redacted]" metal finishing process was used. To the extent that Mr. Hatch opines that the information he considers trade secret from the [redacted] or the [redacted] was necessarily used based on what he reads in the Dionello Declaration, it is unclear how he arrives at this conclusion. Even one of Apple's own declarants, Ms. Hughes, only opines that the [redacted] and [redacted] provide just "example[s]" of what

falls within a broader [redacted] family of processes, and never indicates that using [redacted] necessarily means performing all or substantially all of the steps disclosed in either specification. Hughes Decl. ¶ 10.

84. To the contrary, both Mr. Hatch and Ms. Hughes opine that the "defining feature" or "defining characteristic" of [redacted] finishes is the use of [redacted]. Hatch Decl. ¶ 40; Hughes Decl. ¶ 8. Assuming the "[redacted] metal finishing process" was used, the only thing that clearly follows is that [redacted] was used. But as described above in paragraph 51(a)-(e), Apple's use of [redacted]. I do not see how Mr. Hatch has a basis to conclude any legitimate trade secret was used based on the information made available to him, and Mr. Hatch does not explain his reasoning in depth.

## V. RESPONSE TO THE HUGHES DECLARATION

85. Unlike Mr. Hatch, Ms. Hughes appears qualified in the area of metal finishing. According to her LinkedIn,[30] Ms. Hughes started as a line operator on a Nickel line in 1998 and worked her way up through several R&D positions before eventually beginning her current role as a Surface Finishing Manager at Apple. In many ways, Ms. Hughes' obvious experience with metals over an almost 30-year period illustrates the type of experience that Mr. Hatch appears to lack.

86. Much of Ms. Hughes' declaration consists of her characterizing the contents of the [redacted] and the [redacted]. In general, I believe she accurately quotes and characterizes these documents, though I note that she sometimes does so selectively. For example, Ms. Hughes notes how the [redacted] sets forth requirements for "[redacted]" but as described above in paragraph 52, several [redacted]. I respond below only to certain specific paragraphs of the Hughes Declaration that I believe are inaccurate or would benefit from additional context.

---

[30] Jackie Hughes, LinkedIn, https://www.linkedin.com/in/jackie-hughes-17a08911/.

87. In paragraph 7 of her declaration, Ms. Hughes describes what she personally "considers" Apple's trade secrets in a manner that is (with a few exceptions) generally consistent with Mr. Hatch, at a somewhat less specific level. I incorporate my analysis above.

88. Notably, in addition to also failing to investigate what may be publicly disclosed about Apple's metal finishing processes, Ms. Hughes does not appear to have direct knowledge regarding the initial development of the [redacted]. Ms. Hughes joined Apple "11 years ago" in 2015. At the time she joined Apple, [redacted] It is therefore unclear what Ms. Hughes' opinion about the scope of Apple's trade secrets from early versions of these documents is based on.

89. In paragraph 18, Ms. Hughes opines that Apple's metal finishes cannot be reverse engineered. I incorporate my analysis in paragraphs 56 through 71 above. Like Mr. Hatch, Ms. Hughes also fails to consider the information that Apple has made public. For example, Ms. Hughes opines that "the blast media grade" Apple uses cannot be reverse engineered, but that grade has been publicly reported. *See supra* ¶ 51(a)-(e).

90. Ultimately, the limited opinions offered by Ms. Hughes do not alter my conclusions regarding anything in the Hatch Declaration, and I disagree with several aspects of her analysis, which appear to be conclusory.

## VI. <u>CONCLUSION</u>

91. In sum, Mr. Hatch has not established that the aspects of Apple's aluminum finishing processes he identifies constitute trade secrets. Much of the information he identifies as confidential—including Apple's use of [redacted], and its practice of [redacted]—has already been disclosed by Apple itself or is otherwise publicly available. Mr. Hatch also does not adequately account for the public information and laboratory techniques that would assist in reverse engineering Apple's process, nor does he show that any value in Apple's process is attributable to information that is actually secret, rather than the well-known benefits of anodized aluminum generally.

Although Ms. Hughes brings considerably more relevant experience to her declaration than Mr. Hatch, her opinions suffer from many of the same deficiencies—including a failure to account for information Apple has publicly disclosed—and do not alter my opinions regarding the Hatch Declaration. I reserve the right to supplement these opinions as discovery proceeds and as I review additional materials, including Apple's sealed filings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on this 31st day of August, 2026 in North Caldwell, New Jersey.

By______________________________
Y. Lawrence Yao, Ph.D.