Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC.<br><br>Plaintiff,<br><br>v.<br><br>CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,<br><br>Defendants. | Case No. 5:26-cv-07078-EJD<br><br>**DECLARATION OF INDIVIDUAL NO. 1 IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF APPLE INC.'S MOTION FOR A PRELIMINARY INJUNCTION** |

**DECLARATION OF INDIVIDUAL NO. 1**

I, [redacted], the undersigned, hereby declare and state:

1. I work at OpenAI as a Member of Technical Staff. I have personal knowledge of the facts in this declaration. If called as a witness, I could and would testify competently to the facts stated in this declaration.

2. Based on my review of the redacted versions of Apple's Motion for Preliminary Injunction and the Declaration of Daniel Roffman, I am the person Apple refers to as "Individual No. 1."

3. I joined OpenAI in March 2026. Prior to joining OpenAI, I was employed at Apple for fourteen years, most recently as a senior manager.

4. Earlier this year, I decided to apply to work at OpenAI. I had enjoyed a long career at Apple, but I was curious about working at a more dynamic, earlier-stage company developing exciting new hardware technologies associated with artificial intelligence.

5. On Friday, February 27, 2026, I interviewed for a position at OpenAI. That week, my team at Apple was very busy preparing for various internal executive reviews. We had to prepare several presentations, and I did not want my team to fall behind because I was out that Friday for my interview. Because I had to drive over an hour into San Francisco for the OpenAI interviews, I woke up early that day to work on my time-sensitive deliverables at Apple, and to keep my team on track.

6. While working that morning, I took screenshots of a work-related Keynote (presentation) file on my Apple work MacBook Pro to make sure that I would remember which file and slides I needed to go back and review or work on. I did not screenshot or download any confidential Apple information to prepare for or present at my OpenAI interviews.

7. Taking screenshots of Keynote files was my routine practice for at least 13 years at Apple. I used screenshots to stay on top of my heavy workload as a manager, as a form of taking notes. During my time at Apple, my day was typically scheduled almost fully from 9am - 6pm with meetings, during which my colleagues and I often went over Keynote presentation files. I would typically have tasks I wanted to follow up on coming out of those meetings, but little time to address

them until later in the day or week. To make sure I would remember which file and slide prompted my follow-up task, I had a practice of regularly taking screenshots of the file name and the relevant slide during the meeting. The Keynote presentations often got very long—up to hundreds of slides long—so it was important for me to have a system for remembering which slide I needed to go back to. The screenshots would get automatically saved on my desktop in chronological order with the date and time of the screenshot in the file name, providing me a to-do list and reminder of the specific slides I needed to review or work on. When I left Apple, my MacBook had many screenshots saved to the desktop. This has been my work routine for over a decade and most of my colleagues know of my working style.

8. Once I finished working the morning of my OpenAI interviews, I closed my work MacBook and did not take it with me to OpenAI's offices. I did not bring any Apple work documents, devices, or hardware components to my interviews (apart from my iPhone, which I used to navigate while driving). During my interviews, I did not disclose anything that I would consider Apple confidential information, nor was I asked about any Apple confidential information. In fact, I recall being told by OpenAI not to disclose any Apple information during my interviews, and I did not. I take my confidentiality obligations to Apple very seriously.

9. One of my interview panels included Tang Tan, OpenAI's Chief Hardware Officer, Consumer Products. Mr. Tan knew me from his time working at Apple, and would have known about the project I had been working on at Apple. Mr. Tan did not mention any internal Apple project codename during the interview.

10. During the interview, Mr. Tan asked me: if you were to leave Apple, what would happen with "your program"—was it set up for success? Mr. Tan did not refer to my program by any internal Apple codename. I understood Mr. Tan's question to be about what kind of manager I am, and whether I would leave my team in a good place with a succession plan if I were to leave Apple for OpenAI.

11. I responded to Mr. Tan's question by saying that my manager and direct reports were well positioned to carry on with the project. Mr. Tan responded "good," and then said that he is still friends with many people at Apple and wanted to make sure they succeed.

