Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

David Eiseman (Bar No. 114758)
Jodie W. Cheng (Bar No. 292330)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
jodiecheng@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

[Additional counsel listed in signature block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

APPLE INC.,

Plaintiff,

vs.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-CV-07078-EJD

**DEFENDANTS' RESPONSE TO PLAINTIFF APPLE INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY**

**Judge:** Edward J. Davila

**Hearing Date:** Oct. 1, 2026

**Time:** 9:00 a.m.

## I. Introduction

Briefing on three pending motions has made one thing clear: Apple's claims, without fail, rely on unsupported speculation and attorney storytelling to weave innocuous facts into a sinister, false narrative. Apple's supplemental brief tries to save those claims by using more attorney storytelling to spin more innocuous facts into another sinister, false narrative. Apple touts "shocking evidence" it claims to have discovered on a MacBook Liu recently returned, gathered from Liu's personal text messages and publicly filed without his consent. Apple's claims collapse under the lightest scrutiny. Most strikingly, Apple represents without qualification that a "forensic analysis of the MacBook shows" that Liu "used" a "confidential Apple circuit schematic . . . in his work at OpenAI." Br. at 1. Yet, despite investigating both the MacBook and Liu's personal iCloud account, neither Apple nor its expert provides a shred of forensic support for this serious accusation.

Stripped of conclusions and speculation, Apple's "shocking evidence" comes down to this: in the months after leaving Apple, as Apple is well aware (but omitted when filing this lawsuit), Liu used an Apple file to respond to an Apple employee's questions about Apple work. Apple's expert found no forensic indication that Liu used that file for any other purpose. Separately, around the same time, Liu experimented with AI in his personal capacity (not for OpenAI work) and texted on his personal device with a friend about his insight. Apple's expert found no forensic indication that these personal experiments or discussions involved any Apple file or any OpenAI work. Defendants' forensic investigation demonstrates they did not. Lacking evidence, Apple's forensic expert overstepped his expertise and opined that the temporal proximity between these two separate events means that Liu may have used the Apple file in his personal experiments and for his OpenAI work. Apple's counsel then took this rank speculation and served it to the Court as fact.

Apple tries to bolster its made-up story with allegations of spoliation. Apple again offers no forensic evidence, relying only on texts between Liu and another former Apple employee raising the option of removing personal information from Apple-owned devices, so the devices could be returned and used by others at Apple. Apple's spoliation allegations ring particularly hollow given that they are derived from text messages from a device that Liu forensically preserved and voluntarily returned, and given Apple's counsel's own conflicting instructions to former Apple

employees. Finally, Apple asks the Court to infer wrongdoing from Liu's colloquial use of a publicly known Apple term to describe an everyday software reset function. None of this free-floating conjecture and surmise comes close to justifying expedited discovery.

## II. The MacBook At Issue

The device at issue is a MacBook Pro with Serial No. [redacted] that was issued by Apple to one of its employees, a former Apple co-worker of Liu. Liu Decl. ¶ 4. After Liu left Apple, that employee loaned him the MacBook for personal use. *Id.* Liu logged into his personal iCloud from the MacBook around March 14, 2026, but rarely used that device. *Id.*

## III. Liu Offered Apple The MacBook On July 21, And Apple Ignored Him.

Apple represents to the Court that it received the MacBook at issue "only after weeks of delay." Br. at 1. But it omits a crucial fact: the delay was Apple's.

On July 21, eleven days after Apple commenced this litigation, Liu's counsel informed Apple's counsel that Liu was in possession of the MacBook—an Apple-owned device—and sought instruction on where to return it. *See* Lazarus Decl. ¶ 4. Three weeks later, on August 13, Apple finally responded that the device should be returned to Apple's campus in Cupertino. *Id.* ¶ 5. Apple's counsel subsequently changed its mind and asked that the device instead be shipped to Apple's external expert, presumably after realizing that the device could include private information that Apple is not permitted to review. *Id.* ¶ 6. Apple concedes that Liu's counsel shipped the MacBook immediately upon receiving Apple's belated instructions. Br. 1.

Before the MacBook was shipped to Apple, and with Apple's consent, a forensic expert retained by Liu's counsel captured an image of that device, to ensure it is fully preserved in a forensically sound manner. Lazarus Decl. ¶ 6; ECF No. 115-24. Defendants did not immediately examine the MacBook because it is an Apple-owned device, and the parties are still negotiating a protective order. Defendants proceeded with caution to ensure that all legal and ethical obligations were met.

