Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
andrewschapiro@quinnemanuel.com

Patrick D. Curran (Bar No. 241630)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
patrickcurran@quinnemanuel.com

Jodie W. Cheng (Bar No. 292330)
David Eiseman (Bar No. 114758)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
jodiecheng@quinnemanuel.com
davideiseman@quinnemanuel.com

Yehuda Goor (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
yehudagoor@quinnemanuel.com

*Attorneys for Defendants OpenAI Foundation, OpenAI Group PBC, io Products LLC, and Tang Yew Tan*

Kate E. Lazarus (Bar No. 268242)
klazarus@kblfirm.com
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, CA 94111
Tel: (415) 630-2350

*Attorneys for Defendant Chang Liu*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC, f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**DECLARATION OF CHANG LIU IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF APPLE INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY**

**DECLARATION OF CHANG LIU**

I, Chang Liu, the undersigned, hereby declare and state:

1. I submit this supplemental declaration in support of Defendants' Response to Plaintiff Apple Inc.'s ("Apple") Supplemental Brief in Support of its Motion for Expedited Discovery (the "Supplemental Brief"), dated August 31, 2026. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

2. I incorporate by reference my declaration submitted on August 31, 2026 in support of Defendants' Opposition to Apple's Motion for a Preliminary Injunction (ECF No. 104) (the "PI Declaration"), including without limitation its description of my background, my departure from Apple, and my work at OpenAI.

3. Apple's Supplemental Brief appears to be based entirely on a review of a certain laptop computer (the "MacBook"). Apple claims that this evidence shows that I used Apple confidential information for work at OpenAI. That is not true. I repeat what I said in the PI Declaration: at no point did I use any confidential Apple documents or information in connection with my work at OpenAI or for any purpose other than responding to requests from Apple employees who asked for my help regarding their work at Apple.

4. The MacBook discussed in Apple's supplemental brief is an Apple-owned device that a former Apple colleague, [redacted], loaned to me in February 2026. She lent me this device as a loaner while I decided whether to purchase a personal laptop for myself. When I first received the MacBook, the battery did not work and I could not turn on the computer. Eventually I purchased a new battery and first powered on the computer on or about March 14, 2026. When I initially turned on the computer, I signed in using my personal iCloud account and continued to use my personal iCloud account with the device. I only used the MacBook a handful of times, and never for my OpenAI work. Nor did I use that machine for the help I provided to my former Apple colleagues with their Apple work.

5. Shortly after this lawsuit was filed and I retained counsel, I disclosed to my counsel all computers, electronic storage devices, and accounts that I could think of that were in my possession at that time. Among the devices that I disclosed to my counsel was the MacBook

described in Apple's Supplemental Brief. I disclosed to my counsel that the MacBook was an Apple-owned device, and I agreed that it could be returned to Apple. I then promptly had the computer couriered to my counsel. At no time did I ever try to remove any data or evidence from the MacBook. Indeed, I did not even sign out of my personal iCloud account prior to sending the MacBook to my counsel. I arranged for all of my computers and storage devices that could even potentially contain Apple information to be delivered to Sync, the forensic vendor that my counsel retained. Likewise, I made all my email and electronic storage accounts available to Sync for imaging. I understand Sync promptly imaged all such devices and accounts.

6. No one from Apple contacted me about returning the MacBook at any time prior to my counsel disclosing the MacBook to Apple's counsel.

7. In short, I voluntarily and expeditiously disclosed the MacBook to Apple after this lawsuit was filed, and I never attempted to remove any evidence prior to it being returned to Apple.

## I. THE MARCH 18, 2026 LTSPICE SIMULATION WAS TO HELP AN APPLE EMPLOYEE FINISH WORK WE HAD BEGUN TOGETHER BEFORE I LEFT APPLE

8. Before I left Apple, I worked with my former Apple colleague Yu-Ting "Alyssa" Peng and other former Apple colleagues on an issue involving a possible electrical interference between the [redacted] on an unreleased Apple device, which Apple refers to as "[redacted]" Peng and I attempted to diagnose this issue at an Apple lab on the evening of January 22, my last day at Apple. We were unable to resolve the issue before I was walked out of the office by my former Apple manager, [redacted].

9. As I explained in the PI Declaration, Peng took over much of my former work and occasionally would ask me technical questions about Apple work after I left Apple. As I mentioned in the PI Declaration, Apple's walk out policy left me insufficient time to wind down my work, transfer my files, and hand off my responsibilities before leaving.

10. To the best of my recollection, on March 18, 2026, Peng asked me a question about the behavior of a specific [redacted] as part of the same unresolved issue we discussed on the evening of January 22. Based on my recollection, Peng and I discussed the issue in person when we saw each other on the afternoon of March 18.

