Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com

Adam Gershenson (*pro hac vice*)
Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
adam.gershenson@weil.com
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (*pro hac vice*)
Steven Balcof (*pro hac vice*)
Jun Tong (*pro hac vice*)
Ido Sadeh (*pro hac vice*)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com
koussayef@desmaraisllp.com
sbalcof@desmaraisllp.com
jtong@desmaraisllp.com
isadeh@desmaraisllp.com

Marie Delzell (SBN 367393)
DESMARAIS LLP
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 573-1900
Facsimile: (415) 573-1901
mdelzell@desmaraisllp.com

Atifah Safi (*pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20006
Telephone: (202) 451-4900
Facsimile: (202) 451-4901
asafi@desmaraisllp.com

*Counsel for Plaintiff Apple Inc.*
[Additional counsel listed in signature block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

APPLE INC.,

Plaintiff,

v.

CHANG LIU, TANG YEW TAN, OPENAI FOUNDATION f/k/a OPENAI, INC., OPENAI GROUP PBC, and IO PRODUCTS, LLC f/k/a IO PRODUCTS, INC.,

Defendants.

Case No. 5:26-cv-07078-EJD

**PLAINTIFF APPLE INC.'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**<u>FILED UNDER SEAL</u>**

**Judge**: Edward J. Davila

**Hearing Date**: Oct. 14, 2026

**Time**: 9:00 a.m.

# TABLE OF CONTENTS


Page

I. APPLE'S TRADE SECRET CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS ..... 1

- A. Apple Has Identified Protectable Trade Secrets ..... 1
  - 1. Apple Identified Its Trade Secrets With Sufficient Particularity ..... 2
  - 2. Apple's Trade Secrets Are Not Generally Known ..... 2
  - 3. Apple's Trade Secrets Have Independent Economic Value And Are Not Readily Ascertainable ..... 3
- B. Apple Took Reasonable Measures To Protect Its Trade Secrets ..... 4
- C. Apple Has Shown Misappropriation By All Defendants ..... 6
  - 1. Chang Liu's Misappropriation ..... 6
  - 2. Tang Tan's Misappropriation ..... 9
  - 3. The Corporate Defendants' Misappropriation Based Upon Liu And Tan ..... 10
  - 4. The Corporate Defendants' Misappropriation Of Apple's Metal Finishing Processes And Parameters ..... 11

II. APPLE WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION ..... 12

III. THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION ..... 13

IV. THE PUBLIC INTEREST FACTOR FAVORS APPLE ..... 14

V. APPLE'S PROPOSED ORDER IS APPROPRIATELY TAILORED TO PROTECT APPLE FROM ONGOING HARM CAUSED BY DEFENDANTS' MISCONDUCT ..... 14

VI. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ....................13

*Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034 (N.D. Cal. Aug. 11, 2023) ....................12

*AssuredPartners of Cal. Ins. Servs., LLC v. Clem*, 2026 WL 2044774 (C.D. Cal. July 10, 2026) ....................10

*Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066 (N.D. Cal. 2021) ....................14

*Blackbird Techs., Inc. v. Joshi*, 2015 WL 5818067 (N.D. Cal. Oct. 6, 2015) ....................15

*BNF Distrib. Enter., Inc. v. BA Distrib., Inc.*, 2025 WL 3724558 (N.D. Cal. Dec. 24, 2025) ....................12

*Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169 (W.D. Wash. 2019) ....................10

*Capconvert, LLC v. Brown*, 2026 WL 1471880 (N.D. Cal. May 26, 2026) ....................2

*Cisco Sys. v. Chung*, 462 F. Supp. 3d 1024 (N.D. Cal. 2020) ....................3

*Comet Techs. U.S. of Am. Inc. v. Beuerman*, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ....................12

*Commure, Inc. v. Canopy Works, Inc.*, 792 F. Supp. 3d 971 (N.D. Cal. 2025) ....................3, 6

*Cool Runnings Int'l Inc. v. Gonzalez*, 2021 WL 5331453 (E.D. Cal. Nov. 16, 2021) ....................2

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198 (E.D. Cal. 2020) ....................2

*Dairy, LLC v. Milk Moovement Inc.*, 2022 WL 584003 (E.D. Cal. Feb. 25, 2022) ....................6

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ....................12

**Pages**

*ELT Sight, Inc. v. EyeLight, Inc.*, 2020 WL 7862134 (C.D. Cal. Aug. 28, 2020) .......... 6

*Fujikura Composite Am., Inc. v. Dee*, 2024 WL 3261214 (S.D. Cal. June 28, 2024) .......... 4, 5, 14

*Hooked Media Grp. Inc. v. Apple Inc.*, 55 Cal. App. 5th 323 (Cal. Ct. App. 2020) .......... 6

*Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079 (E.D. Cal. 2012) .......... 4, 5, 14

*SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) .......... 10, 11

*Tran v. Pham*, 2025 WL 3654084 (N.D. Cal. Dec. 17, 2025) .......... 14

*United Flow Techs. Intermediate Holdco II, LLC v. Coholan*, 2026 WL 1077406 (N.D. Cal. Apr. 20, 2026) .......... 8, 12, 13, 15

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) .......... 13

**Rules**

Fed. R. Evid. 801(d)(2) .......... 12

Fed. R. Evid. 803(3) .......... 12

Apple's preliminary injunction motion lays out strong evidence of ex-employee Defendant Chang Liu breaching Apple's third-party Box storage to download dozens of Apple trade secret documents while at OpenAI, Defendant Tang Tan asking Apple employees to bring product parts to OpenAI interviews and asking them details about Apple's confidential products, and OpenAI inducing an Apple supplier to perform Apple's trade secret metal-finishing process for OpenAI.