12. I ultimately received an offer from OpenAI, which I decided to accept. When I resigned on Monday, March 9, 2026, I told my management that I had accepted an offer to work at OpenAI. For the next two days, I had several conversations with management, who tried to convince me to stay at Apple. On Wednesday that week, I told Apple that I had not changed my mind. That day, I handed over all of my Apple-issued work devices to my manager.

13. When I worked at Apple, Apple encouraged me to use my personal iCloud account to store, share, and access proprietary and trade secret Apple information and I did so. I was also encouraged to use my personal iMessage account for work communications. When I left Apple, my manager asked me to move Apple files from my iCloud folder to a shared [redacted] folder so the team could retain access to them. Other than that, I do not recall receiving any guidance or instructions from Apple about whether I needed to do anything to delete or remove any Apple information from my personal iCloud or iMessage account, which I used for my personal affairs both before and during my time at Apple.

14. I do not believe my experience with iCloud and iMessage was unique. By my observation, Apple has a practice of encouraging employees to use their personal Apple IDs and personal cell phone numbers on Apple-owned work devices, including for iMessage and iCloud Drive. When I worked at Apple, employees at all levels, and especially more senior employees up to and including executives, used their personal accounts to send substantive work communications over iMessage, and to save confidential Apple work files, like Keynote files, to their personal iCloud Drive accounts. We were also ultimately given access to enterprise messaging and third-party cloud storage services like Slack and [redacted] on my team, but by my observation, many teams and employees preferred to continue to use their personal iMessage and iCloud accounts for work and did not fully convert to the new third-party services.

15. A few years ago, Apple introduced something called the "Apple Work" folder, which would allow employees to save Apple work files to an Apple-managed folder within their personal iCloud account. Before that time, any Apple files saved to employees' personal iCloud accounts were simply intermingled with their personal files. In my experience, even after the Apple Work folder was introduced, files created on Apple work computers would save by default to employees'

personal iCloud Drive folders rather than to the Apple Work folder. Users had to manually select the Apple Work folder every time they created a new file. And, if a user saved a file to their personal iCloud Drive folder, and then shared the file with a colleague, it would get saved to the colleague's personal iCloud Drive folder rather than the Apple Work folder. In my experience, it was difficult if not impossible to then move that shared file from the colleague into the Apple Work folder.

16. On July 10, 2026, I received a letter from Apple's outside counsel Gabriel Gross instructing me to preserve materials potentially relevant to this litigation, and requesting that I contact him directly to arrange for the return of any Apple proprietary or trade secret information in my possession.

17. If I did retain any Apple information, it would have been inadvertent, because I (like most of my Apple colleagues) used my personal Apple ID for work at Apple. I did not intentionally take any Apple information with me upon leaving, and I do not use any Apple information in my work at OpenAI.

18. On July 17, 2026, my lawyer Carolyn Hoecker Luedtke sent Mr. Gross a letter responding to his July 10, 2026 letter, indicating that I was complying with my preservation obligations and that I would cooperate in a process to return any proprietary or trade secret Apple information that might have been inadvertently retained within my accounts. The letter asked Apple to propose a protocol for handling their requests as they relate to iCloud and iMessage and asked Apple to identify any specific concerns they had.

19. Mr. Gross or his colleagues did not initially respond. My lawyers have since sent Apple's lawyers additional communications following up on those questions, including on July 24, 2026 and August 11, 2026. Those communications also asked Apple how Apple planned to address a common problem among former Apple employees whereby they would delete Apple work files from their personal iClouds only to find that iCloud had repopulated the messages within their accounts.

20. On August 26, 2026, more than a month and a half after receiving Ms. Luedtke's letter, Mr. Gross wrote back to Ms. Luedtke, demanding that I permit a third-party forensics vendor to capture a forensic image of my personal accounts and devices, and then to remove any Apple

information from those accounts or devices. Having just received Mr. Gross's letter, I am still conferring with my lawyer about how to respond. But I have no interest in retaining any Apple files or information that were inadvertently retained in my accounts because of Apple's practice of encouraging me and other Apple employees to use our personal accounts for work.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 30th day of August 2026 in Cupertino, California.

[redacted]

[redacted]