## IV. Apple Infiltrates Liu's Personal Texts And Publicizes Them.

As this litigation has shown, Apple is not shy about infiltrating its employees' personal text messages or using those personal texts against its employees if they leave Apple. But Apple has

now crossed a new line: it accessed personal text messages its former employee sent to a non-Apple employee after leaving Apple. Roffman Decl. Exs. A-F. Apple then quoted those personal text messages in an unsealed public court filing without permission. Br. 2, 3.

## V. Apple's Manufactured "Shock" Is Unavailing.

Apple relies on flimsy logic and attorney characterizations to piece benign text messages into purported actionable conduct. Apple tells this Court without qualification that a "forensic analysis of the MacBook shows" that Liu "used" a "confidential Apple circuit schematic . . . in his work at OpenAI." Br. 1. Yet even after closely analyzing the MacBook and Liu's personal iCloud account, neither Apple nor its expert provide any forensic support for this serious accusation.

Apple's own cited evidence shows that Liu accessed an Apple file to help Apple, at Apple's request. Specifically, on March 18, Liu accessed an Apple file named "[redacted]" (the "[redacted] File"). Liu Decl. ¶ 11. That file is irrelevant to Liu's work at OpenAI. *Id.* ¶ 18. Liu accessed it to assist Alyssa Peng—then an Apple employee—in solving a problem concerning electrical interference between the [redacted]. Liu Decl. ¶¶ 12, 15; Ex. A. This was the same problem that caused Liu to stay late to help Peng on his final day at Apple on January 22. ECF No. 104 ¶ 16. To help Apple, Liu ran the [redacted] File through LTspice to ensure the output would be usable for Peng. Liu Decl. ¶ 12. Once he received that confirmation, Liu texted Peng that if she needs "the current [redacted]," he "has a document" she can "open" and "run." Liu Decl. Ex. A. Liu never used that file for his work at OpenAI. Crain Decl. §§ IV-V.

Separately, but also on March 18, Liu was experimenting with AI in his personal capacity and using his personal accounts and devices. Liu used an OpenClaw AI agent to see whether it could perform certain tasks using public information. Liu Decl. ¶ 16. The purpose of that experiment was not to perform Apple or OpenAI work, but to test how effectively an AI agent could perform tasks that Liu had previously learned to perform manually over years of engineering work. *Id.* ¶ 17. This experiment involved a different type of circuit unrelated to the work Liu did with Peng at Apple, and had nothing to do with the [redacted] File. *Id.* Liu, an electrical engineer, was simply exploring his personal curiosities by experimenting with AI.

The simulations Liu ran with OpenClaw involved different inputs and outputs from those associated with the [redacted] File. *Id.* ¶ 16. In connection with those personal experiments, Liu told a friend how quickly the AI agent had completed the exercise. Roffman Decl. Ex. A. Neither those texts nor the simulations themselves mention Apple or contain Apple information. Liu Decl. ¶ 17.

Apple's "shocking evidence" is nothing more than speculation that Liu's text messages with his friend concern the [redacted] File with which he helped Peng. Br. 2; Roffman Decl. ¶ 22. They do not. They involved different purposes, circuitry, and source material. Liu Decl. ¶ 18; Raychowdhury Decl. ¶ 12. Apple offers no evidence otherwise. Indeed, a forensic investigation of Liu's Mac Mini, the device on which use of the [redacted] File and the AI experiments would have taken place, revealed no evidence that Liu used the [redacted] File in connection with any AI platform, including OpenClaw, ChatGPT, Codex, and Claude. Crain Decl. ¶¶ 9-12. In sum, Apple offers zero evidence that Liu used the [redacted] File in his personal AI experiments, much less for his work at OpenAI—and Defendants' forensic investigation shows he did not. *Id.* § IV.