11. Later that same day, to try to answer Peng's question, I opened the [redacted] file (the "[redacted] File") on my personal Mac Mini. (This computer is currently in the possession of Sync, the forensic investigator, and I understand Sync imaged the Mac Mini shortly after they received it.) The [redacted] File was still on my personal iCloud drive from my time at Apple because, like many Apple employees, I used my personal iCloud account for work. Therefore, I did not need to download that file from any third party repository in order to access it. I opened the [redacted] File in a program called LTspice at approximately 5:47 p.m. Pacific Time. LTspice is a free tool published by Analog Devices. It is simulation software that allows a user to create schematics and run simulations based on those schematics. It does not require an account or login to use, and, to my understanding, does not retain or transmit a user's inputs to any third party.

12. I did this in connection with Peng's question about her work at Apple, to confirm that the [redacted] File would generate a usable result of the current waveform that Peng could use to try to answer her question. After receiving this confirmation, at 6:09:54 P.M., I texted Peng "Oh right... If you need the current [redacted], I think I have a document. You can just open it and run it; it should work." At 6:10:25 P. M., I continued, "I crafted it myself. Even though it's pretty bad. But it should be correct. I can tell you where it is in the folder." A true and correct copy of these messages is attached hereto as **Exhibit A**. These messages refer to the [redacted] File discussed in Apple's brief.

13. I did not end up discussing the [redacted] File further with Peng, though we did discuss the underlying technical issue on March 25. *See* Ex. A. On that day, Peng sent me a screenshot of a Slack message with her Apple colleague [redacted], in which [redacted] asked a question about a parameter related to the same issue. I suggested that Peng tell [redacted] to look at a specific design file. *Id.* That design file related to the same parameters in the simulation file I had run on March 18 in order to help Peng with her work.

14. In sum, I only accessed the [redacted] File in order to assist Peng with her work at Apple. I did not access the [redacted] File in connection with my work at OpenAI, as part of the personal experiments I describe in Section II below, or otherwise.

## II. I DID NOT USE THE APPLE FILE IN CONNECTION WITH MY AI AGENT EXPERIMENTS

15. I understand that based solely on Apple's review of my personal iMessages on the MacBook I returned (a review which I did not permit), Apple claims that I used the [redacted] File to train AI agents I was using around the same time. That is not true. Unrelated to my efforts to help Peng, starting the afternoon of March 18, 2026, I was experimenting on my own time with an AI agent I created using OpenClaw, an open-source tool. I was curious to learn how well the agent could perform circuit-simulation tasks that had previously taken me substantial time to perform and years of training to learn how to create. This work experimenting with AI agents for circuit design involved a specific type of converter circuit that is substantively unrelated to the [redacted] issues I worked on with Peng at Apple, and with which I assisted her after my departure from Apple.

16. For my personal experimentation on using AI agents for circuit design, I asked the OpenClaw agent to design a "boost converter" — a circuit topology that is fundamentally different from the [redacted] reflected in the [redacted] File. A [redacted] a boost converter, in contrast, steps voltage ***up***. I deliberately chose a different circuit topology than the topology I worked on at Apple, and I instructed the AI agent in these March 2026 experiments to use only open-source, publicly available information, such as reference designs available online. I never input the [redacted] File, or any information derived from that file, into OpenClaw or any other AI tool. The purpose of this exercise was to test the OpenClaw agent's capabilities and determine how long it would take the AI agent to create an acceptable circuit design. I did not run these simulations in connection with my OpenAI work, nor for the purpose of assisting my former Apple colleagues with their own work.

17. I later told my friend and former Apple colleague [redacted] about how quickly the AI agent had performed the exercise — work that had previously taken me a full day took the agent a matter of hours. Roffman Ex. A. I shared the information because I found it a striking demonstration of the technology's capability, not because it had anything to do with Apple. Our discussion had nothing to do with the [redacted] File. These are the text messages that

Roffman discusses in paragraph 22 of his declaration and Apple discusses in page 2 of its Supplemental Brief.

18. The [redacted] File is not relevant to my work at OpenAI. The [redacted] File is a document I created while I was at Apple in order to model the behavior of the [redacted] OpenAI does not use Apple's [redacted] Rather, OpenAI uses [redacted] designed and sold by third party vendors. These [redacted] are not custom designed for OpenAI and the [redacted] OpenAI purchases have different designs than the custom Apple [redacted]. Thus, the [redacted] File and the simulation I ran on March 18 for Peng are not at all helpful to anything I do at OpenAI.