Rather than address Apple's allegations head-on, Defendants fabricate a story related to iCloud. That is a strawman to distract from the real evidence in this motion. As Apple expressly stated in its opening brief (Mot. at 3 n.1; *see also* Dkt. 89 at 15 n.4) and as outlined again herein, key allegations in this motion are about the intentional misappropriation of Apple confidential documents stored in Apple's Box storage, which were accessed by an ex-employee exploiting an authentication bug. Defendants' focus on iCloud—a totally different service—merely serves to distract from their misappropriation from Box and otherwise.

Defendants recast Liu's repeated access to Apple trade secret files and Tan's circulation of Apple's departure protocols as innocent efforts to "help." This too is a strawman. Apple's claims are that Liu knowingly accessed Apple trade secret files to aid in his work at OpenAI, Tan pushed Apple employee job applicants for details surrounding Apple confidential trade secret projects, and OpenAI exploited one of Apple's trusted suppliers. These were not attempts to "help" Apple.

Defendants argue that Apple is trying to stop OpenAI from hiring Apple employees. That is yet another strawman. OpenAI remains free to recruit and compete; it simply may not do so with Apple's stolen technology. This case is about ensuring honest competition, not hindering mobility.

Unable to excuse their misappropriation, Defendants claim Apple's trade secrets are insufficiently identified or already known. But Defendants do not grapple with the specific trade secrets Apple identifies in its motion and the attached trade secret identification. Defendants' argument also refutes itself: if the trade secrets were worthless public information, Defendants would not have breached their confidentiality agreements, and induced others to breach theirs, to steal them.

# I. APPLE'S TRADE SECRET CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS

## A. Apple Has Identified Protectable Trade Secrets

### 1. Apple Identified Its Trade Secrets With Sufficient Particularity

Apple does not—as Defendants argue—merely "set[] forth a list of generic categories." Opp. at 11. In its motion, Apple described several trade secrets that comprise information misappropriated by Liu, Tan, and the Corporate Defendants. Mot. at 9–11. Additionally, Apple filed a supporting preliminary trade secret disclosure, which identifies 104 trade secrets, including information contained in over twenty documents identified by file name and related Apple products. *See generally* Dkt. 47-8. At the preliminary injunction stage, courts in this district have repeatedly approved Apple's approach of identifying specific acts of misappropriation and trade secrets within categories. *See, e.g.*, *Capconvert, LLC v. Brown*, 2026 WL 1471880, at *5–6 (N.D. Cal. May 26, 2026).

Apple's trade secret disclosures far exceed the descriptions found to be insufficient in Defendants' cases. In *Insulet Corp. v. EOFlow, Co.*, the Federal Circuit faulted the plaintiff for not establishing even "one, specifically defined, trade secret." 104 F.4th 873, 881 (Fed. Cir. 2024). Similarly, in *Mallet & Co. v. Lacayo*, the district court did not provide any description of the alleged trade secrets except high-level categories that covered public material, including formulas the plaintiff ***admitted*** were disclosed in its patents. 16 F.4th 364, 382–83 (3d Cir. 2021). Here, in contrast, Apple has identified numerous stolen trade secrets with more than sufficient particularity.

### 2. Apple's Trade Secrets Are Not Generally Known

Defendants argue that some of Apple's trade secrets may not be secret because certain cherry-picked information—*e.g.*, industry speculation, processes, the names of certain Apple suppliers, certain Apple codenames—is allegedly public. But that is not the law. Apple needs to show, and has shown, that its trade secrets consist "of sufficiently identified compilations of information that 'derive[] independent economic value, actual or potential, from not being generally known to the public.'" *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020) (citations omitted). "Even if some of the individual parts . . . are publicly known, it is the secrecy of the claimed trade secret as a whole that is determinative." *Cool Runnings Int'l Inc. v. Gonzalez,* 2021 WL 5331453, at *7 (E.D. Cal. Nov. 16, 2021). Thus, for example, even if Defendants are correct that it is generally known that certain materials—e.g., "[redacted]"—are used for metal finishing (Opp. at 12), that does not mean ***Apple's*** proprietary processes and parameters are not

trade secrets. 9/17 Hatch Decl. ¶¶ 27–34; Runge Decl. ¶¶ 24–37.

Furthermore, even if Defendants can show that one of Apple's trade secrets is not secret—they have not—that is not dispositive of Apple's motion, which addresses multiple discrete trade secrets exploited through multiple discrete acts of misappropriation. In the context of a preliminary injunction, "[t]he likelihood of success on a single claim is sufficient if that claim supports the injunctive relief sought." *Commure, Inc. v. Canopy Works, Inc.*, 792 F. Supp. 3d 971, 978 (N.D. Cal. 2025). As Defendants do not dispute the secrecy of most of Apple's trade secrets, Apple has demonstrated it is likely to prove that element of its trade secret claims. *Compare* Dkt. 47-8, *with* Opp. at 12–13.