## VI. <u>Apple's Spoliation Allegations Fail On Their Face.</u>

Apple's allegation that Liu engaged in "anti-forensic conduct" (Br. 3) relies on evidence from the fully preserved computer Liu voluntarily identified, quarantined, preserved, and returned to Apple. Lazarus Decl. ¶¶ 6-7; Crain Decl. ¶ 5. Notably, neither Apple nor its expert point to any forensic evidence of file deletion. Instead, Apple cites fully preserved text messages between Liu and Peng discussing the potential "restore" of Apple-owned devices, so they can be used by other Apple employees. Liu Decl. ¶ 25; Peng Decl. ¶ 9. Apple's allegations of spoliation ring particularly hollow because, on July 8, Apple's own counsel instructed former Apple employees to make sure Apple-related information on their devices is "permanently deleted." Schapiro Decl. Ex. 1.

Apple again offers nothing but hand-waving to support its sweeping accusations of "anti-forensic behaviors." Roffman Decl. ¶ 26. It does not even argue that Liu or Peng actually deleted or "restored" anything. On the other hand, the Crain Declaration confirms that his forensics firm was "retained in this matter shortly after the complaint was filed on July 10," and that his team worked with Liu and his counsel to "expeditiously quarantine various devices," including the MacBook Pro at issue. Crain Decl. ¶ 5; ECF No. 115-24.

## VII. Apple's "Secret" Tool Is A Widely Used, Publicly Known Function.

Apple argues that Liu "referred to using a tool and related software packages with names identical to proprietary internal engineering tools used at Apple." Br. 3. Apple relies on two text messages Liu sent former Apple colleagues on May 9 and June 10, 2026. In the May 9 text, Liu colloquially referred to a software reset function by the nickname Apple assigned it: "[redacted]." Roffman Decl. Ex. F. That nickname is publicly known and appears in numerous places online, including YouTube. Liu did not state he was using any Apple tool, and has not used one: he merely described executing a common function that Apple references by a certain name. Because he was speaking with another former Apple employee, he used the nickname that was familiar to both of them. Liu Decl. ¶ 27. As Apple knows, Liu could not have been using the Apple tool, because it is available only on Apple's network and with Apple credentials. *Id.*

In the second text, sent June 10, Liu messaged a different former Apple colleague that his "codex can build [redacted] directly" for him, again using the Apple nickname for this common function. Roffman Decl. Ex. F. The text does nothing but explain that an AI agent was able to run a process that accomplishes a full software reset, an otherwise tedious human task. Liu Decl. ¶ 27. These texts do nothing to indicate that Liu used any Apple trade secrets.

## VIII. There Is No Good Cause For Expedited Discovery.

Even if discovery in this case were not already open, Apple's purported "new evidence" does not come close to "confirm[ing] misappropriation and use of Apple's trade secrets," Br. 3, warranting some type of expedited discovery. To the contrary, Defendants' forensic expert searched Liu's OpenAI-issued computers, phones, Google Workspace account, USB drive, and Slack data for the Apple files identified by Apple's expert—and found no trace of the [redacted] output files. Crain Decl. ¶ 13. Apple's assertion that the [redacted] File made its way into OpenAI systems (Roffman Decl. ¶ 29) is pure speculation unsupported by facts.

## IX. Conclusion

For the foregoing reasons, as well as those set out in Defendants' Opposition to the Expedited Discovery Motion, Apple's Expedited Discovery Motion should be denied.

DATED: September 11, 2026

By /s/ Andrew H. Schapiro

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Andrew H. Schapiro (*pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

David Eiseman (Bar No. 114758)
Jodie W. Cheng (Bar No. 292330)
Victoria B. Parker (Bar No. 290862)
Andrew M. Mather (Bar No. 345548)
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
jodiecheng@quinnemanuel.com
vickiparker@quinnemanuel.com
andrewmather@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
Lucas A. Hammill (*pro hac vice*)
Jordan M. Nakdimon (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com
lucashammill@quinnemanuel.com
jordannakdimon@quinnemanuel.com

Joseph E. Reed (Bar No. 323524)
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
joereed@quinnemanuel.com

*Attorneys for Defendants*
*OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

DATED: September 11, 2026

By *__/s/ Kate E. Lazarus__*

KWUN BHANSALI LAZARUS LLP

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**ATTESTATION**

I, Andrew H. Schapiro, am the ECF user whose ID and password are being used to file the above document. In compliance with Local Rule 5-1(i)(3), I hereby attest that Kate E. Lazarus has concurred in the filing of the above document.

By *_/s/ Andrew H. Schapiro_*
Andrew H. Schapiro