19. Also, it is worth noting that I am not involved in the selection or integration of [redacted] used in connection with third-party [redacted] supplied to OpenAI. At Apple, in contrast, most of my work involved [redacted] for Apple [redacted].

20. Additionally, the experiments I was conducting on OpenClaw on March 18 (which did not involve the [redacted] File or any other Apple information or files) also were ***not*** for my work at OpenAI. When I do OpenAI work, I exclusively use my OpenAI-issued devices and OpenAI's tools, and I base my work on OpenAI's product requirements. ***To be clear: I never used any Apple file for my work at OpenAI***.

## III. MY JUNE 2026 MESSAGES REFLECTED PRIVACY CONCERNS, NOT EVIDENCE DESTRUCTION

21. On my last day at Apple, I returned all Apple-owned computers in my possession except for the iMac described in my PI Declaration. I returned the iMac through an Apple employee in March. I returned the Apple-owned iPhone I had been using for work and personal purposes shortly after my last day at Apple, after I had finished setting up my new personal phone. I also had an old iPhone I was using with a Chinese number that I had forgotten about but have since returned.

22. I did not attempt to destroy evidence on any of these devices before returning them to Apple. In fact, I left my iCloud signed in on one of the MacBook Pros I returned on January 22,

so that my former Apple manager, [redacted] could download files from my iCloud account, as described in my PI Declaration. For the other devices, I signed out of my iCloud account. I do not recall whether I reset the devices before I left, as I had little time that day to complete my final tasks at Apple.

23. Likewise, when I returned the loaner MacBook through my counsel, I did not attempt to remove any evidence from the machine prior to returning the device. I did not even sign out of my personal iCloud account before returning it.

24. Apple did not contact me about my retaining or accessing any Apple files prior to filing suit against me. Therefore, as of June 2026, I had no knowledge of Apple's claims against me. However, I did hear chatter that Apple had sent threatening letters to numerous former Apple employees who had joined OpenAI about their alleged possession of Apple files. One of these people is [redacted]. I understood Apple's letter had caused him distress, and in the messages attached as Exhibit B to the Roffman Declaration, I was checking on how he was doing. I later heard that Apple was attempting to locate one or more of my old Apple-issued devices. *See* Roffman Ex. C (messages to [redacted]).

25. Apple references a message from me to Peng dated June 6, 2026 (Roffman Ex. D), in which I reminded Peng that she should "restore" any Apple-issued devices she still had. Peng had left Apple almost two months earlier, and I did not know if she still had any Apple devices. But given my understanding that Apple was looking at the devices and accounts from former Apple employees who had gone to OpenAI, I suggested that Peng "restore" any devices she had so that Apple would not be able to review personal messages or files. I was trying to protect the privacy of myself and my friend. When I said, "maybe you should restore it and start using it more often," I used SMS shorthand to say that any Apple-owned devices should be returned to current Apple employees for their use, consistent with typical practices at Apple. For example, from my experience, whenever an employee leaves Apple, they restore their Apple-issued devices before returning and releasing them for the use of other Apple employees.

26. I certainly did not intend for anyone to destroy any evidence of anything related to this case, as I had no knowledge of the case at the time, and had never used Apple files or information for my work at OpenAI.

**IV. THE "[redacted] AND "[redacted]" MESSAGES HAVE NOTHING TO DO WITH APPLE**

27. Apple also points to a May 9, 2026 message from me to former Apple colleague [redacted] referencing a "[redacted]," and a June 10, 2026 message from me to Apple employee [redacted] stating that "My codex can build [redacted] directly for me." Roffman Ex. F. [redacted]" is a term used at Apple to refer to a tool that resets the software on a device. That is a customary function among hardware engineers. To my knowledge, Apple's tool executing this function can only be used with an Apple account and when connected to the Apple network. In my text messages, I was using the term colloquially to refer to the process of resetting software, and I was not using the Apple tool at either time (nor could I have since I was no longer connected to Apple's network). In my message to [redacted] I was using the term to refer to a similar reset process I was doing at the time on OpenAI hardware, using the OpenAI process to do so. Roffman Ex F. In my message to [redacted] I was telling him that I had trained my AI agent to run a process that accomplishes a full software reset. I was telling this to [redacted] because I was impressed that my AI agent was accelerating the kind of tasks that would ordinarily take a human worker much longer to accomplish. Both messages concern OpenAI's own tools, and have nothing to do with Apple or any Apple files or confidential information.

**V. CONCLUSION**

28. I reaffirm that I have never used or shared any Apple confidential information or trade secrets for my work at OpenAI, and I have never directed anyone to destroy evidence relevant to this litigation or otherwise.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 11th day of September, 2026 in San Francisco, California.

Signed by:
C899FC7CF63D488...
Chang Liu