### 3. Apple's Trade Secrets Have Independent Economic Value And Are Not Readily Ascertainable

Apple has spent significant resources to both produce and protect its trade secrets. Mot. at 12; Patel Decl. ¶¶ 5–6, 8–14, 27–28, 34, 36, 42, 49, 55–56; Dionello Decl. § II, ¶ 37; Hughes Decl. ¶¶ 7, 18, 30; 8/3 Hatch Decl. § VII; 8/3 Fayed Decl. § VI. This direct evidence far exceeds the standard, which can be met "by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Cisco Sys. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (citations omitted).

Defendants argue that two categories of trade secrets—"power components and management" and "specific metal finishing processes and parameters"—lack independent economic value because they are readily ascertainable through proper means. Opp. at 12–13. That argument fails.

As to Apple's "power components and management" trade secrets, Defendants claim they "can be derived from publicly available products." *Id.* at 13. Not so. For example, one cannot feasibly determine the tolerances and acceptance criteria of Apple's devices by testing "publicly available products." 9/17 Fayed Decl. ¶¶ 45–62, 65–70. Defendants also speculate that "Apple's development work would not be useful in the development of non-Apple products." Opp. at 13. However, the findings from Apple's development work relate to key technologies, such as "power delivery and conversion[,] battery charging, characterizing, and aging management[, and] peak-power budgeting," that are relevant to a broad range of consumer products. 9/17 Fayed Decl. ¶¶ 85–87.

As to Apple's specific metal finishing processes and parameters, Defendants incorrectly claim

that the value of Apple's trade secret is merely the end result—i.e., the "look, feel, texture, and durability" of the finished metal—and that this end result is readily apparent from looking at Apple's products. Opp. at 12–13. But Apple's trade secrets are not the look, but are how to make it—the processes (e.g., conditions for sealing, surface preparation, and blasting), the specific parameters, and thresholds that Apple ***uses to achieve*** its finishes. 8/3 Hatch Decl. ¶¶ 44–54. A finished product cannot be reverse engineered to reveal this information. *Id.* ¶¶ 55–68; Runge Decl. ¶¶ 38–54.

**B. Apple Took Reasonable Measures To Protect Its Trade Secrets**

In its motion, Apple detailed the ways it protects its trade secrets, including "employee IPAs, annual confidentiality training and reminders, physical facility security, digital security protections, and stringent supplier agreements." Mot. at 6–7, 13. Those protections exceed the reasonable measures standard. *See Fujikura Composite Am., Inc. v. Dee*, 2024 WL 3261214, at *11 (S.D. Cal. June 28, 2024) (citations omitted). Defendants identify several purported reasons why the measures Apple uses to protect its trade secrets are insufficient. The Court should reject each one.

***First,*** Defendants argue that Apple's security measures are not specific to the trade secrets at issue. Opp. at 13–14. To start, the cases Apple cites in the motion—and Defendants ignore—establish that the various security measures Apple employs constitute reasonable measures. *See, e.g.,* Mot. at 13 (collecting N.D. Cal. cases). Further, Apple ***has*** tied its reasonable measures directly to the trade secrets at issue. *See, e.g.,* 8/3 Pooley Decl. ¶¶ 40, 47, 51, 66–76; Patel Decl. ¶¶ 5, 72–82; Dionello Decl. ¶¶ 15–26; 9/17 Pooley Decl., Section III.

***Second,*** Defendants claim that Apple did not revoke Liu's Box access and "check whether it had done so." Opp. at 14. Defendants miss the point. Apple followed its policies and procedures when Liu left. 9/17 Pooley Decl. ¶¶ 18–25, 47. Those measures are reasonable even if Liu ignored them and chose to violate his confidentiality obligations. *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1091 (E.D. Cal. 2012) ("[U]nauthorized actions by . . . employees do not negate reasonable efforts to maintain the confidentiality of [the plaintiff's] proprietary information."); 8/3 Roffman Decl. ¶ 20; Liu Decl. ¶¶ 35–36, 43. To the extent Defendants fault Apple's measures for not being bug-free, that is not the law. The DTSA requires "reasonable measures," not perfect measures. *See, e.g., Pyro,* 861 F. Supp. 2d at 1091 (finding measures reasonable even if "not perfect").

Defendants' reliance on *Buffets, Inc. v. Klinke* is misplaced; there, the plaintiff permitted employees to take manuals home and never informed them of "the manuals' status as secrets" or the "measures that should be taken to prevent their being obtained by others." 73 F.3d 965, 969 (9th Cir. 1996). Apple did the opposite: it required employees to sign IPAs and trained employees on how to identify and protect confidential information. 8/3 Pooley Decl. ¶¶ 48–63; 9/17 Pooley Decl. ¶¶ 23, 38.

***Third***, Defendants next rely upon Defendants Liu's allegation that "Apple never trained employees on Box exit protocols" and that because of its "rushed exit," Apple employees had to ask him about locations of documents. Opp. at 14–15. Such self-serving, unsupported statements are "conclusory and of doubtful probative value." *See Pyro*, 861 F. Supp. 2d at 1091; *see also Fujikura*, 2024 WL 3261214 at *10. They are merely Liu's uncorroborated excuses for violating his IPA and his other misconduct.

Defendants' cases do not support this point either. For example, in *Yellowfin Yachts, Inc. v. Barker Boatworks*, the plaintiff relied exclusively on verbal statements that information "should not be given to outsiders." 898 F.3d 1279, 1300–01 (11th Cir. 2018). Similarly, in *Formfactor, Inc. v. Micro-Probe, Inc.*, the plaintiff "did not enter into a written [confidentiality] agreement" with the defendant and "did not request that [he] return any [of plaintiff's] data when he . . . left the company." No. 10-cv-3095, ECF No. 189 at 11 (N.D. Cal. June 7, 2012). Apple's protective measures far exceed the steps the plaintiffs took in those cases. Mot. at 6–7, 13; 9/17 Pooley Decl., Section III.

***Fourth***, Defendants argue Apple's iCloud policies are deficient, claiming the policies are "voluntary" or put the burden on the employees. Opp. at 15.[1] But, as Defendants acknowledge, the unauthorized downloads referenced in the complaint "are ***not*** based on iCloud activity." Mot. at 3 n.1; White Decl. ¶ 48. Moreover, while Apple's iCloud policies do impose affirmative obligations on employees, supplemented by obligations imposed by IPAs, 9/17 Pooley Decl. ¶¶ 26–29, Apple also takes its own affirmative measures: training employees on how to comply with the policies, maintaining iCloud's ISO/IEC 27001 certification, and deploying digital measures that apply

[1] Although Defendants attempt to extend this argument to Box, their cited support refers exclusively to iCloud. White Decl. ¶¶ 49–52 (analyzing obligations under iCloud policies).

regardless of the repository used. *Id.*; 8/3 Pooley Decl. ¶¶ 32–40.

***Fifth,*** Defendants argue that Apple's measures are insufficient because its employees allegedly asked Liu questions about his work at Apple. Opp. at 16. Not so. Liu remains bound by the confidentiality provisions of his Apple IPA after leaving Apple and fielding a question from a former colleague does not relieve him of that obligation. 9/17 Pooley Decl. ¶¶ 23, 47. Defendants' cases are distinguishable, at least because the plaintiffs either publicly disclosed the alleged trade secret or presented no evidence of reasonable measures at all. *Dairy, LLC v. Milk Moovement Inc.,* 2022 WL 584003, at *2 (E.D. Cal. Feb. 25, 2022) (plaintiff "post[ed] screenshots of its [trade secret] software on its own website"); *ELT Sight, Inc. v. EyeLight, Inc.,* 2020 WL 7862134, at *21 (C.D. Cal. Aug. 28, 2020) (movants "have not presented evidence that reasonable measures were taken"); *Hooked Media Grp. Inc. v. Apple Inc.*, 55 Cal. App. 5th 323, 333 (Cal. Ct. App. 2020) (plaintiff offered "no evidence of . . . reasonable efforts").

***Finally***, Defendants argue—based on their experts' conclusory opinions—that [redacted] confidentiality obligation related to Apple's trade secret metal finishing process expired because Apple first provided an *initial* specification to [redacted] more than ten years ago. Opp. at 16 (citing White Decl. ¶ 84; Freid Decl. ¶¶ 13, 28–38). Defendants are wrong. There is no language in the [redacted] that limits [redacted] confidentiality obligation to ten years from the disclosure of an initial specification.

### C. Apple Has Shown Misappropriation By All Defendants

To succeed at the preliminary injunction stage, Apple need only show "[t]he likelihood of success on a single claim." *Commure*, 792 F. Supp. 3d at 978. Apple's evidence shows much more.

#### 1. Chang Liu's Misappropriation

Liu knew he had confidentiality obligations that continued after he left Apple. He agreed he would not "us[e] … any Proprietary Information without the written consent of Apple," and upon departure, he agreed to "promptly deliver to Apple all … materials of any kind pertaining to [his] work at Apple" and to "not take" materials "containing any Proprietary Information." Ieyoub Decl. ¶ 8, Ex. E § 1. That is why he had to turn in his two Apple-owned MacBook Pros in January 2026. Liu Decl.

¶ 17. Yet, Liu improperly kept an Apple-owned iMac and used that computer to violate his obligations immediately after joining OpenAI. Liu Decl. ¶ 18.

On February 8, Liu, now at OpenAI, gained unauthorized access to an Apple Box repository that he knew contained Apple's proprietary information. Liu Decl. ¶¶ 10, 33. Liu's contemporaneous messages show he knew it was wrong to access those files. 8/3 Roffman Decl., Ex. E ("[redacted]."); *see also* Dkt. 93-5, Ex. B. Unable to deny the forensic record, Liu now admits that from February 8 through March 7, he accessed at least ***eight*** confidential Apple files. Liu Decl. ¶¶ 35–36, 43. One of the files Liu downloaded on March 7 is a confidential file of a schematic of an Apple buck converter for Apple's unreleased [redacted] product, [redacted] (the "[redacted]"). 8/3 Roffman Decl., ¶ 20; Dkt. 93-5 ¶ 14; Dkt. 93-7 ¶ 16; Dkt. 144-6 ¶ 8. While Defendants allege he did so to help Apple employees, neither Liu nor Defendants identify any instance where Liu was asked or authorized by Apple to access those eight files. Opp. at 17–18; Liu Decl. ¶¶ 32–36, 43. And Liu himself cannot even keep his story straight. Liu first swore that he downloaded the [redacted] to help [redacted]. Liu Decl. ¶ 43. Most recently, however, he changed his story, now swearing it was to help Alyssa Peng. Dkt. 144-6 ¶¶ 8–14.

Regardless of Liu's evolving excuses, he knew what he was doing was wrong. On March 11, Liu, knowing he could not keep the Apple-owned iMac much longer without detection, migrated all files from the Apple-owned iMac to his personal Mac Mini. 9/17 Roffman Decl. ¶ 8; Liu Decl. ¶ 44. He could have transferred select files but instead used Apple's Migration Assistant to transfer ***everything***—including Apple's confidential files—to his personal device. *Id.* ¶ 11 The next day, Liu "wiped" the Apple-owned iMac before returning it—he knew what he did was wrong and erased the forensic evidence of his misconduct. *Id.* ¶ 8, Ex. A.

Then, on March 18, while at OpenAI, Liu used his personal Mac Mini to again access the Apple files he misappropriated, including the [redacted], and he used it in an LTSpice simulation. Dkt. 93-5 ¶¶ 14–22. This allowed him to study the nuances of Apple's buck converter circuit. Dkt. 93-7 ¶¶ 16–20; Dkt. 93-5, Ex. A ("[redacted]"). As shown by Liu's contemporaneous messages, this was not to help Apple as Liu now claims (Dkt. 144-6 ¶¶ 8-14); instead, it was directly relevant to his work at OpenAI. 9/17 Roffman Decl. ¶ 54, Ex. C ("[redacted]

[redacted]"); *id.* ("[redacted]").

Lastly, on April 27, Liu downloaded at least an additional ***twenty-five*** confidential Apple files from Box without authorization. 8/3 Roffman Decl. ¶ 20.

Accordingly, from his departure on January 22 through April 27, Liu knowingly accessed and downloaded at least ***thirty-three*** unique Apple confidential files from Box without authorization and in violation of his IPAs. That constitutes "acquisition by improper means [which] is, by itself, enough to establish misappropriation." *United Flow Techs. Intermediate Holdco II, LLC v. Coholan*, 2026 WL 1077406, at *5 (N.D. Cal. Apr. 20, 2026). And that is just what Apple knows before discovery. Moreover, after learning of Apple's investigation, on June 6, Liu told another ex-Apple employee and close friend who had recently joined OpenAI to "restore," *i.e.,* wipe, her device so that her files could not be reviewed. Dkt. 93-5, Ex. D ([redacted]"); Dkt. 144-6 ¶ 25. "Restore" means to "wipe" the device, and to [redacted] is intended to hide the fact that it was wiped. Dkt. 93-5 ¶ 26. And she did so. Dkt. 144-8 ¶¶ 7, 9.

Defendants try to explain this conduct, but their excuses do not add up. ***First***, their technical expert claims the files on Liu's Mac Mini "were never opened, copied, or interacted with" because they "have a file size of 0 bytes." Opp. at 18. That is demonstrably false. In light of the forensic evidence, Liu has now admitted that he successfully ran LTSpice using the stolen [redacted]. Dkt. 144-6 ¶ 11. Further, Liu admits he accessed at least seven other files that show zero bytes. *Compare* Crain Decl. ¶ 24 *with* Liu Decl. ¶¶ 35-36, 43, Addendum 1. Thus, the current image of Liu's Mac Mini showing zero-byte files says nothing about whether they were previously accessed or used. 9/17 Roffman Decl. ¶¶ 15–24.[2]

***Second,*** Liu claims he accessed Apple confidential files only to help Apple employees, but that does not justify: (1) breaching his contractual confidentiality obligations to Apple when there is

---

[2] For similar reasons, Defendants' expert cannot determine whether Liu used Apple's proprietary files from the fact that the "kmditemlastused" field is blank. *See* 9/17 Roffman Decl. ¶¶ 25–26.

evidence he knew Apple would not approve of what he was doing; (2) using his personal Mac Mini to access Apple confidential files, including running the LTSpice simulation on Apple's buck converter circuit file while at OpenAI;[3] (3) wiping his Apple iMac before returning it; and (4) instructing an ex-Apple employee to wipe her device but then [redacted] to hide that it was wiped.[4] *See, e.g.,* Ieyoub Decl., ¶ 8, Ex. E § 1; 8/3 Roffman Decl., Ex. E; Dkt. 93-5 ¶¶ 14-22, Exs. B and D.

***Third***, Defendants have prevented Apple from learning the full extent of Liu's use of Apple's confidential information. As discussed above, some of Liu's misappropriation occurred on his iMac and Mac Mini. Yet Liu wiped his iMac, and despite possessing the Mac Mini and imaging it, Defendants have refused to allow Apple to perform a forensic review of that device. Gross Decl., Ex. A. If the Mac Mini were exculpatory, they would have produced it to Apple already.

**2. Tang Tan's Misappropriation**

Tan also signed an IPA while at Apple. *See* Ieyoub Decl. ¶ 7, Ex. C § 2. And like Liu, Tan also violated that agreement. *See* Mot. at 14–15. Defendants argue that Tan never asked candidates for confidential information at interviews and only asked them to bring public parts. However, the message threads they rely on show it was ***the candidates***, not Tan, who resisted bringing confidential parts. *See, e.g.,* 8/3 Roffman Decl., Ex. L (Tan asking candidate to bring "parts or systems that you

---

[3] Liu submitted a second declaration on September 11 in response to Apple's Motion for Expedited Discovery that now discusses the LTSpice simulation but still fails to justify its use. Liu alleged its use was to help a former colleague but identified no evidence he was asked to run the simulation. Dkt. 144-6, ¶¶ 8–14; *see also* Dkt. 144-8 ¶¶ 5–6. The messages he cited do not even mention LTSpice or the file he ran. *See* Dkt. 144-6, Ex. A. Further, Liu's assertion that the simulation had nothing to do with his work at OpenAI (Dkt. 144-6, ¶¶ 18–20) is directly contradicted by his contemporaneous messages. *See* 9/17 Roffman Decl. ¶ 54, Ex. C.

[4] In his September 11 declaration. Liu now alleges, without support, that he sent these instructions because of privacy concerns, yet messages from the next day revealed his concerns that [redacted]" and that he may "[redacted]." Dkt. 144-6 ¶ 25; Dkt. 93-5, Ex. C.

work on" and candidate offering to bring "shipped" parts), Ex. R (Tan asking candidate to "bring some parts you've done in past" and candidate offering to "check if [he has] non-AOU units").

In addition to asking candidates to bring parts, Tan also interviewed the candidates about Apple's confidential products and plans. For instance, Apple employee [redacted] had an interview with Tan on February 27, 2026. 8/3 Roffman Decl. ¶ 29, Ex. G. Shortly before that interview, [redacted] downloaded and took screenshots from a confidential file titled [redacted] which related to the same unreleased [redacted] Apple product that Liu was downloading and simulating. *Id.* ¶¶ 28-29. Unsurprisingly, as shown by Liu's contemporaneous messages, [redacted] interview with Tan included questions about the unreleased [redacted] product. *Id.*, Ex. E ("[redacted]"). Despite this contemporaneous forensic evidence and [redacted] screenshots and download right before the interview, Defendants' response is that Tan and [redacted]—now both at OpenAI—simply deny the evidence. Opp. at 4.

### 3. The Corporate Defendants' Misappropriation Based Upon Liu And Tan

Because the Corporate Defendants' employees, Liu and Tan, misappropriated Apple's trade secrets "to benefit" the Corporate Defendants, the Court should find Apple likely to successfully prove that the Corporate Defendants misappropriated as well. *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1188 (W.D. Wash. 2019); Mot. at 15. None of Defendants' arguments show otherwise.

***First***, Defendants allege Apple's allegations against Liu and Tan "are insufficient to establish a likelihood of success on claims against their employer." Opp. at 22. Not true. Courts have found a company to be liable for their employees' misappropriation if the conduct was "performed, at least in part, to benefit the employer." *AssuredPartners of Cal. Ins. Servs., LLC v. Clem*, 2026 WL 2044774, at *52–53 (C.D. Cal. July 10, 2026) (citing *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016)). That is the case here: while both are employed at OpenAI while it is working on its first hardware product, Liu improperly used Apple's hardware files, including Apple's [redacted] and Tan improperly sought to obtain Apple trade secrets as part of his recruiting for OpenAI, including about the unreleased [redacted] Apple hardware product. *See* Sections I.C.1 and 2.

***Second***, Defendants assert that "OpenAI has gone out of its way to avoid inadvertent and undesired exposure to sensitive information." Opp. at 22. But other than their say-so, the Corporate Defendants did not identify any documented evidence that they sought to prevent Liu and Tan from misappropriating Apple's trade secrets. Regardless, courts have found an employer liable for the employees' misappropriation "to benefit" the employer "even if [the employer] would have forbid [the employee's] conduct…" *SolarCity*, 2016 WL 11019989 at *5.

Defendants' assertion is also contrary to Defendants' documented hiring processes. For example, rather than "avoiding" sensitive information, the pre-interview guide for OpenAI's Robotics group instructs interviewees to ***bring*** "CAD/design artifacts, or prototypes" (i.e., confidential materials) to their interviews. Lampton Decl., Ex. A. More generally, OpenAI recruiters encouraged candidates to bring confidential information to interviews, including "housing and BGs in different colours," and some candidates did so. *See* 8/3 Roffman Decl. ¶ 40, Exs. U, V (OpenAI recruiter noting "piece parts of a shipped product is ok ***too***. ***some folks*** have done that," and thus, others were not so limited). In fact, OpenAI's solicitation of Apple's confidential information was so well-known that Apple employees discussed it in messages. 9/17 Roffman Decl. ¶ 49, Ex. B ([redacted]).

***Third***, Defendants assert that Apple "inappropriately infer[s] misappropriation based solely on OpenAI's employment of former Apple employees." Opp. at 22. Again, not true. Liu and Tan's misconduct in stealing and soliciting trade secrets occurred while they were at and for the benefit of OpenAI. Defendants' cases are inapposite; they relate to allegations of ex-employees who merely happened to possess trade secrets when hired. *See* Opp. at 22 (citing *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *24 (N.D. Cal. Aug. 24, 2021) and *Bombardier*, 383 F. Supp. 3d at 1182).

#### 4. The Corporate Defendants' Misappropriation Of Apple's Metal Finishing Processes And Parameters

The Corporate Defendants also misappropriated Apple trade secrets by exploiting [redacted] to use Apple's proprietary metal finishing processes and parameters. *See* Mot. at 15. Indeed, Defendants admit the Corporate Defendants use [redacted], and their employee, Tan, merely asserts that he is "not aware of any facts that fit Apple's allegations," not that they are untrue. Tan Decl. ¶¶ 29–30.

In their opposition, Defendants try to distract from their misconduct. ***First***, Defendants argue that Apple's allegation related to [redacted] rests on "useless double-hearsay", (Opp. at 22–23); that is incorrect. Statements by the Corporate Defendants' agents to [redacted] employees about using Apple's [redacted] processes are admissions by a party-opponent, not hearsay. Fed. R. Evid. 801(d)(2); Dionello Decl. ¶¶ 38–40. And statements by [redacted] former employees to Apple about why [redacted] performed the [redacted] processes for the Corporate Defendants qualify for hearsay exceptions. Fed. R. Evid. 803(3). Regardless, as this Court found in *WeRide Corp. v. Kun Huang*, courts can consider hearsay—even if inadmissible—at the preliminary injunction stage. 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019). ***Second***, the Corporate Defendants argue they were permitted to mislead [redacted] into using Apple's trade secret metal finishing processes because Apple's non-disclosure agreement expired. Opp. at 23. That is wrong for the same reasons discussed above in the context of reasonable measures. *See* Section I.B *supra*. In sum, Apple has sufficiently shown that the Corporate Defendants misappropriated Apple's trade secrets.

## II. APPLE WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION

If the Court concludes that Apple's trade secret and breach of contract claims are likely to succeed, the Court may presume a likelihood of irreparable harm to Apple. *See* Mot. at 17; *BNF Distrib. Enter., Inc. v. BA Distrib., Inc.*, 2025 WL 3724558, at *17 (N.D. Cal. Dec. 24, 2025). Indeed, this Court has indicated that it presumes irreparable harm in such circumstances. *See Apple Inc. v. Rivos, Inc.*, 2023 WL 5183034, at *9 (N.D. Cal. Aug. 11, 2023). Contrary to Defendants' assertion, Opp. at 24 (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006)), the presumption still applies in this District after the 2006 *eBay* decision where—like here—the underlying claims are likely to succeed. *See, e.g., United Flow*, 2026 WL 1077406, at *6; *Comet Techs. U.S. of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018); *see also Rivos*, 2023 WL 5183034, at *9. Defendants' citation to out-of-district cases does not show otherwise. *See* Opp. at 24.

Presumption aside, Apple has affirmatively shown that it will suffer irreparable harm without an injunction. Defendants have misappropriated Apple's hardware-related trade secrets while OpenAI actively tries to start a consumer hardware business from scratch. Mot. at 17. "[W]hen a former employee now with a competitor continues to possess trade secrets, there is irreparable harm because [m]isuse of that treasure trove remains an ever-present danger wholly at [the former employee's]

whim, and such misuse cannot be unwound after the fact, nor can it be adequately compensated for with monetary damages." *United Flow*, 2026 WL 1077406, at *6 (quoting *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017)). And there was no "delay[]" in Apple's conduct. *See* Opp. at 24. Rather, Apple diligently worked to uncover the facts underlying OpenAI's and its employees' misconduct and bring suit to protect its confidential and trade secret information. *See* Dkt. 90 at 4–5.

Thus, this factor favors an injunction.

## III. THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION

Apple has shown it is likely to suffer irreparable harm; thus, it need only show the balance of equities "tips" in its favor. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). But if the Court determines Apple has not sufficiently shown likely irreparable harm, a preliminary injunction is appropriate if Apple raises "serious questions going to the merits" and—as discussed further below—the balance of hardships "tips sharply" in Apple's favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Either way, this factor favors an injunction.

Apple's requested injunction will not unduly burden Defendants. Apple merely asks that Defendants follow federal and state law by not continuing to misappropriate Apple's trade secrets and produce materials they would have to produce during discovery. Nonetheless, Defendants claim an injunction would harm them in three ways. The Court should not credit that claim. ***First***, Defendants allege an injunction would be harmful because searching "tens of thousands of devices" and restricting how people interact "would disrupt the work" of OpenAI's employees. Opp. at 24; Lee Decl. ¶¶ 8, 10. But searching devices is an inevitable byproduct of discovery in modern litigation—it is not specific to Apple's requested injunction—and Apple's proposed restrictions will only be disruptive and pertain to "tens of thousands of device" if OpenAI's employees are using Apple's trade secrets to that extent. ***Second***, Defendants claim that an injunction would "impact[] product operations." Opp. at 24; Lee Decl. ¶¶ 13–14. But again, OpenAI's "product operations" will be impacted only to the extent it has used Apple's trade secrets in those operations. If OpenAI has done nothing wrong, then it has nothing to worry about. ***Third*****,** Defendants argue that an injunction would "result in leakage of OpenAI

confidential information to Apple." *See* Opp. at 24; Lee Decl. ¶ 9. Untrue—its information will be protected by the Court's protective order.

## IV. THE PUBLIC INTEREST FACTOR FAVORS APPLE

The public interest strongly favors injunctive relief. Public interest is "served by enabling the protection of trade secrets" and "obligations of contractual agreements." *Tran v. Pham*, 2025 WL 3654084, at *4 (N.D. Cal. Dec. 17, 2025). Defendants argue Apple's requested relief would harm policy favoring employee mobility. Opp. at 25. Not so. First, California's employee mobility policy is not intended to shield employees "caught stealing specific documents or schematics from [their] company"—as in this case. *Fujikura*, 2024 WL 3261214, at *15. Second, Apple seeks only to prohibit Defendants from using Apple's stolen trade secrets—not to restrict employee mobility. Indeed, hundreds of former Apple employees have joined OpenAI and can "work on ideas that [OpenAI] can demonstrate were developed independently." *Id.*

Defendants' cases are distinguishable. In *CleanFish, LLC v. Sims*, the plaintiff sought "to enjoin Defendants from contacting 'any of Plaintiff's customers as of May 17, 2019.'" 2019 WL 2716293, at *5 (N.D. Cal. June 28, 2019). Apple makes no such request. And *Edwards v. Arthur Andersen LLP* merely stands for the proposition that California has "settled legislative policy in favor of open competition and employee mobility." 44 Cal. 4th 937, 945–46 (2008). Courts routinely cite *Edwards* when granting injunctions in trade secret cases because such relief balances the public interests by protecting trade secrets while allowing lawful competition. *See, e.g., Pyro,* 861 F. Supp. 2d at 1092; *Fujikura*, 2024 WL 3261214, at *15. *See also Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1080 (N.D. Cal. 2021) ("[P]ublic interest is served by protecting trade secrets" even in the face of California's "strong public policy in favor of vigorous competition").

## V. APPLE'S PROPOSED ORDER IS APPROPRIATELY TAILORED TO PROTECT APPLE FROM ONGOING HARM CAUSED BY DEFENDANTS' MISCONDUCT

Apple's proposed order is not overly broad. Defendants do not even dispute the first three aspects of the injunction that Apple seeks. Opp. at 25.

Indeed, prior to the filing of Apple's motion, the Defendants agreed as much:

> While OpenAI does not believe that Apple has a basis for an injunction**,** **<u>the first three categories of requested "assurances" are</u>**

> **noncontroversial, and OpenAI agrees to provide them as drafted.** Specifically, OpenAI does not intend to "access, acquire, use, disclose, or solicit" any Apple "confidential, proprietary, [or] trade secret information," and has never done so in the past. Nor is OpenAI engaged in any "access, acquisition, use, disclosure, or solicitation" of such material. Similarly, OpenAI intends to "preserve and not destroy, delete, or conceal evidence that is potentially relevant to the claims in Apple's complaint." **The parties are therefore already in agreement regarding three of the five "assurances" requested by Apple.**

Dkt. 47-5 at 2 (emphasis added).

As for provisions (4) and (5), Apple requests that Defendants search for Apple proprietary and trade secret information on Defendants' devices and repositories, preserve and image any device or repository found to contain such information, and make the images available for inspection. Those requests are appropriately tailored, seek only information Defendants will eventually need to produce in this case, and are necessary to protect Apple's information. *See, e.g.*, *United Flow*, 2026 WL 1077406, at *7 ("Defendant must . . . make available for imaging and forensic preservation every device or storage platform that has contained Plaintiffs' business information."). Accordingly, those provisions are not—as Defendants claim—unduly burdensome.

Contrary to Defendants' assertion, *Advante Int'l Corp. v. Mintel Learning Tech.* ***supports*** Apple's position; there, the court found it would be appropriate for the computers at issue to be reviewed so long as the proposed protocol "protect[s] legitimate privacy, privilege, and safety concerns, and . . . minimize[s] disruption." 2006 WL 1806151, at *1 (N.D. Cal. June 29, 2006); Opp. at 25. Apple likewise proposes forensic review by an outside vendor with appropriate safeguards for such concerns. Moreover, the facts uncovered to date suggests that immediate forensic analysis of the devices in Defendants' possession is critical to understanding the full scope of the misappropriation before Apple's trade secrets get too entangled with OpenAI's products to be undone. Dkt. 93-3 at 5; *see also, e.g., Blackbird Techs., Inc. v. Joshi*, 2015 WL 5818067, at *6 (N.D. Cal. Oct. 6, 2015).

## VI. CONCLUSION

Apple respectfully requests that the Court grant its motion for a preliminary injunction.[5]

---

[5] Defendants agreed to the reasonableness of the first three provisions set forth in Apple's proposed order. *See* Dkt. 47-5 at 2. The Court's order should thus—at a minimum—comprise those first three restrictions.

Dated: September 17, 2026

*/s/ Gabriel S. Gross*
Gabriel S. Gross (SBN 254672)
Gaby LaHatte (SBN 321844)
Vanessa K. Sim (SBN 341107)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
gabe.gross@weil.com
gaby.lahatte@weil.com
vanessa.sim@weil.com

Adam Gershenson (*pro hac vice*)
Christopher W. Henry (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
1001 Boylston Street, Suite 300
Boston, Massachusetts 02115
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
adam.gershenson@weil.com
chris.henry@weil.com

Rachel L. Weiner Cohen (*pro hac vice*)
Nicole Elena Bruner (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
rachel.cohen@weil.com
nicole.bruner@weil.com

Heather Blacklaws (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
600 Congress Avenue, Suite 2170
Austin, Texas 78701
Telephone: (512) 487-1480
Facsimile: (512) 487-1520
heather.blacklaws@weil.com

Nina Shapiro (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
nina.shapiro@weil.com

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (*pro hac vice*)
Steven Balcof (*pro hac vice*)
Jun Tong (*pro hac vice*)
Ido Sadeh (*pro hac vice*)
DESMARAIS LLP

230 Park Avenue, 26th Floor
New York, New York 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
jdesmarais@desmaraisllp.com
koussayef@desmaraisllp.com
sbalcof@desmaraisllp.com
jtong@desmaraisllp.com
isadeh@desmaraisllp.com

Marie Delzell (SBN 367393)
DESMARAIS LLP
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 573-1900
Facsimile: (415) 573-1901
mdelzell@desmaraisllp.com

Atifah Safi (*pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20006
Telephone: (202) 451-4900
Facsimile: (202) 451-4901
asafi@desmaraisllp.com

*Attorneys for Plaintiff Apple Inc.*